Ninth Circuit Court of Appeals No. 24-4818

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee

vs.

GABRIEL COWAN METCALF,

Defendant-Appellant

---

OPENING BRIEF OF DEFENDANT-APPELLANT
ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION
DISTRICT COURT NO. CR-23-103-BLG-SPW
SUSAN P. WATTERS
UNITED STATES DISTRICT COURT JUDGE

RACHEL JULAGAY
Federal Defender, District of Montana
*RUSSELL A. HART
*EDWARD WERNER
Assistant Federal Defender
Federal Defenders of Montana
175 North 27th Street, Ste. 401
Billings, MT 59101
Telephone: (406) 259-2459
*Counsel for Defendant-Appellant

SUBMITTED: November 27, 2024

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ................................................................... iii

I.      STATEMENT OF JURISDICTION ............................................. 1

        A.      Subject Matter Jurisdiction in the District Court ........................ 1

        B.      Jurisdiction in the Court of Appeals ........................................... 1

        C.      Appealability of Order and Timeliness of Appeal……………..2

        D.      Course of Proceedings ................................................................ 2

        E.      Disposition in District Court ...................................................... 2

        F.      Bail Status of the Defendant ...................................................... 3

II.     STATEMENT OF THE ISSUE ..................................................... 3

III.    STATEMENT OF THE CASE ........................................................ 3

IV.     STATEMENT OF THE PERTINENT FACTS ............................. 4

V.      SUMMARY OF ARGUMENT ....................................................... 9

VI.     ARGUMENT .................................................................................... 11

VII.    CONCLUSION ............................................................................... 34

VIII.   CERTIFICATE OF COMPLIANCE ........................................... 36

IX.     STATEMENT OF RELATED CASES .......................................... 37

X.      CERTIFICATE OF SERVICE ...................................................... 38

# TABLE OF AUTHORITIES

<u>TABLE OF CASES</u>                                                    <u>Page</u>

<u>Federal Cases</u>

*New York State Rifle & Pistol Association v. Bruen*,
    142 S. Ct 2111 (2022) ……………………………….…………….*passim*
*United States v. Chovan*,
    735 F.3d 1127 (9th Cir. 2013)……………………………...……………11
*United States v. Vongxay*,
    594 F.3d 111 (9th Cir. 2010)………….....…………………………………..11
*United States v. Lopez*,
    514 U.S. 449 (1995)………………………………….…………13, 14, 22, 31, 33
*United States v. Dorsey*,
    418 F.3d 1038……………………………………………………………………14
*Heller v. District of Columbia*,
    554 U.S. 570 (2008)……………………………………………………....14, 15
*McCulloch v. Maryland*,
    17 U.S. 316 (1819)…………………………….……………………………..17
United States v. Mayer
    503 F.3d 740 (9th Cir. 2007)………………………………………………17
*Ayotte v. Planned Parenthood*
    546 U.S. 320 (2006)……………………………………………………..18
*McDonald v. City of Chicago*,
    561 U. S. 742, 767 (2010)………….……………………………..20, 21
*United States v. Garcia*,
    2024 U.S. App. LEXIS 22409……………………………..……………24
*United States v. Tait*,
    202 F.3d 1320 (11th Cir. 2000)………….....…………….……………..29, 30

<u>Montana District Court</u>

*State v. Carpenter*,
    360 Mont. 173, 252 P.3d 199, 2011 Mont. LEXIS 119………...……..……….4

## STATUTES AND RULES

Federal Rules
Fed.R.Crim.P. 32 ………………………………………………….…………………..2
Fed.R.App.P. 25………………………………………………………………..38

Federal Statutes
18 U.S.C. § 3231…………………………………………………………………...1
18 U.S.C. § 922(q)(2)(A)………………………………………………………*passim*
28 U.S.C. § 1291……………………………………………………………………...2
18 U.S.C. §922(q)(2)(B)(ii)………………………………………..…………………*passim*
18 U.S.C. § 922(g)(1)………………………………………………………………..8, 17
104 Stat. 4709, Pub.L. 101-647………………………………………………...12
18 U.S.C. § 921(a)(26)……………………………………………………………12
18 U.S.C. § 921(a)(27)……………………………………………………………23
1 Stat. 112, Cong. Ch. 9……………………………………………………..24

United States Constitution
Article III, Section 2, Clause I of the United States Constitution…………………1

State Statutes
Mont. Code Ann. § 45-8-360………………………………………………..*passim*
Mont. Code Ann. § 45-8-361……………………………………………………….28
Ala. Code § 13A-11-75-1975……………………………………………………29, 30

Ninth Circuit Court of Appeals No.  22-30050

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee

vs.

GABRIEL COWAN METCALF,

Defendant-Appellant

## OPENING BRIEF OF DEFENDANT-APPELLANT

## I.  STATEMENT OF JURISDICTION

**A.      Subject Matter Jurisdiction in the District Court.**

The United States District Court for the District of Montana had jurisdiction over the original criminal action under Article III, Section 2, Clause I of the United States Constitution and 18 U.S.C. § 3231 because Defendant-Appellant Gabriel Cowan Metcalf was sentenced in the District of Montana after being convicted of possessing a firearm within a school zone in violation of 18 U.S.C. § 922(q)(2)(A).

**B.      Jurisdiction in the Court of Appeals.**

Mr. Metcalf appeals from the Order Denying his Motion to Dismiss Indictment issued by the District Court on January 31, 2024.  The Court of Appeals

1

has jurisdiction over this case pursuant to 28 U.S.C. § 1291 and Rule 32 of the Federal Rules of Criminal Procedure.

