**Ninth Circuit Court of Appeals No. 24-4818**
**District Court No. CR-23-103-BLG-SPW**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**GABRIEL  COWAN  METCALF**,

**Defendant-Appellant.**

---

**EXCERPTS OF RECORD**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION
HONORABLE SUSAN P. WATTERS
UNITED STATES DISTRICT COURT JUDGE, PRESIDING

RACHEL JULAGAY
Federal Defender
**\*RUSSELL A. HART**
Assistant Federal Defender
Federal Defenders of Montana
175 North 27th Street, Suite 401
Billings, Montana 59101
Telephone: (406) 259-2459
     Counsel for Defendant Appellant

SUBMITTED:  November 29, 2024

# INDEX

Pages

**VOLUME I OF I**

Judgment
(CR 68) (08/02/2024) .................................................................4

Plea Agreement
(CR 62) (03/25/2024) ...............................................................10

Transcripts of Trial Transferred to Change of Plea Hearing
(CR 61) (03/25/2024) ...............................................................19

Order Denying Motion to Dismiss
(CR 39) (01/31/2024) ...............................................................67

Reply to Government Response on Motion to Dismiss
(CR 36) (10/31/2023) ...............................................................89

Government Response on Motion to Dismiss
(CR 33) (10/24/2023) .............................................................109

Brief in Support Motion to Dismiss
(CR 32) (10/10/2023) .............................................................135

Motion to Dismiss Indictment
(CR 31) (10/10/2023) .............................................................151

Indictment_Redacted
(CR 21) (09/14/2023 ...............................................................154

Affadavit to Criminal Complaint
(CR 1-1) (08/21/2023) ............................................................156

Criminal Complaint
(CR 1) (08/21/2023) ...............................................................169

Notice of Appeal
(CR 71) (08/06/2024)................................................................170

District Court Docket .............................................................173

Certificate of Service ............................................................182

**[The Presentence Investigation report, a sealed document, is filed
under separate cover.]**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| **GABRIEL COWAN METCALF** | Case Number: CR 23-103-BLG-SPW-1 <br> USM Number: **74404-510** <br> **Russell Allen Hart; Edward Werner** <br> Defendant's Attorneys |

## THE DEFENDANT:

| | | |
|---|---|---|
| ☒ | pleaded guilty to count(s) | 1 |
| ☐ | pleaded guilty to count(s) before a U.S. Magistrate Judge, which was accepted by the court. | |
| ☐ | pleaded nolo contendere to count(s) which was accepted by the court | |
| ☐ | was found guilty on count(s) after a plea of not guilty | |

The defendant is adjudicated guilty of these offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18 U.S.C. § 922(q)(2)(A)  Unlawful Possession Of A Firearm In A School Zone | 08/17/2023 | 1 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐   The defendant has been found not guilty on count(s)

☒   The Forfeiture Count ☒ is  ☐ are dismissed on the motion of the United States

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**August 2, 2024**
Date of Imposition of Judgment

Signature of Judge

**Susan P. Watters**
**United States District Judge**
Name and Title of Judge

**August 2, 2024**
Date

AO 245B (Rev. 10/21) Judgment in a Criminal Case                                                    Judgment -- Page 2 of 6

DEFENDANT:          GABRIEL COWAN METCALF
CASE NUMBER:        CR 23-103-BLG-SPW-1

# PROBATION

The defendant is hereby sentenced to probation for a term of: three (3) years.

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.

2.  You must not unlawfully possess a controlled substance.

3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of
    release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

    □   The above drug testing condition is suspended, based on the court's determination that you pose a low
        risk of future substance abuse. (*check if applicable*)

4.  ☒   You must cooperate in the collection of DNA as directed by the probation officer. (*check if applicable*)

5.  □   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. §
        20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender
        registration agency in which you reside, work, are a student, or were convicted of a qualifying offense.
        (*check if applicable*)

6.  □   You must participate in an approved program for domestic violence. (*check if applicable*)

7.  □   You must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664.
        (*check if applicable*)

8.  □   You must pay the assessment imposed in accordance with 18 U.S.C. § 3013.

9.  □   If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this
        judgment.

10. □   You must notify the court of any material change in your economic circumstances that might affect your
        ability to pay restitution, fines, or special assessments.

        You must comply with the standard conditions that have been adopted by this court as well as with any
additional conditions on the attached page.

AO 245B (Rev. 10/21) Judgment in a Criminal Case

Judgment -- Page 3 of 6

DEFENDANT:        GABRIEL COWAN METCALF
CASE NUMBER:      CR 23-103-BLG-SPW-1

## STANDARD CONDITIONS OF PROBATION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand additional information regarding these conditions is available at https://www.mtp.uscourts.gov/post-conviction-supervision.


Defendant's Signature _____    Date _____

AO 245B (Rev. 10/21) Judgment in a Criminal Case        Judgment -- Page 4 of 6

DEFENDANT:      GABRIEL COWAN METCALF
CASE NUMBER:    CR 23-103-BLG-SPW-1

## SPECIAL CONDITIONS OF PROBATION

1.     You must participate in an outpatient program for mental health treatment as approved by the probation officer. You must remain in the program until you are released by the probation officer in consultation with the treatment provider. You must pay part or all of the costs of this treatment as directed by the probation officer.

2.     You must submit your person, residence, place of employment, vehicles, and papers, to a search, with or without a warrant by any probation officer based on reasonable suspicion of contraband or evidence in violation of a condition of release. Failure to submit to search may be grounds for revocation. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. You must allow seizure of suspected contraband for further examination.

3.     You must abstain from the consumption of alcohol and are prohibited from entering establishments where alcohol is the primary item of sale.

4.     You must participate in substance abuse testing to include not more than 365 urinalysis tests, not more than 365 breathalyzer tests, and not more than 36 sweat patch applications annually during the period of supervision. You must pay part or all of the costs of testing as directed by the probation officer.

5.     You must not purchase, possess, use, distribute or administer marijuana, including marijuana that is used for recreational or medicinal purposes under state law.

6.     You must not possess, ingest or inhale any psychoactive substances that are not manufactured for human consumption for the purpose of altering your mental or physical state. Psychoactive substances include, but are not limited to, synthetic marijuana, kratom and/or synthetic stimulants such as bath salts and spice.

AO 245B (Rev. 10/21) Judgment in a Criminal Case                                    Judgment -- Page 5 of 6

DEFENDANT:        GABRIEL COWAN METCALF
CASE NUMBER:      CR 23-103-BLG-SPW-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

| | Assessment | JVTA Assessment** | AVAA Assessment* | Fine | Restitution |
|---|---|---|---|---|---|
| • | | | | | |
| **TOTALS** | $100.00 | $ 0.00 | $ 0.00 | $.00 | $.00 |

☐    The determination of restitution is deferred until    *An Amended Judgment in a Criminal Case*
☐    *(AO245C)* will be entered after such determination.
     The defendant must make restitution (including community restitution) to the following payees in the
     amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment. However, pursuant to 18 U.S.C.
§ 3664(i), all nonfederal victims must be paid before the United States is paid.

☐    Restitution amount ordered pursuant to plea agreement $
☐    The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before
     the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be
     subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).
☐    The court determined that the defendant does not have the ability to pay interest and it is ordered that:
     the interest requirement is waived for the    ☐   fine                    restitution
     ☐   the interest requirement for the    ☐   fine    ☐   restitution is modified as follows:

*Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
**Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after
September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 10/21) Judgment in a Criminal Case

Judgment -- Page 6 of 6

DEFENDANT:          GABRIEL COWAN METCALF
CASE NUMBER:        CR 23-103-BLG-SPW-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☒  Lump sum payments of $ 100 due immediately, balance due

   ☐  not later than           , or

   ☒  in accordance with   ☐  C,   ☐  D,   ☐  E, or   ☒  F below; or

B  ☐  Payment to begin immediately (may be combined with   ☐  C,   ☐  D, or   ☐  F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment;
      or

D  ☐  Payment in equal 20 (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from
      imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release
      from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that
      time; or

F  ☒  Special instructions regarding the payment of criminal monetary penalties:
      **Criminal monetary penalty payments are due during imprisonment at the rate of not less than $25.00 per
      quarter, and payment shall be through the Bureau of Prisons' Inmate Financial Responsibility Program.
      Criminal monetary payments shall be made to the Clerk, United States District Court, James F. Battin Federal
      Courthouse, 2601 2nd Ave North, Ste 1200, Billings, MT 59101 or online at
      https://www.pay.gov/public/form/start/790999918. Please see www.mtd.uscourts.gov/criminal-debt for more
      information.**

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is
due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

o   Joint and Several
    See above for Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and
    Several Amount, and corresponding payee, if appropriate.

    ☐ Defendant shall receive credit on his restitution obligation for recovery from other defendants who contributed to the same
    loss that gave rise to defendant's restitution obligation.

☐  The defendant shall pay the cost of prosecution.
☐  The defendant shall pay the following court cost(s):
☐  The defendant shall forfeit the defendant's interest in the following property to the United States:


Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine
principal, (6) fine interest, (7) community restitution, (8) JVTA Assessment, (9) penalties, and (10) costs, including cost of prosecution and court
costs.

**THOMAS K. GODFREY**
**ZENO B. BAUCUS**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**James F. Battin U.S. Courthouse**
**2601 Second Ave. North, Suite 3200**
**Billings, MT 59101**
**Phone: (406) 657-6101**
**FAX: (406) 657-6989**
**Email: thomas.godfrey@usdoj.gov**
**zeno.baucus@usdoj.gov**

FILED

MAR 25 2024

Clerk, U.S. Courts
District of Montana
Billings Division

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 23-103-BLG-SPW** |
| **Plaintiff,** | |
| **vs.** | **PLEA AGREEMENT** |
| **GABRIEL COWAN METCALF,** | |
| **Defendant.** | |

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United

States, represented by Assistant U.S. Attorney Thomas K. Godfrey, and the

defendant, Gabriel Cowan Metcalf, and his attorney, Russell Hart, have agreed

upon the following:

| TYG | GM | RH | 3/25/24 | |
|---|---|---|---|---|
| AUSA | DEF | ATTY | Date | Page 1 |

1.    **Scope:**  This plea agreement is between the United States Attorney's Office for the District of Montana and the defendant.  It does not bind any other federal, state or local prosecuting, administrative or regulatory authority, or the United States Probation Office.

2.    **Charge:**  The defendant agrees to plead guilty to the indictment, which charges him with unlawful possession of a firearm in a school zone, in violation of 18 U.S.C. § 922(q)(2).  The offense carries a maximum punishment of five years of imprisonment, a $100,000 fine, three years of supervised release, and a $100 special assessment.

3.    **Nature of the Agreement:**  The parties agree that this plea agreement will be governed by Rule 11(c)(1)(C), Federal Rules of Criminal Procedure.  The defendant and the United States agree that a specific disposition of a probationary sentence, with no agreement as to any other term, is appropriate in this case.  The defendant understands that, if the agreement is accepted by the Court, the defendant will not have an automatic right to withdraw the guilty plea.  Rule 11(d)(2)(A), Federal Rules of Criminal Procedure.  If the Court rejects the agreement, pursuant to Rule 11(c)(5), Federal Rules of Criminal Procedure, the defendant will be able to withdraw the plea and the parties will proceed to trial.

With the consent of the United States, the defendant reserves the right to appeal the Court's adverse pre-trial ruling of that motion.  Rule 11(a)(2), Federal

| ᗩᑕ | GM | PH | 3/25/24 | |
|---|---|---|---|---|
| AUSA | DEF | ATTY | Date | Page 2 |

Rules of Criminal Procedure.  The parties acknowledge that this conditional plea agreement and reservation also requires the consent of the Court, and that if that consent is not given, this agreement is void and the case may be set for trial.

**4.     Admission of Guilt:**  The defendant will plead guilty because the defendant is in fact guilty of the charge contained in the indictment.  In pleading guilty to the indictment, the defendant acknowledges that:

First, the defendant knowingly possessed a firearm;

Second, the firearm had moved in or otherwise affected interstate commerce; and

Third, the possession occurred at a place that the defendant knew or had reasonable cause to believe was a school zone.

**5.     Waiver of Rights by Plea:**

(a)     The government has a right to use against the defendant, in a prosecution for perjury or false statement, any statement that the defendant gives under oath during the plea colloquy.

(b)     The defendant has the right to plead not guilty or to persist in a plea of not guilty.

(c)     The defendant has the right to a jury trial unless the defendant, by written waiver, consents to a non-jury trial.  The government must also consent and the Court must approve a non-jury trial.

| | | | |
|---|---|---|---|
| AUSA | DEF | ATTY | Date 3/25/24 |

Page 3

(d)     The defendant has the right to be represented by counsel, and if necessary, have the court appoint counsel, at trial and at every other stage of these proceedings.

(e)     If the trial is a jury trial, the jury would be composed of 12 laypersons selected at random.  The defendant and defense attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges.  The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty.  The jury would be instructed that the defendant is presumed innocent, and that it could not convict the defendant unless, after hearing all the evidence, it was persuaded of the defendant's guilt beyond a reasonable doubt.

(f)     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, whether or not he was persuaded of the defendant=s guilt beyond a reasonable doubt.

(g)     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against the defendant.  The defendant would be able to confront those government witnesses and the defense attorney would be able to cross-examine them.  In turn, the defendant could present witnesses and other evidence on the defendant's own behalf.  If the witnesses for

ICb        GM       RH       3/25/24
AUSA      DEF      ATTY    Date

Page 4

the defendant would not appear voluntarily, their appearance could be mandated through the subpoena power of the Court.

(h)     At a trial, there is a privilege against self-incrimination so that the defendant could decline to testify and no inference of guilt could be drawn from refusal to testify.  Or the defendant could exercise the choice to testify on his or her own behalf.

(i)     If convicted, and within 14 days of the entry of the Judgment and Commitment, the defendant would have the right to appeal the conviction to the United States Court of Appeals for the Ninth Circuit for review to determine if any errors were made which would entitle the defendant to reversal of the conviction.

(j)     The defendant has a right to have the district court conduct the change of plea hearing required by Federal Rule of Criminal Procedure 11.  By execution of this agreement, the defendant expressly waives that right and agrees to hold that hearing before, and allow the Rule 11 colloquy to be conducted by, the U.S. Magistrate Judge.

(k)     If convicted in this matter, a defendant who is not a citizen of the United States may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

| | | | |
|---|---|---|---|
| AUSA | DEF | ATTY | Date |

3/25/24

Page 5

The defendant understands that by pleading guilty pursuant to this agreement, the defendant is waiving all the rights set forth in the prior paragraph, except as provided in paragraph 3. The defendant's attorney has explained those rights to the defendant and the consequences of waiving them.

**6.** **Recommendations:** The United States will recommend that the defendant be given points for acceptance of responsibility if appropriate under the Guidelines unless the defendant is found to have obstructed justice prior to sentencing, USSG §3C1.1, or acted in anyway inconsistent with acceptance of responsibility.

The parties agree that a specific disposition of probation is appropriate in this case.

The parties reserve the right to make any other arguments at the time of sentencing. Defendant understands that the Court is not bound by this recommendation.

**7.** **Sentencing Guidelines:** Although advisory, the parties agree that the U.S. Sentencing Guidelines must be applied, and a calculation determined, as part of the protocol of sentencing to determine what sentence will be reasonable.

**8.** **Waivers:**

(a) *Waiver of Appeal of the Sentence:* The defendant understands the law provides a right to appeal and collaterally attack the sentence imposed in this case.

| $\overline{\text{AUSA}}$ | $\underline{6M}$ DEF | $\underline{et}$ ATTY | $\underline{3/25/24}$ Date | Page 6 |
|---|---|---|---|---|

18 U.S.C. § 3742(a); 28 U.S.C. §§ 2241, 2255. Based on the concessions made by the United States, the defendant knowingly waives any right to appeal or collaterally attack any aspect of the sentence, including conditions of probation or supervised release. This waiver includes challenges to the constitutionality of any statute of conviction and arguments the admitted conduct does not fall within any statute of conviction. This waiver does not prohibit the right to pursue a collateral challenge alleging ineffective assistance of counsel. This waiver does not prohibit the right to appeal the denial of the defendant's motion to dismiss.

The defendant also waives the right to appeal any aspect of a sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by the court during the district court revocation proceedings. In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

**9.** **Voluntary Plea:** The defendant and the defendant's attorney acknowledge that no threats, promises, or representations have been made to induce the defendant to plead guilty, and this agreement is freely and voluntarily endorsed by the parties.

**10.** **Detention/Release After Plea:** Pursuant to 18 U.S.C.

TYb       GM       RH       3/25/24
AUSA    DEF     ATTY    Date                                                                    Page 7

§ 3143(a)(2), the defendant acknowledges that the defendant will be detained upon conviction unless (A)(i) the Court finds there is a substantial likelihood that a motion for acquittal or new trial will be granted or (ii) this agreement provides that the United States will recommend that no sentence of imprisonment be imposed and (B) the Court finds, by clear and convincing evidence, that the defendant is not likely to flee or pose a danger to any other person or the community. Then, if exceptional circumstances exist, the defendant may be released upon conditions.

**11.    Breach:** If the defendant breaches the terms of this agreement, or commits any new criminal offenses between signing this agreement and sentencing, the U.S. Attorney's Office is relieved of its obligations under this agreement.

**12.    Forfeiture:** The following property is subject to forfeiture as a result of the criminal conviction in this matter. The defendant agrees to abandon all right title and interest in the property:

- Rossi, Model Trifecta, 20-gauge shotgun (SN: SP919241)

- Six (6) rounds of 20-gauge ammunition.

The defendant further consents to the entry of a Preliminary and Final Order of Forfeiture, pursuant to Fed. R. Crim. P. Rule 32.2; to waive any rights to notice of forfeiture and to pronouncement of forfeiture at sentencing; and/or agrees to

YG    CM    RH    3/25/24
AUSA    DEF    ATTY    Date

Page 8

execute a release and waiver of any interests, if any, of seized assets not forfeited, transferring the property to the United States.

13.    **Entire Agreement:** Any statements or representations made by the United States, the defendant, or his counsel prior to the full execution of this plea agreement are superseded by this plea agreement. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. **This plea agreement constitutes the entire agreement between the parties. Any term or condition which is not expressly stated as part of this plea agreement is not to be considered part of the agreement.**

JESSE A. LASLOVICH
United States Attorney


THOMAS K. GODFREY
Assistant U. S. Attorney


GABRIEL COWAN METCALF
Defendant


RUSSELL HART
Defense Counsel

| AUSA | DEF | ATTY | Date |
|------|-----|------|------|
|      | GM  | RH   | 3/25/24 |

Page 9

ER_18

1  Kim Marchwick
   Registered Professional Reporter
2  Certified Realtime Reporter
   Federal Certified Realtime Reporter
3  2601 2nd Ave. N., Suite 4209
   Billings, Montana 59101
4  (406) 671-2307 cellular
   marchwickkim@gmail.com
5

6

                IN THE UNITED STATES DISTRICT COURT
7                  FOR THE DISTRICT OF MONTANA
                        BILLINGS DIVISION
8              _____

9  UNITED STATES OF AMERICA,      )
                                  )
10            Plaintiff,          ) Appeal No. 24-4818
       vs.                        ) Case No:  CR 23-103-BLG-SPW
11                                )
                                  ) Change of Plea Hearing
12  GABRIEL COWAN METCALF,        )
                                  )
13            Defendant.          )
              _____

14
                  TRANSCRIPT OF PROCEEDINGS
15               Monday, March 25, 2024
                 8:35 a.m. to 10:09 a.m.
16             _____

17

             BEFORE THE HONORABLE SUSAN P. WATTERS
18            UNITED STATES DISTRICT COURT JUDGE
         FOR THE DISTRICT OF MONTANA - BILLINGS DIVISION
19

20            James F. Battin Federal Courthouse
                 Snowy Mountains Courtroom
21               2601 2nd Avenue North
                 Billings, Montana 59101
22

23             _____

24

             Proceedings recorded by machine shorthand
25       Transcript produced by computer-aided transcription

2

**APPEARANCES**

For the United States:

 Thomas Godfrey, Assistant U.S. Attorney
 **U.S. ATTORNEY'S OFFICE - BILLINGS DIVISION**
 2601 2nd Avenue North, Suite 3200
 Billings, Montana 59101
 Thomas.godfrey@usdoj.gov

 Zeno B. Baucus, Assistant U.S. Attorney
 **U.S. ATTORNEY'S OFFICE - BILLINGS DIVISION**
 2601 2nd Avenue North, Suite 3200
 Billings, Montana 59101
 Zeno.Baucus@usdoj.gov

For the Defendant:

 Russell Hart, Deputy Federal Defender
 **FEDERAL DEFENDERS OF MONTANA - BILLINGS DIVISION**
 175 N 27th St., Ste 401
 Billings, Montana 59101
 russell_hart@fd.org

 Edward Werner, Deputy Federal Defender
 **FEDERAL DEFENDERS OF MONTANA - BILLINGS DIVISION**
 175 N 27th St., Ste 401
 Billings, Montana 59101
 edward_werner@fd.org

**CONTENTS**

                   PAGE

Proceedings             3

Certificate of Reporter     48

3

1          <u>MORNING SESSION, MONDAY, MARCH 25, 2024</u>

2          (Whereupon, the court convened at 8:35 a.m., with

3     Defendant present, and the following proceedings were had:)

4          THE CLERK:  All rise.  The United States District

5     Court for the District of Montana is now in session.  The

6     Honorable Susan P. Watters presiding.

7          THE COURT:  Good morning, everyone.

8          MR. HART:  Morning.

9          THE COURT:  I haven't heard where we are as far as

10    the jurors' orientation kind of thing, but ultimately we'll

11    get a list of the jurors who are present or prospective

12    jurors who are present today.

13          So can I have a stipulation from counsel that the

14    jurors can be called forward in the order that they appear

15    on that list?

16          MR. GODFREY:  Yes, Your Honor; the United States so

17    stipulates.

18          MR. HART:  As does the defense.

19          THE COURT:  Okay.  We'll call 31 forward and that

20    will allow for voir dire and peremptory challenges resulting

21    in one alternate.

22          So is there anything from the government that we

23    need to take up before we begin?

24          MR. GODFREY:  Yes, Your Honor.  We have two legal

25    issues.  I also want to put on the record the status that

4

1    the United States made a plea offer in this case and then

2    whether the defendant was requesting the jury to decide the

3    forfeiture.

4         So starting in order, the United States previously

5    filed a motion in limine in this case seeking to preclude

6    two types of evidence and argument, the first was

7    constitutionality arguments, which the Court granted.

8         The second was argument and evidence that amounted

9    to a defense of entrapment by estoppel, that is asking

10   witnesses what -- state witnesses whether they told the

11   defendant he was in violation of state law or not, or the

12   fact that he was not in violation of state law.

13        This is a federal trial; that evidence is

14   irrelevant.  Entrapment by estoppel requires a federal agent

15   to tell him he's not in violation of a federal statute, not

16   a state agent saying he's not in violation of a state

17   statute.

18        There's no evidence of entrapment by estoppel.  The

19   defense has not noticed that as a defense, so the United

20   States would ask the Court to rule on that motion and

21   preclude such testimony and argument.

22        THE COURT:  All right.

23        Mr. Hart.

24        MR. HART:  Your Honor, while we have not asserted

25   an entrapment by estoppel defense, what Mr. Metcalf was told

5

1    by law enforcement concerning the legality of his actions

2    does go to his mental state.  The government is required to

3    prove that he knew or had cause to believe that he was in a

4    school zone.  He was told several times he wasn't breaking

5    the law.  I think some of that evidence could be relevant to

6    his mental state.

7              MR. GODFREY:  Your Honor, if I may respond?

8              THE COURT:  Go ahead.

9              MR. GODFREY:  We're certainly required to prove he

10   knew he was in a school zone.  We're not required to prove

11   he knew that his actions were unlawful under federal law,

12   which is what this evidence would be.

13             Any questions about whether he knew he was in a

14   school zone certainly would be relevant in this case, but

15   questions about whether people told him he wasn't in

16   violation of state law has nothing to do with him being in a

17   school zone, would be irrelevant, and is an attempt to bring

18   a nullification entrapment by estoppel without even meeting

19   the elements of that defense.

20             So, again, it's simply not relevant testimony in

21   this case.

22             THE COURT:  I agree with the government.  The

23   motion is granted, the motion in limine.  What's relevant

24   here today is whether the defendant violated federal law and

25   whether he knew he was in a school zone while he possessed a

6

1    firearm on the public sidewalk.

2         And people telling him whether he had violated

3    state law or not is not relevant to the question of

4    violation of federal law, so I will grant that motion in

5    limine.

6         MR. GODFREY:  And, Your Honor, if I may proceed?

7         THE COURT:  Yes.

8         MR. GODFREY:  The second legal issue the United

9    States wanted to bring up in this case, which we briefed in

10   our trial brief in this case, is that the defense has not

11   noticed a duress defense.  By law in the Ninth Circuit, he

12   would have been required to make a prima facia showing of

13   duress in the pretrial offer of proof to present that

14   evidence or argument.  He has not done that.

15        He could not make that showing, even if he had

16   attempted to.  So -- and the reason the United States

17   briefed this issue is because the defendant in his interview

18   and at various times has made statements that there was this

19   ex-neighbor of his named Carpenter, who was the reason he

20   was in the school zone with the firearm because he was

21   afraid of him and this person was out to get him.

22        That is a duress defense because that is defense

23   that the reason he was breaking federal law was because he

24   was under threat.  However, as I noted in my trial brief,

25   the duress defense requires an immediate threat of danger or

7

1     death, which he can't show, and it would require him to

2     have, prior to trial, made a prima facia showing in an offer

3     of proof to this Court to present that defense which is why

4     this wasn't addressed in motions in limine, because he would

5     have to notice this up and prove it.

6          But because he made these previous statements, I

7     just want to make it clear for the Court and defense that

8     the United States would object to any questions about this

9     David Carpenter being a threat to him because that amounts

10    to a duress defense, which he has not noticed, and so I just

11    wanted to make that clear for everybody.

12         If defense was going to do that, that is not

13    relevant, unless the Court allowed a duress defense, which

14    one has not been noticed; and two, he could not meet, so I

15    want to put that on the record as well.

16              THE COURT:  Okay.

17              Mr. Hart.

18              MR. HART:  Thank you, Your Honor.

19         We have not noticed a duress defense; however, the

20    investigation into this matter, that is the majority of what

21    was talked about with Mr. Metcalf, that was the subject

22    of -- I anticipate there is going to be an exhibit by the

23    government consisting of a recording of an interview that he

24    gave to ATF Agents Strobel and Martian where that was talked

25    about a lot.

