No. 24-4818

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiffs-Appellees,*

v.

GABRIEL COWAN METCALF,
*Defendant-Appellant.*

_____

On Appeal from the
United States District Court for the District of Montana
Case No. 1:23-cr-00103-SPW-1
Honorable Susan. P. Watters

_____

**BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL
ASSOCIATION, INCORPORATED, SECOND AMENDMENT LAW
CENTER, INC., MINNESOTA GUN OWNERS CAUCUS, THE SECOND
AMENDMENT FOUNDATION, SECOND AMENDMENT DEFENSE
AND EDUCATION COALITION, LTD., AND FEDERAL FIREARMS
LICENSEES OF ILLINOIS, INC. IN SUPPORT OF APPELLANT AND
REVERSAL**

_____

C. D. Michel
Joshua Robert Dale
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com
*Counsel for Amici Curiae*

December 5, 2024

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., Minnesota Gun Owners Caucus, The Second Amendment Foundation, Second Amendment Defense and Education Coalition, Ltd., and Federal Firearms Licensees of Illinois, Inc. are nonprofit organizations and thus have no parent corporations and no stock.

Date: December 5, 2024                    MICHEL & ASSOCIATES, P.C.

/s/ C.D. Michel
C.D. Michel
*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement.................................................................. i

Table of Contents................................................................................... ii

Table of Authorities .............................................................................. iii

Interest of Amici Curiae .......................................................................... 1

Introduction ......................................................................................... 3

Argument.............................................................................................. 5

I.      The Proper Application of *Bruen* in the Sensitive Places Context ...................... 5

        A.  Historical analysis under the Second Amendment. .................................. 5

        B.  Sensitive places are narrowly defined under Bruen.................................. 7

II.     The District Court's Three Critical Analytical Errors ................................. 10

III.    How § 922(q)(2)(A) Can Harm Law-Abiding Americans................................... 17

Conclusion............................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bonidy v. United States Postal Serv.*,
   790 F.3d 1121 (10th Cir. 2015) ........................................................ 9

*May v. Bonta*,
   2023 WL 8946212 (C.D. Cal. Dec. 20, 2023) ........................................ 2, 4, 10

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................ 5, 12, 15

*Drummond v. Robinson Twp.*,
   9 F.4th 217 (3d Cir. 2021) ........................................................ 6

*Ezell v. City of Chicago*,
   846 F.3d 888 (7th Cir. 2017) ........................................................ 20

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ........................................................ 7

*Koons v. Platkin*,
   673 F. Supp. 3d 515 (D.N.J. 2023) ........................................................ 4

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ........................................................passim

*United States v. Allam*,
   677 F. Supp. 3d 545 (E.D. Tex. 2023) ........................................................ 3, 9, 18, 19

*United States v. Rahimi*,
   602 U.S. --, 144 S. Ct. 1889 (2024) ........................................................ 7, 15, 17, 18

*Wolford v. Lopez*,
   686 F. Supp. 3d 1034 (D. Haw. 2023) ........................................................ 4

*Wolford v. Lopez*,
   No. 23-16164, 2024 WL 4097462 (9th Cir. Sept. 6, 2024) ........................................ 2, 11

**Statutes**

1 THE STATUTES AT LARGE OF VIRGINIA (William Walker Heninged.,
   1809) ........................................................ 13

iii

18 U.S.C. § 922 ..................................................................................passim

19 Colonial Records of the State of Georgia (A. Candler ed.1911) ............................ 12

ARCHIVES OF MARYLAND (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885) ......................................................................................... 12

Del. Const. (1776) art. XXVIII .................................................................13, 14

## Other Authorities

Bernabei, Leo, *Taking Aim at New York's Concealed Carry Improvement Act*, Duke Center for Firearms Law Blog (Aug. 7, 2023), https://firearmslaw.duke.edu/2023/08/taking-aim-at-new-yorks-concealed-carry-improvement-act/ ...................................................................... 19

Kopel, David & Joseph Greenlee, The "Sensitive Places" Doctrine, Charleston L. Rev. 205 (2018) .................................................................................... 8, 9

R. Barondes, Royce de, *Federalism Implications of Non-Recognition of Licensure Reciprocity Under the Gun-Free School Zones Act*, 32 J.L. & Pol'y 139 (2017) ........................................................................ 19

Smith, Mark W., *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, Harvard J.L. & Pub. Pol'y Per Curiam (2022) ..................................................... 7

## INTEREST OF AMICI CURIAE[1]

Founded in 1875, California Rifle and Pistol Association, Incorporated, is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, California Rifle and Pistol Association regularly participates as a party or amicus in firearm-related litigation.

