No. 24-4818

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

Gabriel Cowan Metcalf,
*Defendant-Appellant*,

v.

United States
*Plaintiff-Appellee.*

---

On Appeal from the United States District Court for the District of Montana
Billings Division, Case No. 1:23-CR-00103-SPW, The Honorable Susan P. Watters

---

## BRIEF OF *AMICUS CURIAE* MOUNTAIN STATES LEGAL FOUNDATION'S CENTER TO KEEP AND BEAR ARMS IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

---

Michael D. McCoy
Robert A. Welsh*
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
mmccoy@mslegal.org

*Application for admission pending

*Attorneys for Amicus Curiae
Mountain States Legal Foundation's
Center to Keep and Bear Arms*

## CORPORATE DISCLOSURE STATEMENT[1]

The undersigned attorney certifies that *amicus curiae* Mountain States Legal Foundation ("MSLF") is a nonprofit corporation, formed and in good standing in the state of Colorado under Section 501(c)(3) of the Internal Revenue Code. MSLF is not publicly traded and has no parent corporation. There is no publicly held corporation that owns ten percent or more of its stock.

---

[1] Pursuant to Fed. R. App. P. 29, both parties have consented to the filing of this *amicus curiae* brief. Pursuant to Fed. R. App. P. 29(a)(4)(E), the undersigned affirms that no counsel for a party authored this brief in whole or in part, and no person or entity other than Mountain States Legal Foundation, or its counsel, made a monetary contribution specifically for the preparation or submission of this brief.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF CONTENTS.......................................................... ii

TABLE OF AUTHORITIES .................................................. iii

IDENTITY AND INTEREST OF AMICUS CURIAE......................... 1

INTRODUCTION ................................................................ 2

SUMMARY OF THE ARGUMENT ...................................... 4

ARGUMENT ...................................................................... 4

I.      Bruen Looks to the Mechanical Features of a Statute to Determine 'How' a Challenged Regulation Burdens the Second Amendment Right to Keep and Bear Arms ............................................................... 6

II.     Rahimi Provided Specific Metrics by Which Courts Can Analyze 'How' a Challenged Regulation Burdens the Second Amendment........ 9

III.    Respectfully, the District Court Failed to Adequately Analyze 'How' the Total Restriction Within One-Thousand Feet of a School Burdened the Second Amendment Right, In Accordance With Bruen and Rahimi   12

IV.     Conclusion ...................................................... 19

CERTIFICATE OF SERVICE ............................................... 20

Certificate of Compliance for Briefs...................................... 21

# TABLE OF AUTHORITIES

**Case**                                                                    **Page(s)**

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ...........................................................  1, 2, 5

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ...........................................................  1, 5

*New York State Rifle & Pistol Ass'n v. Bruen,*
  597 U.S. 1 (2022) ...........................................................  1, 2, 5, 8

*Nunn v. State,*
  1 Ga. 243 (1846) ...........................................................  8

*State v. Huntly,*
  25 N.C. 418 (1843) ...........................................................  7

*Teter v. Connors,*
  76 F. 4th 938 (9th Cir. 2023) ...........................................................  1

*United States v. Metcalf,*
  2024 WL 358154 (D. Mont. 2024) ...........................................  13, 15, 16, 17, 18

*United States v. Rahimi,*
  144 S. Ct. 1889 (2024) ...........................................................  3, 10, 12

*VanDerStok v. Garland,*
  633 F. Supp. 3d 847 (N.D. Tex. 2022) ...........................................................  1

**Statutes**

18 U.S.C. § 922(g)(8)...........................................................  3, 9, 10, 11

18 USC § 922(q)(2)(A) ...........................................  12, 13, 15, 16, 17, 18

18 U.S.C. § 924(a)(1)(B) ...........................................................  16

1895 Tex. Crim Stat. ch. 3, art. 169...........................................................  17

Act of Mar. 16, 1870, § 73,
  1870 La. Acts 160 ...........................................................  16

Act of Apr. 16, 1874, ch. 250,
   1874 Md. Laws 336.................................................................... 18

Del. Const. art. 28 (1776).......................................................... 15

**Rules**

Fed. R. App. P. 29...................................................................... i

Fed. R. App. P. 29(a)(4)(E)........................................................ i