**C.    Appealability of District Court Order and Timeliness of the Appeal**.

Pursuant to a plea agreement with the United States, Mr. Metcalf entered a conditional plea in this matter on March 25, 2024, which allows him to appeal the District Court's Order denying his Motion to Dismiss Indictment.  (ER-10–18).  The District Court filed and entered its Judgment on August 2, 2024.  (ER-4–9).  Mr. Metcalf timely filed his Notice of Appeal on August 6, 2024, as required by Rule 32 of the Federal Rules of Criminal Procedure.  (ER-170–172).

**D.    Course of Proceedings**

On September 14, 2023, Mr. Metcalf was named in a one-count indictment charging him with Unlawful Possession of a Firearm in a School Zone, in violation of 18 U.S.C. §922(q)(2)(A).  (ER-154–155).  He appeared for an arraignment on September 21, 2023.  (ER-177 Doc. No. 26).  On March 25, 2024, Mr. Metcalf appeared before the District Court and entered a guilty plea to the sole count in the Indictment.  (ER-179–180, Doc. No. 61).

**E.    Disposition in the District Court**

On August 2, 2024, Mr. Metcalf was sentenced to a 3-year term of probation from an advisory guideline range of 0-6 months.  (ER-4–9).

**F.      Bail Status of Defendant-Appellant**

The Defendant is currently being supervised in the community by the United

States Probation Office.

## II.  STATEMENT OF THE ISSUES

**A.      THE DISTRICT COURT ERRED IN DETERMINING THAT 18 U.S.C. § 922(q)(2)(A) IS CONSTITUTIONAL AS IT WAS APPLIED TO MR. METCALF.**

**B.      THE DISTRICT COURT ERRED IN DETERMINING THAT MR. METCALF WAS NOT EXEMPT FROM FEDERAL PROSECUTION BY VIRTUE OF HIS LICENSE TO POSSESS A FIREARM WITHIN A SCHOOL ZONE FROM THE STATE OF MONTANA.**

## III.  STATEMENT OF THE CASE

Appellant Gabriel Cowan Metcalf appeals from the denial of his Motion to

Dismiss Indictment, issued by the District Court for the District of Montana on

January 10, 2024.  (ER-67–68).  By this appeal from that Order, Mr. Metcalf argues

that he was licensed to possess a firearm within a federally defined "school zone"

by virtue of Mont. Code Ann. § 45-8-360 and was thus exempt from federal

prosecution pursuant to 18 U.S.C. § 922(q)(2)(B)(ii).  Additionally, Mr. Metcalf

argues that 18 U.S.C. § 922(q)(2)(A)'s broad prohibition against the carrying of any

firearm within 1,000 feet of any school's grounds is unconstitutional as applied when

analyzed under the framework of set forth in the United States Supreme Court's

3

decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct 2111 (2022).

## IV.  STATEMENT OF THE PERTINENT FACTS

Gabriel Metcalf moved to Billings, Montana in 2011 to assist his mother, who lives directly across the street from Broadwater Elementary School in Billings, Montana.  PSR at ¶50.  In 2022, the Yellowstone County Justice Court granted Metcalf's mother an order of protection against their next-door neighbor, David Carpenter.  PSR at ¶11.  The same month that Order was served upon Mr. Carpenter, he drove through the alley behind Mr. Metcalf's house, yelled at him, and eventually deployed a can of pepper spray in his face despite having been ordered to stay at least 1,500 feet from Mr. Metcalf and his residence.  *Id.*  This occurred within two city lots from Mr. Metcalf's home.  In their reports of Carpenter's repeated violations of the Order, Mr. Metcalf and his mother provided law enforcement with approximately 20 videos showing Carpenter either "near or driving by the protected property".  *Id.*

On March 28, 2023, the State of Montana filed an Information in Montana's Thirteenth Judicial District charging Mr. Carpenter with violating the Order of Protection concerning the incident described above.  See *State of Montana v. David Lee Carpenter*, DC-2023-397, Montana Thirteenth Judicial District.  After these charges were filed, Mr. Metcalf and his mother made numerous reports to law

enforcement that Carpenter continued to violate the Order, but they were concerned that law enforcement had become indifferent to their reports.  ER-163.

Having once been attacked outside his home and then observing Mr. Carpenter's continued violation of the Order, Mr. Metcalf made the decision to arm himself.  Mr. Metcalf owned one functional firearm: a 20-guage break-action, single-shot shotgun.  ER-167.  Mr. Metcalf began carrying the firearm with him when he left the interior of his home and would carry it with him when he performed chores in the yard.  Broadwater Avenue, which runs directly between Mr. Metcalf's residence and Broadwater Elementary School, is a busy street, and Mr. Metcalf was noticed by the public.

On August 2, 2023, Mr. Metcalf was the subject of a 911 call "concerning a male pacing in front of his house with a rifle" near Broadwater Elementary School in Billings.  ER-157.  A Billings Police Department Detective "conducted surveillance" on the male – later determined to be Mr. Metcalf – and was informed by dispatch that Mr. Metcalf lived at the house in question and "patrols his yard due to a protection order he believes is in place and he is trying to protect his mother." ER-158.

Following the initial dispatch, officers with the Billings Police Department continued surveilling Mr. Metcalf for the next few weeks and spoke with him nearly every day.  ER-158.  Mr. Metcalf expressed to them that Mr. Carpenter and his

associates had continued stalking him and his mother while the Order of Protection was in place. ER-159.  Mr. Metcalf was asked several times to stop carrying his firearm on whether on or off his property by different police officers, but local law enforcement confirmed to him each time he asked that he was not doing anything illegal by arming himself.