8

1              That has been testified to a couple times in this

2    case by Agent Strobel.  I believe it does have some

3    relevance to this case; however, we are not planning on

4    asserting a duress defense or asserting any kind of

5    justification, but I think it does have relevance, Your

6    Honor.

7              THE COURT:  Okay.

8              MR. GODFREY:  If I may respond, Your Honor?

9              THE COURT:  You may.

10             MR. GODFREY:  The United States did -- does have

11   the defendant's interview as a potential exhibit.  The only

12   reason the United States would play that interview is if

13   this testimony got in.  Because it would, you know, go to --

14   because then it would be in.  The United States doesn't

15   intend to play that exhibit for the jury unless this was

16   allowed to be in.

17             In terms of the fact that there is previous

18   testimony about this, his state of mind regarding the

19   statement was certainly relevant at a detention hearing for

20   the magistrate judge to decide, you know, whether he should

21   be released to the public or not, which ultimately the

22   magistrate made the decision to do.

23             However, at trial it is a duress defense to say, "I

24   was afraid of this guy.  The reason I had the gun in the

25   school zone, was I was out there because this guy was out to

9

1    get me." And if that evidence is allowed, that is a duress

2    defense, because the jury would have to be instructed as to

3    why that would be allowed to justify him to be in the school

4    zone or not.

5          Because, otherwise, it's just irrelevant testimony

6    that doesn't -- that doesn't relate to any element. The

7    defendant would essentially be admitting to the charge

8    saying, "Yes, I was in the school zone, but I had a

9    justification," as defense counsel said, "because I was

10    under duress to be in the school zone."

11          And, again, to present that evidence at all, they

12    would have had to notice it and make a prima facia showing,

13    which they could not do, because it requires an immediate

14    threat of death or physical harm.

15          As I noted in my trial brief, the Ninth Circuit

16    refers to this as the proverbial gun to your head that, you

17    know, "I had to go into the school zone because that was the

18    only way to maintain my safety."

19          So the defendant should not be allowed to talk

20    about duress evidence without having notice of duress

21    defense and made that showing to the Court, which he cannot

22    do.

23          The United States will not present that evidence,

24    and I'd agree if I did, we would have opened the door to it,

25    and then defense could present that evidence.

10

1          But given they haven't noticed duress and it's

2    irrelevant, the United States, again, and as indicated, it

3    appears defense does intend to ask questions relating to

4    that.  The Court should preclude that.

5          THE COURT:  Okay.  Did you have something you

6    wanted to add, Mr. Hart?

7          MR. HART:  I do, Your Honor.

8          I mean there was an investigation of this matter.

9    There were several 911 calls.  Government is planning on

10   calling four witnesses that called 911 to state that

11   Mr. Metcalf was out near his property with the firearm.

12         I anticipate there's going to be testimony about

13   how fearful that made them, which is irrelevant to this

14   issue of whether Mr. Metcalf was in a school zone.  It seems

15   like the investigation of this matter consists of

16   Mr. Metcalf's motivation for being in the school zone and

17   the reaction that people had to seeing him there -- or to

18   being in his yard, to being near the school, and people's

19   reaction to seeing him there.

20         THE COURT:  Okay.  Well, it's not being in his

21   yard; it's being on the public sidewalk.

22         MR. HART:  Correct.

23         THE COURT:  Right.  Okay.

24         MR. HART:  Correct.  And we have callers that said

25   they saw him on the yard.  We have callers that say they saw

11

```
 1    him on the sidewalk.  Nobody was particularly concerned
 2    about which location it was.  They were concerned --
 3              THE COURT:  Well, I am.
 4              MR. HART:  Correct.
 5              We're going to have four witnesses come in here and
 6    testify to that.  I think context is important in this case.
 7              THE COURT:  Okay.  Well, the fact that a criminal
 8    investigation involves a number of different lines of
 9    questioning and discussions and so forth doesn't mean that
10    all of those things, all those areas that were discussed in
11    an interview or all the things that were motivating an
12    investigation are relevant at trial.
13              And the Court has to look at the evidence through
14    the relevancy rule, and there's no assertion of a duress
15    defense.  I agree the Ninth Circuit law is clear that if
16    there was going to be a duress defense, the defendant would
17    have had to have given notice of that and made an offer of
18    proof as to that defense.
19              And the elements that the government has cited in
20    its trial brief, and they cite the *Moreno* case and *United
21    States vs. Vasquez-Landaver*; none of that has been done
22    here, none of those requirements have been fulfilled.
23              And the argument the defense counsel made a moment
24    ago is that they were not asserting a duress defense and
25    they were not asserting any justification for the
```

12

```
 1   defendant's actions, and so there is -- that evidence about
 2   Mr. Carpenter is irrelevant and that motion is granted.
 3           MR. GODFREY:  May I proceed, Your Honor?
 4           THE COURT:  You may, but while we're talking about
 5   it, maybe before you proceed, we have a number of lay
 6   witnesses indicated on the government's witness list.  And,
 7   of course, we briefly know what they are going to testify
 8   to.
 9           But I would agree with defense counsel that the
10   fact they were afraid is not relevant.  If we have witnesses
11   who are talking about seeing the defendant in his yard,
12   that's not a violation of federal law, as I determined in my
13   prior ruling, and so it needs to be witnesses who are
14   testifying that he's on the public sidewalk with the firearm
15   within the school zone.
16           And so I would agree that the fact that they are
17   afraid is not relevant, and it seems to be an emotional
18   argument to the jury that wouldn't be appropriate.
19           MR. GODFREY:  I agree with that, Your Honor.
20           We do have one witness that only saw the defendant
21   in his yard, but that witness is also an identification
22   witness so that's the purpose for us calling that witness is
23   because she knows the defendant, can identify him, and saw
24   him with the gun that is at issue, so that's why that
25   witness would be called.
```

13

1       THE COURT:  Okay.  Go ahead.

2       MR. GODFREY:  And the next thing I wanted to

3  address was the United States did make two plea offers in

4  this case.  The first plea offer was to a recommendation of

5  a probationary sentence.  The second plea offer was an

6  11(c)(1)(C) where both parties stipulated to a probationary

7  sentence in this case.

8       My understanding is that those plea offers have

9  been rejected because I have not heard anything from defense

10  in terms of the defendant accepting those plea offers, so I

11  wanted to put that on the record that the United States has

12  made plea offers in this case.

13       The best plea offer was to an 11(c)(1)(C) to a

14  probationary sentence, pleading to the count at issue in

15  this case, and I just want it on the record that the

16  defendant has not accepted that plea offer.

17       THE COURT:  Okay.

18       MR. GODFREY:  And then, finally, as the Court is

19  aware, for the jury to decide forfeiture, one of the parties

20  has to ask for the jury to be the one to decide whether or

21  not the forfeiture should happen in this case, which would

22  be the firearm that's involved.  The United States has not

23  made that request.

24       I asked defense if the defendant was going to ask

25  for that.  If the defendant asks for that, that's fine; we

14

1  will prepare forfeiture instructions for the Court this

2  evening.  But if he wants the Court to decide it, we don't

3  have to address that at trial, so I just wanted to raise

4  that issue this morning.

5              THE COURT:  Okay.

6              Well, as to the forfeiture, Mr. Hart?

7              MR. HART:  We'd ask the Court to decide, Your

8  Honor.

9              THE COURT:  Okay.  And I'm sure you did, but for

10  purposes of the record, you received the two plea offers

11  from the government, right, Mr. Hart?

12              MR. HART:  Yes, Your Honor.

13              THE COURT:  And did you discuss those plea offers

14  with your client?

15              MR. HART:  Yes, Your Honor.

16              THE COURT:  And you feel he has had adequate time

17  to consider those plea offers and make a well-informed

18  decision about whether or not to accept them?

19              MR. HART:  I do.

20              THE COURT:  Okay.  And since we are here, I assume

21  that he is -- has rejected those plea offers?

22              MR. WERNER:  If I may, Your Honor?

23              THE COURT:  Go ahead.

24              MR. WERNER:  Let us have a moment.  I will not ask

25  for a long delay.  I just want to make sure I've spoken to

15

```
 1   Mr. Metcalf, just in light of what has happened in court,
 2   too, and make sure he understands.  I'll be brief, if I may?
 3          THE COURT:  Okay.  And do you want to do that while
 4   we're all here or do you want us to take a recess?
 5          THE DEFENDANT:  If the Court's willing to take a
 6   five-minute recess, we would more than appreciate it.
 7          THE COURT:  Okay.  Court's in recess.
 8      (Whereupon, a recess was had from 8:50 a.m. until
 9   9:19 a.m.)
10          THE COURT:  And so, Mr. Hart, I have now been
11   presented with an executed plea agreement.  So, again, do
12   you feel like you -- your client has had sufficient time to
13   consider the plea offer and the contents of that plea
14   agreement and so forth?
15          MR. HART:  I do, Your Honor.
16          We received the plea offer late last week, spent
17   some considerable time with Mr. Metcalf, and I think in
18   light of the Court's rulings today, he has decided to sign
19   that plea agreement and wishes to go forward with the guilty
20   plea today.
21          THE COURT:  Okay.  And the government, I guess,
22   will have to make an oral offer of proof under the
23   circumstances, and are you prepared to do that?
24          MR. GODFREY:  We will use our trial brief, Your
25   Honor; that has the factuals.
```

16

1          THE COURT:  Okay.  All right.  All right.  Well,
2     then we will proceed to a change of plea hearing in this
3     matter.
4          So, Mr. Godfrey, for the record, could you please
5     state the essence of the plea agreement.
6          MR. GODFREY:  Yes, Your Honor.
7          The defendant will plead guilty to the sole charge
8     in the indictment.  The plea agreement is governed by Rule
9     11(c)(1)(C) of the Federal Rules of Criminal Procedure.
10    Insofar as that the parties agree to an 11(c)(1)(C) to a
11    probationary sentence, if the Court rejects the plea
12    agreement, the defendant would then have the opportunity to
13    proceed to trial.
14         The United States agrees to recommend that the
15    defendant be given acceptance of responsibility, if
16    appropriate, under the guidelines.  There is also a waiver
17    of his appeal in the agreement based on the concessions made
18    by the United States.
19         The defendant knowingly waives any right to appeal
20    or collateral attack any aspect of the sentence, including
21    conditions of probation of supervised release.  This waiver
22    includes challenges to the constitutionality of any statute
23    or convictions and argues that the admitted conduct does not
24    fall within any statute of conviction.
25         This does not prohibit the right to pursue a

17

```
1   collateral challenge alleging ineffective assistance of
2   counsel.  He is also allowed to appeal the denial of his
3   motion to dismiss that was previously addressed by the
4   Court, arguing that 922(q) is unconstitutional and that the
5   Montana exemption would apply in his case.
6           The defendant also waives the right to appeal any
7   aspect of the sentence imposed below or within the guideline
8   range upon a revocation of supervised release in this case
9   number, except where he unsuccessfully objects to the grade
10  of violation applied by the Court during the district court
11  revocation proceedings.
12          In that event, this waiver would not apply, and the
13  defendant may appeal the sentence imposed upon a revocation
14  of supervised release, even if that sentence falls below or
15  within the guideline range calculated by the Court.
16          There is the explanation of his constitutional
17  rights, and the two -- again two principal provisions of
18  this plea, it's an 11(c)(1)(C) to a probationary sentence,
19  and he maintains the right to appeal the denial of his
20  motion to dismiss.
21          And that is the agreement, Your Honor.
22          THE COURT:  Okay.  And does the government believe
23  that this is the most favorable offer presented to the
24  defendant?
25          MR. GODFREY:  It was, Your Honor.
```

18

1          THE COURT:  Okay.

2          And, Mr. Hart, do you agree that's an accurate

3    description of the plea agreement?

4          MR. HART:  I do, Your Honor.

5          THE COURT:  Do you agree that the plea agreement

6    represents the most favorable offer your client received

7    from the government?

8          MR. HART:  I do.

9          THE COURT:  Okay.

10         Mr. Metcalf, if you could please stand and raise

11   your right hand, the clerk will swear you in.

12                    **GABRIEL COWAN METCALF,**

13   having been first duly sworn by the clerk, testified as

14   follows:

15         THE COURT:  Mr. Metcalf, do you understand that you

16   are now under oath, and if you answer any of my questions

17   falsely, that your answers could later be used against you

18   in another prosecution for perjury or making a false

19   statement?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Today I must determine whether your

22   plea of guilty is entirely voluntary and being made on an

23   informed basis, and that you fully understand the following:

24   The charge against you, the consequences of pleading guilty,

25   the potential penalties you face, the rights you are

19

```
1    waiving, and I must satisfy myself that the government could
2    prove the charge in the indictment.
3            Do you understand that?
4            THE DEFENDANT:  Yes.
5            THE COURT:  Would you state your full name for the
6    record, please.
7            THE DEFENDANT:  Gabriel Cowan Metcalf.
8            THE COURT:  And where were you born?
9            THE DEFENDANT:  Montrose, Colorado.
10           THE COURT:  How old are you?
11           THE DEFENDANT:  Forty-nine.
12           THE COURT:  Are you married?
13           THE DEFENDANT:  No.
14           THE COURT:  Do you have any children?
15           THE DEFENDANT:  No.
16           THE COURT:  What education have you had?
17           THE DEFENDANT:  High school.
18           THE COURT:  So you have a high school diploma?
19           THE DEFENDANT:  GED.
20           THE COURT:  GED, okay.  Are you working?
21           THE DEFENDANT:  No.
22           THE COURT:  And have you worked in the past,
23   though?
24           THE DEFENDANT:  Yeah, yes.
25           THE COURT:  What kind of things have you done for a
```

20

1    living?

2        THE DEFENDANT:  Carpentry, towing, restaurant,

3    kitchen work, variety of other stuff.

4        THE COURT:  Okay.  And is there a reason that

5    you're not employed currently?

6        THE DEFENDANT:  I'm providing care and property

7    maintenance for my mother, care for the household.  And it's

8    difficult to -- for me to make a commitment to a regular

9    schedule considering the sort of issues that arise

10   concerning my commitments to the -- my mother and my loved

11   ones at the household.

12       THE COURT:  Okay.  In exchange for that, I assume

13   you get room and board and --

14       THE DEFENDANT:  Clothes.

15       THE COURT:  -- basically.

16       THE DEFENDANT:  Food and clothes and yeah, a place

17   to stay.

18       THE COURT:  Okay.  Have you ever been treated for

19   any kind of mental illness?

20       THE DEFENDANT:  No, I have not.

21       THE COURT:  Have you ever been treated for an

22   addiction to alcohol or drugs of any kind?

23       THE DEFENDANT:  No, I have not.

24       THE COURT:  Do you take any prescription

25   medication?

21

1          THE DEFENDANT:  No, I do not.

2          THE COURT:  Would you say that you are under the

3    influence of any drugs, alcohol, or medication of any kind

4    this morning?

5          THE DEFENDANT:  No, ma'am.

6          THE COURT:  And so, obviously, we were set to go to

7    trial today, but now with the execution of the plea

8    agreement, this is now a hearing with regard to your change

9    of plea.

10          You understand that, Mr. Metcalf?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  And did you receive a copy of the

13    indictment that was filed in this case?

14          THE DEFENDANT:  Yes, I did.

15          THE COURT:  Did you read that document?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Do you understand what you've been

18    charged with in the indictment?

19          THE DEFENDANT:  Yes, fully.

20          THE COURT:  And have you discussed the charge in

21    the indictment with your attorneys, Mr. Hart and Mr. Werner?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Have they discussed with you your case

24    in general and, specifically, have they talked to you about

25    the evidence that the government has against you?

22

```
1            THE DEFENDANT:  Yes.
2            THE COURT:  Have they talked to you about the facts
3    that the government has to prove in order to convict you of
4    the charge?
5            THE DEFENDANT:  Yes.
6            THE COURT:  Have they talked to you about any
7    possible defenses you might have to the charge?
8            THE DEFENDANT:  Hmm.
9            THE COURT:  There may not be any or there may be,
10   so if they think --
11           THE DEFENDANT:  I have heard of ideas.
12           THE COURT:  Okay.  The point of my questioning is,
13   have your attorneys discussed fully with you the facts the
14   government has to prove --
15           THE DEFENDANT:  (Nod of head.)
16           THE COURT:  -- the evidence against you, and
17   whether you'd have a defense to the charge?
18           THE DEFENDANT:  Hmm, doesn't seem like an effective
19   defense against it; I mean, the evidence that the
20   prosecution has --
21           MR. HART:  We have talked about it, right?
22           THE DEFENDANT:  Yeah, we have talked about it.
23           THE COURT:  Okay.
24           THE DEFENDANT:  Yeah.
25           THE COURT:  Do you feel you've had sufficient time
```

23

```
 1    to meet with Mr. Hart and Mr. Werner to discuss the

 2    consequences of pleading guilty here today as opposed to

 3    going to trial?

 4              THE DEFENDANT:  Yes.

 5              THE COURT:  Did they investigate the case to your

 6    satisfaction?

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  Are you satisfied with their

 9    representation and advice?

10              THE DEFENDANT:  Yes.

11              THE COURT:  Do you need any more time to talk with

12    your attorneys before we proceed with the change of plea?

13              THE DEFENDANT:  No.

14              THE COURT:  You understand that you've been charged

15    in the indictment with unlawful possession of a firearm in a

16    school zone in violation of 18 United States Code Section

17    922(q)(2)(A)?

18              THE DEFENDANT:  Yes.

19              THE COURT:  Do you understand that if you plead

20    guilty to that charge and if I accept your plea, that you

21    face a maximum punishment of five years' imprisonment, a

22    maximum fine of $100,000, and three years of supervised

23    release?

24              THE DEFENDANT:  Yes.

25              THE COURT:  However, there is a binding aspect to
```

24

1   the plea agreement that you and the government have entered

2   into which states that if I were to disagree with the

3   binding sentencing recommendation of probation, that then

4   you could go to trial; you understand that?

5           THE DEFENDANT:  Yes.

6           THE COURT:  And are you aware that parole has been

7   abolished with respect to federal crimes so if you were

8   sentenced to prison, you wouldn't be released on parole,

9   you'd have to serve your entire sentence, less any good

10  time?  This is just in general.

11          THE DEFENDANT:  Yes.

12          THE COURT:  Do you understand that if you are

13  sentenced to a term of supervised release, or in this

14  circumstance the probation that both your counsel and the

15  government are recommending, that there will be numerous

16  conditions that you'll have to comply with?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Do you understand that if you don't

19  comply with those conditions that your supervised release or

20  your probation could be revoked?

21          THE DEFENDANT:  Yes.

22          THE COURT:  And if your probation was revoked, do

23  you understand that then you could be sent to prison for

24  violating the conditions?

25          THE DEFENDANT:  Yes.

25

```
 1            THE COURT:  Okay.  Now, do you have a copy of the
 2   plea agreement in front of you, Mr. Metcalf?
 3            THE DEFENDANT:  Yes, I do.
 4            THE COURT:  Okay.  I would like to talk to you
 5   about that plea agreement.  Could you turn to the very last
 6   page of that agreement, it's page 9.
 7            THE DEFENDANT:  Yes.
 8            THE COURT:  Do you see where your name is typed on
 9   page 9?
10            THE DEFENDANT:  Yes.
11            THE COURT:  Is that your signature immediately
12   above your typed name?
13            THE DEFENDANT:  It is.
14            THE COURT:  Now, did you just sign this plea
15   agreement a few minutes ago?
16            THE DEFENDANT:  Yes.
17            THE COURT:  Okay.  And it's my understanding, from
18   what Mr. Hart has previously stated, that your attorneys
19   received this plea agreement offer from the government on
20   Friday, I believe.
21            Is that right, Mr. Hart?
22            MR. HART:  I believe so, Your Honor.
23            THE COURT:  Okay.  So did Mr. Hart and/or
24   Mr. Werner visit with you on Friday about the contents of
25   this plea agreement?
```

26

1           THE DEFENDANT:  Yes.

2           THE COURT:  Okay.  And did they visit with you

3    again this morning when we took our recess about the

4    contents of the plea agreement and --

5           THE DEFENDANT:  Yes.

6           THE COURT:  -- basically, the rulings I have just

7    made and so forth?

8           THE DEFENDANT:  Yes.

9           THE COURT:  Okay.  So do you feel like you've had

10   adequate opportunity to review the plea agreement prior to

11   signing it this morning?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Do you feel like you understand the

14   terms of the plea agreement that you've signed?

15          THE DEFENDANT:  I do.

16          THE COURT:  Do you have any questions whatsoever

17   about the terms of the plea agreement?

18          THE DEFENDANT:  No.

19          THE COURT:  Okay.  Do you agree that the plea

20   agreement represents the most favorable offer that the

21   government has made to you in this case?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Does it represent the entire agreement

24   that you have with the United States Government?

25          THE DEFENDANT:  Yes.

27

```
1              THE COURT:  Has anyone made any promises to you
2    that aren't contained within that plea agreement in order to
3    get you to plead guilty this morning?
4              THE DEFENDANT:  No.
5              THE COURT:  Now, the plea agreement, as we have
6    discussed, contains some binding conditions.  Do you
7    understand that, Mr. Metcalf?
8              THE DEFENDANT:  Yes.
9              THE COURT:  And by that I mean binding on the
10   Court, do you understand?
11             THE DEFENDANT:  (Nod of head.)
12             THE COURT:  So what's binding on the Court is that
13   the joint recommendation for a probationary sentence.  Do
14   you understand that?
15             THE DEFENDANT:  Yes.
16             THE COURT:  So if I were to decide, particularly
17   after reading the presentence report that will be prepared,
18   that I didn't agree with that probationary sentence
19   recommendation, do you understand that then you could
20   withdraw your plea of guilty and go to trial?
21             THE DEFENDANT:  I do.
22             THE COURT:  Okay.  Also contained within paragraph
23   3 of the plea agreement is the consent of the United States
24   that you could, even upon your plea of guilty and ultimately
25   being sentenced, appeal my ruling that was adverse or
```

28

```
 1    denying your motion to dismiss?

 2              THE DEFENDANT:  I do.

 3              THE COURT:  And that requires the consent of the

 4    Court also, and I do consent to that, to you being allowed

 5    to appeal that ruling.

 6              Again, the only time that consent wouldn't matter

 7    from me is if I ultimately decided that I didn't agree with

 8    the probationary sentence, and then you could go to trial.

 9    You understand that?

10              THE DEFENDANT:  I do.

11              THE COURT:  Okay.  Now, there -- we'll get to that

12    in a moment.

13              Is anyone forcing you to plead guilty or has anyone

14    threatened you in any way to get you to do so?

15              THE DEFENDANT:  No.

16              THE COURT:  Have you ever been convicted of a

17    felony in state or federal court before?

18              THE DEFENDANT:  No.

19              THE COURT:  Do you understand that by pleading

20    guilty here today, you lose valuable civil rights such as

21    the right to vote, to hold public office, to serve on a

22    jury, and you won't ever be allowed to possess a firearm,

23    ammunition, or other dangerous devices as defined by federal

24    law?

25              THE DEFENDANT:  I do.
```

29

1          THE COURT:  Do you understand that if you are not a

2    citizen of the United States, in addition to the other

3    possible penalties you are facing, a plea of guilty may

4    subject you to deportation, exclusion, or voluntary

5    departure from the United States and prevent you from

6    obtaining United States citizenship?

7          THE DEFENDANT:  Yes.

8          THE COURT:  With regard to sentencing, do you

9    understand that your sentence will be determined by a

10   combination of the Advisory Sentencing Guidelines and any

11   possible variances or authorized departures from those

12   guidelines and other statutory sentencing factors?

13          And, basically, in this situation, what that means

14   for you, Mr. Metcalf, given that we have this binding plea

15   agreement, is that regardless that there is this binding

16   recommendation for probation, I still have to determine what

17   your sentence -- what your sentencing guidelines would be

18   under the United States Sentencing Guidelines --

19          THE DEFENDANT:  Yes.

20          THE COURT:  -- do you understand?

21          THE DEFENDANT:  Correct.

22          THE COURT:  And I would only determine your

23   sentence pursuant to those guidelines, if in fact, I

24   rejected the plea agreement and you went to trial and were

25   convicted or you pled guilty without the plea agreement.  Do

30

1    you understand that?

2            THE DEFENDANT:  I do.

3            THE COURT:  Okay.  And have your attorneys talked

4    to you about what the guideline sentence would be if you

5    were to have been convicted at trial today for example?

6            THE DEFENDANT:  They have.

7            THE COURT:  Okay.  Now, before we get to

8    sentencing, a presence report will be prepared, and the

9    U.S. Probation Officer, who is the author of that, will

10   calculate your total offense level and your criminal

11   history.

12           And this process I'm talking about now is all

13   geared toward a determination of what your guideline

14   sentencing range would be.  So do the terms "total offense

15   level" and "criminal history" and "criminal history

16   category," are those familiar terms to you?

17           THE DEFENDANT:  Yes.

18           THE COURT:  There are various factors that are

19   taken into consideration in determining the total offense

20   level.  We start with a base offense level that is assigned

21   to the offense pursuant to the guidelines, and then if there

22   are factors that would increase that level, then we would

23   add those to the base offense level.

24           If there are factors that would decrease that

25   level, we subtract them from the base offense level.  And

31

1    after doing that mathematical calculation, we get to what we

2    call the adjusted offense level.

3          And the government, apparently, has agreed, even

4    though this is the day of trial, that you could take

5    advantage of the three-point reduction -- or it just the two

6    points that you're going for, the two points?  It's not

7    timely.

8          MR. GODFREY:  It would be two points, and it won't

9    make a difference in the guidelines because of the base

10   offense level of the statute, so it would never be there.

11         THE COURT:  Oh, sure.  Gotcha.

12         So the government is agreeing that if you plead

13   guilty today that then that adjusted offense level would be

14   reduced by two levels for your acceptance of responsibility,

15   and then we'd get to the total offense level.

16         Does that all of that sound familiar to you?

17         MR. HART:  May I have one second, Your Honor?

18         THE COURT:  I might have gotten you kind of

19   confused on that.

20     (Discussion held off the record between Mr. Hart and the

21   defendant.)

22         MR. HART:  Thank you, Your Honor.  I think we're

23   cleared up.

24         THE COURT:  Okay.

25         So you understand that minus two from the adjusted

32

1    offense level for acceptance of responsibility?

2              THE DEFENDANT:  I do.

3              THE COURT:  And I haven't calculated what the --

4    what your base offense level would be or anything like that,

5    but it sounds like the adjusted offense level would be less

6    than 16, and that's why you don't -- you wouldn't get

7    three-point reduction.  You would only be entitled to a

8    two-point reduction.  And Mr. Hart's explained that to you,

9    right?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Okay.

12             And then the presentence author would look at your

13   criminal history, and she'd look at every encounter you've

14   ever had with a law enforcement, and she would score those

15   encounters according to the guidelines and then total those

16   scores up for a total criminal history score that would then

17   be converted to one of six criminal history categories.