Second Amendment Law Center, Inc. is a nonprofit corporation headquartered in Henderson, Nevada. Second Amendment Law Center is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

Minnesota Gun Owners Caucus ("MGOC") is a 501(c)(4) non-profit organization incorporated under the laws of Minnesota with its principal place of business in Shoreview, Minnesota. MGOC seeks to protect and promote the right of citizens to keep and bear arms for all lawful purposes. MGOC serves its members and the public through advocacy, education, elections, legislation, and legal action. MGOC's members reside both within and outside Minnesota.

The Second Amendment Foundation is a non-profit membership organization

---

[1] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

founded in 1974 with over 720,000 members and supporters in every state of the union. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms.

Second Amendment Defense and Education Coalition, Ltd. ("SADEC"), is an Illinois not-for-profit corporation. SADEC is dedicated to the defense of human and civil rights secured by law including, in particular, the right to bear arms. SADEC's activities are furthered by complementary programs of litigation and education.

Federal Firearms Licensees of Illinois, Inc. is an Illinois not-for-profit corporation that represents federally licensed gun dealers across the State of Illinois.

Together, Amici California Rifle & Pistol Association and the Second Amendment Foundation are also associational plaintiffs in a case challenging California's new "*Bruen* response" law which declared every public place, save for some streets and sidewalks, "sensitive" and thus off-limits to carry, even for those with a concealed handgun license. Amici prevailed in the district court and won an injunction against most of the law, and then partially prevailed in the Ninth Circuit following the State's appeal. *See May v. Bonta*, No. SACV2301696-CJC(ADSx), 2023 WL 8946212 (C.D. Cal. Dec. 20, 2023); *see also Wolford v. Lopez*, No. 23-16164, 2024 WL 4097462 (9th Cir. Sept. 6, 2024). Amici are now seeking en banc rehearing as to the portions of the analysis they believe the panel erred on. Due to their extensive prior litigation and briefing on this topic, Amici's perspective on the application of the sensitive places doctrine may be useful to this Court as it considers this appeal.

# INTRODUCTION

Amici are Second Amendment advocacy groups that focus on civil litigation to advance the rights of their members who are peaceable citizens. Their advocacy in criminal matters like this one is sparing. Yet criminal cases can make precedential law as readily as civil cases, and that case law often affects not just one criminal defendant in his or her prosecution, but millions of peaceable citizens. Of late, the aphorism "bad facts make bad law" often applies in the Second Amendment context, and any bad facts present here should not lead this court to reach a ruling harming the rights of millions of law-abiding citizens.[2]

The district court's Second Amendment analysis largely replicated that of a Texas district court that ruled similarly. *See United States v. Allam*, 677 F. Supp. 3d 545 (E.D. Tex. 2023). The *Allam* court, in turn, was plainly motivated by an understandable public policy desire to address the threat of school shootings. No doubt school shootings are horrific crimes that "instill fear in parents' hearts and have now become a recurring nightmare." *Allam*, 677 F. Supp. 3d at 568. But where Amici part ways with the *Allam* ruling and the drafters of 18 U.S.C. § 922(q)(2)(A) is the belief that "gun-free zones" are a solution to this societal problem. Such laws only disarm the law-abiding citizen,[3] and certainly do not affect monstrous individuals bent

---

[2] Amici take no position on whether the Appellant himself was otherwise acting lawfully when he was arrested. But, as Mr. Metcalf had also made a facial challenge to 18 U.S.C. § 922(q)(2)(A), his individualized conduct is not relevant to that question.

[3] Acting as plaintiffs in their own litigation against California's expansive new "sensitive places" law, Amici presented data from several states demonstrating that Americans with CCW permits are overwhelmingly more law-abiding than the population as a whole. The District Court for the Central District of California relied on that data as part of the reason for issuing a preliminary injunction against the law.