Fed. R. App. P. 29(a)(5)............................................................. 21

Fed. R. App. P. 32(a)(5)............................................................. 21

Fed. R. App. P. 32(a)(6)............................................................. 21

Fed. R. App. P. 32(f)................................................................. 21

**Other Authorities**

*The "Sensitive Places" Doctrine: Locational Limits on the Right to bear arms*,
   13 Charleston L. Rev. 205 (2018)...................................... 13

## IDENTITY AND INTEREST OF AMICUS CURIAE

The Center to Keep and Bear Arms ("CKBA") is a project of Mountain States Legal Foundation ("MSLF"), a Colorado-based non-profit, public interest legal foundation. MSLF was founded in 1977 to defend the Constitution, protect private property rights, and advance economic liberty. CKBA was established in 2020 to continue MSLF's litigation to protect Americans' natural and fundamental right to self-defense. CKBA represents individuals and organizations challenging infringements on the constitutionally protected right to keep and bear arms. *See, e.g.*, *VanDerStok v. Garland*, 633 F. Supp. 3d 847 (N.D. Tex. 2022), *cert. granted* Apr. 22, 2024 (No. 23-852); *Sullivan, et al. v. Ferguson, et al.*, 3:22-cv-05403 (W.D. Wash.); *Garcia v. Polis*, 1:23-cv-02563-JLK (D. Colo.).

CKBA also files *amicus curiae* briefs with the U.S. Supreme Court and circuit courts across the nation. *See, e.g.*, *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (representing *amicus curiae* CKBA); *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (representing *amici curiae* Rocky Mountain Gun Owners and National Association for Gun Rights); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (representing *amicus curiae* MSLF); *Teter v. Connors*, 76 F. 4th 938 (9th Cir. 2023), *reh'g en banc granted*, 2024 WL 719051 (9th Cir. Feb. 22, 2024) (representing *amicus curiae* MSLF). The Court's decision will directly impact CKBA's current clients and litigation.

1

## INTRODUCTION

In 2022, the Supreme Court announced its landmark decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The opinion held that a New York concealed carry law violated the Second Amendment because it required citizens to establish a special need before they could be licensed to carry a concealed firearm in public. In *Bruen*, the Supreme Court reaffirmed and significantly expanded the precedent that it set nearly 15 years earlier in *District of Columbia v. Heller*, 554 U.S. 570 (2008). By extending the right to possess a firearm for self-defense to areas outside of the home, the Court indicated that the Second Amendment protects a wide swath of conduct that some courts had not previously considered covered. This decision also represented a sea-change in the way that lower courts are required to doctrinally evaluate and address cases involving Second Amendment-protected rights. Put simply, means-ends scrutiny is dead. Instead, once a challenged regulation is found to be covered by the text of the Second Amendment, courts must put the government to the exceedingly stringent test of establishing that a regulation is consistent with the nation's historical tradition of firearm regulation.

Like the District Court in this case, many lower courts have grappled with the analysis surrounding which laws from the founding are 'relevantly similar' analogues for current firearm regulations. The Court in *Bruen* looked to *Heller* and *McDonald* to provide context to their analysis in the form of metrics. The Court

2

explained "that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen* at 29. It was these two metrics that the Court put to further use in their analysis in *United States v. Rahimi*, 602 U.S. —, 144 S. Ct. 1889 (2024), when determining whether founding-era surety and going-armed laws were 'relevantly similar' to 18 U.S.C. § 922(g)(8). In that case, the Court found that such laws were 'relevantly similar' enough as historical analogues to conclude that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 1903.

Unfortunately, *Rahimi* was an easy case. Decided by an 8-1 vote, the Court had little difficulty concluding that § 922(g)(8) was close enough to relevantly similar laws at the Founding. But *Rahimi* should not be mistaken as an *apologia* for *Bruen*. Instead, courts must continue to strictly review historical laws, so as to analyze 'why' the regulation burdened the Second Amendment right, and 'how' it did so, including a discussion of the duration of the burden and/or penalties imposed by the historical regulation in comparison to the challenged law. Nothing in *Rahimi* obviates the Court's need to fully compare, including mechanical, implementation features of 'how,' and 'why' the challenged regulation is 'relevantly similar' to a proffered historical analogue.