This confused Mr. Metcalf, who placed a call to the FBI "stating that Billings Police are harassing him and [he] wished to speak to a Federal Officer".  ER-161. On August 17, 2023, Mr. Metcalf was contacted via phone by two ATF agents, who presented themselves as following up on his concerns. ER-162.  The agents listened to Mr. Metcalf's grievances about his stalker and his confusion regarding local law enforcement continually asking him to change his behavior while simultaneously telling him he wasn't breaking the law. ER-162.  The agents then began to question Mr. Metcalf; not about his concerns related to Mr. Carpenter or local law enforcement, but about specific times he had been on the sidewalk with his firearm as opposed to within the boundary of his private property. ER-164.  After giving an honest account, Mr. Metcalf was informed that, in the view of these agents, he had admitted to being in violation of 18 U.S.C. § 922(q)(2)(A) each time he stepped from his property onto the sidewalk in front of his house. ER-167.

Mr. Metcalf was not alleged to have threatened anyone with the firearm nor to have done anything unsafe with it.  However, his home is located directly across

a busy street from an elementary school, certainly within 1,000 feet of the "school grounds" and, thus, within a "school zone". While 18 U.S.C. § 922(q)(2)(b)(ii) provides an exception from prosecution for the possession of firearms "on private property" within a school zone, the United States asserted on that phone call and later in its Complaint that "[t]he sidewalk and streets in front of METCALF's residence are public property within 1,000 feet from the school and are a 'school zone'" within the meaning of the firearm prohibition of § 922(q)(2)(A). ER-158.

It has not been alleged that Mr. Metcalf was ever seen with a firearm again following that August 17, 2023, phone call with the ATF. That phone call was the first time Mr. Metcalf was advised he was within a "school zone" each time he entered the sidewalk in front of his house. However, August 21, 2023, the United States charged Mr. Metcalf via a Criminal Complaint with violating 18 U.S.C. § 922(q)(2)(A) and he was arrested the following day, a few hours before the 2023 school year began. ER-169. On September 14, 2023, the Grand Jury returned an Indictment alleging the same violation.

No 911 calls were disclosed in discovery concerning an individual with a rifle being near the school after August 17, and, when Mr. Metcalf was later indicted, it was alleged that his offense was committed between August 2 and August 17 of 2023. School was not in session until August 22, 2023 – five days after Mr. Metcalf

7

is last alleged to have possessed a firearm within a "school zone" and the same day he was arrested pursuant to the Complaint.

On October 10, 2023, Mr. Metcalf filed a Motion in the District Court seeking dismissal of the Indictment.  ER-151–153.  Mr. Metcalf articulated two bases for dismissal pursuant to that Motion: 18 U.S.C. §922(q)(2)(A) is unconstitutional as applied pursuant to the United States Supreme Court's decision in *New York Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), and that he was exempt from prosecution pursuant to 18 U.S.C. § 922(q)(2)(B)(ii) because he was licensed by the State of Montana to possess a firearm within a school zone.  The District Court denied his Motion on January 31, 2024.  ER-67–88.  On March 25, 2024, Mr. Metcalf pled guilty to the sole count of the Indictment, reserving his right to appeal the District Court's denial of his Motion to Dismiss pursuant to a plea agreement. ER-178–179, Doc. No. 61.  On August 2, 2024, Mr. Metcalf was sentenced to a 3-year term of probation.  ER-4–9.  His right to lawfully possess a firearm for any otherwise lawful purpose has been stripped from him for the remainder of his life. See 18 U.S.C. § 922(g)(1).

On November 19, 2024, Mr. Metcalf's former neighbor was sentenced in Montana's Thirteenth Judicial District for a felony offense following a guilty plea. See Cause No. DC-2023-397.  Mr. Carpenter's adjudication as a felon stemmed entirely and directly from the continued harassment of Mr. Metcalf and his mother

that motivated Mr. Metcalf to arm himself in the areas near the exterior of his home for self-defense.

Mr. Metcalf filed a timely notice of appeal and now files his opening brief whereby he asserts (1) that he was licensed to possess a firearm within a school zone pursuant to Mont. Code Ann. § 45-8-360 and exempt from prosecution by virtue of 18 U.S.C. § 922(q)(2)(B)(ii), and (2) that 18 U.S.C. § 922(q)(2)(A)'s ban on firearm possession within 1,000 feet of any school grounds is unconstitutional as applied.

## V. SUMMARY OF ARGUMENT

Exempt from prosecution for possessing a firearm within a school zone, otherwise a violation of 18 U.S.C. § 922(q)(2)(A), are persons "licensed to do so by the State." 18 U.S.C. § 922(q)(2)(B)(ii). The law of the state must require "that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license". *Id.*

At the time of the offense alleged in the Indictment, Mr. Metcalf was considered "individually licensed and verified by the State of Montana within the meaning of the provisions regarding individual licensure and verification in the federal Gun-Free School Zones Act" by virtue of Mont. Code Ann. § 45-8-360 because he had "not been convicted of a violent, felony crime and [was] lawfully able to own or to possess a firearm under the Montana constitution."

9

In denying his Motion to Dismiss Indictment, the District Court found that, while Mr. Metcalf was licensed under Montana law to possess a firearm within a federally defined "school zone", Montana's law was insufficient to satisfy the exemption of 18 U.S.C. § 922(q)(2)(B)(ii) because it did not require law enforcement authorities to verify the recipient was qualified under law to receive the license. ER-77. Since the District Court deemed Montana's licensure law to be inadequate, it determined Mr. Metcalf was subject to prosecution under the 18 U.S.C. § 922(q)(2)(A).

Mr. Metcalf respectfully asserts that 18 U.S.C. § 922(q)(2)(B)(ii) delegated the duty of administering a licensing structure entirely to the States, that Montana implemented a law verifying that individuals who were qualified to possess a firearm under the Montana Constitution were qualified to receive a license under law, and that it granted a valid license to all such individuals which exempted Mr. Metcalf from prosecution under § 922(q)(2)(A).