18             Do you understand that process?

19             THE DEFENDANT:  I do.

20             THE COURT:  Okay.  And there is a sentencing table

21   there on counsel table.  Do you see that, Mr. Metcalf?

22             THE DEFENDANT:  I do.

23             THE COURT:  Have you seen one of those before?

24             THE DEFENDANT:  Yes.

25             THE COURT:  And so for purposes of determining what

33

```
 1   your applicable guideline sentencing range is, after I've
 2   reviewed the final presentence report and ruled on any
 3   possible objections to that report, then I would determine
 4   what your total offense level is and what your criminal
 5   history category is, and then I simply go down and across on
 6   that table to where they -- those two columns intersect, and
 7   that tells me the applicable guideline range.
 8            Do you understand that?
 9            THE DEFENDANT:  I do.
10            THE COURT:  Okay.
11            I can't determine that guideline range today; first
12   of all, because I have not received the final presentence
13   report and so I have not been able to review that report or
14   to consider any of the objections and rule on the objections
15   to that report.
16            So what that means for you is if you intend to
17   plead guilty, you have to do so without knowing for certain
18   what ultimately the applicable guideline range will be.  Do
19   you understand that?
20       (Discussion held off the record between Mr. Hart,
21   Mr. Werner, and the defendant.)
22            MR. HART:  Thank you, Your Honor.  I think we're
23   clear.
24            THE COURT:  Okay.
25            Again, the discussion about the guideline range
```

34

```
 1    calculation, Mr. Metcalf, I have to do that --

 2              THE DEFENDANT:  Yes.

 3              THE COURT:  -- and determine what that is, and I

 4    have to do it properly.

 5              THE DEFENDANT:  I understand.

 6              THE COURT:  But that would only come into play if I

 7    rejected the plea agreement, and then you ultimately pled

 8    guilty or were convicted at trial; do you understand?

 9              THE DEFENDANT:  Okay.

10              THE COURT:  Because the plea agreement is a binding

11    agreement for a probationary sentence.

12              Do you understand that?

13              THE DEFENDANT:  Yes.

14              THE COURT:  Okay.  Do you have any questions about

15    that?

16         (Discussion held off the record between Mr. Hart,

17    Mr. Werner, and the defendant.)

18              MR. HART:  Thank you, Your Honor.

19              THE COURT:  Okay.  And with the exception of you

20    reserving your right to appeal my denial of your motion to

21    dismiss, Mr. Metcalf; otherwise, do you understand that

22    pursuant to paragraph 8 of the plea agreement that you have

23    waived your right to appeal the sentence that I impose?

24              THE DEFENDANT:  I do.

25              THE COURT:  And do you have any questions about the
```

35

1    waiver of your right to appeal that you've agreed to?

2              THE DEFENDANT:  No.

3              THE COURT:  In addition, if you plead guilty today,

4    you will be waiving other rights.  You have the right to

5    persist in your not guilty plea and to have this matter

6    tried to a jury of your peers; and of course, that's what we

7    were gathered here to do today, was to go to trial on this

8    indictment.

9              But the jury would be comprised of 12 people

10   randomly selected from the jury pool in the counties that

11   make up the Billings division of this court.  So do you

12   understand that if you plead guilty this morning, then we

13   won't proceed to trial today?

14             THE DEFENDANT:  I do.

15             THE COURT:  Do you understand that you have the

16   right to be represented by an attorney at trial and during

17   every stage of these proceedings?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Do you understand that Mr. Hart and

20   Mr. Werner have been appointed to represent you at no

21   expense to you?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Do you understand that at trial the

24   jury would be instructed as follows:  That you are presumed

25   to be innocent, that the government is required to prove the

36

```
 1    offense charged beyond a reasonable doubt to the
 2    satisfaction of all 12 jurors, and that all 12 jurors would
 3    have to unanimously agree that the government had proved
 4    your guilt beyond a reasonable doubt?
 5              THE DEFENDANT:  I do.
 6              THE COURT:  Do you understand that at trial you'd
 7    have the right to confront and cross-examine each of the
 8    government's witnesses through your attorneys?
 9              THE DEFENDANT:  I do.
10              THE COURT:  Do you understand that at trial you'd
11    also have the right to present evidence and call witnesses
12    in your defense?
13              THE DEFENDANT:  I do.
14              THE COURT:  And do you understand that if there
15    were witnesses who you wanted to have come and testify for
16    you, who were refusing to do so, that you could call upon
17    the power of the Court to make them come and testify?
18              THE DEFENDANT:  Yes.
19              THE COURT:  Do you understand that at trial you
20    have the right to remain silent and to not testify, unless
21    you chose to voluntarily waive that right?
22              THE DEFENDANT:  Yes.
23              THE COURT:  Do you understand today, however, that
24    you will have to waive your right against self-incrimination
25    and tell me what it is that you did that makes you plead
```

37

1  guilty?

2          THE DEFENDANT:  I do.

3          THE COURT:  Do you understand that at trial if you

4  chose not to testify or to present any evidence, that the

5  jury would be instructed that they could not use your

6  decision against you in determining your guilt or innocence?

7          THE DEFENDANT:  I do.

8          THE COURT:  Do you understand that the burden to

9  prove you guilty rests entirely upon the government, and

10  that you don't have to prove anything or present any

11  evidence?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Do you understand that if you were

14  convicted at trial, that you would have the right to appeal

15  your conviction and your sentence to the Ninth Circuit Court

16  of Appeals?

17          THE DEFENDANT:  Yes.

18          THE COURT:  And are you aware that that court has

19  the authority to reverse a sentence and/or a conviction if

20  it determines that errors were made or the trial wasn't

21  fair?

22          THE DEFENDANT:  Yes.

23          THE COURT:  So do you fully understand that by

24  pleading guilty here today, and if I accept your plea, that

25  we will not proceed to trial this morning?

38

1    THE DEFENDANT:  I do.

2    THE COURT:  And do you understand that you will

3 have waived all of the rights that I have gone over with

4 you?

5    THE DEFENDANT:  Yes.

6    THE COURT:  Now, the rights that you're waiving

7 today, do you understand that those are important rights

8 that are guaranteed to you by the United States

9 Constitution?

10    THE DEFENDANT:  I do.

11    THE COURT:  And so, Mr. Godfrey, could you please

12 explain the elements the government would have to prove

13 beyond a reasonable doubt before Mr. Metcalf could be

14 convicted of the charge.

15    MR. GODFREY:  Yes, Your Honor.

16    First, he knowingly possessed a firearm;

17    Second, the firearm had been transported from one

18 state to another or between a foreign nation and the United

19 States; and

20    Third, at the time the defendant possessed the

21 firearm the possession occurred at a place that the

22 defendant knew or had reasonable cause to believe was a

23 school zone.

24    THE COURT:  And, Mr. Hart, do you agree that's an

25 accurate statement of the legal elements?

39

1          MR. HART:  I do, Your Honor.

2          THE COURT:  Mr. Metcalf, do you understand what the

3    government would have to prove in order to convict you of

4    the charge?

5          THE DEFENDANT:  I do.

6          THE COURT:  Mr. McCarty -- that's not right --

7    Mr. Godfrey, I don't know where came from.

8          MR. GODFREY:  It's vaguely Irish, Your Honor, it's

9    completely fair.

10         THE COURT:  Mr. Godfrey, could you please

11   exchange the proof -- discuss the proof that you would

12   present to the jury he if we went to trial.

13         MR. GODFREY:  Yes, Your Honor.

14         If we went to trial, the United States would prove

15   that on or between August 2, 2023, and August 17, 2023, at

16   Billings, in Montana, various lay witnesses observed the

17   defendant on the sidewalk in the vicinity of Broadwater

18   Elementary School, which is a state grade school under

19   Montana law.

20         There were also witnesses that observed the

21   defendant go down an alley on both of the occasions on the

22   sidewalk, and in the alley, witnesses saw the defendant in

23   possession of a firearm.  That possession of the firearm

24   occurred on public grounds within the school zone as defined

25   by federal law.

40

1          The firearm was recovered by ATF pursuant to a

2    search warrant.  It was determined the firearm was

3    manufactured in Brazil, and the defendant purchased it in

4    Colorado, and; therefore, it traveled in and affected

5    interstate commerce.

6          The defendant was interviewed by law enforcement,

7    admitted to possessing the firearm on the sidewalk, and that

8    he knew that he was in a school zone.

9          THE COURT:  So, Mr. Metcalf, having heard the

10   government's offer of proof, is there anything in that offer

11   of proof that you disagree with?

12         THE DEFENDANT:  Um, at the time I did not realize

13   that I was in a school zone.

14         THE COURT:  Okay.  But do you understand that

15   whether you knew that or not is not a defense?

16         THE DEFENDANT:  I do.

17         THE COURT:  Okay.

18         And, Mr. Hart, did you hear anything in the

19   government's offer of proof that you thought was incorrect

20   based on your representation and investigation?

21         MR. HART:  No, Your Honor.

22         THE COURT:  Okay.  Well, I will grant the

23   defendant's motion to change his plea and allow him to

24   withdraw his not guilty plea to the charge in the

25   indictment.

41

1        Mr. Metcalf, how do you plead to the charge of

2  unlawful possession of a firearm in a school zone in

3  violation of 18 United States Code Section 922(q)(2)(A)?

4        THE DEFENDANT:  Guilty.

5        THE COURT:  So tell me in your own words,

6  Mr. Metcalf, what is it that you did that makes you plead

7  guilty?

8        THE DEFENDANT:  I entered into a school zone

9  carrying a firearm.

10        THE COURT:  Okay.  And do you agree or disagree

11  that the firearm was not manufactured in the state of

12  Montana and as a result went through interstate commerce --

13        THE DEFENDANT:  Yes.

14        THE COURT:  -- do you agree with that?  Okay.

15        So it is the Court's finding in the case of the

16  United States of America vs. Gabriel Cowan Metcalf,

17  CR 23-103-BLG-SPW, that the defendant is fully competent and

18  capable of entering an informed plea; that he is aware of

19  the nature of the charge and the consequences of the plea;

20  and that his plea of guilty is knowingly and voluntarily

21  made, supported by an independent basis in fact that

22  establishes each of the essential elements of the offense.

23        Mr. Metcalf, I believe that if a jury heard the

24  proof that the government has put on the record today, that

25  the jury would find beyond a reasonable doubt that you are

42

1    guilty.  And I'm further satisfied, based on your sworn

2    testimony today, that you are guilty; therefore, your guilty

3    plea is accepted, and you are now adjudged guilty of the

4    offense charged in the indictment.

5           And I will reserve my decision of whether to accept

6    or reject the plea agreement until I've had an opportunity

7    to review the final presentence report.  You may be seated.

8           The next thing that will happen in this process is

9    that a Presentence Investigation Report will be prepared.

10   United States Probation Officer Molly G. will be preparing

11   that report.  She will interview you for purposes of that

12   report.  You need to be truthful when you answer her

13   questions or it will negatively affect your sentencing.

14          But you do have the right to have your attorneys

15   present with you during that interview, and to follow their

16   advice if they were to advise you not to answer a particular

17   question.  Then Officer Molly will verify the information

18   you provide, and she'll gather other information.

19          She'll prepare a draft presentence report which you

20   will have an opportunity to review.  Please review it

21   carefully.  If you think it contains information that is not

22   correct, you need to bring that to the attention of your

23   attorneys, and they'll try to resolve those issues

24   informally with Officer Molly.

25          But they do have a right to file formal objections

43

 1    to the final presentence report on your behalf as do the

 2    attorneys for the government.  Then, if formal objections

 3    are filed, I'll rule on those at the time of sentencing.

 4          At the sentencing hearing, the government will

 5    argue to the Court as to what they feel is an appropriate

 6    sentence, and in this case we know that they will argue for

 7    a probationary sentence pursuant to the plea agreement.  And

 8    your attorneys will argue on your behalf and, again, we know

 9    that they will argue for a probationary sentence pursuant to

10    the plea agreement.

11          And, again, if I determined that a probationary

12    sentence was not appropriate, you would be allowed to

13    withdraw your plea of guilty and proceed to trial.  I will

14    set sentencing to occur on Friday, August 2nd at 9:30 a.m.

15    in this courtroom.

16          And Mr. Metcalf has been on pretrial release.  I'm

17    not aware of any violations that pretrial release.  Is there

18    any objection to that continuing?

19          MR. GODFREY:  Not from the government.

20          THE COURT:  Okay.

21          So, Mr. Metcalf, you will continue to be released

22    pending sentencing.  You'll continue to have to comply with

23    the conditions of your release that were previously ordered

24    by Judge Cavan.

25          And I'm going to have the prospective jurors

44

1    brought up to the courtroom so I can let them know what has

2    occurred and excuse them.  I don't necessarily think counsel

3    needs to be here for that.  You're welcome to be here for

4    that, but otherwise, I would excuse you, and Mr. Metcalf

5    doesn't have to stay for that, either, if he doesn't wish.

6          MR. HART:  Thank you, Your Honor.

7          THE COURT:  Okay.  All right.  So, Emily, can you

8    have Susan bring our jurors up.

9          THE CLERK:  Yes, Your Honor.

10     (All counsel and the defendant exited the courtroom at

11   9:57 a.m., and the jury assembled in the courtroom at

12   10:02 a.m.)

13         THE COURT:  Well, good morning, ladies and

14   gentlemen.  I'm Judge Watters and you might be wondering why

15   the courtroom is empty.  Well, you've been waiting because

16   the defendant decided to change his plea and plead guilty to

17   the charge.

18         And so what we've been doing while you've been

19   waiting, is I've been taking his plea, his guilty plea, to

20   make sure that all went through before I excused you because

21   if for some reason it didn't, then we would proceed to trial

22   this morning.

23         That will be good news for some, and I understand

24   it's very frustrating for others because some of you have

25   come quite a ways, and I'm certain that some of you didn't

45

1   have very good roads yesterday, and so I apologize for that,

2   even though it's not anything within our control,

3   necessarily.

4           But sometimes that's how it works.  I mean, I've

5   been doing this a long time, and sometimes it's the morning

6   of trial that it finally dawns on the defendant that we have

7   a group of citizens here ready to hear the case and

8   deliberate and come to a verdict, and it's then that it all

9   seems real, and they decide that they will just plead

10  guilty.

11          Just for your information, particularly those of

12  you who are from Billings, this case was the case about the

13  man carrying the firearm in front of the school or across

14  the street from the school that we all heard about, gosh,

15  now I have forgotten, last summer, right before school

16  started, last August.

17          And it was on Broadwater there in front of

18  Broadwater Elementary School, and it caused quite a stir, as

19  you can imagine.  You know, he felt like he was justified in

20  doing what he had done, and I think it was that that caused

21  him to resist pleading guilty to the charge.

22          But charges such as this, which the charge itself

23  is unlawful possession of a firearm in a school zone.  There

24  aren't a whole lot of defenses to that.  If you are in a

25  school zone, basically a thousand feet from, in this case

46

1    from the grounds of Broadwater School, and you have a

2    firearm, and you're on public property.

3         You can have a firearm in your private residence in

4    a school zone, but you can't have that firearm on public

5    property and the evidence was and would have been

6    demonstrated through a number of people who had seen him

7    walking on the public sidewalk and the public alleyway and

8    so forth across from Broadwater Elementary School.

9         And so the elements are fairly straightforward that

10   he possesses a firearm within that gun-free school zone, and

11   that means he's on part of the -- either in the street or

12   the sidewalk or the alley, some public portion of property

13   within that school zone with a firearm.

14        You know, he felt like he had been threatened by

15   his neighbor and some other things that justified his

16   conduct, but the fact of the matter is, that is not a

17   defense.  As I said, very straightforward, you either were

18   or you weren't, and I think finally when he got to the

19   courtroom, and we discussed the -- that that evidence

20   wouldn't come in because it isn't a defense, that he -- and

21   I know his lawyers told him that, but, you know, sometimes

22   they have to hear it from the judge.

23        So I think that's ultimately what made him decide

24   that he really did not have a defense to the charge, and it

25   was a straightforward trial, the elements are pretty simple,

47

1    and that he had, in fact, violated that federal statute, and

2    so he decided that he would plead guilty this morning.

3         So that means we don't have a trial, and we don't

4    need a jury.  But we do understand very much that it seems

5    like a real waste of time for you people, but I want you to

6    understand that it isn't necessarily, because as I say,

7    sometimes they have to just realize that people are here and

8    ready to hear their case and make a decision, that finally

9    they decide that the day has come and they need to take

10   responsibility.

11        So I hope the roads are better going back.  I don't

12   know that they will be.  It's snowing here like crazy or at

13   least it was when I came to the courthouse this morning, but

14   we do appreciate you coming.  It's just, we can't do it

15   without you, and so I'm sorry that you weren't able to

16   fulfill your role here, maybe have a more satisfying

17   experience.

18        But it is all part of the process, and having

19   prospective jurors show up is an absolute essential part of

20   our justice system.  So thank you, again, for coming, but

21   you're free to go now.  And for those of you have a long

22   drive ahead, safe travels.

23        Thank you very much and we're adjourned.

24      (Whereupon, the proceedings concluded at 10:09 a.m.)

25

48

**CERTIFICATE OF REPORTER**

1

2      I, Kim Marchwick, a Registered Professional

3  Reporter and Certified Realtime Reporter, do hereby certify

4  that the foregoing 47 pages of transcript is a true and

5  correct record of the proceedings given at the time and

6  place hereinbefore mentioned; that the proceedings were

7  reported by me in machine shorthand and thereafter reduced

8  to typewritten form using Computer-Aided Transcription; that

9  after being reduced to typewritten form, a certified copy of

10 this transcript will be filed electronically with the court.

11     I further certify that I am not an attorney for nor

12 employed by, nor related to any of the parties or attorneys

13 to this action, nor financially interested in this action.

14     Whereupon, this document was signed by me in

15 Billings, Montana, this Monday, the 23rd day of September,

16 2024.

17

18

19           */s/ Kim Marchwick*

20           Kim Marchwick
             Registered Professional Reporter
21           Federal Certified Realtime Reporter
             Certified Realtime Reporter
22           2601 2nd Avenue North
             Billings, Montana 59101
23           (406) 671-2307
             marchwickkim@gmail.com
24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 23-103-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER |
| GABRIEL COWAN METCALF, | |
| Defendant. | |

Before the Court is Defendant Gabriel Cowan Metcalf's Motion to Dismiss Indictment.    (Doc. 31).    Metcalf was charged with violating 18 U.S.C. § 922(q)(2)(A) – Unlawful Possession of a Firearm in a School Zone.  (Doc. 19). Metcalf seeks dismissal of the count on the grounds that (1) § 922(q) does not apply to his conduct because he was licensed under Montana law to carry a firearm within a school zone, and (2) § 922(q) is unconstitutional as applied[1] to him under the analytical framework established by *New York State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).

For the following reasons, the Court denies Metcalf's motion.

---

1. Metcalf asserts a facial challenge in his motion, and his briefing reflects this, even though he claims on page 2 of his brief to be asserting an as-applied challenge. (*See* Docs. 31 at 1; 32 at 2, 10–11).  Whether Metcalf is making an as applied or a facial challenge does not change the outcome.

## I.     Legal Standard

Federal Rule of Criminal Procedure 12(b)(1) provides that a party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits. A pretrial motion is proper when it involves questions of law rather than fact. *United States v. Phillips*, 367 F.3d 846, 855 n.25 (9th Cir. 2004). The Court has determined that Metcalf's motion is appropriate for pre-trial resolution because it only involves questions of law.

## II.    Facts

Metcalf lives across the street from Broadwater Elementary School, a public elementary school in Billings, Montana. (Doc. 32 at 2). In August 2023, local law enforcement received several complaints about Metcalf carrying his firearm across the street from the school.[2] (Doc. 33 at 4). Callers reported Metcalf carrying his firearm while walking in his yard, following cars down the street, and following a cleaning service employee up a neighbor's driveway and causing the employee to run inside to seek safety. (*Id.*). Local law enforcement confronted Metcalf, and he told them that he "patrol[led]" the neighborhood to protect himself and his mother from a stalker against whom his mother had a protection order.[3] (*Id.* at 5). The officers could not prevent Metcalf from carrying his firearm because Montana law

---

2. Metcalf's house sits within 1,000 feet of the school.
3. The stalker in question is currently pending trial for a felony violation of that order of protection. (Doc. 32 at 8 n.1).

does not prohibit the carrying of a firearm across the street from a school. (Doc. 32 at 9). *See* Mont. Code Ann. §§ 45-8-356(8).[4]

Around the time the schoolyear began, two federal agents confronted Metcalf. (*Id.*). During their conversation, Metcalf told them that the federal Gun-Free School Zones Act was unconstitutional, and he would not stop carrying his firearm. (Doc. 33 at 5). Metcalf also admitted to the federal officers that he had stepped off his private property onto the public sidewalk while carrying his firearm. (*Id.*).

On August 21, 2023, U.S. Magistrate Judge Timothy Cavan issued a warrant for Metcalf's arrest for Unlawful Possession of a Firearm in a School Zone in violation of 18 U.S.C. § 922(q). (Doc. 2). Metcalf was arrested the next day. (Doc. 4).

## III.   Analysis

18 U.S.C. § 922 makes illegal under federal law certain persons possessing, acquiring, manufacturing, or selling firearms; certain types of firearms; and carrying a firearm in certain locations. 18 U.S.C. § 922(q), enacted via the Gun-Free School Zones Act, specifically prohibits the possession of firearms within a school zone, or the area within a 1,000-foot radius of a school. 18 U.S.C. §§ 922(q)(2)(A); 921(a)(26). Congress enacted 18 U.S.C. § 922(q) (the "Gun-Free School Zones Act"

---

4. Section 45-8-356 prohibits the carrying of a firearm "in a school building as determined by the school board pursuant to 45-8-361", but does not prohibit the carrying of a firearm outside the school building or in a school zone. Mont. Code Ann. § 45-8-356

or the "Act") because it found that crime involving drugs and guns was a "pervasive, nationwide problem," that violent crime in school zones had caused a decline in the quality of education in the country, and that school systems had unsuccessfully attempted to control gun-related crime. 18 U.S.C. § 922(q)(1)(A), (F), (G), (H).

Section § 922(q)(2)(B) contains seven exemptions from the prohibition on carrying guns within school zones. *See* 18 U.S.C. §§ 922(q)(2)(B)(i)–(vii). Relevant in this case are the exemptions for firearms possessed by a person licensed under state law, § 922(q)(2)(B)(ii), and firearms on private property not part of school grounds, § 922(q)(2)(B)(i).[5] Section § 922(q)(3) prohibits the discharge of firearms in a school zone, and § 922(q)(4) allows states to establish their own gun free school zones.

> A.     *Montana Law Does not Meet the Requirements for the State Licensure Exception in § 922(q)(2).*

Metcalf does not dispute that he was carrying a firearm within 1,000 feet of a school.   Rather, he argues he is exempted from the Act under 18 U.S.C. § 922(q)(2)(B)(ii), which reads:

> (ii) [I]ndividual[s] possessing the firearm [who are] licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law

---

5. Because 18 U.S.C. § 922(q)(2)(B)(i) exempts firearms on private property not part of school grounds, Metcalf was not in violation of 18 U.S.C. § 922(q)(2)(A) until he stepped onto the public sidewalk.

enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

18 U.S.C. § 922(q)(2)(B)(ii).  The Act defers to state licensing requirements in determining whether the federal law has been violated.  *United States v. Tait*, 202 F.3d 1320, 1324 (11th Cir. 2000).  For the state licencing requirement to exempt the holder, the licensing process must require that a law enforcement authority ensure that the holder is qualified under state law to receive a license.  *Id.* at 1324 (citing 18 U.S.C. § 922(q)(2)(B)(ii)).

Montana law provides two ways for a person to obtain a license to carry a firearm: through a concealed weapons permit and through Establishment of Individual Licensure ("Individual Licensure").[6] Mont. Code Ann. §§ 45-8-321, 45-8-360.  Individual Licensure applies to all persons—residents and non-residents— physically present in the state of Montana who are not otherwise prohibited from carrying a firearm under Montana law.  § 45-8-360.  The relevant portion reads:

> [A] person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and verified by the state of Montana within the meaning of the provisions regarding individual licensure and verification in the federal Gun-Free School Zones Act.

---

6. Individual Licensure applies to both open and "permitless" concealed carry.  *See* Mont. Code Ann. § 45-8-316 (exempting from fine or imprisonment for permitless concealed carrying of a weapon those who are "eligible to possess a firearm under state or federal law").  Montana also recognizes concealed carry permits issued by other states.  Mont. Code Ann. § 45-8-329.

*Id.* No additional steps are required before an individual is licensed under § 45-8-360.

Metcalf argues that, as he is exempted from the Act, the indictment should be dismissed. (Doc. 32 at 3–4). He reasons the following: he has a license to open carry in Montana under § 45-8-360; Montana law complies with the requirements in § 922(q)(2)(B)(ii) because the Montana legislature explicitly enacted Individual Licensure to comply with the Gun Free School Zones Act; and he is therefore exempted from the Act. (*Id.*).[7]

The Government does not challenge Metcalf's assertion that he was licensed under Individual Licensure. Rather, it argues that Montana's Individual Licensure, § 45-8-360, does not meet the requirement for the exemption in § 922(q)(2)(B)(ii) because it does not require local law enforcement to verify that the qualifications for licensure are met before considering a person licensed. (*Id.* at 6–8). Since the Montana statute does not impose clear qualifications before an individual obtains a license, licensure under Individual Licensure does not exempt a person from the requirements of § 922(q)(2)(A). (*Id.* at 8–9).

---

7. Metcalf also seems to argue that the Court should consider in its analysis the fact that Metcalf was not in violation of the Montana law restricting the carrying of weapons in a school building. (Doc. 32 at 4–5). Montana law restricts the carrying of a weapon in a school building, but not on school grounds or in a zone around the school. Mont. Code Ann. § 45-8-361. It is undisputed that Metcalf did not carry the firearm into the school, and he was not charged with a violation under Montana law, so § 45-8-361 is inapplicable here.

Metcalf responds that, in passing the Act, Congress delegated the enactment and implementation of licensing programs to the states instead of developing a uniform federal licensing scheme. (Doc. 36 at 3). As Congress did not provide any guidance on what "verification" and "qualified under law" mean, Metcalf seems to suggest that the Court should defer to Montana's interpretation of § 922(q)(2)(B)(ii) to allow automatic licensure to all those "not disqualified under law." (*Id.* at 5). He asserts that the federal government cannot "punt[]" this issue to the states in 1995 and then come back almost 30 years later and argue that the Montana law does not offer protection to gun holders in Montana. (*Id.* at 7). Metcalf also points out that, for years, Gart Spots, a federally licensed firearms dealer, operated within a school zone in Billings, and an indoor shooting range currently sits in the school zone of Washington Elementary School in Billings. (*Id.* at 8).