3

on mass murder. In other words, laws like § 922(q)(2)(A) make the areas they ostensibly protect enticing "soft targets" for mass killers, while disarming the very people who may have otherwise been able to stop them. If the government wants to deem a place "sensitive" and off-limits to those lawfully carrying firearms, then it should offer comprehensive security at those places, as it does at courthouses, airports, and in legislative chambers.

But this is not a policy brief, and the *Metcalf* district court's analysis did not err because of policy disagreements. It erred because it replicated several errors in the *Bruen* analysis also made in *Allam*. First, it applied the looser standard of the "more nuanced approach" prescribed for assessing firearms restrictions applied to modern problems, even though there is nothing new about schools or people carrying firearms at or near them. Second, the district court relied on an insufficient number of historical polling place "buffer zone" laws in concluding these laws are a representative analogue of § 922(q)(2)(A), elevating these "outliers" to analogue status in contravention of *Bruen*. Finally, the reliance on polling place buffer zone laws was flawed; even if polling place buffer zone laws were not outliers, they are not relevantly similar to § 922(q)(2)(A) given the dramatically lesser comparative burden they impose on the Second Amendment right in both temporal and physical size terms.

Amici will conclude with a discussion of how § 922(q)(2)(A) can harm

---

*See May*, 2023 WL 8946212, at *19 ("Simply put, CCW permitholders are not the gun wielders legislators should fear"). Other courts have reached the same conclusion. *See Wolford v. Lopez,* 686 F. Supp. 3d 1034, 1076 (D. Haw. 2023) ("the vast majority of conceal carry permit holders are law abiding"); and *Koons v. Platkin,* 673 F. Supp. 3d 515, 669 (D.N.J. 2023) ("despite ample opportunity for an evidentiary hearing, the State has failed to offer any evidence that law-abiding responsible citizens who carry firearms in public for self-defense are responsible for an increase in gun violence").

peaceable Americans trying to exercise their right to carry.

## ARGUMENT

I. **THE PROPER APPLICATION OF *BRUEN* IN THE SENSITIVE PLACES CONTEXT**

### A. Historical analysis under the Second Amendment.

In 2022, the Supreme Court reaffirmed the "original public meaning test" of *District of Columbia v. Heller*, 554 U.S. 570 (2008), for analyzing Second Amendment challenges. Applying it, the Court found that the Second Amendment protects the right to armed self-defense in public. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19, 31-33 (2022). *Bruen* reiterated that courts may not engage in any form of "intermediate scrutiny" or "strict scrutiny" in Second Amendment cases. *Id.* at 23. The proper test is:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24. The burden that the Second Amendment imposes is "the *government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17 (emphasis added); *see also id.* at 19, 24, 58 n.25, 59 & 70.

Moreover, the government cannot simply proffer just any historical law that references firearms. Rather, when challenged laws regulate conduct or circumstances that already existed at the time of the Founding, the absence of widespread historical laws restricting that same conduct or circumstances suggests that the Founders

5

understood the Second Amendment to preclude such regulation. *Id.* at 27. In contrast, uniquely modern circumstances that did not exist at the time of the Founding call for an analogical analysis, based on the government's proffered historical record. *Id.* at 28-29.

Outlier statutes do not satisfy the requirement. A law must be a "well-established and representative historical analogue." *Id.* at 30. Courts may not uphold a modern law just because a few similar laws may be found from the past. *Id.* Doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Id.* (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)).

For example, in *Bruen*, New York presented three laws from the Colonial era, three turn-of-the-18th-century laws, three 19th-century laws, and five late-19th-century regulations from the Western Territories. *Bruen*, 597 U.S. at 37-70. The Court found them to be outliers insufficient to uphold New York's law, and emphasized, as it had in *Heller*, that it would not stake its interpretation of the Second Amendment upon historical outliers that contradict the overwhelming weight of other evidence about the right to bear arms in public for self-defense. *Id.* at 65.

This emphasis on sufficient numerosity returned in the Court's latest Second Amendment case, *United States v. Rahimi*, where it decided that a modern federal statute that prohibits an individual subject to a domestic violence restraining order from possessing a firearm is constitutional. In its historical analysis, the Court relied on two categories of historical analogues rooted in the Founding era and earlier which continued into the 19th century. For the first category it identified, historical surety laws, the Court referred to nine total Founding-era or later laws, not including the

6

pre-Founding history of similar laws. *United States v. Rahimi,* 602 U.S. --, 144 S. Ct. 1889 (2024). The second category of laws was the historical "going armed in terror of the people" laws, which were also quite well-represented in Founding era and earlier. The Court cited pre-Founding English history, colonial laws, and Founding-era laws supporting the tradition of "going armed" laws, as well as Blackstone. *Id.* at 1901.