## SUMMARY OF THE ARGUMENT

Attorneys and judges frequently use historical reasoning, historical analogues, and historical precedent as underpinnings for their arguments. Both *Bruen* and *Rahimi* are clear on what needs to take place under the 'relevantly similar' analysis for determining appropriateness of a historical analogue. In fact, the Court in each case engaged in a full analysis with due regard to 'how' a challenged regulation may burden the Second Amendment right consistent with potential historically analogous firearm regulations during the founding-era. Lower courts cannot sidestep their judicial obligations under *Bruen* and *Rahimi* by addressing only either 'how' or 'why,' but not both, the challenged regulation burdens the Second Amendment-protected right at issue. *Bruen* and *Rahimi* are themselves instructive in showcasing what features are most relevant for analyzing 'how' a challenged regulation burdens the Second Amendment.

## ARGUMENT

In laying the foundation for the historical analogue analysis, the Court in *Bruen* began by looking to precedent contained within *Heller* and *McDonald* to guide itself in structuring a framework upon which future Second Amendment analyses would be required to follow. The Court focused in on the methodology, specifically within *Heller*, that "began with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language . . . [f]rom

there, [the Court] assessed whether our initial conclusion was 'confirmed by the historical background of the Second Amendment.'" *Bruen*, 597 U.S. at 20 (quoting *D.C. v. Heller*, 554 U.S. 570, 599 (2008)). Just as it did in *Heller*, the Court relied on this historical approach in reaching its conclusion. However, it provided a more in-depth look that supported a comparison-based analysis allowing courts to determine whether a challenged regulation was consistent with history, via analogue. The Court explained that "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation required a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 597 U.S. at 28. To this end, "*Heller* and *McDonald* point toward two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court concluded "[therefore], whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29 (citing *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010)) (emphasis added). It is this comparison, focusing on 'how' and 'why' regulations burden the Second Amendment, that serves a court in finding a proper historical analogue in any given historical firearms regulation. However, in many cases, lower courts simply engage one aspect of the test—the 'why'—and unfortunately minimally address 'how' that

5

regulation burdens the Second Amendment right. Instead, courts should be fully engaging 'how' a challenged regulation burdens the Second Amendment right by looking to at least the same metrics as the Court in *Bruen* and *Rahimi*.

## I. *Bruen* Looks to the Mechanical Features of a Statute to Determine 'How' a Challenged Regulation Burdens the Second Amendment Right to Keep and Bear Arms

In looking at 'how' and 'why' a regulation burdens an individual's Second Amendment protected right to keep and bear arms, we must take the same strides as the Supreme Court. In *Bruen*, the court looked to certain, implementation-based, 'how' aspects of the challenged regulation, in addition to its more goal-oriented, 'why' aspects, and directly compared them to the corresponding features of the purported historical analogue. In analyzing the proper cause restriction at issue in *Bruen*, the Court centered on various statutes ranging in age and application. Notably, the Court addressed the Statute of Northampton, going-armed laws, concealed carry laws, and public carry laws. In each case, the Court was careful to address not only the 'why' but the 'how' of each, so as to <u>totally verify</u> consistency with the history and tradition of firearms regulation under the Second Amendment.

In addressing 'how' the 1328 Statute of Northampton burdened the Second Amendment right, the Court detailed that the statute applied only to those who demonstrated an "intention to commit [an] Act of Violence or Disturbance of the Peace[.]" It was not a broad prohibition that restricted the "public carry of self-

defense weapons that would ultimately be adopted in Colonial America and justify onerous public-carry regulations." *Id.* at 40-41. This limited application cabined its application to a particular subset—indeed, a minuscule subset—of the population. *Id.* at 47 ("Far from banning the carrying of any class of firearms, they merely codified the existing common-law offense of bearing arms to terrorize the people, as had the Statute of Northampton itself."). To be clear, the Court ultimately found the statute to be outside of the relevant timeframe for analysis under *Bruen*'s history and tradition test. *Id.* at 41 ("Notwithstanding the ink the parties spill over this provision, the Statute of Northampton—at least as it was understood during the Middle Ages— has little bearing on the Second Amendment adopted in 1791."). Yet the analysis remains instructive, because the Court was willing to distinguish the law on this basis. *Id.* at 45 ("To be sure, the Statute of Northampton survived both Sir John Knight's Case and the English Bill of Rights, but it was no obstacle to public carry <u>for self-defense</u> in the decades leading to the founding.") (emphasis added).