Additionally, it is undisputed that Mr. Metcalf's conduct in this case consists of his possessing a firearm on his person for self-defense in the area immediately outside of his home. The legal history and tradition of the United States demonstrates that the Second Amendment does not support any regulation so expansive as to disarm any citizen who passes within 1,000 feet of any "school grounds" throughout the entire Republic. When the District Court denied Mr.

10

Metcalf's Motion to Dismiss it acknowledged that the United States ***did not*** meet its burden to demonstrate that § 922(q)(2)(A) is consistent with this Nation's historical tradition of firearm regulation.  ER-83 (emphasis added).  However, the District Court engaged in "its own analysis of the historical sources to locate a historical analogue to a law creating a 'buffer zone' where firearms were not allowed ***around*** a 'sensitive place.'", finding historical election laws the District Court offers as analygous to § 922(q)(2)(A).  ER-85 (emphasis added).

Mr. Metcalf respectfully asserts that the law is unconstitutional as applied, that the District Court acted in error when it determined the Government did not meet its burden and engaged in its own analysis, and that it also acted in error when it determined that Mr. Metcalf's Montana license was invalid due to the licensing procedure enacted by the State.

## VI.  ARGUMENT

## I.  THE DISTRICT COURT ERRED IN DETERMINING THAT 18 U.S.C. § 922(q)(2)(A) IS CONSTITUTIONAL AS APPLIED TO MR. METCALF.

### A. Standard of Review and Reviewability

The Court of Appeals "reviews de novo the constitutionality of a statute." *United States v. Chovan*, 735 F.3d 1127, 1132 (9th Cir. 2013) (citing *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010)).  The Court of Appeals also

11

"reviews de novo constitutional challenges to a district court's denial of a motion to dismiss." *Id.*

**B. The History of 18 U.S.C. § 922(q) and Mont. Code Ann. § 45-8-360.**

In 1990, President George H.W. Bush signed into law Section 1702 of the Crime Control Act of 1990.  Pub.L. 101-647, 104 Stat. 4789.  The Act added a Section "(q)" to 18 U.S.C. § 922.  Section (q) made it a criminal offense to possess a firearm within a "school zone".  This provision has since been commonly referred to as the "Gun Free School Zones Act" (or the "Act" herein).  The term "school zone" means "(A) in or on the grounds of, a public, parochial or private school; or (B) within a distance of 1,000 feet from" the same.  18 U.S.C. § 921(a)(26).  The Act contained an exception from prosecution for persons who are "licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license".  18 U.S.C. § 922(q)(2)(B)(ii).

//

//

//

In 1995, the State of Montana enacted Mont. Code Ann. § 45-8-360, which provides:

> In consideration that the right to keep and bear arms is protected and reserved to the people in Article II, section 12, of the Montana constitution, a person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and verified by the state of Montana within the meaning of the provisions regarding individual licensure and verification in the federal Gun-Free School Zones Act of 1990.

Mont. Code Ann. § 45-8-360 (1995).

Shortly after Montana's passage of Mont. Code Ann. § 45-8-360, the United States Supreme Court held that 18 U.S.C. § 922(q)(2)(A) amounted to an unconstitutional exercise of Congress's authority to regulate the commerce between the states, rendering the Act void.  See *United States v. Lopez*, 514 U.S. 449 (1995). However, in 1996 the Act was amended to require that a firearm possessed within a school zone must be shown to have "moved in or otherwise affect[ed] interstate or foreign commerce" as an element of any offense prosecuted under the Act.  The 1996 amendment did not alter the language exempting persons licensed by the State to possess a firearm within a school zone from prosecution under the Act.

In 1997, Mont. Code Ann. § 45-8-360 was amended to remove only the words "of 1990" from the statute.  See Mont. Code Ann. § 45-8-360 (1997).

In 2005, this Court determined that the amended version of the Act is within Congress's power to regulate firearm possession under the Commerce Clause,

because it "includes a 'requirement that [the defendant's] possession of the firearm have a[] concrete tie to interstate commerce.' This new version of § 922(q) resolves the shortcomings that the *Lopez* Court found in the prior version of this statute because it incorporates a 'jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce.'" *United States v. Dorsey*, 418 F.3d 1038, 1046 (2005) (quoting Lopez at 567, 561).

Mr. Metcalf has not brought a challenge to § 922(q) pursuant to the commerce clause, but he urges that the reasoning of *Lopez* often foreshadows many reasons the Act cannot survive as-applied post-*Bruen*.

### C. *Heller* and *Bruen*

In 1975, the District of Columbia enacted a law criminalizing the carrying of any unregistered firearm within the District while simultaneously prohibiting the registration of handguns, effectively banning them. *Heller v. District of Columbia*, 554 U.S. 570, 574 (2008). Additionally, any lawfully owned firearm (i.e., registered long gun) possessed within the District was required to be "unloaded and dissembled or bound by a trigger lock or similar device" unless located in a place of business or being used for lawful recreational activities. *Id*.

In *Heller*, the United States Supreme Court considered "whether [the District's] prohibition on the possession of usable handguns in the home violates the

14

Second Amendment to the Constitution". *Id*. at 573. The Court not only found that the prohibition was unconstitutional, it also declared that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller* at 635. The Supreme Court struck down both the law's complete ban on handguns and its restriction against keeping functional firearms in the home: the complete prohibition on handguns was constitutionally "invalid" for any purpose, and the requirement that any other firearm in the home be rendered and kept inoperable at all times "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id*., at 630.