When a court interprets a statute, it must first "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S 337, 340 (1997) (internal citations and quotations omitted). The court's inquiry ceases if the "statutory language is unambiguous" and the "statutory scheme is coherent and consistent." *Id.* Here, the Court finds, and parties do not dispute, that the statutory language of the Act is unambiguous, and the statutory scheme is coherent and consistent. Thus, Metcalf violated federal law by possessing a firearm in a school zone unless (1) Metcalf was

licensed by Montana law, *and* (2) the Montana state law under which he is licensed requires that law enforcement authorities verify Metcalf was qualified to receive his firearm license before Metcalf obtained the license.  18 U.S.C. § 922(q)(2)(B)(ii).

Neither party disputes that Metcalf is licensed to possess a firearm under Montana law, so the issue before the Court is whether Individual Licensure complies with the requirements for the exemption in 18 U.S.C. § 922(q)(2)(B)(ii).  This is an issue of first impression.

For the exemption in § 922(q)(2)(B)(ii) to apply, the state law must require that a law enforcement officer "verify" that a person is "qualified" to hold a firearm before the license is issued.  *Id.*  The Oxford English Dictionary defines "verify" as to "assert, affirm, or confirm, as true or certain," requiring some kind of action on the part of the State.  *Verify, Oxford English Dictionary* (3d. ed.).  It defines "qualified" as having "qualities or possessing accomplishments which fit one for a certain end, office, or function[.]"  *Qualified, Oxford English Dictionary* (3d. ed.).  Accordingly, the Court reads the Act as follows: to exempt a licensee under § 922(q)(2)(B)(ii), Montana state law must require that, before an individual obtains a firearms license, a law enforcement authority "assert[s], affirm[s], or confirm[s], as true or certain" that a person "possess[es] accomplishments which fit" the individual to hold a license to carry a firearm.  Thus, while the Act gives deference to each state's decision as to whom it will issue licenses and how those licenses are

issued, the Act requires, at a minimum, that the state require some kind of process for law enforcement to determine whether a person is qualified to own a firearm before issuing a license.

Montana Individual Licensure does not meet this requirement because it automatically "consider[s]" every person in the state to be licensed then claws back licensure from those who have committed violent felonies or are disqualified by the Montana Constitution. In other words, there is no licensure process in place under § 45-8-360 where state or local law enforcement ensure that a person is qualified to carry a firearm before giving them a license. Thus, under the plain text of the Act, Individual Licensure under Montana Code Annotated § 45-8-360 does not meet the requirements for the exemption in § 922(q)(2)(B)(ii).

Legal scholarship supports the Court's conclusion, with one legal scholar writing that § 45-8-360 "likely doesn't exempt Montanans from the federal Act[.]" Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1528 n.349 (2009).

As to Metcalf's argument that the Montana legislature enacted Individual Licensure to comply with federal law, the Court recognizes that the Montana legislature effectively declared Individual Licensure compliant with the requirements for exemption from the Gun-Free School Zones Act. *See* Mont. Code

Ann. § 45-8-360.  But a state legislature cannot work around federal law by simply proclaiming that a state statute meets the federal requirement.  Proclamation of compliance does not override non-compliance on the face of the text.

Further, the Court is unpersuaded by Metcalf's suggestion that, because Congress did not provide any guidance on the meaning of "verification" and "qualified under law", the Court should defer to the Montana legislature's interpretation of § 922(q)(2)(B)(ii) to allow automatic licensure to all those "not disqualified under law."  As explained above, the plain text of the Act is unambiguous: exemption under § 922(q)(2)(B)(ii) only applies if the state law requires a law enforcement officer verify that a person is qualified to carry a firearm before deeming them licensed.

The Court also rejects Metcalf's argument that the federal government cannot adopt state standards and then come back almost 30 years later to argue that the state standards do not offer protection to gun holders in Montana.  Only one other case has been brought in the District of Montana under the Act since 1995.  In that case, brought in 2022, two defendants pled guilty to Possession of a Firearm in a School Zone after they left a loaded firearm in an elementary school playground.  *Offer of Proof*, *United States v. Fetter*, No. 1:22-cr-40 (D. Mont. Jul. 27, 2022), ECF No. 39.  The defendants there did not make a similar challenge.  Accordingly, the Government has never had to argue that Montana law does not qualify for the

exemption in § 922(q)(2)(B)(ii) before now because this is the first time that a party has argued that the exemption applies. The Government has not flipped its position on a whim, but rather is responding to novel challenges to the Act and evolving conceptions of gun control in light of intervening law, namely *Bruen*.

For these reasons, the Court finds that, while Metcalf was licensed under Montana law to carry a gun, his license does not exempt him from the requirements of the Gun-Free School Zones Act because Montana's Individual Licensure does not comply with federal law. Thus, when Metcalf walked on public property within a school zone while carrying a loaded firearm, he did so in violation of 18 U.S.C. § 922(q)(2)(A).

B.    *The Gun-Free School Zones Act does not Violate the Second Amendment.*

Metcalf alternatively argues that his indictment should be dismissed because 18 U.S.C. § 922(q) is unconstitutional as applied to this case in light of the Supreme Court's decision in *New York Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct 2111 (2022). In *Bruen*, the Supreme Court held that the Second Amendment protects an individual's right to carry a handgun for self-defense outside the home and rejected the means-end scrutiny test that courts of appeal had been applying when assessing the constitutionality of firearms regulations. 142 S. Ct. at 2122, 2127. Instead, the Court held that a court must apply the two-step test "set forth in *Heller*": (1) whether the conduct in question is covered by the plain text of the

Second Amendment, and (2) "whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131, 2134 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008)). When the challenged regulation addresses an issue that has persisted since the founding era, a lack of a similar historical regulation "is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131.

The Government has the burden to demonstrate that a law is consistent with the Nation's history and tradition. *Id.* at 2126, 2133. The Government does not need to point to an identical statute but only a "representative historical analogue." *Id.* at 2133. Importantly, when a court encounters "unprecedented societal changes or dramatic technological changes," the court must use a "more nuanced approach" in finding a historical analogue. *Id.* at 2132. Because the Constitution and Second Amendment were created to "be adapted to the various crises of human affairs," they can be applied to "circumstances beyond those the Founders specifically anticipated." *Id.* (citing *McCulloch v. Maryland*, 4 Wheat. 316, 416 (1819)). When analyzing the constitutionality of a firearms regulation, the Court considers the text of the Second Amendment's right to "keep and bear arms" as it was understood "when the people adopted [it.]" *Heller*, 554 U.S. at 634–35.

In a concurring opinion, Justice Kavanaugh, joined by the Chief Justice, agreed with the Court's opinion in full but underscored that "the Second Amendment

allows a variety of gun regulations," and that nothing in the Court's opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools[.]"  142 S. Ct. at 2162 (internal citations and quotations omitted).  *Accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.") (internal citations and quotations omitted).

Metcalf argues that, under *Bruen*, the Gun-Free School Zones Act unconstitutionally infringes on his Second Amendment rights because (1) the ban violates the Second Amendment by infringing on his right to carry a firearm, and (2) the Government cannot identify a historical analogue sufficient to justify the prohibition against possessing a weapon, so the Act's prohibition falls outside the Nation's historical firearm regulation. (Doc. 32 at 12–13 (citing 142 S. Ct. at 2133)). He argues that, while schools have been historically treated as sensitive places where the Second Amendment tolerates restrictions on the right to bear arms, the Act's prohibition of firearms in a school zone constitutes an inappropriate "legislative extension" of that space. (*Id.* at 13).

The Government responds that the Second Amendment does not protect Metcalf's "course of conduct" because the Supreme Court has made clear that the government may prohibit "the carrying of firearms into sensitive places such as schools[.]" (Doc. 33 at 2 (citing *Bruen*, 142 S. Ct. at 2133)). Even if the Second Amendment protects Metcalf's conduct, the Act's prohibition is nonetheless consistent with the Nation's historical tradition of firearms regulation. (*Id.* at 13–14). For historical precedents, the Government points to a Founding Era prohibition of firearms on the campuses of public universities, as well as 19th century laws banning firearms in schools. (*Id.* at 18–22).

*Bruen*'s first step requires that the Second Amendment's plain text cover the conduct burdened by 18 U.S.C. § 922(q)(2)(A). *See* 142 S. Ct. at 2126. The Court finds that the Second Amendment's text covers Metcalf's conduct in this case. The Second Amendment's plain text guarantees that "the right of the people to keep and *bear* Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). "Possession" is encompassed by the definition of the word "keep." *See Heller*, 554 U.S. at 582–83 ("Keep arms" was simply a common way of referring to possessing arms[.]"). Thus, the Second Amendment applies to Metcalf's possession of his firearm within a school zone.

In the next step of the analysis, the Court looks at whether a prohibition on the right to carry a weapon within a school zone is part of the Nation's history and

tradition of prohibiting weapons in "sensitive places." This presents two sub-issues: (1) whether the prohibition on possessing a firearm in a "sensitive place"—in this case, a school—is consistent with history and tradition, and (2) whether the prohibition on possessing a firearm within 1,000 feet of the "sensitive place" is consistent with history and tradition.

In *Heller*, the Supreme Court noted longstanding laws forbidding the carrying of firearms in "sensitive places." 554 U.S. at 626. Though there were few such "sensitive places" where weapons were completely forbidden in the 18th and 19th centuries, the Court considered it "settled" that the Second Amendment allows the government to prohibit the carrying of firearms in "sensitive places," including schools. *Bruen*, 142 S. Ct. at 2133. Thus, the government regulation of firearms in "sensitive places" is presumptively lawful. *Heller*, 554 U.S. at 627 n.26; *see Bruen*, 142 S. Ct. at 2133 ("[C]ourts can use analogies to these historical regulations of 'sensitive places' to determine that modern regulations prohibiting the possession of firearms in *new* and analogous sensitive places are constitutionally permissible."). Because Supreme Court jurisprudence allows governments to prohibit the possession of firearms in school buildings, the Court finds that Congress's prohibition on possessing firearms in a school does not violate the Second Amendment.

The question remains as to whether Congress may prohibit weapons in the 1,000-foot radius surrounding every school. The Western District of Texas has referred to this area as a "buffer zone," and the Court will as well. *See United States v. Allam*, No. 1:23-CR-10, 2023 WL 5846534, at *22 (E.D. Tex. June 14, 2023).

As an initial matter, the Court finds that the prevalence of school shootings both before and since the enactment of the Gun-Free School Zones Act constitutes an "unprecedented societal concern" that likely does not have a direct historical analogue. *See Bruen*, 142 S. Ct. at 2132. According to the Center for Homeland Defense and Security between 1970 and 2022, there were 2,069 school shootings, with 684 fatalities and 1,937 injuries; in 1970, there were 20 reported school shootings, growing to 249 by 2021; in 2021, 43% of all school shooters were students and 57% were non-students. Center for Homeland Defense and Security, *Shooting Incidents at K-12 Schools* (Jan. 1970–June 2022), https://www.chds.us/sssc/data-map/ (last visited November 21, 2023). By contrast, the only school shooting the Court could find in colonial North America occurred in the Pennsylvania Colony during the French and Indian War, and the second school shooting in this Nation's history appears to have occurred in Kentucky in 1853. Saul Cornell, *The Lessons of a School Shooting—in 1853*, Politico, March 24, 2018, https://www.politico.com/magazine/story/2018/03/24/first-us-school-shooting-gun-debate-217704/. It is thus highly unlikely that the Founders could have

anticipated the prevalence of gun violence today, and a more nuanced analysis of the historical regulations is warranted.

The Government points to a number of early regulations in this nation's history that governed the carrying of firearms. (Doc. 33 at 19). It first points to several bans on firearms by public universities. In 1810, the University of Georgia "ordained" that "no student shall be allowed to keep any gun [or] pistol . . . in College or elsewhere." (*Id.* (citing *The Minutes of the Senatus Academicus of the State of Georgia, 1799-1842* 86 (Aug. 1810)). In 1824, the Board of Visitors of the University of Virginia—a public university—banned students from keeping any weapon on the university campus. (*Id.* (citing *University of Virginia Board of Visitors Minutes* 6–7 (Oct. 1824)). In 1838, the University of North Carolina prohibited students from "carry[ing], keep[ing], or own[ing] at the College . . . any deadly weapon" and students could not "use firearms without permission from the president. (*Id.* (citing *Act of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina* 15 (Sept. 1838))).

The Court is unconvinced by evidence of these early university bans because they were not regulations on carrying weapons in "sensitive places." Rather, they banned certain persons—students—from carrying weapons. The University of Georgia restriction banned students from carrying weapons anywhere. Neither the

University of Virginia ban nor the University of North Carolina ban applied to faculty members or to members of the community, so they, too, only banned certain persons from carrying weapons. *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L.R. 205, 250 (2018).

The Government also cites several late 19th-century state restrictions on carrying weapons *inside* school buildings, including laws from Texas (1871), Mississippi (1878), Missouri (1879, 1883), Arizona (1889), Oklahoma (1890), and Montana (1903). (Doc. 33 at 19–20). The Court finds that these laws support restricting possession of guns in school buildings but not in the buffer zone around the school. *See* Law of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws 25–26; Law of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175–76; Law of Mar. 5, 1883, § 1, 1883 Mo. Laws 76; Law of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30–31; Law of Feb. 27, 1903, § 3, 1903 Mont. Laws 49–50. Additionally, the 1879 Missouri law banned the discharging of guns, not the possession of them, so it is not a proper historical analogue in this case. Law of Apr. 30, 1879, § 1, 1879 Mo. Laws 90

The parties have not cited a founding-era historical analogue where a "sensitive place" included an area as expansive as a 1,000-foot radius around a building. This restriction covers almost the entirety of every urban location in the

United States, including many places that have nothing to do with the closest school. Kopel & Greenlee, *supra*, 265.

The Court therefore will engage in its own analysis of the historical sources to locate a historical analogue to a law creating a "buffer zone" where firearms were not allowed around a "sensitive place."[8]  In the absence of historical regulations of firearms in buffer zones around schools, the Court believes election places to be a proper historical antecedent: the Founders believed voting and education to both be at the "very root of republican government." *See The Federalist No. 57 (James Madison)* (arguing that periodic elections provided rulers with a "habitual recollection" of their "dependence on the people,"); *Northwest Ordinance of 1787, art. III* (""Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged".); *see also* Letter from Thomas Jefferson to James Madison (Dec. 20, 1787), *in The Papers of James Madison Digital Edition* (J.C.A. Stagg, ed. 2010) (explaining that educating citizens was necessary "for the preservation of a due degree of liberty").

---

8. In its search for historic regulations, the Court found the same sources cited by both the Eastern District of Texas in *Allam* and by the District Court of the Virgin Islands.  2023 WL 5846534 at *22–25; *United States v. Walter*, No. 3:20-cr-0039, 2023 WL 3020321, at *6–8 (D.V.I. Apr. 20, 2023).  The Court comes to the same conclusion as both its sister courts—that the buffer zones around polling locations shows that a ban of firearms in buffer zones around "sensitive locations" like schools is consistent with this Nation's history and tradition.  *See* 2023 WL 5846534, at * 24–25; 2023 WL 3020321, at *6–8.

Polling places were historically considered "sensitive places" around which legislatures established a buffer zone where firearms were prohibited. *See Bruen*, 142 S. Ct. at 2133; *Allam*, 2023 WL 5846534 at *22. The 1776 Delaware Constitution prohibited the possession of firearms within one mile of a polling place for 24 hours before an election until 24 hours after the election closed. *Del. Const.* (1776) art. XXVIII. It did so for the purpose of "prevent[ing] any violence or force being used at the said elections." *Id.* Additionally, in the Reconstruction and post-Reconstruction Eras, where violence against Black voters threatened to subvert elections, several southern states prohibited people from carrying firearms within a fixed distance of a polling place to protect voters. For instance, Louisiana prohibited the carrying of any "dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration." Act of Mar. 16, 1870, § 73, 1870 La. Acts 160. An 1873 law in Texas prohibited the carrying of any firearm or other dangerous weapon within a half-mile of any polling or voting place. Kopel & Greenlee, *supra*, 246; *see also* 1895 Tex. Crim. Stat. ch. 3, art. 169. Maryland's 1874 prohibition was even broader: on election day, a person could not carry any weapon in Kent County, Queen Anne's County or Montgomery County. Act of Apr. 16, 1874, ch. 250, 1874 Md. Laws 336. Although the Supreme Court finds Founding Era statutes more

persuasive, in cases where Congress passes a firearms law to address unprecedented societal concerns, *Bruen* seems to allow a broader approach. 142 S. Ct. at 2133*; see, e.g., id. at 2154; Heller*, 554 U.S. at 632.

The Court finds the historic evidence sufficient to show that this Nation has a historic tradition of banning firearms in buffer zones around "sensitive places" that are necessary to "preserve the very root of republican government." The Colonial and post-Reconstruction laws that formed a buffer zone around the location of elections further persuades the Court that this Nation has a history and tradition of banning firearms within a certain proximity of "sensitive places" in order to hold safe and fair elections. Like voting, the Founders considered education essential for a responsible citizenry. The Court's conclusion under the *Bruen* analysis ensures that the law protects children from the deadly gun violence that threatens to subvert their first duty as citizens—to become educated.

There is no perfect historic analogue to 18 U.S.C. § 922(q)'s banning of firearms within 1,000 feet of a school because the Founders did not—and could not—foresee the level of gun violence in schools today. Still, the Nation does have a tradition of restricting firearms within a buffer zone of a "sensitive place." Thus, the Gun-Free School Zones Act, 18 U.S.C. § 922(q) does not violate the Second Amendment.

The Court feels it important to reiterate that Metcalf was not in violation of 18 U.S.C. § 922(q)(2)(A) while he possessed the firearm on his private property (home or yard).   18 U.S.C. § 922(q)(2)(B)(i).   Meltcalf violated 18 U.S.C. § 922(q)(2)(A) when he stepped onto the public sidewalk while possessing a firearm, when that public sidewalk was within 1,000 feet of a school. § 922(q)(2)(A). Thus, he was allowed to possess the firearm for home defense on his private property.

## III. Conclusion

Accordingly, the Court finds that Metcalf is not exempted from 18 U.S.C. § 922(q)(2)(A) because the Individual Licensure under Montana Code Annotated § 45-8-360 does not meet the requirements for exemption under 18 U.S.C. § 922(q)(2)(B)(ii). The Court further finds that the restrictions on gun possession in a school zone in 18 U.S.C. § 922(q)(2)(A) are constitutional, and Metcalf's facial challenge to the statute fails.   Accordingly, Metcalf's Motion to Dismiss the Indictment (Doc. 31) is DENIED.

DATED this _31st_ day of January, 2024.

SUSAN P. WATTERS
U.S. DISTRICT COURT JUDGE

RUSSELL A. HART
Assistant Federal Defender
Federal Defenders of Montana
Billings Branch Office
175 North 27th Street, Suite 401
Billings, MT  59101
Phone:  (406) 259-2459
Fax:  (406) 259-2569
russell_hart@fd.org
        Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **Case No. CR-23-103-BLG-SPW** |
| Plaintiff, | |
| vs. | **REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| GABRIEL COWAN METCALF, | |
| Defendant. | |

The Defendant, Gabriel Metcalf, submits this Reply in opposition to the Government's Response (ECF-33) and in support of his Motion to Dismiss the Indictment.  (ECF-31).

## INTRODUCTION

In its Response, the Government asserts that (1) Mr. Metcalf was not licensed to possess a firearm under Montana law because Mont. Code Ann. § 45-8-360 "does not

1

meet the federal requirements" of 18 U.S.C. § 922(q)(2)(B)(ii), (2) Mr. Metcalf's conduct was not covered by the Second Amendment and, thus, is not presumptively protected, and (3) even under the *Bruen* analysis, §922(q) is a valid infringement on the Second Amendment because it is consistent with the United States' historical tradition of firearm regulation.

### I.    Mont. Code Ann. § 45-8-360 and 18 U.S.C. § 922(q)(2)(B)(ii)

The Gun Free School Zones Act (GFSZA) was passed in 1990, then amended in 1995 following the United States Supreme Court decision in *United States v. Lopez*, 514 U.S. 549 (1995) holding that the GFSZA was an unconstitutional exercise of the Commerce Clause powers of the federal government.   It appears the Montana Legislature was following the *Lopez* case as it unfolded: Montana, in 1995, did not have a law that prohibited the carrying of weapons in a school.  That year, House Bill 258, which became Mont. Code Ann. § 45-8-361, and House Bill 332, which became Mont. Code Ann. § 45-8-360, were introduced, debated, passed by the legislature, and signed into law by the Governor between the oral argument in *Lopez* on November 8, 1994, and the Court's April 26, 1995, decision.  Section 361 created penalties for possessing any weapon in a school building (and for parents allowing their children to do so), while Section 360 appealed directly to the exception at §922(q)(2)(B)(ii), seeking to protect Montanans from prosecution for constitutionally protected activities

2

elsewhere within the federal "school zone" by verifying that persons not prohibited by law from possessing a firearm were qualified under the law, and granting such persons a license.

There is no denying Montana passed a lenient licensing law in Mont. Code Ann. § 45-8-360.  The Government, in its Response, argues that the exception at 18 U.S.C. § 922(q)(2)(B)(ii) "requires more than a state law licensing an individual to possess a firearm in a school zone".  Br. pg. 6.  While Montana's law is obviously more lenient than the Alabama law at issue in *United States v. Tait*, 202 F.3d 1320 (11th Cir. 2000) (cited by the Government in its Response), there is no other law on point specifically because Congress delegated this function to the states.

When Congress passed the GFSZA it likely noticed potential problems with such a broad prohibition extending 1,000 feet into residential areas from the thousands of "schools" in the United States and created a short list of exceptions.  One of those was §922(q)(2)(B)(ii).  It is worth noting that Congress, in 1990, absolutely could have developed a licensing structure that would be uniformly implemented across the 50 United States.  It didn't.  Instead, it placed the burden – financial, logistical and otherwise – upon the states to enact and implement their own licensing programs.

The GFSZA unquestionably restricted the Second Amendment rights of every person who lives somewhat near or even passes by a school.  Mr. Metcalf asserts it

3

does so in a way that does not square with *Heller* or *Bruen*: a person who lives within 1,000 feet of a school does not have the right to possess a functional firearm to protect against confrontation immediately outside their home as the GFZA is being applied to Mr. Metcalf.  The manner in which it is being applied to Mr. Metcalf demonstrates that the scope of this restriction is enormous: as of 2020, there were roughly 128,930 public and private prekindergarten, elementary, middle, and high schools in the 50 states and the District of Columbia that are "schools" under 18 U.S.C. §922(q)(2)(A)[1]. This does not include post-secondary institutions, of which there are at least two dozen in Montana.  The GFSZA directly impacts the second amendment rights of millions of citizens, especially if it were uniformly applied as it is being applied to Mr. Metcalf in this case.  By comparison, the population of the District of Columbia in the Census immediately preceding the Court's decision in Heller was 572,059.[2]

In *United States v. Tait*, the Defendant raised 18 U.S.C. § 922(q)(2)(B)(ii) in response to the same charge referenced in Mr. Metcalf's Indictment.  The United States argued that Tate's license in Alabama was "void" for purposes of §922(q) because "Alabama's requirements for verifying an applicants' qualifications are too relaxed to ever qualify their licensees for §922(q)(2)(B)(ii) protections".  *Tait*, at 1324.

---

1 https://nces.ed.gov/fastfacts/display.asp?id=84
2 https://www2.census.gov/census_2000/census2000/states/dc.html

The 11th Circuit rejected this argument, holding that, "[w]hile the Alabama law is extremely lenient, it is nonetheless the only pertinent law.  Alabama has chosen its laws, and these are the only laws which determine whether the federal statute's exception applies.  Alabama is free to set forth its own licensing requirements, and Congress chose to defer to those licensing requirements when it established 'qualified under law' as its criterion for the exception to the Gun-Free School Zones Act."  *Id.* (citations omitted).

Likewise, Mont. Code Ann. § 45-8-360 is the only law pertinent to the exception raised by Mr. Metcalf.  Not only did Congress decline to implement a uniform standard, it also did not provide any guidance on what constitutes "verification" or even what "qualified under law" means.  Montana interpreted the latter as meaning "not disqualified under law", which seems appropriate considering the GFSZA infringes on a fundamental constitutional right: all United States citizens who have not had the right stripped from them by some function of the Government are qualified under law to possess a firearm as a birthright.  Congress did not enumerate any additional requirement for issuance of a license under §922(q).  It appears the only qualification for a license under the GFSZA is that one not be prohibited from possessing a firearm by state or federal law, which is the same requirement for possessing a firearm anywhere in the United States.

5

To protect the right to bear arms – guaranteed to its citizens by the Montana Constitution – the 1995 Montana legislature sent a bill to the Governor – the top law enforcement official in Montana's Government – who signed the bill into law, verifying that all persons who had not lost the right under Montana's laws were qualified under the law to possess a firearm within a school zone.  Until that bill was signed by the Governor, the entire populace of Montana was "unverified" and, thus, unlicensed.  While Montana's law is lenient, §922(q)(2)(B)(ii) explicitly invited the patchwork of state licensing schemes that exist today.  The only Circuit Court to hear this issue dismissed the United States' argument and demonstrated significant hesitancy to second-guess a state law implemented in the face of such a federal delegation.  See *Tate*.

What the Government's argument suggests is that Congress' delegation to the states required that each state establish another layer of state government bureaucracy to protect their citizens from federal prosecution.  §922(q)(2)(B)(ii).  Seeing the scope of this broad encroachment and Congress' complete lack of will to engage in the licensure requirements, Montana acted broadly but within the requirements of the federal law.

What the United States has done via §922(q) is impose a complete federal ban on the possession of any functional firearm within 1,000 feet of a certain type of local

6

government building.  Local governments across the country strive to locate these types of buildings as evenly as they can throughout municipalities to ensure that no citizen is too far from one.  This suddenly created a federal jurisdiction that wove itself seamlessly throughout communities across the United States, carrying a criminal penalty for violating the ban.

Then, the United States completely punted to the states the issue of protecting its law-abiding citizens from federal prosecution for exercising a constitutional right within the statutorily created "Gun Free Zone".  The United States now prosecutes Mr. Metcalf on the theory that Montana's law, after almost 30 years on the books, was never good enough to protect him.  If the Government is correct, a sizable majority of Montana gun owners have likely violated §922(q) at some point in the last 33 years.

Congress tasked the states with protecting its citizens from federal prosecution under these very circumstances, and Montana has purported to provide that protection to its citizens for 28 years.  As the 11th Circuit said of the law at issue in *Tate*, Mont. Code Ann. § 45-8-360 is "the only pertinent law", and this is so because Congress designed it this way.  There is no way to understand the Government's argument other than to recognize the United States is telling this Court that anyone who has driven within 1,000 feet of a school with an unlocked firearm in their vehicle at any point since 1995 has committed the same offense Mr. Metcalf is charged with.