Reconstruction-era evidence is relevant only if it provides confirmation of what had been established before, but "postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 597 U.S. at 36 (quoting *Heller v. District of Columbia,* 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).[4] 20th-century evidence was considered even less persuasive. *Bruen*, 597 U.S. at 66 n.28. While the Court in *Rahimi* declined to expressly disqualify Reconstruction-era laws that had no Founding-era counterparts, it is quite clear that is the direction in which the Court is moving. "[E]vidence of 'tradition' unmoored from original meaning is not binding law . . . And scattered cases or regulations pulled from history may have little bearing on the meaning of the text." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring).

### B.    Sensitive places are narrowly defined under *Bruen.*

As to whether there are any special locations where the right to bear arms might be restricted without infringing Second Amendment rights, the Court explained

---

[4] *See also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities remained consistent with the public understanding in 1791").

that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 597 U.S. at 30. And:

> expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly . . . [and] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*Id.* at 31. "[T]here is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.*

Indeed, sensitive places are intended to be the rare *exception* to the general right to public carry. Using the historical record, the Court acknowledged only three types of places where it suspected firearm carry might presumptively be foreclosed: legislative assemblies, polling places, and courthouses. *Id.* (citing David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018)). Beyond that, the Court identified no other well-represented examples that would obviously and facially meet *Bruen*'s test.

Government-provided security, while not dispositive of whether a place is actually sensitive, at least evidences the government's honest belief that it is. It also lessens the concern of the citizen who is temporarily giving up his right to armed self-defense, because some reasonable degree of security has been provided. By contrast, when the government declares a place a "gun-free zone" but provides no security of its own, it both effectively admits it does not truly consider that place sensitive but nonetheless removes the effective means of self-defense from law-abiding citizens in that space. As the Kopel & Greenlee article cited approvingly in *Bruen* explains:

8

> The government's behavior can demonstrate the true importance of the alleged government interest…when a building, such as a courthouse, is protected by metal detectors and guards, the government shows the seriousness of the government's belief that the building is sensitive. . . . Conversely, when the government provides no security at all—such as in a Post Office or its parking lot—the government's behavior shows that the location is probably not sensitive…

Kopel & Greenlee, *supra*, at 290. So it is with § 922(q)(2)(A). It declares wide swaths of land around all schools—a thousand feet in every direction—completely off limits to the right of armed self-defense, but it does nothing to protect any of that area from criminals.

Moreover, it is unclear what historical or other basis there is for a blanket rule declaring off limits 1,000 feet, no more or less. As discussed below, this distance—like the more recent six-foot distancing requirement for pandemic mitigation based on science no more rigorous than speculation about public acceptance—seems to be grounded in little more than being a nice round number. To extend the curtilage of all schools this distance, regardless of whether a school is immediately surrounded by the density of New York City or the sparseness of Montana, requires some history of regulation that such wide swaths of curtilage are sensitive regardless of location or density. Yet, none exists. *See, e.g.*, *Allam*, 677 F. Supp. 3d at 562.

To be sure, some curtilage might be found to be genuinely sensitive after historical analysis. As one partial dissenting opinion that has been vindicated by *Bruen* explained, "[t]he White House lawn, although not a building, is just as sensitive as the White House itself" but, "[a]t the spectrum's other end[,] we might find a public park associated with no particular sensitive government interests–or a post office parking lot surrounding a run-of-the-mill post office." *Bonidy v. United States Postal Serv.*, 790

9

F.3d 1121, 1137 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part); *see also May*, 2023 WL 8946212, at *17 ("[The] designation of parking areas as sensitive places is inconsistent with the Second Amendment. Both *Heller* and *McDonald* describe sensitive places where carry may be prohibited using the preposition 'in,' not 'near' or 'around.' ").

The school zones restricted by § 922(q)(2)(A) are clearly not like the White House lawn; they are so numerous and ubiquitous that the term "sensitive places" is effectively meaningless if it is applied to them.