Similarly, the Court found that going-armed laws applied to those individuals "[o]nly carrying for a 'wicked purpose' with a 'mischievous result ... [to] constitute[] a crime.'" *Id.* at 51 (quoting *State v. Huntly*, 25 N.C. 418 (1843) (*Per curiam*)). Once again, the intent to carry for a specifically malicious purpose was a condition precedent for application of the statute. Therefore, going-armed laws only placed a narrow burden on the Second Amendment right. *Id.* at 50-51 ("[A]s with the earlier

periods, there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.").

In considering various statutory prohibitions on public and concealed carry from five different states, the Court found a pre-Civil War era Georgia statute "particularly instructive," because it provided no distinction between concealed and public carry, and was thus struck down by the Georgia court as being violative of the Constitution. *Bruen*, 597 U.S. at 54 (citing *Nunn v. State*, 1 Ga. 243 (1846)). Simply stated, 'how' the Georgia prohibition burdened the Second Amendment was too broad, because it restricted <u>all</u> carry.

Lastly, the Court set its eyes on surety statutes that allowed individuals to post bond so that they could carry in public if an adjudicating body had previously found them likely to do harm at some point in the future. The Court rejected the argument that these laws were historically analogous to the proper-cause requirement because "[such] laws were not *bans* on public carry, and they typically targeted only those threatening to do harm." *Bruen*, 597 U.S. at 55. "[P]roving special need simply avoided a fee <u>rather than a ban</u> . . . 'under surety laws ... everyone started out with robust carrying rights' and <u>only those reasonably accused</u> were required to show a special need in order to avoid posting a bond." *Id.* at 57 (emphasis added). The burden placed on the Second Amendment was limited to those reasonably accused, by which the penalty was a mere fine, and not an all-encompassing ban on the right

to carry. The challenged regulation was therefore not relevantly similar to surety statutes.

The Court's own analysis in *Bruen* showcases that 'how' a challenged regulation burdens the Second Amendment right to keep and bear arms is fundamentally an inquiry that involves looking at the specific mechanisms by which the challenged regulation restricts the Second Amendment's protections on the right to keep and bear arms. If the mechanisms are too dissimilar to a purported historical analogue, then the two regulations cannot be said to be relevantly similar for the purposes of a Second Amendment analysis.

## II. *Rahimi* Provided Specific Metrics by Which Courts Can Analyze 'How' a Challenged Regulation Burdens the Second Amendment

The Court's analysis in *Rahimi* adhered to the *Bruen* standard by analyzing the mechanical features that showcase 'how' § 922(g)(8) burdened the Second Amendment's protections on the right to keep and bear arms. In *Rahimi*, an individual who was temporarily restricted from possessing firearms under § 922(g)(8) brought a challenge to the regulation on the grounds that it violated his Second Amendment right. In upholding the statute, the Court found proper historical analogues in surety and going-armed laws. In looking at both 'how' and 'why' the regulation burdened the rights protected by the Second Amendment, it reasoned that "Section 922(g)(8) restricts gun use to mitigate demonstrated threats of physical violence, just as the surety and going armed laws do. Unlike the regulation struck

9

down in *Bruen*, Section 922(g)(8) does not broadly restrict arms use by the public generally." *Rahimi* 144 S. Ct. at 1901. There were three distinct parts of the Court's analysis with respect to 'how' the challenged regulation burdens the Second Amendment right. The first was that of the scope of the regulation; the second looked at the duration of the regulation's application; and the third was the specific penalty that an individual would be subject to for violation.

As to the first part, the Court stated that "§ 922(g)(8) applies only once a court has found that the defendant 'represents a credible threat to the physical safety' of another. That matches the surety and going-armed laws, which involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Id.* at 1901-02. These laws did not impose a broad prohibition on the People's right to keep and bear arms. Similarly, § 922(g)(8) is targeted in its approach – its restrictions only apply to those who have been previously found by some sort of adjudicating body to pose a credible threat to the physical safety of another.