Fourteen years later, in *Bruen*, the Supreme Court held that the right it articulated in *Heller* also extended to areas outside the home and emphasized that the right cannot be analyzed using "means-end" scrutiny. *Bruen*, at 2127. New York had enacted a law criminalizing possession of a firearm whether inside or outside the home without a license in 1905. In 1911, it enacted a separate law requiring a government finding of "good moral character" and "proper cause" as prerequisites for an individual obtaining such a license. *Bruen*, at 2122.

In *Bruen*, the Court reaffirmed the Second Amendment's guarantee of "an individual right to possess and carry weapons in case of confrontation" as articulated in *Heller*, then recognized that "confrontation can surely take place outside the

15

home". *Id.*, at 2135. The Court held that the "proper cause" requirement of the 1911 law violated the Second and Fourteenth Amendments "in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms". *Id.*, at 2156.

In reaching its conclusion, the *Bruen* Court articulated the test that guides Mr. Metcalf's instant challenge to the firearm ban of 18 U.S.C. § 922(q)(2)(A): "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. To justify §922(q) as it has been applied to Mr. Metcalf, *Bruen* requires the United States, at the District Court level, to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* The Government's proffered historical evidence must be sufficiently comparable to the challenged regulation to satisfy Bruen's requirements. *Id.* at 2133.

//

//

//

//

//

16

Relevant to Mr. Metcalf's appeal, the *Bruen* Court went on to qualify that:

"[w]hile the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

*Bruen*, 597 U.S. 1, 27-28 (2022) (quoting *McCulloch v. Maryland*, 17 U.S. 316 (1819)).

### D. *Heller*, *Bruen*, and 18 U.S.C. § 922(q)(2)(A) as Applied to Mr. Metcalf

Stated broadly, this is where Mr. Metcalf's circumstances meet this Court: he has been prosecuted for possessing a firearm for self-defense, as the *Heller* Court determined is his right, in the public areas immediately outside of his home, which the *Bruen* Court also determined is his right. His actions placed him in violation of a regulation that makes it a crime punishable by up to five years' imprisonment, the effect of which imposes a lifetime ban on the possession of firearms. See 18 U.S.C. § 922(g)(1).

"[A]n indictment sought under a statute that is unconstitutional on its face or as applied will [ ] be dismissed." *United States v. Mayer*, 503 F.3d 740, 747 (9th Cir. 2007). "[T]he 'normal rule' is that 'partial, rather than facial, invalidation is the

required course,' such that a 'statute may . . . be declared invalid to the extent that it reaches too far, but otherwise left intact.'" *Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006).

The Second Amendment likely tolerates a regulation prohibiting the carrying of firearms in a school building, and perhaps even on the school's grounds. However, nothing in the Nation's history and tradition suggests that the Second Amendment tolerates the manner in which § 922(q)(2)(A) has been applied against Mr. Metcalf – it has served as a complete ban on his ability to arm himself for self-defense on the sidewalk immediately outside of his home, or to carry a functional firearm off of his property because he lives within 1,000 feet of the type of building that exists within 1,000 feet of most urban homes.

The District Court, in denying Mr. Metcalf's Motion to Dismiss, determined that gun violence in schools constitutes an "unprecedented societal concern" that does not have a direct historical analogue, and that "a more nuanced analysis of the historical regulations is warranted". ER-82–83.

The District Court agreed that the Government did not meet its burden, and that there appears to exist "no founding-era historical analogue where a 'sensitive place' included an area as expansive as a 1,000-foot radius around a building". ER-84. The District Court noted that "[t]his restriction covers almost the entirety of every urban location in the United States, including many places that have nothing

18

to do with the closest school". ER-84–85. The Court determined that the "nuanced approach" contemplated in *Bruen* required that it "engage in its own analysis of the historical sources to locate a historical analogue to a law creating a 'buffer zone' where firearms were not allowed ***around*** a 'sensitive place'". ER-85. (emphasis added).

In a responsive Brief to Mr. Metcalf's Motion to Dismiss the Indictment, the United States had argued that several regulations in this country's history banning firearms at public universities and on school grounds served as sufficient analogues to carry the Government's burden that § 922(q)(2)(A)'s prohibition on possessing a firearm within 1,000 feet of a "school's grounds" is consistent with the Nation's history and tradition of firearm regulation. ER-84. However, as the District Court noted, the Founding Era prohibitions of firearms on the campuses of public universities and the 19th century laws banning firearms in schools were insufficient analogues to a law that effectively bans firearms in all urban areas through the creation of a "buffer zone" around a historically recognized "sensitive place". ER-83.

Engaging in its own analysis, the District Court determined that election places are a "proper historical antecedent" around which legislatures had previously established a "buffer zone" in which firearms were prohibited. ER-84–85. The Court cited state and local laws from 1776, 1870, 1873, and 1874, respectively,

19

which prohibited the "carrying" of firearms within a specified distance of a polling place on or near election day. The laws were more expansive in distance: one-mile, one-half mile, and, in 1874, anywhere within Kent, Queen Anne's, or Montgomery County, Maryland. However, these prohibitions applied only on "election day" or days of "registration or revision of registration", with the exception of Maryland's 1776 Constitution that prohibited the possession of firearms within one-half mile of a polling place on election day, as well as the 24 hours that preceded and followed each election day. ER-85–86.

While unconvinced by the Government's proffered historical analogues, the Court employed the "nuanced approach" contemplated in *Bruen*, engaged in its own historical analysis, and found that these early election laws demonstrate "a tradition of restricting firearms within a buffer zone of a 'sensitive place.' Thus, the Gun-Free School Zones Act, 18 U.S.C. § 922(q) does not violate the Second Amendment". Pg. 21.