7

One needs only to look around the community to understand the law has never been enforced like this.  For many years after the GFZA was passed, Gart Sports – a federally licensed firearm dealer – sat directly across 24th Street West from Billings West High School.  Currently, within 1,000 feet of Washington Elementary School in Billings is an indoor shooting range.  There is no exception in §922(q) for this, and if Mont. Code Ann. § 45-8-360 is indeed invalid as the Government asserts, everyone who patronizes that establishment violates §922(q) with every visit.  Similar examples no doubt exist across the state and the country.  For the United States to have punted this issue to the states in 1995 and then argue in 2023 that Montana's 28-year-old law never offered any protection is precisely how well-intentioned legislation can turn into exactly what its opponents initially cautioned against.

## II.   Mr. Metcalf has met his burden

The Government argues that Mr. Metcalf has not met his burden to demonstrate that his conduct was covered by the text of the Second Amendment.  Mr. Metcalf has failed to carry that burden, says the Government, because he carried a firearm in a "settled" "sensitive place".  Br. at pg. 13.  The Government acknowledges that Mr. Metcalf had the right to carry his firearm for self-defense but argues "he may not do so anywhere he chooses."  *Id*.  The Complaint (ECF-1) makes clear Mr. Metcalf armed himself in response to numerous threats he'd received from a neighbor and that

8

the location of the school proximate to his house was incidental: he sought to arm himself in and within the immediate proximity of the home he was trying to protect.

It is not at all "settled" that the area within 1,000 feet of each of America's 128,930 public schools is a "sensitive place", and the Government worked hard in its Response to disregard the distinction.  However, the "historical analogues" cited by the Government and discussed in detail below emphasize the difference: the laws restricting possession of firearms in schools, at ratification, did not typically extend beyond the school building and bore little resemblance to §922(q).  The Government's argument would have the Court expand the "sensitive places" doctrine into a place that has not traditionally been seen as constitutionally "sensitive".

As it relates to Mr. Metcalf's burden, the Government's argument would write its interpretation of the "safe places" doctrine into the text of the Second Amendment. Not only would such a reading disregard Mr. Metcalf's conduct in direct contradiction of *Heller* and *Bruen*, but this is not how a textual analysis works: the text of the Second Amendment says nothing about the place or manner in which the right enumerated therein may be exercised.  If a place like the one where Mr. Metcalf possessed is alleged to have carried a firearm was recognized as a "safe place" at ratification, that is an argument appropriate for the Government to make as part of ***its*** burden to overcome the presumption of constitutional protection that attaches to Mr.

9

Metcalf's conduct.  The Government is attempting to shift that burden to Mr. Metcalf with this argument.

Mr. Metcalf's conduct in this case can only be described as carrying a firearm outside his home for self-defense.  That there was a school across the street was incidental as it relates to Mr. Metcalf's intentions with the firearm, but it concerned some citizens enough that several called law enforcement to report their observations of him.[3]  Officers responded to his residence several times, and each time they concluded he wasn't breaking any state laws.  The matter was debated over several days and, and Agent Stroble testified at Mr. Metcalf's preliminary hearing that at least one legal opinion was sought before the theory of Mr. Metcalf's prosecution was developed: when Mr. Metcalf was in his yard, his conduct was protected by the Second Amendment.  However, when he stepped onto the sidewalk, his conduct brought him into violation of §922(q).

This would not happen concerning a "settled" issue.  In fact, it is difficult to imagine a better example of conduct that is covered by the text of the Second Amendment but runs afoul of a regulation.  The Government's argument would

---

[3] Almost every caller reported they were calling out of an abundance of caution and that they just found his presence with a firearm to be odd.  Some were embarrassed about calling, most said they weren't sure if he was doing anything wrong.  The Government's briefing and argument in proceedings to this point have leaned almost exclusively upon the two reports it views as the most damaging to Mr. Metcalf.  Defense counsel would only caution that, among the people who contacted law enforcement, a few presented as having inherently excitable personalities.

10

liberally supplement the text of the Second Amendment with its *Bruen* argument in a way that would impermissibly shift its burden onto Mr. Metcalf.

### III.   <u>The Government's historical analysis.</u>

The Second Amendment was ratified in 1791. *Heller* and *Bruen* make it clear that even long-standing laws can violate the rights guaranteed by the Second Amendment. *Heller* struck down a law passed in 1975, while Bruen struck down laws enacted in 1905 and 1911, respectively. The length of time §922(q) has been in effect does not weigh in the Government's favor.[4]

In its Response, the United States points to several historical restrictions on the right to possess firearms it considers analogous to §922(q). The only two which predated ratification were rules of conduct for students at Harvard and Yale Universities in the 17th century. Harvard and Yale were then and are now private educational institutions. These prohibitions, propounded by private entities and applicable only to willing subjects of their institution, are not in any way analogous. The Second Amendment, at the time of ratification, applied only to the Federal Government. Following *McDonald*, it also applies to state government action. Never, however, has the Court held that the Second Amendment prohibits a private employer

---

4 As has been addressed throughout the briefing, §922(q) became effective in 1990 but was deemed unconstitutional in US v. Lopez, 514 US 549 (1995). Five and one half months later, the law was amended to cure its constitutional defect. The version of the GFSZA in effect during the time referenced in the Indictment has been in place since October of 1995, which was ***after*** Mont. Code Ann. § 45-8-360 was enacted.

11

or educational institution from restricting its employees or students from possessing firearms while on campus or at work.

The other Second Amendment restrictions presented by the Government as analogues are addressed below.

### A.   Public University Prohibitions

The public university restrictions identified by the United States were propounded in 1810, 1824, and 1838, respectively.  The 1824 University of Virginia rule prohibited students from "keep[ing] or us[ing] weapons of arms of any kind", but only "within the precincts of the University".  Mr. Metcalf has not suggested at any point that the second amendment prohibits educational institutions – even public ones – from restricting the possession or use of firearms by students on the school grounds themselves.  Even in drafting a rule limited to its own students, however, the University of Virginia did not go so far as to prohibit the carrying of a firearm within an enumerated distance of its campus.

The University of Georgia's 1810 ordinance prohibited students from possessing a firearm "in college or elsewhere", while the University of North Carolina, in 1838, prohibited possession by students on campus and required students to obtain permission from the university president to use firearms.  Again, a student code of conduct is different from a federal criminal statute, even if it provides for

12

penalties.  Had Broadwater elementary implemented a restriction analogous to any of the public university restrictions cited by the Government – or even those of private institutions like Harvard or Yale – Mr. Metcalf's conduct in this case would not have violated it: each applied only to students.  None restricted the rights of any person who didn't first seek and then gain admission to the University, and they certainly didn't curtail the rights of any non-student who lived near or passed by its vicinity.  The Government offers no case law analyzing these prohibitions, and none appears to exist.

## B.    <u>State Restrictions</u>

The United States points to seven 19th and early 20th century state laws that restrict firearm possession relating to schools.  It did not point to any law that was in effect at ratification.  Each case referenced in the Government's Response is addressed below.

In 1871, Texas prohibited "any person" from carrying "a pistol or other firearm" into "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes."  The portion of this statute that restricts firearm possession relative to a school only restricted possession in a "school

13

ER_101

room", like Montana's § 45-8-361 does today.  The conduct alleged in the Indictment would not have violated this law.[5]

In 1878, Mississippi prohibited "any student of any university, college or school" from carrying, concealed or partially concealed, a pistol or other deadly weapon."  Like the university prohibitions addressed above, this applied only to students and did not affect the rights of anyone merely within a specified vicinity of a school.  Unlike §922(q), the law only prohibited these students from carrying "concealed or partially concealed weapon[s]".  The conduct alleged in the Indictment would not have violated this prohibition.

In 1879, Missouri also prohibited "any person" from discharging "any gun, pistol, or fire-arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes."  Of the laws offered by the Government to meet its burden, this law may be the most analogous to §922(q): it prohibits certain activities within a specified distance of a school.  However, this law prohibited only the "discharging" of a firearm within a certain distance of a school, not the mere possession of one like §922(q).

A separate 1883 Missouri law prohibited "any person" from carrying "any kind of fire arms" into (inter alia) "any school room or place where people are assembled

---

5 The portion which prohibits possession in any "other place where persons are assembled for amusement or for educational or scientific purposes" is common to several of these post-ratification statutes and is addressed below.

14

for educational, literary or social purposes". In 1889, Arizona prohibited "any person" from carrying "a pistol or other firearm" into "any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes." In 1890, Oklahoma (1890) and Montana (1903) enacted statutes with identical language to the Arizona law. The conduct alleged in the Indictment would not have violated these prohibitions, as Mr. Metcalf is not alleged to have entered a school room with a firearm.

Interestingly, these laws do not purport to prohibit the possession of a firearm on school grounds or even within a school building: they are limited to the "school room". It appears one could possess a firearm on the school grounds, in an out-building, or even in the lobby of a school building without violating any of these laws. The Government has offered no case law interpreting these statutes, and none likely exists. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court commented on the historical rarity of Second Amendment litigation, cautioning that "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field...". *Heller*, at 635. Absent litigation on this issue, we are left with the text. The Government is unable to demonstrate that any of these laws prohibited possession of a firearm on

15

school grounds, within certain parts of a school, and certainly not within 1,000 feet of one.

Each law cited above which restricts the right to *possess* a firearm – with the exception of Mississippi's law prohibiting only public university *students* from carrying a firearm anywhere – does so first explicitly within a "school room". Section 922(q) purports to expand the sensitive place recognized in these cases three times: once from the school room to the school building. Again, to from the school building onto the "school grounds". Then, once again, to an area within 1,000 feet of the school's grounds. This expansion is precisely what Mr. Metcalf takes issue with. The Government has not identified a single law that supports such an expansion and has ignored the distinction in its briefing.

The laws cited from Montana, Oklahoma, Arizona, Texas, and the 1883 Missouri law also prohibit possession at a "place where persons are assembled for educational, literary, or social purposes." The Government presents this language as a historical analogue for extending the "school room" prohibition beyond the school room, apparently to any place where people "assemble". Setting aside that each of these laws were enacted well after ratification and any deferring comment on their constitutionality had they been analyzed post-*Bruen*, the Indictment alleges Mr. Metcalf committed his offense between August 12 and August 17, 2023. School did

16

not start in Billings until August 22, 2023.  Even if the Government were to rely on this extremely broad interpretation, Broadwater Elementary was not a place where "persons [were] assembled" for any purpose between August 12 and August 17, 2023, and there is no evidence Mr. Metcalf set foot on the school grounds while possessing a firearm at any time.

*Heller* and *Bruen* made clear that at various times between 1791 and present day, our society and culture have tolerated laws that infringed upon the Second Amendment in ways that the Constitution does not tolerate under the currently applicable analysis.  Each of the laws cited by the United States were enacted after ratification, none were challenged in court, and some may well be found unconstitutional if challenged today.  However, the Court need not address the constitutionality of any historical example posed by the Government, as none are sufficient to overcome the presumption that §922(q), as it is being applied to Mr. Metcalf, is unconstitutional.

## CONCLUSION

Congress delegated the implementation of a licensing scheme wholesale to the States in 1990 and Montana followed Congress' charge in 1995 when it enacted Mont. Code Ann. § 45-8-360.  Either Mr. Metcalf enjoyed those protections between August 12 and August 17, 2023, or the law has been void all along as the Government argues.

17

As the 11th Circuit said in *Tate*, "[Montana] is free to set forth its own licensing requirements, and Congress chose to defer to those licensing requirements when it established 'qualified under law' as its criterion for the exception to the Gun-Free School Zones Act." *Tate*, at 1324. The GFSZA, however well-intentioned, impermissibly purported to expand the "safe places" doctrine of constitutional law via statute deep into residential communities across the country. The expansion of federal prosecutorial authority was, in hindsight, immense. Not only did it function to federalize the streets and sidewalks surrounding millions of homes, *Heller* and *Bruen*, demonstrate that Congress exceeded its authority as it existed when the Second Amendment was ratified when it enacted the GFSZA.

To follow the Government's argument would strip Montanans of the protection from federal prosecution they've had for 28 years. Congress had the opportunity to implement a uniform standard when it passed the GFSZA in 1990, and again in 1995 when it was amended. Instead, it invited the patchwork of state licensing systems that followed, and the United States has now at least twice gone to court arguing that a citizen should bear the consequences for what it deems an insufficient state licensing system – one Congress explicitly declined to implement themselves and delegated to the states.

The historical examples provided by the Government are simply not analogous to the GFSZA: there is no historical analogue for prohibiting possession of a weapon in the ways the GFSZA infringes upon the Second Amendment.  Schools are uniquely interwoven into our communities unlike just about any other type of building.  When one spends some time in this case, they cannot help but notice how often they come within 1,000 feet of a school's "grounds" in day-to-day life.  This was likely not the case in 1791, but governments would not go this far even then prohibiting possession only within the "school room".

For the reasons stated herein and in the Defendant's Motion, Mr. Metcalf respectfully repeats his request that the Indictment in this matter be dismissed.

RESPECTFULLY SUBMITTED October 31, 2023.

/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
Counsel for Defendant

19

## CERTIFICATE OF SERVICE
### L.R. 5.2(b)

I hereby certify that on October 31, 2023, the foregoing document was served on the following persons by the following means:

| 1, 2 | CM-EDF |
| ____ | Hand Delivery |
| __3__ | Mail |
| ____ | Overnight Delivery Service |
| ____ | Fax |
| ____ | E-Mail |

1.   CLERK, UNITED STATES DISTRICT COURT

2.   THOMAS GODFREY
     Assistant United States Attorney
     United States Attorney's Office
     2601 2nd Avenue North, Suite 3200
     Billings, MT  59101
           Counsel for the United States.

3.   GABRIEL COWAN METCALF
           Defendant

                              /s/ Russell A. Hart
                              RUSSELL A. HART
                              Federal Defenders of Montana
                                    Counsel for Defendant

**THOMAS K. GODFREY**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**James F. Battin U.S. Courthouse**
**2601 Second Ave. North, Suite 3200**
**Billings, Montana 59101**
**Phone: (406) 657-6101**
**FAX: (406) 657-6989**
**Email: Thomas.Godfrey@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 23-103-BLG-SPW** |
| **Plaintiff,** | |
| **vs.** | **UNITED STATES'** **RESPONSE TO** **MOTION TO DISMISS** |
| **GABRIEL COWAN METCALF,** | |
| **Defendant.** | |

Defendant Gabriel Cowan Metcalf has filed a motion to dismiss the

indictment in this matter.  Metcalf asserts the indictment should be dismissed for

two reasons: (1) the defendant argues his conduct is covered by the exception in 18

U.S.C. § 922(q)(2)(B)(ii); and (2) the defendant argues that 18 U.S.C. § 922(q)

violates the Second Amendment as construed in *New York State Rifle*

1

& *Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) and *District of Columbia v. Heller*, 554 U.S. 570 (2008).

His claim to the exception in Section 922(q)(2)(B)(ii) fails because that exception only applies where "the law of the State . . . requires that, before an individual obtains [a license to possess a firearm in a school zone], the law enforcement authorities of the State . . . verify that the individual is qualified under law to receive the license."  The Montana law that Metcalf relies upon, Mont. Code Ann. § 45-8-360, includes express qualifications for a person to be "considered to be individually licensed" for purposes of the exceptions to the Gun-Free School Zones Act: excluding individuals (1) convicted of a violent, felony crime," or (2) otherwise not "able to own or to possess a firearm under the Montana constitution." The statute, however, does not require that law enforcement authorities of the state verify that the individual meets those qualifications before obtaining a license. Because the Montana provision does not meet the federal requirements for the exemption to apply, Metcalf's firearm possession was not exempted.

His claim under the Second Amendment fails for two reasons, either of which is sufficient to deny relief.  First, the Second Amendment does not protect Metcalf's "course of conduct." *Bruen*, 142 S. Ct. at 2134.  The Supreme Court has repeatedly made clear that the government may prohibit "the carrying of firearms in sensitive places such as *schools* and government buildings." *Bruen*, 142 S. Ct. at

2

2133 (*quoting Heller*, 554 U.S. at 626) (emphasis added); *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality).

Second, even assuming the Second Amendment "presumptively protects" Metcalf's conduct, Section 922(q)(2) is valid because it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2130. The nation has a long tradition of regulating firearms in "sensitive places," including schools, consistent with the original understanding of the Second Amendment. *Id.* at 2118. The Founding generation heavily regulated firearms on the campus of public universities. And starting in the latter half of the 19th century, some States heavily regulated firearms in and near schools. In some ways the restrictions were narrower than Section 922(q)(2). But in other ways they were broader, and there was no apparent dispute about their constitutionality. Further, under *Bruen*, a modern-day restriction need not be a "dead ringer for historical precursors." *Id.* at 2133. It need only be "relevantly similar" to the precursors in "how" and "why" it burdens the "right to armed self-defense." *Id.* at 2132-2133. Section 922(q)(2) passes that test.

The United States respectfully requests the Court deny the motion to dismiss.

3

## FACTS[1]

In August of 2023 Billings Police Department received multiple 911 calls reporting Metcalf walking in the area of Broadwater Avenue in Billings, Montana carrying a firearm directly across the street from Broadwater Elementary School which provides education from kindergarten through fifth Grade.  Metcalf lives directly across the street from Broadwater Elementary School.  Callers reported seeing Metcalf walking with a firearm on multiple occasions directly across the street from the school.  Callers also reported Metcalf following cars down the street while carrying a firearm.  In one incident, Metcalf followed a cleaning service employee up the driveway of a neighbor's house while armed with a firearm, causing her to flee inside to seek safety.  Callers reported Metcalf standing on the sidewalk facing the school staring into traffic while armed with a firearm.  All of this occurred directly within view of and directly across the street of the Elementary School.

---

[1] It is not entirely clear from Metcalf's papers whether he intends his constitutional challenge to be a facial challenge to the statute or a challenge as applied to his particular conduct.  The result is the same in either case.  *See United States v. Butts*, 637 F. Supp. 3d 1134, 1135 (D. Mont. 2022) (noting that challenge to the constitutionality of 18 U.S.C. § 922(g)(1) failed on both facial and as applied challenges).  To the extent necessary, however, the United States is prepared to show that Metcalf cannot show that his conduct was protected.

4

Law enforcement spoke to Metcalf and his mother about his conduct.  Both stated that Metcalf would "patrol" the neighborhood with a firearm including to his mother's shop at the corner of 5th Steet West and Broadwater.  Metcalf stated he did this because he believed he was being "gang-stalked" by a former neighbor and the neighbor had "agents" who worked for him.  Metcalf stated he would walk around the block and survey down the streets to attempt to identify vehicles of his "gang-stalkers."  He stated he would carry his shotgun during these patrols.

Metcalf made further statements that made law enforcement concerned about his mental stability.  He stated he stands watch at night and only sleeps a few hours in the morning and the first thing he does when he leaves his front door is check for incendiary devices and explosives around the house.  Metcalf stated that his former neighbor had attempted to poison him and his yard, attempted to burn down his house, and had set up a trap involving gasoline, a leaf blower, and a nearby lawnmower to mask Metcalf's screams.

When told about how his conduct was concerning Metcalf stated that the federal school gun zone act was unconstitutional and would not commit to stopping his conduct.  Law enforcement then executed a search warrant on Metcalf's residence and recovered the shotgun he described patrolling with as well as ammunition for the shotgun.

5

# ARGUMENT

**I.    Metcalf does not meet the exception in 922(q)(2)(B)(ii) because the Montana law he relies upon does not meet the federal requirements for the exception.**

Section 922(q)(2)(B)(ii) provides:

> Subparagraph (A) does not apply to the possession of a firearm ... if **[1]** the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and **[2]** the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license.

18 U.S.C. § 922(q)(2)(B)(ii) (interpolations added).

The exception requires more than a state law licensing an individual to possess a firearm in a school zone.  It makes clear that, for the exemption to apply, the law of the state must *require* that *before an individual obtains a license* that *law enforcement authorities* of the state verify that the individual is qualified under law.  *Id.*

The Eleventh Circuit has found that the licensing requirement of 922(q)(2)(B)(ii) is met when under state law a sheriff of a county may license an individual after they apply, and the sheriff determines the applicant has a

6

proper reason for carrying a pistol and is a suitable person to be licensed.[2] *United States v. Tait*, 202 F.3d 1320, 1324 (11th Cir. 2000). The Eleventh Circuit noted "[b]y its basic terms, the statute merely requires that the Alabama sheriff ensured that Tait was qualified under *Alabama law* to receive the license." *Id.* In other words, the determination of the qualifications for licensure are a matter of state law, but the requirement that law enforcement, in this case the Alabama sheriff, "ensure" that the individual was qualified before obtaining a license was a matter of federal law.

Here, Montana law creates qualification necessary to be "considered" licensed but does not require that state law enforcement verify that those qualifications are met before an individual obtains a license. As a result, the statute does not contain the elements necessary for the exception in 922(q)(2)(B)(ii) to apply. Montana law includes language containing qualifications necessary to be "considered" licensed under 922(q)(2)(B)(ii) in MCA 45-8-360:

> In consideration that the right to keep and bear arms is protected and reserved to the people in Article II, section 12, of the Montana constitution, a person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and

---

[2] "The sheriff of a county may, upon application of any person residing in that county, issue a qualified or unlimited license to such person to carry a pistol ... if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed." Code of Alabama Section 13A-11-75.

verified by the state of Montana within the meaning of the provisions
regarding individual licensure and verification in the federal Gun-Free
School Zones Act.

Mont. Code Ann. § 45-8-360.

Montana law establishes qualifications excluding individuals from potential
licensure.  The Montana statute restricts the licensing to "a person who has
not been convicted of a violent, felony crime and who is lawfully able to own
or to possess a firearm under the Montana constitution." Mont. Code Ann. §
45-8-360.  Those qualifications are at the discretion of the state.  The
qualification set out by a state can be "extremely lenient," as were those
Alabama required in *Tait*.  202 F.3d at 1324.

As evident by the plain language of the statute, however, Montana's
code does not require that "*before an individual obtains such a license*, the
law enforcement authorities of the State or political subdivision verify that
the individual is qualified under law to receive the license." 18 U.S.C. §
922(q)(2)(B)(ii).  Indeed, by stating that certain persons are "considered"
licensed, Montana makes clear that no qualifications check can occur "before
an individual obtains a license."  The verification of qualifications, however,
is a requirement of the federal statute for the exemption to apply.  The
qualification imposed can be extremely lenient, but law enforcement still

8

must "ensure" an individual is qualified by law prior to being licensed.  *Tait*, 202 F.3d at 1324.

Nor does it help Metcalf that the Montana statute says that individuals meeting the criteria shall be "considered . . . verified."  Mont. Code Ann. § 45-8-360.  Stating that individuals who meet the qualifications are considered verified, and requiring law enforcement authorities to determine if those qualifications are met are two different things.  Federal law, not state law, governs our interpretation of federal statutes.  *United States v. Diaz*, 838 F.3d 968, 972 (9th Cir. 2016); *see also United States v. Norbury*, 492 F.3d 1012, 1014 (9th Cir. 2007) ("Whether a defendant's prior state conviction was a 'conviction' [within the meaning of § 841] is a question of federal, not state, law.").  Section 922(q)(2)(B)(ii) expressly applies only where the law of the state requires law enforcement authorities to verify the qualifications before issuing a license.  That is simply not the way Montana law operates.[3]

---

[3] There is little question, of course, that in passing Section 45-8-360, the Montana legislature intended to create a broad exemption to Section 922(q)(2)(B)(ii).  Federal law, however, imposes clear requirements on what must be included in a state licensing regime for the exemption to apply and the one established by the State of Montana does not meet those requirements.  The Supreme Court has made clear that "courts should not strain to find ways reconcile federal law with seemingly conflicting state law," and instead look no further than the "ordinary meaning of federal law."  *See PLIVA, Inc. v. United States*, 564 U.S. 604, 622-23 (2011); *see id.* ("The *non obstante* provision of the Supremacy Clause indicates that a court need look no further than "the ordinary meanin[g]" of federal law, and

9

For 18 U.S.C. § 922(q)(2)(B)(ii) to apply the law of the state must

*require* state law enforcement to verify an individual is qualified under law

before a license is issued.  Montana Code § 45-8-360 does not meet that

requirement because while it imposes restrictions on who is licensed, it does

not require verification by law enforcement before a license is obtained.

Metcalf is not licensed under the requirements of 18 U.S.C. §

922(q)(2)(B)(ii) and cannot use it as a defense in this case.

## II.    Metcalf does not show that the Second Amendment protects his possession of a firearm in a sensitive place next to a school.

The Second Amendment provides: "A well regulated Militia, being necessary

to the security of a free State, the right of the people to keep and bear Arms, shall

not be infringed." U.S. CONST. amend. II. In *Heller*, the Supreme Court held that

the Amendment guarantees "an individual right to keep and bear arms." 554 U.S.

at 595. The central aspect of that right, the Court observed, is "the inherent right of

self-defense." *Id.* at 628. The Court emphasized that, like other rights, "the right

secured by the Second Amendment is not unlimited." *Id.* at 626. And it cautioned

that "nothing in our opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill, or laws

---

should not distort federal law to accommodate conflicting state law." (citation
omitted)).

10

forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-627. In a footnote, the Court added that those were "examples" of "presumptively lawful regulatory measures," and that the list was not "exhaustive." *Id.* at 627 n.26.

Two years after Heller, the Supreme Court held that the Second Amendment right applies to the States. *McDonald*, 561 U.S. at 750. The plurality went out of its way to "repeat" the Court's "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 786 (quotation marks omitted).

Twelve years later, the Supreme Court decided *Bruen*. There, it struck down a New York law that prohibited a law-abiding citizen from carrying a firearm in public unless he could demonstrate a special need for self-defense. 142 S. Ct. at 2122. In doing so, the Court reaffirmed *Heller*'s basic tenants and rejected the use of "means-end scrutiny" because that methodology was "inconsistent with *Heller*'s historical approach." *Id.* at 2129; *see id.* at 2126-2130. Making *Heller*'s approach "more explicit," *id.* at 2134, the Court laid out a two-part framework for deciding

11

whether a firearm restriction comports with the Second Amendment. The first question is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. If it does not, the analysis ends, and the restriction is valid. If instead the conduct is covered, the Constitution "presumptively protects" it, and the analysis continues to a second stage. *Id.* at 2126, 2130. At that stage, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126; *see id.* at 2130.