## II.    THE DISTRICT COURT'S THREE CRITICAL ANALYTICAL ERRORS

The district court upheld § 922(q)(2)(A) because it made three errors that doomed its analysis.

**First**, even though schools and the threat of violence in schools has existed for centuries, the district court inappropriately applied *Bruen*'s "more nuanced approach." While the Supreme Court said "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," *Bruen*, 597 U.S. at 27, this is not such a case because § 922(q)(2)(A) purportedly "addresses a general societal problem that has persisted since the 18th century." *Id.* at 26. The social concern of criminals committing crimes with weapons they carry in public is not a novel 21st-century challenge, and the Supreme Court made clear that the "lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added).

The Ninth Circuit recently confirmed this is the standard as well, with this

10

Court acknowledging that when places have existed since the Founding, the more stringent "distinctly similar test" applies, rather than stretched analogies. *Wolford,* 2024 WL 4097462, at \*12. There is no dispute that schools have existed since before the Founding, meaning the more nuanced approach has no place in this analysis.[5]

The district court in this matter conceded that while there have been attacks on schools in the past dating back to the French and Indian War, it argued that there are many more of them lately, beginning after the 1970s. 1-ER-82. The problem with this argument is that the same could be said for *most* public places. The scourge of mass shootings has inflicted parks, grocery stores, shopping malls, churches, hospitals, banks, bars, and even streets and sidewalks. If the district court were correct that the crime of mass shootings is justification for more general analogies, then every public place, even those that also existed in the 18th and 19th Centuries, would be subject to the "more nuanced approach." The government would never have to demonstrate that "distinctly similar" historical laws exist before deeming a place "sensitive," turning *Bruen's* detailed analogue discussion into surplussage.

The district court essentially determined that the reprehensible crime of school

---

[5] To be sure, the *Wolford* panel opined that schools could nonetheless be "sensitive places" by ignoring its own stated rule in favor of a reliance on early 19th-century school rules (not laws) that banned students (but not adults) from carrying firearms on campus. *Wolford,* 2024 WL 4097462, at \*11. However, its discussion of the constitutional legitimacy of school buffer zones was far more constrained than the expansive 1,000-foot radius the district court here considered permissible, stating only that "[o]ther parking areas—such as a student-only parking area at a school or a fenced, gated, parking lot at a jail or nuclear power plant—likely fall within a reasonable buffer zone such that firearms may be prohibited there." *Id.* at \*19. While Amici do not believe the Founding-era historical record supports doing so, perhaps this Court may decide the parking lots adjoining the school an appropriate "sensitive place", but even if it does, that does not justify expansion to all unrelated property within 1,000 feet in any direction.

11

shootings was enough justification for it to wave through the government's imposition of a substantial burden on the individual right to carry. 1-ER-82. The Supreme Court warned against exactly this:

> [The analogical inquiry does] not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry. Again, the Second Amendment is the "product of an interest balancing *by the people*," not the evolving product of federal judges. . . . It is not an invitation to revise that balance through means-end scrutiny.

*Bruen*, 597 U.S. at 29 n.7.

Moreover, the district court ignored another reason the more nuanced approach should not apply: "If earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26-27. In the Founding era, churches were the frequent target of violent attacks, often by hostile Native American tribes. Did the Founders respond to this by declaring churches "gun-free zones" and disarming the adult congregants? No, they did the opposite. Founding-era and pre-Founding laws often *required* churchgoers to be armed to defend against such attacks. The Supreme Court even cited one example: "Many colonial statutes required individual arms bearing for public-safety reasons—such as the 1770 Georgia law that 'for the security and *defence of this province* from internal dangers and insurrections' required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.' " *Heller*, 554 U.S. at 601 (citing 19 Colonial Records of the State of Georgia 137-39 (A. Candler ed.1911)). Similarly, Maryland in 1642 and Virginia in 1631, 1642, and 1755 required able-bodied men to bear arms while at church. ARCHIVES OF MARYLAND 103 (William Hand Browne ed., Baltimore, Md. Hist. Soc'y 1885); 1

THE STATUTES AT LARGE OF VIRGINIA 174, 263, 534 (William Walker Hening ed., 1809).