With respect to the second part, the Court analyzed the statute's duration in relation to that of surety laws. It stated that "like surety bonds of <u>limited</u> duration, Section 922(g)(8)'s restriction was <u>temporary</u> as applied to Rahimi. Section 922(g)(8) only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Id.* at 1902 (emphasis added). The fact that the court made sure to

establish a close consistency between the surety laws and the restriction under § 922(g)(8) was no accident—the Court was making clear that the duration of any restriction must mirror the analogue statute.

And in looking at the final part, that of the penalty imposed by the statute, the Court found that "the penalty [of §922(g)(8)]—another relevant aspect of the burden—also fits within the regulatory tradition. The going-armed laws provided for imprisonment, and if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." *Id.* at 1902 (emphasis added). This final comparison is telling as the Court compares a more restrictive historical analogue with the less strict challenged regulation in terms of penalty. This existing dynamic between the statutes allowed the Court to conclude that § 922(g)(8) fit well within the historical tradition of U.S. firearms regulation. It is this sort of relationship between the statutes that would indicate that if a purported historical analogue is less restrictive than its modern counterpart, then the historical analogue does not satisfy the 'relevantly similar' standard.

The Court in *Rahimi* ultimately reiterated that 'how' and 'why' a regulation burdens the Second Amendment is central to the 'relevantly similar' inquiry. It was keen to state, however, that "[e]ven when a law regulated arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so <u>to</u>

11

an extent beyond what was done at the founding." *Id.* at 1898 (emphasis added). To analyze any particular "extent" is to scrutinize what effect that the regulation has on the right at issue. In doing this, the Court held that "why and how the regulation burdens the right are central to this inquiry." *Rahimi*, 144 S. Ct. at 1898 (emphasis added). Not only must courts appropriately analyze the goal-oriented aspect of "why" a challenged regulation burdens the Second Amendment right, it must also fully analyze "how" the regulation burdens the Second Amendment right by following in the footsteps of the Supreme Court, and at least analyzing the mechanical features of the statutes that the Court looked to in both *Bruen* and *Rahimi*, if available. Only after a court has fully engaged in the "why" and "how" can they conclude that there is an appropriate historical analogue for any given challenged statute.

### III. Respectfully, the District Court Failed to Adequately Analyze 'How' the Total Restriction Within One-Thousand Feet of a School Burdened the Second Amendment Right, In Accordance With *Bruen* and *Rahimi*

The District Court appropriately held that the historical precedents proffered by the Government were not relevantly similar to the challenged statute and chose to engage in a search for a proper historical analogue on its own accord. Unfortunately, its analysis did not adequately follow *Bruen* and *Rahimi*. In finding a historical analogue in polling places to the 1000-foot buffer zone restriction under § 922(q)(2)(A), the Court did not engage in a full analysis showing the true extent of

12

'how' polling place restrictions imposed a comparable burden on the right of armed self-defense. In fact, § 922(q)(2)(A) is vastly different from the founding-era polling place restrictions identified by the District Court, because of the significant differences in (1) the duration of the restriction at issue and (2) the potential penalties imposed for violating each.

To begin, the District Court looked at the purported analogues that the Government offered up. In citing various regulations that amounted to firearms restrictions by public universities, the Court remained "unconvinced by [the] evidence of these early university bans because they were not regulations on carrying weapons in 'sensitive places.' Rather, they banned certain persons—students—from carrying weapons." *United States v. Metcalf*, 1:23-cr-000103-SPW-1, 2024 WL 358154, at \*7 (D. Mont. Jan. 31, 2024). The Court also acknowledged that such bans did not "apply to faculty members or to members of the community, so they, too, only banned certain persons from carrying weapons." *Id.* (citing David B. Kopel, Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to bear arms*, 13 Charleston L. Rev. 205, 250 (2018)). As to the Government's proffered 19th century restrictions on the carry of weapons inside school buildings, the Court appropriately found that "these laws support restricting possession of guns in school buildings but not in the buffer zone around the school." *Metcalf*, 2024 WL 358154, at \*8. Having found no suitable analogies presented by the actual party

13

defending the law, the Court then elected to engage in its own analysis of potential historical analogues to the restriction of carrying a firearm within one-thousand feet, or a buffer zone, around a school.