In *Bruen*, the United States Supreme Court made clear that whether "modern and historical regulations impose a ***comparable burden*** on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Bruen*, at 29, quoting *McDonald v. City of Chicago,* 561 U. S. 742, 767 (2010). In assessing this "central" question, courts

must analyze "how and why" a historical regulation burdened that right when compared to a challenged modern regulation:

> While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense. As we stated in *Heller* and repeated in *McDonald*, "individual self-defense is 'the central component' of the Second Amendment right."

*Bruen*, 597 U.S. 1, 29 (2022) (internal citations omitted).

Respectfully, the historical election laws cited by the District Court serve as insufficient analogues under the question of "how" they burdened a law-abiding citizen's right to armed self-defense when compared to the Act.

The question of "why" these early voting regulations restricted firearm possession bear some corollaries to § 922(q)(2)(A). The legislative bodies who enacted the early election laws appear to have seen importance in avoiding disruption to the election process and determined it was appropriate to place restrictions against the carrying of firearms near people who were in the process of exercising that right. Similarly, Congress in 1990 and 1997 saw importance in avoiding disruption to the education process via gun violence and determined it was appropriate to place restrictions against the carrying of firearms near facilities where the Nation's youth were tasked with obtaining their education.

21

Indeed, the Government made a similar point in *Lopez* when it unsuccessfully argued that the regulation of firearms within school buildings inherently fell within its power to regulate commerce in defense of the 1990 Act:

> "[V]iolent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe. The Government also argues that the presence of guns in schools poses a substantial threat to the educational process by threatening the learning environment. A handicapped educational process, in turn, will result in a less productive citizenry. That, in turn, would have an adverse effect on the Nation's economic well-being. As a result, the Government argues that Congress could rationally have concluded that § 922(q) substantially affects interstate commerce."

*United States v. Lopez*, 514 U.S. 549, 563-564 (1995).

However, when it comes to the "how" question, the Act burdens the right of law-abiding citizens to bear arms in ways unlike anything that existed at the founding.  As the Act has been applied to Mr. Metcalf, it serves as a complete ban on the right of all law-abiding persons to leave their home with a functioning firearm for the purpose of self-defense if the egress to their private property lies within 1,000 feet of any school's grounds.

The election laws cited by the District Court were narrowly tailored in aspects that demonstrate the sheer breadth of the Act's modern prohibition.  First, unlike the early election laws cited by the Court, the prohibition of 18 U.S.C. § 922(q)(2)(A) applies year around, regardless of whether school is in session.  Mr. Metcalf has been convicted of violating the Act between August 2, 2023, and August 17, 2023,

22

when school was not in session[1].  While some of the regulations cited by the Court were more expansive in distance than the act, they applied for only between one and three days per election year.

Conversely, the Gun-Free School Zones Act serves as a complete ban on the carrying of firearms within a distance of 1,000 feet from the grounds of any place deemed a "school", and the prohibition is in effect at all times.  The term "school" means "a school which provides elementary or secondary education, as determined under state law."  18 U.S.C. § 921(a)(27).  As the Act is being applied in this case, whether a place is a "school" for the purpose of §922(q)(2)(A)'s firearm ban is unaffected by whether that place is actively "provid[ing]" elementary or secondary education.

Perhaps more importantly, the regulations cited by the District Court applied only within certain states and localities.  Texas, Delaware, and Louisiana all appear to have enacted sate-wide bans on the carrying of firearms within specified distances of a polling place on election day at certain points in their history.  ER-86.  Maryland prohibited the carrying of firearms altogether across certain counties.  ER-86.  Again, while these laws were more expansive in the distances enumerated and

---

[1] Mr. Metcalf was arrested on August 22, 2023, the morning school started, six days after he was most recently the subject of any known citizen complaints to law enforcement.

codified in each respective regulation, each only applied in one jurisdiction, in no case did any law apply for more than three days, and each was only effective on the dates enumerated during election years.

The Gun-Free School Zones Act applies every day, everywhere, and it applies regardless of whether a person's possession of a firearm has any relationship to a school aside from the 1,000-foot distance.  As the District Court noted, "[t]his restriction covers almost the entirety of every urban location in the United States, including many places that have nothing to do with the closest school".  At the founding, both the federal police power and the prevalence of schools throughout urban communities bear few similarities to modern times.

The Crimes Act of 1790 defined the first federal crimes in the United States. 1 Stat. 112; 1 Cong. Ch. 9.  America's first defined federal crimes were crimes against the institutions of the United States and those committed within the exclusive jurisdiction of the United States.  Among the punishable offenses when committed against the United States were treason, counterfeiting, interference with diplomatic immunity, perjury, judicial bribery, obstruction of judicial process, and prison break. Among offenses punishable when committed within the exclusive jurisdiction of the United States were murder, manslaughter, mayhem, and larceny.  *United States v. Garcia, 2024 U.S. App. LEXIS 22409, *45.*  No regulation in the early federal

24

criminal code at the founding resembled a ban on the possession the possession of a firearm.

Through the exercise of its authority to regulate commerce between the states in 1990 and again in 1997, the United States essentially created a federal jurisdiction of every urbanized area of the country, but only for the purpose of banning the possession of a firearm for any reason, including self-defense. As it has been applied to Mr. Metcalf, it bans him and millions who are similarly situated from carrying a functional firearm kept in their home anywhere. Respectfully, when it comes to the question of "how" the Act regulates firearm possession, founding era election day prohibitions serve as an insufficient analogue to the Act, even considering the unprecedented modern societal problem of gun violence in schools.

A ban on the possession of all firearms as comprehensive as the Gun Free School Zones Act was inconceivable at the founding. Even if it had occurred to the founding generation to enact a ban on the possession of any firearm within 1,000 feet of any school, school buildings were not interwoven throughout communities across the United States as they are today: even if Congress had passed the Gun Free School Zone Act as it is currently written in 1790, it would not have served to grant the the United States the general police power it has exercised over Mr. Metcalf.