*Bruen* did not address which party has the burden to show, at the first stage, that the Second Amendment's text does or does not cover the person's conduct. But it assigned the second-stage burden to the government based on an analogy to the First Amendment. 142 S. Ct. at 2130. With respect to that step, the Court analogized the burden to the government's burden to prove the validity of a regulation that "restricts speech." *Id.* (quotation omitted). Following the same logic, in First Amendment cases, the Supreme Court has held that the challenging party must show at the outset that the regulation in fact restricts speech. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984) ("the person desiring to engage in assertedly expressive conduct" must "demonstrate that the First Amendment even applies").  The same burden-shifting approach should apply in the Second Amendment

12

context.  The "general rule" in any context is that the "one seeking relief bears the burden of demonstrating that he is entitled to it." *Clark*, 468 U.S. at 293 n.5.

In short, because Metcalf is the one who invokes the Second Amendment as a basis for relief, he has the initial burden of showing that it applies to his conduct. He does not meet that burden.  Even when a person wishes to carry a firearm only for self-defense, he may not do so anywhere he chooses.

*Bruen* reaffirmed the Supreme Court's earlier assurances that it was not casting doubt on "longstanding laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 142 S. Ct. at 2133 (quotation omitted). On reviewing the historical record, the Court discerned "no disputes regarding the lawfulness of such prohibitions" in places like legislative assemblies and courthouses. *Id.* Thus, the Court took it as "settled" that "these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.*

**III. Historical Analogues Support 922(q)(2)**

Because Metcalf does not show that the Second Amendment reaches his conduct, the government need not "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126; *see id.* at 2129-2130. *Bruen*, however, makes that task easy.

13

*Bruen* provided the Court an opportunity to review the long-held tradition that has become known as the "sensitive places" doctrine. The Court affirmatively noted that it was "aware of no disputes regarding the lawfulness" of prohibitions of firearms in "sensitive places," in the 18th and 19th centuries. 142 S.Ct. at 2134. The Court "assumed it settled" that legislative assemblies, polling places, and courthouses, were "'sensitive places" where arms carrying could be prohibited consistent with the Second Amendment." *Id.* The Court then held that "courts can use historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carrying of firearms in *new* and analogous sensitive areas are constitutionally permissible." *Id.*

The Court expressly identified schools as an example of where "even if a modern-day regulation is not a dead ringer for historical precursors, it may still be analogous enough to pass constitutional muster." *Id.* at 2118. It explained "Courts can use analogies to 'longstanding' 'laws forbidding the carrying of firearms in sensitive places *such as schools* and government buildings,'" to determine whether modern regulations are constitutionally permissible. *Id.* (quoting *McDonald*, 561 U.S. at 626).

With this history and framework in mind, Section 922(q)(2) is plainly consistent with our nation's traditions, because it is "relevantly similar" to

14

historical precursors in "how" and "why" it burdens "a law-abiding citizen's right to armed self-defense." *Id.* at 2132-2133. Part A below discusses the scope of Section 922(q)(2). Part B then explains why, properly understood, the statute is "analogous enough" to "historical precursors" to "pass constitutional muster." *Id.* at 2133.

**A. Section 922(q)(2)**

As relevant here, Section 922(q)(2) makes it "unlawful for any individual knowingly to possess a firearm … at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). A person is in a school zone if he is "in, or on the grounds of, a public, parochial or private school," 18 U.S.C. § 921(a)(26)(A), or if he is "within a distance of 1,000 feet from the grounds of a public, parochial or private school," 18 U.S.C. § 921(a)(26)(B).

The scope of Section 922(q)(2)(A) is narrowed by Section 922(q)(2)(B) which provides that it doesn't apply to possession of a firearm in seven different circumstances.

First, it does not apply to "private property not part of school grounds" so Metcalf possessing the firearm in his house or in his yard is not a violation of the statute, allowing him to possess a firearm for home defense. 18 U.S.C. § 922(q)(2)(B)(i).

15

Second, as discussed in the section above, a state may create a license in compliance with 18 U.S.C. § 922(q)(2)(B)(ii).  While Montana's statute does not meet the requirements, other states have passed laws meeting the licensing requirement.  *See Tait*, 202 F.3d at 1324 (discussing Alabama's licensing requirement).  Texas law, for example, requires the Department of Public Safety—the law enforcement authority of the State, TEX. GOV'T CODE ANN. § 411.002*; see Westfall v. Miller*, 77 F.3d 868, 872 n.1 (5th Cir. 1996)—to "issue a license to carry a handgun to an applicant if the applicant meets all the eligibility requirements and submits all the application materials." TEX. GOV'T CODE ANN. § 411.177(a); *see id.* § 411.172(a) (eligibility requirements).

Third, it does not apply to unloaded firearms in a locked container.  18 U.S.C. § 922(q)(2)(B)(iii).  This allows individuals to transport firearms through a school zone without being in violation of the law.  Fourth, it does not apply to individuals for use in a program approved by a school in the school zone.  18 U.S.C. § 922(q)(2)(B)(iv).  Fifth, it does not apply to an individual in accordance with a contract between the school and the individual.  18 U.S.C. § 922(q)(2)(B)(v).  Sixth, it does not apply to law enforcement officers acting in their official capacity.  18 U.S.C. § 922(q)(2)(B)(vi).  Lastly, it does not apply to a firearm "that is unloaded and

16

is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities." 18 U.S.C. § 922(q)(2)(B)(vii).

Even apart from those carveouts, the mens rea element in subsection (A) protects an unwitting but otherwise well-intentioned armed citizen. A person does not violate the statute unless he "knows" or "has reasonable cause to believe" that the place of possession is a school zone. 18 U.S.C. § 922(q)(2)(A). That element has teeth. At least two courts of appeals have reversed convictions for insufficient evidence where the government's only proof of mens rea was the defendant's proximity to the school. *United States v. Guzmán-Montañez*, 756 F.3d 1, 10-12 (1st Cir. 2014); *United States v. Haywood*, 363 F.3d 200, 207-209 (3d Cir. 2004). One of the courts added that, because the defendant "did not live in the neighborhood, his awareness had to be readily proven." *Guzmán-Montañez*, 756 F.3d at 12.

To be clear, this discussion of the statute's scope is not aimed at satisfying the means-end scrutiny that *Bruen* rejected. The point is that, for most law-abiding citizens most of the time—i.e., in states with licensing requirements in compliance with the statute—Section 922(q)(2) is more akin to a licensing requirement than to a ban. *See* 18 U.S.C. § 922(q)(2)(B)(ii).  When a law-abiding citizen is on their own property the statute is not a ban. *See* 18 U.S.C. § 922(q)(2)(B)(i).  And even when a law-abiding citizen is in a State in which he is not licensed, the statute is more akin

17

to a transitory storage requirement than to a ban. See 18 U.S.C. §

922(q)(2)(B)(iii). Understood in that properly cabined way, Section 922(q)(2)

is "relevantly similar" to the historical precursors below, both in "how" and

"why" it burdens "a law-abiding citizen's right to armed self-defense."

*Bruen*, 142 S. Ct. at 2132-2133. It does not matter that the precursors did not

ban everyone, always, from possessing firearms near a school, because

Section 922(q)(2) does not do that either.

## B. Precursors

The non-exhaustive list below cites ten historical analogues falling into

two categories: public-university restrictions relating to firearms on campus,[4]

and state restrictions relating to firearms in or near schools. Links to the

university restrictions are available online at Duke Law School's research

repository, under the subject "Sensitive Places and Times." Duke Center for

---

[4] In 1655, Harvard's rules provided that "noe students shall be suffered to have [ag]un in his or theire chambers or studies, or keepeing for theire use any where else in the town." A COPY OF THE LAWS OF HARVARD COLLEGE, 1655, at 10 (1876) (brackets in original). Similarly, in 1745, Yale's rules prescribed punishment for "any Scholar" who "Shall keep a Gun or Pistol, or Fire one in the College-Yard or College." II FRANKLIN BOWDITCH DEXTER, BIOGRAPHICAL SKETCHES OF THE GRADUATES OF YALE COLLEGE: MAY 1745–MAY 1763, at 8 (1896). In an abundance of caution, however, the list below omits those and other private-university restrictions.

18

Firearms Law, *Repository of Historical Gun Laws*, law.duke.edu/gunlaws (last visited Oct. 24, 2023).

*University restrictions:*

• **1810.** The University of Georgia "ordained" that "no student shall be allowed to keep any gun, pistol, … or any other offensive weapon in College or elsewhere," including "out of the college." THE MINUTES OF THE SENATUS ACADEMICUS OF THE STATE OF GEORGIA, 1799–1842, at 86 (Aug. 1810).

• **1824.** The University of Virginia Board of Visitors—whose six members included Thomas Jefferson and James Madison—resolved that: "No Student shall, within the precincts of the University, … keep or use weapons or arms of any kind, or gunpowder[.]" UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES, at 6-7 (Oct. 1824).

• **1838.** The University of North Carolina established that: "No Student shall keep a dog, or fire arms, or gunpowder. He shall not carry, keep, or own at the College … any deadly weapon; nor shall he use fire arms without permission from the President." ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA, at 15 (Sept. 1838).

*State restrictions relating to schools:*

• **1871.** Texas prohibited "any person" from carrying "a pistol or other firearm" into (inter alia) "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes." Law of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws 25-26**.**

• **1878.** Mississippi prohibited "any student of any university, college or school" from carrying, concealed or partly concealed, a pistol or other deadly weapon. Law of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175-176.

• **1879.** Missouri prohibited "any person" from discharging "any gun, pistol or fire-arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes." Law of Apr. 30, 1879, § 1, 1879 Mo. Laws 90. The statute defined "immediate vicinity" to mean "a distance not exceeding two hundred yards." *Id.* § 3, at 91.

• **1883.** Missouri also prohibited "any person" from carrying "any kind of fire arms" into (*inter alia*) "any school room or place where people are assembled for educational, literary or social purposes." Law of Mar. 5, 1883, § 1, 1883 Mo. Laws 76.

• **1889.** Arizona, then a territory, prohibited "any person" from carrying "a pistol or other firearm" into (inter alia) "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes." Law of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30-31.

• **1890.** Oklahoma, then a territory, prohibited "any person" from carrying a pistol or revolver into (inter alia) "any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes." The Statutes of Oklahoma, ch. 25, art. 47, § 7, 1890 Okla. Sess. Laws 495-496.

• **1903.** Montana prohibited "any person" from carrying "a pistol or other firearm," concealed or partly concealed, into (inter alia) "any school room or other place where persons are assembled for amusement or for educational or scientific purposes." Law of Feb. 27, 1903, § 3, 1903 Mont. Laws 49-50.

* * * * *

On average, those precursors were broad. The university restrictions applied to all students regardless of age; they prohibited possession everywhere on campus (and "elsewhere," in Georgia's case); and they did not confer extensive licensing, storage, and other exceptions of the sort found in Section 922(q)(2)(B). The school

20

restrictions were broader still. They made limited exceptions for peace officers and the like, but they otherwise prohibited any person—adult or child—from carrying firearms in schools. And they, too, contained few or no carveouts akin to those in Section 922(q)(2)(B). *But see* Law of Feb. 27, 1903, § 4, 1903 Mont. Laws 50 (a person who showed that he was "peaceable" and of "good moral character" could get judicial permission to carry a pistol or revolver).

To be sure, most of the precursors did not extend a prescribed distance beyond the campus or school. But at least one did: Missouri prohibited discharging a firearm within 600 feet of a school. Law of Apr. 30, 1879, §§ 1, 3, 1879 Mo. Laws 90-91. In a similar vein, Mississippi banned any student of any age from carrying any concealed firearm anywhere. Law of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175-176. And most notably, the more common prohibitions on any person carrying any firearm into any school were not limited to the school itself. They extended beyond "school room[s]" to unspecified "other place[s]" where children and others assembled for education, science, worship, or amusement.

Moreover, the nation's precedents establish the clear historical tradition of providing constitutional limitations in the zones immediately surrounding sensitive areas. For example, the Supreme Court has recognized the constitutionality of regulating the areas surrounding sensitive areas in the analogous First Amendment context. *Renton v. Playtime Theatres,* 475 U.S. 41, 43 (1986) (considering

21

regulation prohibiting adult theaters from locating within 1000 feet of
residential areas, churches, parks, and schools).

Perhaps none of the precursors is an "historical twin" of Section
922(q)(2). *Bruen*, 142 S. Ct. at 2133 (emphasis in original). But none needs
to be a twin: "analogical reasoning under the Second Amendment," although
not a "regulatory blank check," is not a "regulatory straitjacket" either. *Id.*
That goes double for statutes that regulate sensitive places. Crucially, *Bruen*
held that courts may analogize to historical regulations governing previously-
identified sensitive places—e.g., schools and government buildings—to
uphold "modern regulations prohibiting the carry of firearms in new and
analogous sensitive places." *Id.* (emphasis in original).

Even assuming that the statute's 1,000-foot radius around school
grounds is a "new" sensitive place it passes muster because it closely
parallels the aforementioned "other place[s]" where children congregated in
the 19th century. And even assuming that the 1,000-foot radius exceeds the
reach of some precursors in terms of distance, the burden it puts on "a law-
abiding citizen's right to armed self-defense" (*Bruen*, 142 S. Ct. at 2133) is
no heavier given all the exceptions in Section 922(q)(2)(B).

Accounting for the passage of two centuries, it would be unrealistic to
expect even closer analogues. As *Bruen* cautioned, "cases implicating

22

unprecedented social concerns or dramatic technological changes may require a more nuanced approach" to precursors. 142 S. Ct. at 2132. Plainly, the precursors here were aimed at minimizing the danger that deadly weapons pose when many young and naturally irresponsible people assemble in one place for many hours at a time. Over the years, that danger has only multiplied.[5] Nineteenth-century legislators did not confront mass shootings on the modern scale. Nor did they have to address everyday juvenile assaults, gang violence, and drug trafficking. That conduct is inevitably more dangerous when committed with firearms. And much of it is committed near but not on school grounds.

It is neither surprising nor unconstitutional for Congress to make modest adjustments to traditional restrictions.

## CONCLUSION

The United States respectfully requests the Court deny the motion to dismiss.

//

//

---

[5] "There have been 389 school shootings since 1999." www.washingtonpost.com/education/interactive/school-shootings-database (last visited Oct. 17, 2023). Congress was well within its discretion to consider the zone immediately around schools to be an area where firearms can be constitutionally regulated without infringing upon the Second Amendment, just as speech can be regulated in such areas without infringing upon the First Amendment. *Renton*, 475 U.S. at 43.

23

DATED this 24th day of October, 2023.

JESSE A. LASLOVICH
United States Attorney

*/s/ Thomas K. Godfrey*
THOMAS K. GODFREY
Assistant U.S. Attorney

24

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. CR 12, I hereby certify that the foregoing document is proportionately spaced, has a typeface of 14 points or more, and the body of the brief contains 4,838 words.

DATED this 24th day of October, 2023.

/s/ Thomas K. Godfrey
THOMAS K. GODFREY
Assistant U.S. Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 24, 2023, a copy of the foregoing document

was served on the following persons by the following means:

  <u>1, 2</u>   CM-ECF
\_\_\_\_\_   Hand Delivery
\_\_\_\_\_   Mail
\_\_\_\_\_   Overnight Delivery Service
\_\_\_\_\_   Fax
\_\_\_\_\_   E-Mail

1. Clerk, United States District Court

2. Russell A. Hart
   Counsel for the Defendant

DATED this 24th day of October, 2023.

*/s/ Thomas K. Godfrey*
THOMAS K.GODFREY
Assistant U.S. Attorney

RUSSELL A. HART
Assistant Federal Defender
Federal Defenders of Montana
Billings Branch Office
175 North 27th Street, Suite 401
Billings, MT  59101
Phone:  (406) 259-2459
Fax:  (406) 259-2569
russell_hart@fd.org
          Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **Case No. CR-23-103-BLG-SPW** |
| Plaintiff, | |
| vs. | **BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| GABRIEL COWAN METCALF, | |
| Defendant. | |

The Defendant has filed a Motion to Dismiss the Indictment.  (ECF-31).  This Brief supports that Motion.

## **INTRODUCTION**

Rule 12(b)(1) of the Federal Rules of Criminal Procedure states that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."  Mr. Metcalf is charged with a single count of

1

violating 18 U.S.C. §922(q)(2)(A) for allegedly possessing a firearm within a school

zone.  He is not otherwise prohibited from possessing a firearm and is not accused of

committing any other crime in connection with this allegation.  Dismissal is necessary

for two reasons: first, §922(q) does not apply to persons licensed to carry a firearm

within a school zone by the laws of the state in which the school zone lies, and Mr.

Metcalf was licensed under Montana law at the time of his alleged offense.

Additionally, §922(q) is unconstitutional as it is being applied to Mr. Metcalf in this

case under the analytical framework established by *New York State Rifle and Pistol

Association, Inc*. v. *Bruen*, 142 S. Ct. 2111 (2022).

## BACKGROUND

Mr. Metcalf lives directly across the street from Broadwater Elementary, a

public school, in Billings, Montana.  He has been accused of openly carrying a firearm

in his yard and on the sidewalk in front of his house, within 1,000 feet of but not on

school grounds.  Section 922(q) prohibits "any individual" from possessing a firearm

at a place the individual "knows or has reasonable cause to believe" is a "school

zone", defined as on the grounds of or "within a distance of 1,000 feet from the

grounds of a public, parochial or private school".  18 U.S.C. § 921(a)(26).

The black letter of §922(q)(2)(A) would prohibit Mr. Metcalf and anyone who

lives within 1,000 feet of a school's "grounds" from possessing a firearm, even in

2

their home.  However, §922(q)(2)(B) contains some exceptions to that otherwise broad prohibition.  One of those exceptions allows for possession of a firearm "on private property not part of school grounds".  §922(q)(2)(B)(i).  Another exception to possession of a firearm in a school zone applies to individuals "licensed to do so" by the State or a political subdivision of the State in which the school zone is located. §922(q)(2)(B)(ii).

The Criminal Complaint filed in this matter (ECF-1) and subsequent public statements by the Department of Justice clarify that, as §922(q) is being applied to Mr. Metcalf, he violated §922(q) when he allegedly stepped from his property onto the public sidewalk; by leaving his "private property" he is alleged to have removed himself from the protections of 18 U.S.C. §922(q)(2)(B)(i).  Assuming this theory does not violate the Second Amendment under the framework of *District of Columbia v. Heller* and *Bruen*, Mr. Metcalf would need to demonstrate that he qualifies for one of the other exceptions enumerated at §922(q)(2)(B).

## I.  Mr. Metcalf meets the exception of 18 U.S.C. § 922(q)(2)(B)(ii)

Section 45-8-359 of Montana Code Annotated explicitly grants, to every person in Montana who has not been convicted of a violent felony crime or who is not otherwise prohibited from possessing a firearm under the Montana Constitution, a "license[ ] and verif[ication] by the State of Montana within the meaning of the

3

provisions regarding individual licensure and verification in the federal Gun-Free

School Zones Act" to possess a firearm:

> In consideration that the right to keep and bear arms is protected and reserved to the people in Article II, section 12, of the Montana constitution, a person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and verified by the state of Montana within the meaning of the provisions regarding individual licensure and verification in the federal Gun-Free School Zones Act.

Mont. Code Ann. § 45-8-360, "Establishment of individual licensure."

This language explicitly appeals to the exception at 18 U.S.C. §922(q)(2)(B)(ii),

which states in full:

> Subparagraph (A) does not apply to the possession of a firearm— if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license.

The next section of the Code, Mont. Code Ann. § 45-8-361, prohibits

"possession or allowing possession of a weapon *in a school building*". (emphasis

added). While §922(q) applies only to firearms that affect interstate commerce, a

"weapon" as used in the Montana law is not specific to firearms and includes a knife

with a blade of 4 inches or more, a sword, straight razor, throwing star, nun-chucks,

brass knuckles, or "any other article or instrument possessed with the purpose to

commit a criminal offense." Mont. Code Ann. § 45-8-361(5)(b).

4

Montana has (1) verified that any individual who is not prohibited under the laws of Montana or who has not been convicted of a violent felony crime is qualified to receive a license to carry a firearm within a school zone, (2) enacted legislation granting such a license to all verified individuals, (3) explicitly stated that this license applies for purposes of "the federal Gun-Free School Zones Act", and (4) enacted separate legislation that goes farther than §922(q) could under its Commerce Clause authority, prohibiting the possession of any type of "weapon", including a firearm, but only within the school *building* itself.

If Mr. Metcalf stepped from his property onto the public sidewalks while carrying a firearm as the Government alleges, he was licensed to do by the State of Montana at the time, the prohibition of §922(q)(2)(A) does not apply to him, and the Indictment must be dismissed.

## II. Section 922(q) is unconstitutional under *Heller* and *Bruen*

In 1975, the District of Columbia enacted a law criminalizing the carrying of any unregistered firearm within the District while simultaneously prohibiting the registration of handguns, effectively banning them. *District of Columbia v. Heller*, 554 U.S. 570, 574 (2008). Additionally, any lawfully owned firearm (i.e., registered long gun) possessed within the District was required to be "unloaded and dissembled

5

or bound by a trigger lock or similar device" unless located in a place of business or being used for lawful recreational activities.  *Id.*

In *Heller*, the United States Supreme Court considered "whether [the District's] prohibition on the possession of usable handguns in the home violates the Second Amendment to the Constitution".  *Id.* at 573.  The Court not only found that the prohibition was unconstitutional, it declared that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Heller* at 635.  The Court struck down both the law's complete ban on handguns and its restriction against keeping functional firearms in the home: the complete prohibition on handguns was constitutionally "invalid" for any purpose, and the requirement that any other firearm in the home be rendered and kept inoperable at all times "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional."  *Id.*, at 630.

While *Heller* established the right to keep a firearm in one's home for the purpose of self-defense, in *United States v. Bruen*, 142 S. Ct. 2111 (2022), the Court determined the right also extended to areas outside the home and emphasized that the right cannot be analyzed using "means-end" scrutiny.  *Bruen*, at 2127.

In 1905, New York enacted a law criminalizing the possession of a firearm whether inside or outside the home without a license.  In 1911, it enacted a separate

6

law requiring a government finding of "good moral character" and "proper cause" as prerequisites for an individual obtaining such a license.  *Bruen*, at 2122.

In *Bruen*, the Court reaffirmed the Second Amendment's guarantee of "an individual right to possess and carry weapons in case of confrontation" as articulated in *Heller*, then recognized that "confrontation can surely take place outside the home".  *Id.*, at 2135.  The Court held that the "proper cause" requirement of the 1911 law violated the Second and Fourteenth Amendments "in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms".  *Id.*, at 2156

The Court went on to explain:

the constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' We know of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need. That is not how the First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense.

*Id.*, at 2156 (internal citations omitted)

The *Bruen* Court clarified that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id.* at 2126.  To justify §922(q) as it is being applied to Mr. Metcalf, the government

7

"must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.*

### *Heller* and *Bruen* Applied to Mr. Metcalf's Circumstances

Discovery has taken place and demonstrates law enforcement received several complaints about a man carrying a firearm in the yard of a residence directly across the street from Broadwater Elementary School in Billings, Montana over the course of several days in August of 2023. Law enforcement responded to that address multiple times and typically encountered a male – Mr. Metcalf – standing on the property with a firearm in his possession or nearby. The investigation revealed Mr. Metcalf lived with his mother at the residence in question and was patrolling his property in response to threats made against him and his mother by a specific individual. Mr. Metcalf repeatedly spoke to law enforcement about these threats, before and during August of 2023. His mother had obtained an order of protection and Mr. Metcalf claimed this individual had violated it several times both directly and through third-party contact.[1]

---

[1] This individual is currently pending trial in Yellowstone County for a felony offense of violating an order of protection, the victim being Mr. Metcalf's mother.

8

Law enforcement repeatedly told Mr. Metcalf they couldn't make him stop what he was doing, but expressed frustration that he would not stop voluntarily.  Mr. Metcalf continued to insist he was the victim of a stalking crime, that law enforcement was not taking his reports seriously, and that he felt his actions were necessary to protect himself and his mother.  He reached out to federal authorities seeking assistance concerning what he perceived as indifference by local law enforcement to his reports.

As the school year approached, Metcalf was called by two ATF agents who represented that they were following up on his call and wished to address his concerns.  They asked him where besides his property he had carried the firearm, eliciting statements that the Government now uses against him.  The agents then expressed their opinion that his actions within his house and in his front yard were constitutionally protected, but that he had violated 18 U.S.C. § 922(q)(2)(A) when he stepped from his property onto the sidewalk in front of his house while carrying his firearm.

There is no evidence Mr. Metcalf carried the firearm outside of the house or his yard following that conversation.  He was arrested a few days later, almost

immediately after the Billings Gazette published an article on its website about the situation.[2]

The Government has not alleged Mr. Metcalf carried a weapon onto the school grounds. This prosecution relies entirely upon Mr. Metcalf allegedly carrying a firearm in the areas immediately outside his private residence, specifically onto the sidewalk. While *Bruen* clearly states such activities are constitutionally protected – above all other concerns, no less – the Indictment claims these actions were illegal because they occurred within 1,000 feet of a school, which was still on summer recess.

## I.    The ban, like those in *Heller* and *Bruen*, is complete and void.

In *Heller*, the Supreme Court held that the Second Amendment protects the right to keep a firearm in the home for self-defense, and that any regulation that requires them to be stored in an inoperable state is "invalid". *Heller*, at 630. In *Bruen*, the Court held that this right extends to areas outside the home and emphasized that the right cannot be analyzed using "means-end" scrutiny. *Bruen*, at 2127. To find relief from the broad prohibition of 922(q)(2)(A), when Mr. Metcalf stepped from

//

---

2 Billings Gazette, August 22, 2023: "Man with rifle near Broadwater Elementary School isn't breaking law, Billings police say". https://billingsgazette.com/news/local/billings-police-broadwater-elementary-man-with-gun-rifle/article_d144ec32-410d-11ee-bbf5-6fd13809d8ac.html#tracking-source=article-related-bottom

10

his property onto the sidewalk, his firearm would have to have been rendered inoperable.  18 U.S.C. §922(q)(2)(B)(iii).

When it comes to firearms carried for purposes of self-defense outside the home, 922(q) contains an identical ban to the one flatly struck down in *Heller* when applied to firearms stored inside the home.  In *Bruen,* the Court ruled that regulations concerning firearms carried *outside the home* must be held to the *Heller* standard while unequivocally rejecting the application of any "means-end" scrutiny to justify the regulation.  *Bruen*, at 2129.

The ban prohibiting possession of a functional firearm within 1,000 feet of a school's "grounds" in §922(q)(2)(A) prevents a citizen from using it for self-defense if confrontation happens outside their home.  On its face, §922(q) is impossible to square with the Second Amendment in the post-means-end scrutiny era of *Heller* and *Bruen*.