Historical "sensitive places" in the Founding era were largely limited to those places where the business of government was conducted; where it was feared that armed people could intimidate voters, courts, or elected officials to act according to their wishes. For example, the 1776 Delaware constitution provided that "[t]o prevent any violence or force *being used at the said elections*, no persons shall come armed to any of them; and no muster of the militia shall be made on that day. . . ." Del. Const. of 1776, art. XXVIII (emphasis added).

Faced with an increase in violent attacks at schools, the Founders would never have seen disarming peaceful adults as the solution. They would have allowed them—or even required them—to be armed to deal with any violent threats. The district court was wrong to engage in the "more nuanced approach" given this history.

**Second**, the district court was also wrong to conclude that there was any representative tradition of buffer zones around polling places (let alone schools).

The analogical analysis began well enough, with the district court rightfully rejecting the limited historical school restrictions the government presented as insufficient and not actually analogous, given they mostly only applied to students and not adults, and they only applied on school property anyway, not areas around the schools.[6] 1-ER-83-84. As for the 19th-century laws and territorial restrictions the

---

[6] The district court could have also rejected them for another reason: *Bruen* looks for "an enduring American tradition of *state regulation*," not private rules or mores. *Bruen*, 597 U.S. at 69 (emphasis added).

government presented, while they were far too few in number and late in time to be representative analogues, the district court again noted correctly that they only applied on the school premises themselves, not in zones around them. *See id.*

But then, after rejecting all of the government's proposed historical analogues, the district court put forward its own history in an effort to uphold § 922(q)(2)(A), in the exact same way the *Allam* court did. In doing so, the district court presented three laws involving buffer zones around polling places rather than schools. The first was a pre-founding Delaware state constitution provision which the Court described as prohibiting "the possession of firearms within one mile of a polling place for 24 hours before an election until 24 hours after the election closed." 1-ER-86 (citing Del. Const. (1776) art. XXVIII.). But the Court misread the text of that article. It does say that no person can be armed at a polling place, but the one-mile restriction the Court referenced only applied to those in a "battalion or company." The full text reads:

> **ART. 28.** To prevent any violence or force being used at the said elections, **no person shall come armed to any of them**, and no muster of the militia shall be made on that day; nor shall any battalion or company give in their votes immediately succeeding each other, if any other voter, who offers to vote, objects thereto**; nor shall any battalion or company, in the pay of the continent, or of this or any other State, be suffered to remain at the time and place of holding the said elections, nor within one mile of the said places respectively, for twenty-four hours before the opening said elections, nor within twenty-four hours after the same are closed,** so as in any manner to impede the freely and conveniently carrying on the said election: *Provided always*, That every elector may, in a peaceable and orderly manner, give in his vote on the said day of election.

Del. Const. (1776) art. XXVIII (emphasis added). This colonial provision was thus about preventing military or militia from intimidating voters, it was not about making sure individuals were disarmed (except for those at a polling place). As no additional

14

antebellum laws were provided by either the government or the district court, there is no Founding-era example of a buffer zone law that applied to individuals presented in this case. This is critical because "we seek to honor the fact that the Second Amendment 'codified a *pre-existing* right' belonging to the American people, one that carries the same 'scope' today that it was 'understood to have when the people adopted' it." *Rahimi*, 144 S. Ct. at 1908 (Gorsuch, J., concurring) (citing *Heller*, 554 U.S. at 592).

The district court instead relied on a few additional laws from the Reconstruction era. One applied in Louisiana and banned carry entirely on election days, and within half a mile of registration locations on registration days. 1-ER-86 (discussing various Reconstruction-era Louisiana carry laws). The district court also cited a similar 1873 Texas law, as well as an 1874 Maryland law that applied in only three counties, not the entire state. *Id.*

Of course, by 1874, there were 37 total states, and the vast majority of them had no similar buffer zone laws on the books. But the district court relied on a single pre-Founding law that did not apply to individuals, two state laws from after the Civil War, and one more law applying to just three counties in a single state. These are patently outliers, not the sort of "well-established and representative historical *analogue*" *Bruen* requires. 597 U.S. at 30. *Bruen* itself rejected two historical state laws as insufficient to uphold New York's carry law. *See Bruen*, 597 U.S. at 65 ("We acknowledge that the Texas cases support New York's proper-cause requirement. . . . But the Texas statute, and the rationales set forth in *English* and *Duke*, are outliers. In fact, only one other State, West Virginia, adopted a similar

public-carry statute before 1900."). Given that two statewide laws were insufficient in *Bruen*, there is absolutely no reason that a similarly small number should be sufficient here to save § 922(q)(2)(A).