Properly, the District Court began its *Bruen* inquiry by addressing 'why' the regulation burdens the Second Amendment right to keep and bear arms. Specifically, it sought to "locate a historical analogue to a law creating a 'buffer zone' where firearms were not allowed around a 'sensitive place.'" *Id.* The Court identified polling places as a potential historical analogue, and found that "in the absence of historical regulations of firearms in buffer zones around schools, the Court believes election places to be a proper historical antecedent: the Founders believed voting and education to both be at the 'very root of republican government.'" *Id.*

In comparison, the Court looked to four different election-day provisions that were enacted to quell violence at elections: (1) the 1776 Delaware Constitution, (2) an 1870 Louisiana restriction, (3) an 1895 Texas restriction and (4) an 1874 firearm prohibition in Maryland. However, in looking at 'how' these provisions burden an individual's rights protected by the Second Amendment, the District Court did not follow *Bruen* and *Rahimi*. It instead only looked at how broadly the restriction applied to the people, even though the other statutory mechanisms that the Supreme Court looked at in *Rahimi* were available to it. *See Supra* Part II.

The district court stopped short of fully addressing 'how' § 922(q)(2)(A) burdens the individual right under the Second Amendment, and simply justified its conclusion that it provided a sufficient historical analogue to the challenged statute because "[a]lthough the Supreme Court finds Founding Era statutes more persuasive, in cases where Congress passes a firearms law to address unprecedented societal concerns, *Bruen* seems to allow a broader approach." *Id.*

Unlike the Supreme Court's analysis in both *Bruen* and *Rahimi*, *See Supra* Part I, Part II, the District Court failed to compare the full nature of the restrictions under § 922(q)(2)(A) with that of its purported historical analogues. For example, when looking at the 1776 Delaware Constitution, the District Court found that it "prohibited the possession of firearms within one mile of a polling place for 24 hours before an election until 24 hours after the election closed." *Metcalf*, 2024 WL 358154, at *8 (quoting Del. Const. art. 28 (1776)). To be clear, the Delaware Constitution only prohibited firearm possession for "24 hours before an election until 24 hours after the election closed." *Metcalf*, 2024 WL 358154, at *8. This prohibition was thus only <u>temporary</u> in duration. In comparison, § 922(q)(2)(A) is a <u>permanent and indefinite</u> restriction on the possession of firearms within a school zone. This drastic contrast between the burden that § 922(q)(2)(A) places on the individual right to keep and bear arms cannot be squared with the 1776 Delaware Constitution.

15

Similarly, the Louisiana prohibition from 1870 "prohibited the carrying of 'any dangerous weapon, concealed or unconcealed, <u>on any day of election during the hours the polls are open</u>, or on any day of registration or revision of registration[.]" *Metcalf*, 2024 WL 358154, at *8 (quoting Act of Mar. 16, 1870, § 73, 1870 La. Acts 160.) (emphasis added). The Court, again, did not take into consideration that the polling place restriction only applied for a limited duration and that § 922(q)(2)(A) applies indefinitely within the 1000-foot buffer zone of a school. Once again, the statutes are not analogous.

In *Rahimi*, the penalty for breaking the relevant law was another aspect of the regulations that required comparison. *See Supra* Part II. Here, the Louisiana prohibition provided that "any person violating the provision of this section shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the parish jail for not less than one month." Act of Mar. 16, 1870, § 73, 1870 La. Acts 160. The punishment for violation of § 922(q)(2)(A) is significantly more, as it provides that violators "shall be fined under this title, imprisoned not more than five years, or both." 18 U.S.C. § 924(a)(1)(B). While monetary penalties are difficult to gauge for similarity, given inflation, the length of imprisonment is not. There is a glaring disparity of the penalties between the Louisiana polling place restriction and § 922(q)(2)(A), which cannot possibly be conceived to be 'relevantly similar' for the purposes of the *Bruen* standard.