"In 1791, when the Second Amendment was adopted, there were no police departments, and many families lived alone on isolated farms or on the frontiers. If

25

these people were attacked, they were on their own. It is hard to imagine the furor that would have erupted if the Federal Government and the States had tried to take away the guns that these people needed for protection." *Bruen*, at 78. As of 2020, there were roughly 128,930 public and private prekindergarten, elementary, middle, and high schools in the 50 states and the District of Columbia that are "schools" under 18 U.S.C. §922(q)(2)(A). This does not include post-secondary institutions, of which there are at least two dozen in Montana.[2]

Schools are unique in that they are strategically placed throughout a community to ensure that citizens have access to them. Even if one does not live directly across the street from a school like Mr. Metcalf, it is difficult to imagine traveling any distance within most urban settings and not coming within 1,000 feet of a school's grounds. When the District Court acknowledged that this distance covers almost the entirety of every urban location in the United States, it effectively recognized that the Act directly impacts the second amendment rights of millions of citizens.

As this ban is being enforced against Mr. Metcalf, no citizen may possess a firearm that is ready to use for self defense in almost any urban location in the United States. By comparison, the District of Columbia ban struck down by the Supreme

---

[2] https://nces.ed.gov/fastfacts/display.asp?id=84

Court in *Heller* impacted 572,059 people, per the census immediately preceding that decision.[3]

## II. THE DISTRICT COURT ERRED IN DETERMINING THAT MR. METCALF WAS NOT EXEMPT FROM FEDERAL PROSECUTION BY VIRTUE OF HIS LICENSE TO POSSESS A FIREARM WITHIN A SCHOOL ZONE FROM THE STATE OF MONTANA.

Exempt from prosecution under the Act for possessing a firearm within a "school zone" are persons "licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license".  18 U.S.C. § 922(q)(2)(B)(ii).

By Mont. Code Ann. § 45-8-360, the State of Montana "verified" that every person in Montana who has not been convicted of a violent felony crime or who is not otherwise prohibited from possessing a firearm under the Montana Constitution is qualified to possess a firearm within a school zone, and granted a "license[ ]" to all such persons "within the meaning of the Gun Free School Zones Act".  Mr. Metcalf has not been convicted of a violent felony crime and is not otherwise prohibited from possessing a firearm under the Montana Constitution.

---

[3] https://www2.census.gov/census_2000/census2000/states/dc.html

The next section of the Code, Mont. Code Ann. § 45-8-361, prohibits "possession or allowing possession of a weapon in a school building". While §922(q) applies only to firearms that affect interstate commerce, a "weapon" as used in the Montana law is not specific to firearms and includes a knife with a blade of 4 inches or more, a sword, straight razor, throwing star, nun-chucks, brass knuckles, or "any other article or instrument possessed with the purpose to commit a criminal offense." Mont. Code Ann. § 45-8-361(5)(b). Montana's local laws ban possession of a weapon within a school building more broadly than § 922(q).

Mr. Metcalf is unquestionably "licensed to [possess a firearm within a school zone] by the State in which the school zone is located". The Act provides no guidance to the States in establishing a licensing process aside from what is enumerated in § 922(q)(2)(B)(ii): "the law of the State or political subdivision [must] require[ ] that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license".

In denying Mr. Metcalf's Motion to Dismiss, the District Court determined that, "[f]or the state licensing requirement to exempt the holder, the licensing process must require that a law enforcement authority ensure that the holder is qualified under state law to receive a license." ER-70. The Court went on to find that "[s]ince the Montana statute does not impose clear qualifications before an individual obtains

a license, [it]… does not exempt a person from the requirements of § 922(q)(2)(A)." ER-72.

Case law on this exception is scant, and *United States v. Tait*, 202 F.3d 1320 (11th Cir. 2000) provides some guidance. Defendant Tait raised the exception in defense[4] of being charged with possession of a firearm within a school zone, having been accused of placing "a fully-loaded gun against a student's neck" at an Alabama high school. *Tait*, at 1321. Tait was licensed to carry a firearm by the State of Alabama, which issued licenses as follows:

> The sheriff of a county may, upon application of any person residing in that county, issue a qualified or unlimited license to such person to carry a pistol … if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed.

Ala. Code § 13A-11-75(1975)

The United States argued that Tate's license in Alabama was "void" for purposes of §922(q) because "Alabama's requirements for verifying an applicants' qualifications are too relaxed to ever qualify their licensees for §922(q)(2)(B)(ii) protections". *Id.*, at 1324.

---

[4] Tait also argued that the Act is unconstitutional pursuant to Lopez, however both the District and Circuit Courts declined to entertain the constitutional question after finding that Tait was exempt from prosecution under § 922(q)(2)(B)(ii) due to his valid Alabama license. *Tait*, 1323, n.5.

29

The 11th Circuit rejected the Government's argument and determined that Tait could not be prosecuted for violating the Act because he was licensed by the State in which the school was located. "While the Alabama law is extremely lenient, it is nonetheless the only pertinent law. Alabama has chosen its laws, and these are the only laws which determine whether the federal statute's exception applies. Alabama is free to set forth its own licensing requirements, and Congress chose to defer to those licensing requirements when it established 'qualified under law' as its criterion for the exception to the Gun-Free School Zones Act." *Id.* (internal citations omitted).

Mr. Metcalf does not argue that Montana's law is less lenient than the Alabama law at issue in *Tait*. It is surely more lenient. Like in *Tait*, however, the Act completely defers this task to the states, Montana "is free to set forth its own licensing requirements", and Mont. Code Ann. § 45-8-360, is "the only law [that] determine[s] whether the federal statute's exception applies." *Id.*

//

//

//

//

//

//

30

Consider also the Supreme Court's final words in its *Lopez* decision:

> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further. To do so would require us to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated, and that there never will be a distinction between what is truly national and what is truly local. This we are unwilling to do.