## II.    The Government must demonstrate §922(q) would have been tolerated at the United States' founding.

Mr. Metcalf's alleged conduct, openly carrying a firearm in public for self-defense, is clearly protected by the plain text of the Second Amendment.  In *Heller*, the Supreme Court made clear that the Second Amendment protects an individual right to possess a firearm unconnected with service in a militia for traditionally lawful purposes, specifically for self-defense within the home.  *Heller*, at 2821-2822.  In

11

*Bruen*, it held the right extended beyond the home.  *Bruen*, at 2135.  Section 922(q)

unquestionably infringes upon the right to carry a firearm for self-defense outside the

home, particularly for anyone who lives within 1,000 feet of the grounds of a school.

The Government must demonstrate such an infringement would have been tolerated at

the time of ratification.

"Because the Second Amendment was adopted in 1791, only those regulations

that would have been considered constitutional then can be constitutional now."

*United States v. Butts*, 2022 WL 16553037, at *2 (D. Mont. Oct. 31, 2022) (quoting

*United States v. Price*, 2022 WL 6968457, at *1 (S.D.W.V. Oct. 12, 2022)).  The

Second Amendment has always tolerated laws forbidding the carrying of firearms in

"sensitive places such as schools and government buildings." *Bruen*, at 2133, quoting

*Heller*, 554 U. S., at 626, 128 S. Ct. 2783, 171 L. Ed. 2d 637.  Montana recognizes

this and has enacted legislation to prohibit the possession of a firearm within a school

building.  Section 922(q), however, broadly serves to extend the "sensitive place" of a

school to a distance within 1,000 feet of the school's "grounds", irrespective of any

circumstances other than the few enumerated at §922(q)(2)(B).

To justify §922(q)'s infringement as this prosecution applies it to Mr. Metcalf,

the Government must "identify a well-established and representative historical

analogue" at the time of the Second Amendment's ratification to such a prohibition.

12

*Bruen*, at 2133.   The regulation is presumed unconstitutional, and Mr. Metcalf believes there is no historical analogue sufficient to justify the prohibition against possessing a weapon near but not on the grounds of a school while it is not in session. In fact, the Supreme Court in *Bruen* and *Heller* flatly rejected the means-end analysis upon which the validity of this regulation must rely.  *Bruen*, 2129.

Schools themselves have historically been treated as "sensitive places" where the Second Amendment tolerates restrictions on the right to bear arms.  However, §922(q) constitutes a legislative extension of the historically recognized "sensitive place" that exists within a school building onto the adjoining school property, and then another 1,000 feet as the crow flies, regardless of what or who exists within that space. The Court is not tasked with determining whether this is sound policy or one justified by a compelling government interest.  Having established that Mr. Metcalf's conduct is covered by the plain text of the Second Amendment, the Government instead bears the burden to establish a historical analogue for such an expansive reading of the "sensitive places" doctrine that was recognized at ratification.

## CONCLUSION

Gabriel Metcalf's decision to arm himself for self-defense on his property struck several Billings residents as peculiar and it alarmed others as the school year approached.  However, those actions on his property were unquestionably protected

13

by the Second Amendment and fall squarely within the exception of 18 U.S.C. §922(q)(2)(B)(i).

Law enforcement also alleges it observed him on August 12, 2023, and said he stepped onto a sidewalk with the firearm on that date.  On an August 17 phone call with ATF agents, Mr. Metcalf said he made his patrols daily.  He was informed on this call of the Government's position that his stepping onto any sidewalk, street, or alley with his firearm constituted a violation of §922(q).  There is no evidence he left his property with a firearm after that date.  This theory of prosecution is precluded by 18 U.S.C. §922(q)(2)(B)(ii) and Mont. Code Ann. §45-8-360, as Mr. Metcalf was licensed and exempt from §922(q)(2)(A)'s broad prohibition.

If the Court reaches the constitutional question, Mr. Metcalf's conduct between August 12 and August 17, 2023, is covered by the plain text of the Second Amendment.  Section 922(q) clearly infringes upon the rights enumerated therein. The Government bears the burden of demonstrating that the Second Amendment tolerated similar infringements when it was ratified in 1791.

Counsel for Mr. Metcalf has consulted with the Assistant United States Attorney assigned to this case for the Department of Justice in compliance with Local Rule 12.1.  The United States opposes the relief requested by the Motion and this Brief.

14

RESPECTFULLY SUBMITTED October 10, 2023.

/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
        Counsel for Defendant

15

## CERTIFICATE OF SERVICE
## L.R. 5.2(b)

I hereby certify that on October 10, 2023, the foregoing document was served on the following persons by the following means:

<u>1, 2</u>   CM-EDF
\_\_\_\_   Hand Delivery
 <u>3</u>   Mail
\_\_\_\_   Overnight Delivery Service
\_\_\_\_   Fax
\_\_\_\_   E-Mail

1.     CLERK, UNITED STATES DISTRICT COURT

2.     THOMAS GODFREY
      Assistant United States Attorney
      United States Attorney's Office
      2601 2nd Avenue North, Suite 3200
      Billings, MT  59101
          Counsel for the United States.

3.     GABRIEL COWAN METCALF
      Defendant

/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
     Counsel for Defendant

16

RUSSELL A. HART
Assistant Federal Defender
Federal Defenders of Montana
Billings Branch Office
175 North 27th Street, Suite 401
Billings, MT  59101
Phone:  (406) 259-2459
Fax:  (406) 259-2569
russell_hart@fd.org
        Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **Case No. CR-23-103-BLG-SPW** |
| Plaintiff, | |
| vs. | **DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| GABRIEL COWAN METCALF, | **(OPPOSED)** |
| Defendant. | |

Comes now, the Defendant, Gabriel Cowan Metcalf, who moves this Court for an Order dismissing the Indictment in this matter.  Mr. Metcalf is being prosecuted for violation of 18 U.S.C. §922(q)(2)(A).  By the attached Brief in Support of this Motion, Mr. Metcalf asserts (1) prosecution is precluded because he meets the exception at 18 U.S.C. § 922(q)(B)(iii), and (2) §922(q)(2)(A) is an unconstitutional

1

infringement on the right to bear arms protected by the Second Amendment of the United States Constitution.

Counsel for Mr. Metcalf has consulted with the Assistant United States Attorney assigned to this case for the Department of Justice in compliance with Local Rule 12.1. The United States opposes the relief requested by the Motion and this Brief.

RESPECTFULLY SUBMITTED October 10, 2023.

/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
Counsel for Defendant

2

# CERTIFICATE OF SERVICE
## L.R. 5.2(b)

I hereby certify that on October 10, 2023, the foregoing document was served on the following persons by the following means:

1, 2    CM-EDF
____    Hand Delivery
_3_    Mail
____    Overnight Delivery Service
____    Fax
____    E-Mail

1.     CLERK, UNITED STATES DISTRICT COURT

2.     THOMAS GODFREY
Assistant United States Attorney
United States Attorney's Office
2601 2nd Avenue North, Suite 3200
Billings, MT 59101
       Counsel for the United States.

3.     GABRIEL COWAN METCALF
Defendant

/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
       Counsel for Defendant

3



FILED

SEP 1 4 2023

Clerk, U.S. District Court
District Of Montana
Great Falls

**THOMAS GODFREY**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**James F. Battin U.S. Courthouse**
**2601 Second Ave. North, Suite 3200**
**Billings, MT 59101**
**Phone: (406) 657-6101**
**FAX: (406) 657-6989**
**E-mail: Thomas.Godfrey@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CR 23- 103 -BLG-SPW** |
| **Plaintiff,** | **INDICTMENT** |
| **vs.** | **UNLAWFUL POSSESSION OF A FIREARM IN A SCHOOL ZONE** Title 18 U.S.C. § 922(q)(2)(A) **(Penalty: five years of imprisonment, $100,000 fine, and three years of supervised release)** |
| **GABRIEL COWAN METCALF,** | |
| **Defendant.** | **CRIMINAL FORFEITURE** Title 18 U.S.C. § 924(d) |

THE GRAND JURY CHARGES:

That on or between August 2, 2023, and August 17, 2023, at Billings and

within Yellowstone County, in the State and District of Montana, the defendant,

GABRIEL COWAN METCALF, did knowingly possess a firearm that had affected

1

interstate commerce, within a distance of 1,000 feet of the grounds of Broadwater

Elementary School, a place the defendant knew and had reasonable cause to believe

was a school zone, in violation of 18 U.S.C. § 922(q)(2)(A) and 924(a)(4).

## FORFEITURE ALLEGATION

If convicted of the offense charged in this indictment, the defendant,

GABRIEL COWAN METCALF, shall forfeit to the United States, pursuant to 18

U.S.C. § 924(d), any firearm and ammunition used and involved in a knowing

violation of said offense.

A TRUE BILL.

Foreperson signature redacted. Original document filed under seal.

_____
FOREPERSON

For JESSE A. LASLOVICH
United States Attorney

CYNDEE L. PETERSON
Criminal Chief Assistant U.S. Attorney

2

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Dustin Stroble, being first duly sworn, depose and state as follows:

### I.       INTRODUCTION AND AGENT BACKGROUND

1. I am a Task Force Officer ("TFO") with the United States Bureau of
   Alcohol, Tobacco, Firearms, and Explosives ("ATF"), currently assigned to
   the Billings Field Office.  I have been employed by the ATF as a TFO since
   January of 2023.  While working as a TFO in Billings, Montana, I received
   specialized training from ATF concerning violations of the Gun Control Act
   within Title 18 of the United States Code and violations of the National
   Firearms Act within Title 26 of the United States Code.  As such, I am an
   investigative or law enforcement officer of the United States, within the
   meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States
   empowered by law to conduct investigations and make arrests for offenses
   enumerated by 18 U.S.C. § 2516.  In addition to working as a TFO, I have
   been employed by the City of Billings as a Billings Police Officer since
   September 2016, until present and I have completed the Montana Law
   Enforcement Academy in Helena, Montana.

2. Your Affiant is involved in the investigation of a suspected violation of Federal laws by Gabriel Cowan METCALF.

## II.    DESCRIPTION

3. This Affidavit is submitted in support of a Criminal Complaint requested for Gabriel Cowan METCALF, charging him with Possessing a Firearm within a School Zone in violation of Title 18, United States Code, Section 922(q)(2)(A). The statements in this Affidavit pertain to the investigation described below and are based in part on information provided by my own observations and experience as an ATF Task Force Officer, and the observation and experiences of other fellow law enforcement officers participating in the investigation. This Affidavit does not purport to contain all the facts related to this investigation, but only those facts necessary to establish probable cause with respect to the aforementioned offenses.

## III.    PROBABLE CAUSE

4. On August 2, 2023, at approximately 1258hrs, Billings Police Department (BPD) Dispatch received a call concerning a male pacing in front of his house with a rifle. The subject would later be identified as Gabriel Cowan METCALF. The caller stated they were safe inside of a home and last saw METCALF walking westbound on the sidewalk on Broadwater Avenue.

5. A BPD Detective arrived and conducted surveillance of METCALF. METCALF was observed by the BPD Detective walking onto the property of 607 5th Street West carrying a firearm. Per dispatch narrative, METCALF lives at 430 Broadwater and patrols his yard due to a protection order he believes is in place and he is trying to protect his mother.

6. Billings Police would receive multiple calls regarding METCALF's behavior over the next few weeks. On August 11, 2023, METCALF was observed walking on the sidewalk with a rifle.

7. On August 14, 2023, at 1315hrs, METCALF was observed at the intersection of 4th Street West and Broadwater Avenue with a firearm. Another caller reported METCALF walking westbound on Broadwater Avenue. A BPD officer arrived after METCALF was back on his property and did not make contact.

8. METCALF's residence is located at 430 Broadwater Avenue in Billings, Montana. Broadwater Elementary School is directly across the street from METCALF's residence and is a "school" that provides elementary education in the State of Montana. Broadwater Elementary School is a "school" as defined in Title 18 U.S.C. 921(a)(27). The sidewalk and streets in front of METCALF's residence are public property within 1,000 feet from the school and are a "school zone," as defined in Title 18 U.S.C. 921(a)(26). The

school zone is marked with school zone speed limit signs and flashing lights

at the corners of 4th Street W and Broadwater Avenue and at 5th Street W and

Broadwater Avenue.  607 5th Street West is within the school zone.

9. On August 14, 2023, at 2236hrs, Billings Police was dispatched to a

weapons complaint at the intersection of 5th St. West and Broadwater

Avenue.  The complainant advised that METCALF was walking around the

area with a firearm.  BPD Officers contacted METCALF who was armed

with a firearm and a can of bear spray and wearing camouflage pants.

10.METCALF told officers that he was securing his perimeter due to being

"gang stalked" by a male named David Carpenter.  METCALF told the

Officer that he had walked from his property of 430 Broadwater Avenue

with the firearm to the corner of 5th Street West and Custer to record an SUV

parked there as he believed David Carpenter once drove a similar vehicle.

11. METCALF states he must clear his corners outside of the house to ensure

David Carpenter is not on scene to assault him.  METCALF also states that

he patrols his property numerous times throughout the day to ensure no one

has planted incendiary devices in his yard.

12. A BPD Lieutenant arrived and attempted to explain to METCALF the

danger of his actions for himself and others.  METCALF became

argumentative. Per the Officer's observations, METCALF suffered from a mental ailment.

13. METCALF has a Billings Police Department "Officer Caution" dating back to 2013 for becoming agitated with officers while carrying a loaded .22 caliber rifle on two separate occasions. The officer caution also states that METCALF suffers from a mental ailment and to use caution when dealing with him.

14. The Officer observed that METCALF's behavior is escalating as he has gone from sitting on his porch to following cars while being directly across from Broadwater Elementary School.

15. On August 15, 2023, a Billings Police Sergeant for the School Resource Officer (SRO) program heard officers were being dispatched to 430 Broadwater for a weapons complaint. The SRO Sergeant was aware of the multiple calls from this location regarding METCALF and that he lives across from Broadwater Elementary where staff, students, and parents have found his behavior frightening.

16. The SRO Sergeant made contact METCALF regarding his behavior. METCALF explained that a male named David Carpenter has made threats to him and his family. METCALF believes that David Carpenter has sprayed METCALF with pesticides and herbicides and tried to kill his trees.

METCALF stated he did not want to hurt kids and patrols his yard to prevent crime from happening to him.

17. METCALF was made aware of the concerns from school staff and was asked if he would consider not patrolling during school hours. METCALF would not commit to this compromise.

18. On August 17, 2023, a Billings Police Patrol Sergeant was dispatched to METCALF who was reported to be at 5th Street West and Broadwater Avenue with a firearm. METCALF was contacted at his property by the Patrol Sergeant. METCALF was not in possession of a firearm at the time of contact. METCALF was advised of being within 1,000 feet of a school zone. METCALF stated that he was currently on private property.

19. On August 17, 2023, TFO Dustin Stroble and Special Agent (SA) Andrew Martian made phone contact with METCALF after being informed that METCALF had called the Federal Bureau of Investigation (FBI) stating that the Billings Police are harassing him and wished to speak to a Federal Officer.

20. TFO Stroble and SA Martian called a phone number which was provided by Billings Police which was believed to be METCALF's. A female, identified as Vivian Scott, who is METCALF's mother answered the phone. She provided TFO Stroble with METCALF's phone number. She was

adamant that TFO Stroble listen to METCALF's entire story and alleged the Billings Police Department was telling METCALF he was violating law which did not exist.

21. TFO Stroble and SA Martian then contacted METCALF via the provided phone number and conducted a phone interview. TFO Stroble and SA Martian identified themselves as federal officers from the ATF and acknowledged his request to speak to federal officers per his contact. METCALF began by stating he has a decade worth of experiences to explain for the situation to be fully understood. He mentioned to TFO Stroble that he has been "gang stalked" for over a year and that there were police actions and inactions to explain. He then stated that he believes he is in danger and needs to tell his story because he may not be alive to tell it soon.

22. METCALF started by explaining how he came to Montana and then relayed how he has researched the law pertaining to firearms. METCALF went to great lengths to articulate that he follows the law and spoke of how he had packed a bicycle and went on a hunting trip. METCALF said that in his journey, he came across Billings Police Officers and stated that the officers were scrutinizing him as he rode by. He goes on to say that he was stopped by an unmarked police car. METCALF stated he was armed with a .22LR rifle during this instance and went on to say that the police vandalized

this rifle, and it no longer works. The aforementioned interaction with law enforcement is where METCALF received his officer caution.

23. SA Martian then directed METCALF to more current events with the Billings Police. METCALF stated that he is in constant fear of the police when contacted and believes the contact is due to the police not wanting him to exercise his constitutional rights. METCALF then abruptly switched from this topic to being gang stalked. He went on to say how he had called for police service many times and there was either an improper investigation or no action at all.

24. TFO Stroble was a BPD night shift patrol officer during this period METCALF is referring. TFO Stroble can recall many instances of contact where there was a dispute between David Carpenter and METCALF and Vivian Scott. Carpenter had an officer caution for being anti-law enforcement and is known to carry a firearm and phone contact was often made in lieu of an officer safety situation from in-person contact.

25. METCALF believed the lack of physical presence from law enforcement was due to his property being "bombarded" with chemicals. He then alleged that the Billings Police hold extreme prejudice against him for the incident where he received his officer caution. METCALF believes the police department is trying to "brush that incident under the rug."

26. METCALF then spoke of a neighbor who moved in next to him which he would later identify as David Carpenter. METCALF stated that he would see Carpenter smoking a cigarette by his shed, while glaring at him.

27. SA Martian then redirected METCALF by asking explicitly about the reports of him walking up and down the street off his property. METCALF then stated that he has never gone into any private property but has utilized the "right of way" which he states is his right and clarified was the sidewalk. He said he does go to his mother's shop at the corner of 5th Street West and Broadwater. METCALF confirmed he has walked down the sidewalk from his property with a firearm. The sidewalk at this location is public area within the Broadwater Elementary School "school zone."

28. METCALF then stated that he will occasionally walk around the block and survey down the streets to see if he can identify any of the vehicles he believes to be associated with the "gang stalkers." METCALF says he does this surveillance to secure his property and protect his loved ones. TFO Stroble asked what firearm METCALF carries while conducting surveillance. METCALF stated the firearm is a Rossi, Model Trifecta, .20-gauge break-action shotgun.

29. METCALF then talked about how since he has moved to Montana, he has begged his mother to buy him a handgun to protect her property. He stated

that she refuses to with numerous excuses as to why. He then said that her refusal is going to lead to him being shot.

30. METCALF then articulated that an officer had advised him to keep the firearm out of sight from the public. METCALF believed that this was an officer's attempt to make him look suspicious to set him up so that the police could show up and shoot him. He then said that he is not a "trigger happy gun nut" like the police are trying to do to him.

31. METCALF clarified that he patrols his property daily, however, goes around the block occasionally which is once or twice or week but has been several times a day at one point recently. He said the frequency of the block patrols are dictated by the atmosphere and vehicle presence. METCALF said that he has encountered his stalker recently without further detail.

32. SA Martian then asked METCALF specifically about how neighbors are becoming more concerned about his presence and the fact that there is a school very near him. METCALF agreed with this statement. SA Martian asked for METCALF to clarify how he is mitigating people feeling unsafe with him walking around the block and being in a school zone. SA Martian also noted that this is why METCALF has garnered so much attention from the police.

33.  METCALF dismissed the school zone statement and said that he believes

people are calling only because they see a person with a firearm.

METCALF did not directly answer the question and went back to how

David Carpenter was the reason for arming himself.  METCALF detailed a

situation where he said was the first time, he spoke with Carpenter in person

he knew that Carpenter was "crazy."  METCALF then started speaking

about how Carpenter would mow his own lawn but also encroached onto his

property.  METCALF said that this was by Carpenter's design to instigate

conflict.  This confrontation would lead to Vivian calling Carpenters

landlord.  Later Carpenter would confront METCALF over calling his

landlord.  METCALF further detailed neighbor disputes between himself

and Carpenter.

34.  TFO Stroble then asked about how METCALF would check his yard for

incendiary devices.  He stated that he stands watch during the night and gets

just a few hours of sleep in the morning.  He said the first thing he does

when he leaves his front door is to sweep his property for anyone lying in

wait and to make sure no one has left incendiary devices and explosives

around the house.  METCALF said that Carpenter set up an elaborate trap

with gasoline and a leaf blower.  He said that Carpenter also left his

lawnmower on high-idle to what METCALF assumed would mask any

screams.  It should be noted that during this time, Carpenter owned

Broadwater Lawn Care, which he ran out of his address of 426 Broadwater

Avenue.

35.  METCALF denied any drug use or mental health issues.  He stated he is

not on any medications.  He deferred any drug use to Carpenter or his friend.

36.  TFO Stroble then asked METCALF if he knew he was in a school zone.

METCALF replied by saying the gun free school zone act was

unconstitutional.  TFO Stroble made METCALF aware that there is in fact a

federal firearm law prohibiting firearms possession in a school zone.

37.  TFO Stroble then told METCALF that the school would be locked down

due to his actions.  METCALF did not acknowledge this statement and

began to speak to Billings Police actions.

38.  TFO Stroble advised METCALF that his actions have gained negative

public attention due to patrolling around the block with a firearm in a school

zone.  METCALF became angry with TFO Stroble, and the phone interview

became unmanageable.  This concluded the phone interview.

39.  TFO Stroble spoke with SA Matthew Schieno regarding the Rossi, Model

Trifecta, .20-gauge break-action shotgun METCALF stated he carries, and

SA Schieno confirmed Rossi firearms are manufactured outside of the state

of Montana and travelled in or affected Interstate Commerce to be in the State of Montana.

## IV.    CONCLUSION

40. Based on the above information, observations and investigation, on August 2, to August 17, 2023, in Yellowstone County, Montana, in the State and District of Montana, Gabriel Cowan METCALF committed the crimes of Possession of a Firearm within a School Zone in violation of Title 18, United States Code, Section 922(q)(2)(A).  I swear that the facts presented herein are true and accurate to the best of my knowledge.

_____          8-21-23
Dustin Stroble, ATF Task Force Officer          Date

SUBSCRIBED TO AND SWORN BEFORE ME THIS  21  DAY OF AUGUST 2023.

_____
Honorable Judge Timothy J. Cavan
United States Magistrate Judge
District of Montana

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Montana

**FILED**

AUG 2 1 2023

Clerk, U S District Court
District Of Montana
Billings

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Gabriel Cowan METCALF | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

Case No.   MJ-23-130-BLG-TJC

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___August 2, 2023 to August 17, 2023___ in the county of _____Yellowstone_____ in the

_____ District of _____Montana_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC § 922(q)(2)(A) | Unlawful possession of a firearm in a school zone. |

This criminal complaint is based on these facts:

See attached affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Dustin Stroble, Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  8-21-23

_____
*Judge's signature*

City and state:  _____Billings, Montana_____

Timothy J. Cavan, U.S. Magistrate Judge
*Printed name and title*

RUSSELL A. HART
EDWARD M. WERNER
Assistant Federal Defender
Federal Defenders of Montana
Billings Branch Office
175 North 27th Street, Suite 401
Billings, MT  59101
Phone:  (406) 259-2459
Fax:  (406) 259-2569
russell_hart@fd.org
edward_werner@fd.org
        Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No. CR-23-103-BLG-SPW** |
| Plaintiff, | |
| vs. | **NOTICE OF APPEAL** |
| GABRIEL COWAN METCALF, | |
| Defendant. | |

NOTICE IS HEREBY GIVEN that Defendant GABRIEL COWAN METCALF, appeals to the United States Court of Appeals for the Ninth Circuit from the Judgment filed and entered against him in the District Court on August 2, 2024. This appeal is from the District Court's denial of Mr. Metcalf's Motion to Dismiss Indictment.

The issue was preserved pursuant to a plea agreement that was accepted by the District Court at the time of sentencing.

RESPECTFULLY SUBMITTED August 6, 2024.