**Third**, even if the exceedingly few 19th-century polling place buffer zone laws the district court cited were deemed sufficient in number to be valid historical analogues, they are not relevantly similar to the school zone restriction of § 922(q)(2)(A) in terms of the burden they impose on the exercise of the right. The polling place buffer zones would only apply on election days, totaling no more than two-to-three days maximum each year depending on how many federal, state, local, and primary elections occurred. By contrast, the school zone laws apply all day, every day of the year, regardless of the presence of children or staff, including when school is not in session and when the school year has concluded.

The district court ignored this critical difference in temporal scope, failing to address it at all. In doing so, it ignored a critical part of the *Bruen* analysis. In addition to examining the "how" and "why" metrics to determine the similarity of a modern law to proposed historical analogues, the Supreme Court also explained that "whether modern and historical regulations impose a *comparable burden* on the right of armed self-defense and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29 (emphasis added). Here, the burdens imposed by the two types of laws are entirely different. Whereas the polling place restrictions only burdened the right of armed self-defense on the rare occasion of an election day, § 922(q)(2)(A) is in effect *every day*, making 1,000 feet around each school off-limits to a constitutional right on a

16

permanent basis.

    *Rahimi* further confirms the district court's error. There, the Supreme Court emphasized the similar temporal burdens imposed by the historical laws as compared to the modern law at issue. "[L]ike surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary as applied to Rahimi. Section 922(g)(8) only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Rahimi*, 144 S. Ct. at 1902. Had the district court's logic been correct that temporal differences do not matter, then the Supreme Court's analysis would have been different. "[A] court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at *30 (Barrett, J., concurring).

    Astonishingly, the district court acknowledged the massive burden imposed by Section 922(q)(2)(A), writing that its expansive 1,000-foot radius rule "covers almost the entirety of every urban location in the United States, including many places that have nothing to do with the closest school." 1-ER-84-85. It is not clear why that admittedly massive and material burden nonetheless had no impact on the court's analysis. Regardless, the district court was wrong to ignore the critical differences in the temporal burden imposed by the historical and modern laws, and, for that reason as well, it should be reversed.

## III.   How § 922(q)(2)(A) Can Harm Law-Abiding Americans

    Given the unsympathetic facts present in many criminal cases, courts can often overlook how the challenged law detrimentally affects millions of peaceable citizens. Section 922(q)(2)(A) is such a law, as it makes carry difficult or impossible for people simply trying to peaceably exercise their right of armed self-defense.

17

While all overbearing "sensitive place" restrictions are an affront to the Second Amendment, buffer zone laws are in their own special category because they can lead to accidental violations. Someone legally carrying a firearm in an urban environment will not necessarily know exactly when they have entered into a school zone. 1,000 feet in every direction is quite a wide radius, as it is the length of approximately three football fields (or a total end-to-end diameter of over a third of a mile for each school zone). Given the sheer size of these zones, it can be very easy to go about one's day and stop for coffee, get gas, or even just drive near a school while otherwise lawfully carrying without realizing you have entered into a school zone. *See Fig. 1*, *infra*, excerpted from Google Maps (last visited September 4, 2024).



*Fig. 1: Brooklyn's famous James Madison High School contains numerous businesses, hundreds of residences, 17 streets, and a major thoroughfare within its 1,000-foot gun-free zone.*

The *Allam* district court made much of the limited exceptions, most notably the allowance for an unloaded and locked firearm, 677 F. Supp. 3d at 566, but they are

often of no help to someone who is exercising his right to armed self-defense and inadvertently crosses into a school zone while doing so. Nor is such an exception helpful to someone who is travelling on foot or by public transit and has no means to either unload or lock up their firearm for the perhaps significant or merely fleeting period when they will be passing through a school zone and thus violating the law.