16

In the next instance, the District Court looked at a Texas statute that "prohibited the carrying of any firearm or other dangerous weapon within a half-mile of any polling or voting place." *Metcalf*, 2024 WL 358154, at *8 (quoting 1895 Tex. Crim Stat. ch. 3, art. 169). However, there is no mention of either duration or penalty in the District Court's analysis, even though the statute itself contains these details. As to duration, the prohibition applied "on any day of election, during the hours the polls are open." 1895 Tex. Crim Stat. ch. 3, art. 169. Separately, the penalty for a violation was a "fine of not less than one hundred nor more than five hundred dollars, and in addition thereto, may be imprisoned in the county jail for a period not exceeding one month." *Id.*

Just like the Louisiana statute that the District Court relied on, the Texas statute's own duration and penalty cannot be squared with § 922(q)(2)(A). The Texas statute's duration only lasted for as long as the polls were open, it too wasn't of indefinite duration like § 922(q)(2)(A). Furthermore, its penalty was far less than § 922(q)(2)(A). The fine was minimal at between one and five hundred dollars, and its provision for imprisonment of not more than one month is far below § 922(q)(2)(A)'s language of subjecting violators to a fine and/or up to five years imprisonment. Once more, this purported historical analogue cannot pass constitutional muster.

17

Finally, in reviewing the 1874 Maryland polling place restriction, the District Court concluded that it offered a relevantly similar analogue to § 922(q)(2)(A) since its "prohibition was even broader: on election day, a person could not carry any weapon in Kent County, Queen Anne's County or Montgomery County." *Metcalf*, 2024 WL 358154, at *8 (quoting Act of Apr. 16, 1874, ch. 250, 1874 Md. Laws 336). But, in reaching this conclusion, the District Court once again failed to adequately consider the differences in both the duration and relevant penalties between the 1874 statute and § 922(q)(2)(A). The duration of the restriction was only temporary, as it was applicable only "on election day" and not indefinite like the restriction under § 922(q)(2)(A). *Id.* Furthermore, the penalty was much like that of the Texas restriction, by providing that violators "shall be deemed guilty of a misdemeanor, and . . . upon conviction thereof . . . fined not less than five nor more than twenty dollars, and on refusal to pay . . . shall be committed by such justice of the peace to the jail of the county, until the same is paid." Act of Apr. 16, 1874, ch. 250, 1874 Md. Laws 336-37. Here, there is another minimal fine and imprisonment only upon the refusal of the convicted to pay the fine. For a court to see these aspects and simply skip over them betrays the duty to evaluate the 'how' of the historical regulation's burden on the right to keep and bear arms.

## IV.    Conclusion

Unfortunately, the District Court erred in stopping short of a full 'relevantly similar' analysis by not taking into consideration all of the features of 'how' a challenged regulation burdens the individual right to keep and bear arms under the Second Amendment. Both *Bruen* and *Rahimi* establish the elements of this inquiry: (1) the scope of the regulation's application, (2) the regulation's duration and (3) the penalty imposed by the regulation. By only addressing one of these features instead of all three, the District Court did not conduct a sufficient analysis. There is no consistency between the purported historical analogues and this Nation's history and tradition of firearms regulation in light of all three features. We respectfully request that this Court reverse the District Court's decision.

DATED this 6th day of December 2024.

Respectfully Submitted,

*/s/ Michael McCoy*
Michael McCoy
Robert A. Welsh*
MOUNTAIN STATES
LEGAL FOUNDATION
Lakewood, CO 80227
(303) 292-2021
mmcccoy@mslegal.org

*Application for admission pending

*Attorneys for Amicus Curiae
Mountain States Legal Foundation's
Center to Keep and Bear Arms*

19

## **CERTIFICATE OF SERVICE**

I certify that that on the 6th day of December, 2024, the foregoing Amicus Curiae Brief in Support of Defendant-Appellant was served on counsel for appellant by electronically filing the same with the United States Court of Appeals for the Ninth Circuit via their CM/ECF portal.

*/s/ Michael McCoy*
Michael McCoy

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**: 24-4818

     I am the attorney or self-represented party.

     **This brief contains 4,540 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

     I certify that this brief *(select only one)*:

[] complies with the word limit of Cir. R. 32-1.

[] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

     [] it is a joint brief submitted by separately represented parties.

     [] a party or parties are filing a single brief in response to multiple briefs.

     [] a party or parties are filing a single brief in response to a longer joint brief.

[] complies with the length limit designated by court order dated_____.

[] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Michael McCoy*    **Date** December 6, 2024

*(use "*s/ [typed name]*" to sign electronically filed documents)*

21