*United States v. Lopez*, 514 U.S. 549, 567-568 (internal citations omitted).

While Mr. Metcalf has not raised a challenge under the commerce clause like in *Lopez*, the issue of whether his Montana license protects him from prosecution under the Act presents another example of this however-well-intentioned law's failure, in practice, to appreciate the "distinction between what is truly national and what is truly local". Twenty-eight years before *Bruen*, the Supreme Court recognized that the Act infringed on "truly local" activity:

> The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.

*United States v. Lopez*, 514 U.S. 549, 567.

Mr. Metcalf was told numerous times he had done nothing illegal by local law enforcement. It was when he called the Federal Government for help that the United States stepped into a matter that had, until that point, been "truly local" in the most literal sense: Metcalf's offense conduct consists of his stepping from his private yard onto the sidewalk that runs across it while he was armed for self-defense against a credible threat with a single-shot bird gun.

Mr. Metcalf took his actions 35 years after the United States enacted a law that made it a felony to possess a firearm in "almost the entirety of every urban location in the United States" unless one is "licensed to do so" by the state. It was also 28 years after Montana passed a law informing its citizenry who among them it deemed verified and licensed for that explicit purpose. Thousands of Montanans have violated this law believing they were licensed to do so. An indoor shooting range currently operates in Billings, Montana, within 1,000 feet of another elementary school, a few blocks from Mr. Metcalf's home. ER-73.

Since before the current version of § 922(q)(2)(A) was enacted, the State of Montana decided it did not want almost the entirety of its urban areas to become zones in which its citizens needed to fear prosecution from the United States for lawfully possessing firearms. As Congress delegated the duty of establishing and implementing a licensing system to the States, if Mr. Metcalf is "licensed under Montana law" to possess a firearm within a school zone as the District Court held,

that the remedy for the State's licensing law's perceived shortcomings is Mr. Metcalf's criminal prosecution highlights much of the concern expressed by the Supreme Court in *Lopez*.

Mr. Metcalf walked from his front door to the sidewalk doing something the United States Supreme Court and his state's government, through Mont. Code Ann. 45-8-360, have deemed to be his right. The *Lopez* Court struck an earlier version of this law down so as not "to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, at 567. In this case, local law enforcement said Mr. Metcalf wasn't breaking the law and took no action for more than two weeks. The Federal Government came in and had Mr. Metcalf arrested a few hours before the school year began, five days after his alleged offense conduct.

Montana has (1) verified that any individual who is not prohibited under the laws of Montana or who has not been convicted of a violent felony crime is qualified to receive a license to carry a firearm within a school zone, (2) enacted legislation granting such a license to all verified individuals, (3) explicitly stated that this license applies for purposes of "the federal Gun-Free School Zones Act", and (4) enacted separate legislation that goes farther than §922(q) could under its Commerce Clause authority, prohibiting the possession of any type of "weapon", including a firearm,

33

but only within the school building itself.  Montana has legislated extensively in this specific, "truly local" area.

## VII.  CONCLUSION

Schools themselves have historically been treated as "sensitive places" where the Second Amendment tolerates restrictions on the right to bear arms.  However, §922(q) constitutes a legislative extension of the historically recognized "sensitive place" that exists within a school building – where the Second Amendment has long-tolerated restrictions on the possession of firearms – onto the adjoining school property, and then another 1,000 feet as the crow flies regardless of what or who exists within that space.

Mr. Metcalf's course of conduct is protected by the Second Amendment.  He is one of "The People" referenced in the Second Amendment.  He has stepped from his private property onto the sidewalk outside of his home, which runs across his property, while armed for self-defense.  He was licensed by the State of Montana explicitly to "do so".

Nothing in the Nation's history and tradition supports the regulation that made it unlawful for Mr. Metcalf to carry a firearm when and where he did.  Since § 922(q) has been applied in this instance to serve as the basis for the federal prosecution and permanent disarmament of a law-abiding citizen who was licensed by the State to

possess a firearm on the sidewalk that runs across his property, the District Court's

Denial of Mr. Metcalf's Motion to Dismissed must be reversed.

RESPECTFULLY SUBMITTED this 29th day of November, 2024.


/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
        Counsel for Defendant

35

## VIII.  CERTIFICATE OF COMPLIANCE

I hereby certify that this Opening Brief of Defendant-Appellant is in compliance with Ninth Circuit Rule 32(a).  The Brief's line spacing is double spaced.  The brief is proportionately spaced, the body of the argument has a Times New Roman typeface, 14 point size and contains less than 14,000 words at an average of 280 words (or less) per page, including footnotes and quotations.  (Total number of words: 7,968 excluding tables and certificates).

DATED this 29th day of November, 2024.

/s/ Russell A. Hart_____
RUSSELL A. HART
Federal Defenders of Montana
       Counsel for Defendant

## IX.  STATEMENT OF RELATED CASES

The undersigned, Counsel of record for the Defendant-Appellant, pursuant to Rule 28-2.6 of the Rules of the United States Court of Appeals for the Ninth Circuit, states that, to his knowledge, there are no related cases pending in this Court.

DATED this 29th day of November, 2024.

/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
            Counsel for Defendant

## X.  CERTIFICATE OF SERVICE
### Fed.R.App.P. 25

I hereby certify that on November 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

GABRIEL COWAN METCALF
430 Broadwater Avenue
Billings, MT 59101

      Defendant-Appellant

                      /s/ Russell A. Hart
                      RUSSELL A. HART
                      Federal Defenders of Montana
                          Counsel for Defendant