/s/ Russell A. Hart
RUSSELL A. HART
Federal Defenders of Montana
    Counsel for Defendant


/s/ Edward M. Werner
EDWARD M. WERNER
Federal Defenders of Montana
    Counsel for Defendant

## CERTIFICATE OF SERVICE
### L.R.5.2(b)

I hereby certify that on August 6, 2024, a copy of the foregoing document was served on the following persons by the following means:

<u>1, 2</u>  CM-EDF
\_\_\_\_  Hand Delivery
<u> 3 </u>  Mail
\_\_\_\_  Overnight Delivery Service
\_\_\_\_  Fax
\_\_\_\_  E-Mail

1.    CLERK, UNITED STATES DISTRICT COURT

2.    THOMAS K. GODFREY
       ZENO B. BAUCUS
       Assistant United States Attorney
       United States Attorney's Office
       2602 2nd Avenue North, Suite 3200
       Billings, MT  59101
           Counsel for the United States of America

3.    GABRIEL COWAN METCALF
       Defendant

    /s/ Russell A. Hart
    RUSSELL A. HART
    Federal Defenders of Montana
       Counsel for Defendant

    /s/ Edward M. Werner
    EDWARD M. WERNER
    Federal Defenders of Montana
       Counsel for Defendant

Query    Reports    Utilities    Help    Log Out

APPEAL

# U.S. District Court
## District of Montana (Billings)
## CRIMINAL DOCKET FOR CASE #: 1:23-cr-00103-SPW-1

Case title: USA v. Metcalf

Date Filed: 09/14/2023

Magistrate judge case number: 1:23-mj-00130-TJC

Date Terminated: 08/02/2024

---

Assigned to: Judge Susan P. Watters

Appeals court case number: 24-4818 Ninth
Circuit Court of Appeals

**Defendant (1)**

**Gabriel Cowan Metcalf**
*TERMINATED: 08/02/2024*

represented by **Edward Werner**
Federal Public Defender's Office
2702 Montana Avenue
Suite 101
Billings, MT 59101
406-259-2459
Fax: 406-259-2569
Email: edward_werner@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Russell Allen Hart**
Federal Defenders of Montana
175 N. 27th Street
Suite 401
Billings, MT 59101
406-259-2459
Fax: 406-259-2569
Email: russell_hart@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Pending Counts**

18:922Q.F UNLAWFUL POSSESSION
OF A FIREARM IN A SCHOOL ZONE;

**Disposition**

Sentenced to Probation for 3 years

ER_173

FORFEITURE ALLEGATION
(1)

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                        **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                               **Disposition**

18:922Q.F UNLAWFUL POSSESSION
OF A FIREARM IN A SCHOOL ZONE

---

**Plaintiff**

**USA**                                    represented by   **Thomas Godfrey**
                                                            U.S. ATTORNEY'S OFFICE - BILLINGS
                                                            2601 2nd Avenue North, Ste 3200
                                                            Billings, MT 59101
                                                            406-247-4631
                                                            Fax: 406-657-6989
                                                            Email: Thomas.Godfrey@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*
                                                            *Designation: Retained*

                                                            **Zeno B. Baucus**
                                                            U.S. ATTORNEY'S OFFICE - BILLINGS
                                                            2601 Second Avenue North
                                                            Suite 3200
                                                            Billings, MT 59101
                                                            406-657-6101
                                                            Fax: 406-657-6989
                                                            Email: Zeno.Baucus@usdoj.gov
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/21/2023 | | Notification to Counsel of Record as to Gabriel Cowan Metcalf. Counsel of record has been given sealed access so they may view and e-file documents in the case. **TIPS TO REMEMBER** You can view a document via the NEF only once. Only the filers login is authorized to view the document. The filing user may not be able to view the document if any secondary e-mail addresses associated with the filing users account tries to open the NEF. **NOTE: This case is currently SEALED. Do not allow any documents to** |

CM/ECF - District of Montana LIVE https://ecf.mtd.uscourts.gov/cgi-bin/DktRpt.pl?978310045549244-L_1_0-1

| | | **be seen by unauthorized persons.** (JLE) [1:23-mj-00130-TJC] (Entered: 08/21/2023) |
|---|---|---|
| 08/21/2023 | 1 | CRIMINAL COMPLAINT as to Gabriel Cowan Metcalf (1). (Attachments: # 1 Affidavit) (JLE) [1:23-mj-00130-TJC] (Entered: 08/21/2023) |
| 08/21/2023 | 3 | MOTION to Seal Case by USA as to Gabriel Cowan Metcalf. (JLE) [1:23-mj-00130-TJC] (Entered: 08/21/2023) |
| 08/21/2023 | 4 | ORDER granting 3 Motion to Seal Case as to Gabriel Cowan Metcalf (1). Signed by Magistrate Judge Timothy J. Cavan on 8/21/2023. (JLE) [1:23-mj-00130-TJC] (Entered: 08/21/2023) |
| 08/22/2023 | | Arrest of Gabriel Cowan Metcalf (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/23/2023 | | Set Hearing as to Gabriel Cowan Metcalf. Initial Appearance set for 8/23/2023 at 02:30 PM in Billings, MT before Magistrate Judge Timothy J. Cavan. (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/23/2023 | | Case unsealed as to Gabriel Cowan Metcalf (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/23/2023 | 5 | MINUTE ENTRY for proceedings held before Magistrate Judge Timothy J. Cavan: Initial Appearance as to Gabriel Cowan Metcalf held on 8/23/2023. Defendant is present, in custody, and appearing with FD Russell Hart; AUSA Thomas Godfrey appearing for the government. Deft acknowledges his name and that he has reviewed the complaint with counsel. Deft is advised of his rights. The Court appoints FD Russell Hart. Deft requests for a preliminary hearing. Preliminary Hearing to be set for 8/28/23. AUSA moves for detention; Defense requests for a detention hearing. Deft is remanded to the custody of the USMS pending further proceedings. Hearing commenced at 2:38 PM and concluded at 2:43 PM (Court Reporter FTR Gold) (USPO: Cyisa Weidman), (Hearing held in Billings-Big Horn Courtroom) (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/23/2023 | | FTR CERTIFICATION: A clear and complete recording of this proceeding exists re Minute Entry document number 5 as to Gabriel Cowan Metcalf. (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/23/2023 | 6 | CJA 23 Financial Affidavit by Gabriel Cowan Metcalf (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/23/2023 | 7 | ORDER APPOINTING FEDERAL PUBLIC DEFENDER as to Gabriel Cowan Metcalf. Russell Allen Hart for Gabriel Cowan Metcalf appointed. Reimbursement information: Defendant is not required to reimburse the Court. Signed by Magistrate Judge Timothy J. Cavan on 8/23/2023. (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/23/2023 | | Set Hearing as to Gabriel Cowan Metcalf. Detention Hearing set for 8/24/2023 at 02:30 PM in Billings, MT before Magistrate Judge Timothy J. Cavan. (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/23/2023 | | Set Hearing as to Gabriel Cowan Metcalf. Preliminary Hearing set for 8/28/2023 at 09:00 AM in Billings, MT before Magistrate Judge Timothy J. Cavan. (JLE) [1:23-mj-00130-TJC] (Entered: 08/23/2023) |
| 08/24/2023 | 10 | MINUTE ENTRY for proceedings held before Magistrate Judge Timothy J. Cavan: Detention Hearing as to Gabriel Cowan Metcalf held on 8/24/2023. Defendant is present, in custody, and appearing with FD Russell Hart; AUSA Thomas Godfrey |

CM/ECF - District of Montana LIVE                                        https://ecf.mtd.uscourts.gov/cgi-bin/DktRpt.pl?978310045549244-L_1_0-1

| | | |
|---|---|---|
| | | appearing for the government. The govt maintains it's motion for detention. Witnesses sworn and examined. Arguments heard. For reasons stated on the record, Defendant ordered detained. Defendant is remanded to the custody of the USMS. Hearing commenced at 2:56 PM and concluded at 3:36 PM (Court Reporter Kim Marchwick) (Government Witnesses Sworn and Examined: Dustin Stroble, Cyisa Weidman), (USPO: Cyisa Weidman), (Hearing held in Billings-Big Horn Courtroom) (JLE) [1:23-mj-00130-TJC] (Entered: 08/24/2023) |
| 08/25/2023 | 11 | ORDER OF DETENTION as to Gabriel Cowan Metcalf. Signed by Magistrate Judge Timothy J. Cavan on 8/25/2023. (JLE) [1:23-mj-00130-TJC] (Entered: 08/25/2023) |
| 08/28/2023 | 13 | MINUTE ENTRY for proceedings held before Magistrate Judge Timothy J. Cavan: PRELIMINARY HEARING as to Gabriel Cowan Metcalf held on 8/28/2023. Defendant is present and in custody appearing with FD Russell Hart; AUSA Tom Godfrey appearing for the government w/BPD-TFO Dustin Strobel. AUSA Godfrey calls Officer Strobel to the stand. Witness s/e. Arguments heard. The Court finds probable cause to believe a crime has been committed. Defendant bound over fro further proceedings and is remanded to the custody of the USMS. Hearing commenced at 9:07 a.m. and concluded at 9:50 a.m. (Court Reporter FTR Gold) (Government Witnesses Sworn and Examined: Dustin Strobel, BPD ATF-TFO), (Law Clerk: L. Amongero), (Hearing held in Big Horn Courtroom - Billings Division) (JDH) [1:23-mj-00130-TJC] (Entered: 08/28/2023) |
| 08/28/2023 | | FTR CERTIFICATION: A clear and complete recording of this proceeding exists re Minute Entry document number 13 PRELIMINARY HEARING as to Gabriel Cowan Metcalf. (JDH) [1:23-mj-00130-TJC] (Entered: 08/28/2023) |
| 08/28/2023 | 14 | ORDER REGARDING PRELIMINARY HEARING as to Gabriel Cowan Metcalf. Signed by Magistrate Judge Timothy J. Cavan on 8/28/2023. (JLE) [1:23-mj-00130-TJC] (Entered: 08/28/2023) |
| 09/08/2023 | 15 | Evaluation Filed Under Seal *Psychological Evaluation* by Gabriel Cowan Metcalf (Hart, Russell) [1:23-mj-00130-TJC] (Entered: 09/08/2023) |
| 09/08/2023 | 16 | MOTION for Detention Hearing by Gabriel Cowan Metcalf. (Attachments: # 1 Text of Proposed Order) (Hart, Russell) [1:23-mj-00130-TJC] (Entered: 09/08/2023) |
| 09/11/2023 | 17 | ORDER as to Gabriel Cowan Metcalf re 16 MOTION for Detention Hearing filed by Gabriel Cowan Metcalf. IT IS ORDERED that the United States shall file its opposition to Defendant's motion on or before September 15, 2023. (Responses due by 9/15/2023.) Signed by Magistrate Judge Timothy J. Cavan on 9/11/2023. (JLE) [1:23-mj-00130-TJC] (Entered: 09/12/2023) |
| 09/14/2023 | 19 | SEALED INDICTMENT as to Gabriel Cowan Metcalf (1) count(s) 1. (AMC) (Entered: 09/15/2023) |
| 09/14/2023 | 20 | Criminal Cover Sheet filed by USA regarding the 19 Indictment (Sealed) as to Gabriel Cowan Metcalf. (AMC) (Entered: 09/15/2023) |
| 09/14/2023 | 21 | Redacted Indictment as to Gabriel Cowan Metcalf. (AMC) (Entered: 09/15/2023) |
| 09/15/2023 | 18 | RESPONSE to Motion by USA as to Gabriel Cowan Metcalf re 16 MOTION for Detention Hearing (Godfrey, Thomas) [1:23-mj-00130-TJC] (Entered: 09/15/2023) |
| 09/15/2023 | | Set Hearings as to Gabriel Cowan Metcalf. ARRAIGNMENT set for 9/21/2023 at 09:00 AM in Billings, MT before Magistrate Judge Timothy J. Cavan. (JLE) (Entered: |

CM/ECF - District of Montana LIVE                    https://ecf.mtd.uscourts.gov/cgi-bin/DktRpt.pl?978310045549244-L_1_0-...

| | | |
|---|---|---|
| | | 09/15/2023) |
| 09/18/2023 | 23 | ORDER granting 16 Motion for Detention Hearing as to Gabriel Cowan Metcalf (1). Detention Hearing set for 9/21/2023 at 09:00 AM in Billings, MT before Magistrate Judge Timothy J. Cavan. Signed by Magistrate Judge Timothy J. Cavan on 9/18/2023. (JDH) (Entered: 09/18/2023) |
| 09/19/2023 | 24 | ARREST Warrant Returned Executed on 9/14/2023 in case as to Gabriel Cowan Metcalf. (HEG) (Entered: 09/19/2023) |
| 09/19/2023 | 25 | NOTICE *Detention Hearing Memorandum* by Gabriel Cowan Metcalf (Attachments: # 1 Exhibit Exhibit A) (Hart, Russell) Modified on 9/19/2023: Filer informed the clerk's office that he inadvertently captioned document with the original MJ case number. No need to re-file. (JDH). (Entered: 09/19/2023) |
| 09/21/2023 | 26 | MINUTE ENTRY for proceedings held before Magistrate Judge Timothy J. Cavan: Arraignment as to Gabriel Cowan Metcalf (1) Count 1 held on 9/21/2023. Defendant is present and in custody appearing with FD Russ Hart; AUSA Tom Godfrey appearing for the USA. Deft ATN and is advised of his rights. Appointment of FD Hart continues. Deft has rec'd and reviewed the Indictment with counsel. Deft waives reading of the charges and is advised of the max possible penalties. NOT GUILTY Plea entered by Gabriel Cowan Metcalf on Count 1. Hearing commenced at 9:11 a.m. and concluded at 9:13 a.m. Detention Hearing as to Gabriel Cowan Metcalf held on 9/21/2023. Witness ATF S/A Andrew Martin sworn and examined. Arguments by counsel. Deft is released subject to standard and special conditions, pending further proceedings. Hearing commenced at 9:13 a.m. and concluded at 9:48 a.m. (Court Reporter FTR Gold) (Government Witnesses Sworn and Examined: Andrew Martin, ATF), (USPO: Cyisa Weidman), (Law Clerk: D. Boyd), (Hearing held in Big Horn Courtroom - Billings Division) (JDH) (Entered: 09/21/2023) |
| 09/21/2023 | | FTR CERTIFICATION: A clear and complete recording of this proceeding exists re Minute Entry document number 26 Arraignment and Detention Hearing as to Gabriel Cowan Metcalf. (JDH) (Entered: 09/21/2023) |
| 09/21/2023 | 27 | ORDER Setting Conditions of Release as to Gabriel Cowan Metcalf. Signed by Magistrate Judge Timothy J. Cavan on 9/21/2023. (JDH) (Entered: 09/21/2023) |
| 09/21/2023 | 29 | SCHEDULING ORDER as to Gabriel Cowan Metcalf Discovery due by 9/26/2023. Motions due by 10/10/2023. Motion to Change Plea due by 10/30/2023. Pretrial Conference set for 11/13/2023 at 08:30 AM before Judge Susan P. Watters. Jury Trial set for 11/13/2023 at 09:00 AM in Billings, MT before Judge Susan P. Watters. Signed by Judge Susan P. Watters on 9/21/2023. (AMC) (Entered: 09/21/2023) |
| 09/26/2023 | 30 | NOTICE OF TRIAL DAYS by USA as to Gabriel Cowan Metcalf. Number of Trial Days: 2 (Godfrey, Thomas) (Entered: 09/26/2023) |
| 10/10/2023 | 31 | First MOTION to Dismiss *Indictment* by Gabriel Cowan Metcalf. (Hart, Russell) (Entered: 10/10/2023) |
| 10/10/2023 | 32 | BRIEF/MEMORANDUM in Support by Gabriel Cowan Metcalf re 31 First MOTION to Dismiss *Indictment* (Hart, Russell) (Entered: 10/10/2023) |
| 10/24/2023 | 33 | RESPONSE to Motion by USA as to Gabriel Cowan Metcalf re 31 First MOTION to Dismiss *Indictment* (Godfrey, Thomas) (Entered: 10/24/2023) |

5 of 9                                                                                                8/21/2024, 4:27 PM

CM/ECF - District of Montana LIVE                    https://ecf.mtd.uscourts.gov/cgi-bin/DktRpt.pl?978310045549244-L_1_0-1

| 10/30/2023 | 34 | First MOTION to Continue *Trial and Pretrial Deadlines* by Gabriel Cowan Metcalf. (Attachments: # 1 Text of Proposed Order) (Hart, Russell) (Entered: 10/30/2023) |
|---|---|---|
| 10/31/2023 | 35 | ORDER RESETTING TRIAL AND PRETRIAL DEADLINES. GRANTING 34 Motion to Continue as to Gabriel Cowan Metcalf (1) Motions due by 11/28/2023. Motion to Change Plea due by 1/2/2024. Jury Trial set for 1/16/2024 at 09:00 AM in Billings, MT before Judge Susan P. Watters. Pretrial Conference set for 1/16/2024 at 08:30 AM in Billings, MT before Judge Susan P. Watters. Signed by Judge Susan P. Watters on 10/31/2023. (AMC) (Entered: 10/31/2023) |
| 10/31/2023 | 36 | REPLY TO RESPONSE to Motion by Gabriel Cowan Metcalf re 31 First MOTION to Dismiss *Indictment* (Hart, Russell) (Entered: 10/31/2023) |
| 11/28/2023 | 37 | Unopposed MOTION to Continue *Trial and Pretrial Deadlines* by Gabriel Cowan Metcalf. (Attachments: # 1 Text of Proposed Order) (Hart, Russell) (Entered: 11/28/2023) |
| 11/28/2023 | 38 | ORDER RESETTING TRIAL AND PRETRIAL DEADLINES. GRANTING 37 Motion to Continue as to Gabriel Cowan Metcalf (1) Motions due by 2/5/2024. Motion to Change Plea due by 3/11/2024. Jury Trial set for 3/25/2024 at 09:00 AM in Billings, MT before Judge Susan P. Watters. Pretrial Conference set for 3/25/2024 at 08:30 AM in Billings, MT before Judge Susan P. Watters. Signed by Judge Susan P. Watters on 11/28/2023. (AMC) (Entered: 11/28/2023) |
| 01/31/2024 | 39 | ORDER DENYING 31 Motion to Dismiss Indictment as to Gabriel Cowan Metcalf (1). Signed by Judge Susan P. Watters on 1/31/2024. (AMC) (Entered: 01/31/2024) |
| 02/05/2024 | 40 | Unopposed MOTION for Extension of Time to File *Pretrial Motions* by Gabriel Cowan Metcalf. (Attachments: # 1 Text of Proposed Order) (Hart, Russell) (Entered: 02/05/2024) |
| 02/06/2024 | 41 | ORDER GRANTING THE EXTENSION OF PRETRIAL MOTIONS DEADLINE ( Motions due by 2/9/2024.) GRANTING 40 Unopposed MOTION for Extension of Time to File *Pretrial Motions* filed by Gabriel Cowan Metcalf. Signed by Judge Susan P. Watters on 2/6/2024. (AMC) (Entered: 02/06/2024) |
| 02/09/2024 | 42 | (Reserves ruling per order 46) MOTION in Limine by USA as to Gabriel Cowan Metcalf. (Attachments: # 1 Exhibit 1) (Godfrey, Thomas) Modified on 2/26/2024 (AMC). (Entered: 02/09/2024) |
| 02/09/2024 | 43 | First MOTION in Limine by Gabriel Cowan Metcalf. (Hart, Russell) (Entered: 02/09/2024) |
| 02/09/2024 | 44 | BRIEF/MEMORANDUM in Support by Gabriel Cowan Metcalf re 43 First MOTION in Limine (Hart, Russell) (Entered: 02/09/2024) |
| 02/22/2024 | 45 | RESPONSE to Motion by USA as to Gabriel Cowan Metcalf re 43 First MOTION in Limine (Godfrey, Thomas) (Entered: 02/22/2024) |
| 02/26/2024 | 46 | ORDER GRANTED as to argument or evidence of the constitutionality of 18 U.S.C.§922(q)(2)(A). The Court RESERVES ruling on the defense of entrapment by estoppel or any argument or evidence amounting to such defense re 42 MOTION in Limine filed by USA. Signed by Judge Susan P. Watters on 2/26/2024. (AMC) (Entered: 02/26/2024) |

ER_178

| | | |
|---|---|---|
| 02/27/2024 | 47 | ORDER granting 43 Motion in Limine as to Gabriel Cowan Metcalf (1). Signed by Judge Susan P. Watters on 2/27/2024. (EMH) (Entered: 02/27/2024) |
| 03/01/2024 | 48 | TRANSCRIPT ORDER FORM by USA for proceedings held on 8/24/2023 before Judge Timothy J. Cavan. Court reporter Kim Marchwick. Type of transcript: 14-Day. Transcript due by 3/15/2024. (Godfrey, Thomas) (Entered: 03/01/2024) |
| 03/01/2024 | 49 | NOTICE OF ATTORNEY APPEARANCE Zeno B. Baucus appearing for USA. (Baucus, Zeno) (Entered: 03/01/2024) |
| 03/11/2024 | 50 | Third MOTION to Continue *Trial* by Gabriel Cowan Metcalf. (Attachments: # 1 Text of Proposed Order) (Hart, Russell) (Entered: 03/11/2024) |
| 03/14/2024 | 51 | RESPONSE to Motion by USA as to Gabriel Cowan Metcalf re 50 Third MOTION to Continue *Trial* (Godfrey, Thomas) (Entered: 03/14/2024) |
| 03/15/2024 | 52 | ORDER denying 50 Motion to Continue as to Gabriel Cowan Metcalf (1). Signed by Judge Susan P. Watters on 3/15/2024. (EMH) (Entered: 03/15/2024) |
| 03/15/2024 | 53 | TRANSCRIPT of Detention Hearing as to Gabriel Cowan Metcalf held on Thursday, August 24, 2023, before Judge Timothy J. Cavan. Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER, the clerks office, or the court reporter. NOTICE: A NOTICE OF INTENT TO REQUEST REDACTION MUST BE FILED WITHIN 7 DAYS OF THIS FILING. Contact court reporter Kim Marchwick, 406-671-2307, marchwickkim@gmail.com. For further information, please see the Transcript Redaction Procedure and Schedule on the Court Reporters page of our website. Redaction Request due 4/5/2024. Redacted Transcript Deadline set for 4/15/2024. Release of Transcript Restriction set for 6/13/2024. (Marchwick, Kim) (Entered: 03/15/2024) |
| 03/18/2024 | 54 | TRIAL BRIEF by USA as to Gabriel Cowan Metcalf (Godfrey, Thomas) (Entered: 03/18/2024) |
| 03/18/2024 | 55 | Proposed Voir Dire by USA as to Gabriel Cowan Metcalf (Godfrey, Thomas) (Entered: 03/18/2024) |
| 03/18/2024 | 56 | Proposed Jury Instructions *Working Copy* by USA as to Gabriel Cowan Metcalf (Attachments: # 1 Clean Copy) (Godfrey, Thomas) (Entered: 03/18/2024) |
| 03/18/2024 | 57 | Proposed Verdict Form by USA as to Gabriel Cowan Metcalf (Godfrey, Thomas) (Entered: 03/18/2024) |
| 03/18/2024 | 58 | NOTICE OF INTENT TO USE JERS by USA as to Gabriel Cowan Metcalf (Godfrey, Thomas) (Entered: 03/18/2024) |
| 03/18/2024 | 59 | Proposed Jury Instructions by Gabriel Cowan Metcalf (Hart, Russell) (Entered: 03/18/2024) |
| 03/19/2024 | 60 | NOTICE OF ATTORNEY APPEARANCE: Edward Werner appearing for Gabriel Cowan Metcalf *Co-Counsel* (Werner, Edward) (Entered: 03/19/2024) |
| 03/25/2024 | 61 | MINUTE ENTRY for proceedings held before Judge Susan P. Watters: (THIS WAS THE TIME SET FOR A JURY TRIAL).Defendant present, NOT in custody appearing with Federal Defender Russ Hart and Edward Werner; AUSA Tom Godfrey and Zeno Baucus present for Government. Pretrial conference, housekeeping matters discussed. Counsel stipulate to random electronic jury list. Government addresses remaining legal |

| | | |
|---|---|---|
| | | issues. Court hears brief argument on governments remaining motions in limine; both Motions GRANTED. Defense requests a brief recess based on the Courts rulings. Change of Plea Hearing as to Gabriel Cowan Metcalf held on 3/25/2024. Defendant signs and provides the Court an executed plea agreement and elects to proceed with a change of plea hearing. Government states the essence of the plea agreement. Defendant advised of his rights, administered Oath and states full name. Defendant answers courts usual questions. No medications, drugs or alcohol that affect understanding of todays proceeding. Defendant has reviewed the charge in the indictment with his atty and understands the charges. Court reviews the charges, defendant advised of the maximum possible penalties and all the rights that are waived by a guilty plea. Plea agreement discussed and reviewed. Plea is voluntary without promises, force or threats. Elements and Offer of Proof (trial brief) read into the record. Defendant states disagreement to Offer of Proof. Court GRANTS defendants motion to change plea. DEFENDANT PLEADS GUILTY TO COUNT 1 IN THE INDICTMENT and defendant explains what he did to make him plead guilty of the charge. Court accepts guilty plea, finding defendant competent, plea is voluntarily made and defendant adjudged guilty. PSR ordered. Sentencing set 8/2/2024 at 9:30 AM. Defendant to remain on same pretrial conditions pending sentencing. Potential jurors brought in, Judge explains defendant has changed his plea, they are thanked and excused. Hearing commenced at 8:35 AM and concluded at 10:09 AM. (Court Reporter K.Marchwick) (Law Clerk: K.Naef), (Hearing held in Billings-SMC) (EMH) (Entered: 03/25/2024) |
| 03/25/2024 | 62 | PLEA AGREEMENT as to Gabriel Cowan Metcalf (EMH) (Entered: 03/25/2024) |
| 03/25/2024 | 63 | ORDER SETTING SENTENCING as to Gabriel Cowan Metcalf. Sentencing set for 8/2/2024 at 09:30 AM in Billings, MT before Judge Susan P. Watters. Signed by Judge Susan P. Watters on 3/25/2024. (AMC) (Entered: 03/25/2024) |
| 06/20/2024 | | Terminate Deadlines (RELEASE OF TRANSCRIPT RESTRICT FOR DOC 53) as to Gabriel Cowan Metcalf. (AMC) (Entered: 06/20/2024) |
| 07/18/2024 | 64 | SENTENCING MEMORANDUM by USA as to Gabriel Cowan Metcalf (Godfrey, Thomas) (Entered: 07/18/2024) |
| 07/18/2024 | 65 | SENTENCING MEMORANDUM by Gabriel Cowan Metcalf (Hart, Russell) (Entered: 07/18/2024) |
| 07/25/2024 | 66 | RESPONSE by Gabriel Cowan Metcalf re 64 Sentencing Memorandum (Hart, Russell) (Entered: 07/25/2024) |
| 08/02/2024 | 67 | MINUTE ENTRY for Sentencing proceedings held 8/2/2024 as to Gabriel Cowan Metcalf before Judge Susan P. Watters. Defendant is present, NOT in custody, appearing with Federal Defenders Russ Hart and Edward Werner. AUSA Thomas Godfrey Russell appearing for Government. Government moves for a two point reduction in sentence for acceptance of responsibility; Granted. PSR received. Federal Defender Hart with objection to PSR. Court states findings, objection is overruled. Plea agreement accepted. Court summarizes statutory and guideline calculations. AUSA moves to dismiss forfeiture motion; granted. Sentencing arguments made. Court reviews 3553(a) factors. Defendant is SENTENCED to PROBATIONARY PERIOD FOR 3 YEARS with standard and special conditions. Deft has reviewed all conditions with his attorney and waives reading of conditions. Fine is waived and special assessment $100 due immediately. Pursuant to plea agreement right to appeal is waived. Hearing commenced at 9:30 and concluded at 10:06. (Presentence Report due by 8/9/2024. ) (Court Reporter K. Marchwick) (USPO: Molly G.), (Law Clerk: K. Naef), |

| | | (Hearing held in Billings - SMC) (TLO) (Entered: 08/02/2024) |
|---|---|---|
| 08/02/2024 | 68 | JUDGMENT as to Gabriel Cowan Metcalf (1), Count(s) 1, Sentenced to Probation for 3 years. Signed by Judge Susan P. Watters on 8/2/2024. (AMC) (Entered: 08/02/2024) |
| 08/02/2024 | 69 | STATEMENT OF REASONS as to Gabriel Cowan Metcalf re 68 Judgment. Signed by Judge Susan P. Watters on 8/2/2024. (AMC) (Entered: 08/02/2024) |
| 08/05/2024 | 70 | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Gabriel Cowan Metcalf (AMC) (Entered: 08/05/2024) |
| 08/06/2024 | 71 | NOTICE OF APPEAL by Gabriel Cowan Metcalf Filing fee $ 605, receipt number fdom. (Hart, Russell) (Entered: 08/06/2024) |
| 08/07/2024 | 72 | USCA CASE NUMBER AND TIME SCHEDULE ORDER as to Gabriel Cowan Metcalf 24-4818 for 71 Notice of Appeal - Order filed by Gabriel Cowan Metcalf. (AMC) (Entered: 08/07/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/21/2024 16:26:49 | | |
| **PACER Login:** | fdom0341 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cr-00103-SPW |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

ER_181

## CERTIFICATE OF SERVICE
### Fed.R.App.P. 25

I hereby certify that on October 29, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

GABRIEL COWAN METCALF
Reg. No. 74404-510
430 Broadwater Avenue
Billings, MT  59101
      Defendant-Appellant

/s/ Russell A. Hart
_____

RUSSELL A. HART
Federal Defenders of Montana
      Counsel for Defendant