Another exception is for individuals licensed to carry by the state they are carrying in; but as more and more states become "constitutional carry" states where no permit is required (like Montana), this exemption puts more otherwise law-abiding citizens at risk if they can only carry without a permit. And as for those carrying through school zones with permits issued by the other states but honored via reciprocity, "[t]he ATF has taken the position that a nonresident who is licensed by a state through reciprocity alone, giving recognition to a permit issued by another state, is not 'licensed to do so by the State in which the school zone is located'—licensure by that state through reciprocity is not, in their view, licensure by a state." 677 F. Supp. 3d at 567 n.31 (citing Royce de R. Barondes, *Federalism Implications of Non-Recognition of Licensure Reciprocity Under the Gun-Free School Zones Act*, 32 J.L. & Pol'y 139, 144 (2017)). As visitors from out of state are the least likely to know where schools are located, they are the most at risk of an unintended but nonetheless serious criminal charge.

Given that many schools exist in urban areas, this Court should also consider whether school zones, "when considered in combination[,] . . . effectively exempt cities from the Amendment's protections." *See* Leo Bernabei, *Taking Aim at New York's Concealed Carry Improvement Act*, Duke Center for Firearms Law Blog (Aug. 7,

19

2023), https://firearmslaw.duke.edu/2023/08/taking-aim-at-new-yorks-concealed-carry-improvement-act/. This "aggregate-effect" analysis was adopted by the Seventh Circuit in barring the City of Chicago from zoning gun ranges out of existence, because the "combined effect" of the various zoning rules left very little of the City of Chicago available for ranges. *Ezell v. City of Chicago*, 846 F.3d 888, 894 (7th Cir. 2017). So too can the combined effect of dozens of school zones make the right to carry difficult or impossible. And as noted previously, the district court in this case acknowledged that the 1,000-foot rule can effectively cover entire urban areas. 1-ER-84-85.

For example, below is a map of schools in Billings, Montana, where the facts of this case arose. For each school marked on the map, recall that a radius of 1,000 feet, about three football fields, extends out in every direction thanks to § 922(q)(2)(A). Cumulatively, that is quite a lot of land suddenly off limits to people otherwise lawfully carrying. *See Fig. 1*, *infra*, excerpted from Google Maps (last visited September 4, 2024):



20

*Fig. 2: According to Google Maps, more than a dozen schools are located in Billings, Montana.*

Even an informed individual who has memorized where each school is would have a difficult time traversing this maze of sometimes-overlapping school zones which render large swaths of the city off-limits to them if they are exercising their right to carry. Section 922(q)(2)(A) is even more of a problem to the uninformed individual, such as people visiting Billings or just passing through, as they will not know where schools are. And while the law requires the individual to "knowingly" possess a gun somewhere they have reasonable cause to believe is a school zone, that is cold comfort to someone whose degree of knowledge is disputed by the government. Such an individual may be dragged through the criminal justice system, or more commonly, forced into a plea bargain that may cost them their Second Amendment rights permanently. Limitations on constitutional rights must have clearer boundaries than this. Section 922(q)(2)(A) is unconstitutional.

## CONCLUSION

For these reasons, Amici urge this Court to reverse the district court and rule that § 922(q)(2)(A) is unconstitutional.

Respectfully submitted,

Dated: December 5, 2024

**MICHEL & ASSOCIATES, P.C.**

/s/ C.D. Michel
C.D. Michel
Joshua Robert Dale
Konstadinos T. Moros
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Email: cmichel@michellawyers.com
*Counsel for Amici Curiae*

21

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-4818

I am the attorney or self-represented party.

**This brief contains** | 5,999 | **words,** including | 0 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
 ☐ it is a joint brief submitted by separately represented parties.
 ☐ a party or parties are filing a single brief in response to multiple briefs.
 ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [       ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/C.D. Michel   **Date** | December 5, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                   *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, SECOND AMENDMENT LAW CENTER, INC., MINNESOTA GUN OWNERS CAUCUS, THE SECOND AMENDMENT FOUNDATION, SECOND AMENDMENT DEFENSE AND EDUCATION COALITION, LTD., AND FEDERAL FIREARMS LICENSEES OF ILLINOIS, INC. IN SUPPORT OF APPELLANT AND REVERSAL with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on December 5, 2024, using the Court's Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: December 5, 2024                    MICHEL & ASSOCIATES, P.C.

                                          /s/ C.D. Michel
                                          C.D. Michel
                                          *Counsel for Amici Curiae*

23