No. 24-4818

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

**UNITED STATES OF AMERICA**,
PLAINTIFF-APPELLEE,

V.

**GABRIEL COWAN METCALF**
DEFENDANT-APPELLANT.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
D.C. NO. CR-23-103-BLG-SPW
_____

**ANSWERING BRIEF OF THE UNITED STATES**
_____


JESSE A. LASLOVICH
United States Attorney

THOMAS KEOKI GODFREY
Assistant U.S. Attorney
District of Montana
2601 2nd Avenue North
Suite 3200
Billings, MT 59101
Telephone: (406) 657-6101

Attorneys for Appellee

# TABLE OF CONTENTS

Table of Contents .................................................................... I

Table of Authorities ......................................................... III

Introduction ......................................................................... 1

Statement of Jurisdiction ................................................... 3

Statement of the Issues ...................................................... 3

    I.  Whether 18 U.S.C. § 922(q)(2)(A), which bars possession of firearms in a school zone, is unconstitutional under the Second Amendment as applied to Metcalf's possession on the street and sidewalk directly across from an elementary school ................ 3

    II.  Whether Mont. Code Ann. § 45-8-360 meets the requirements for exemption from 18 U.S.C. § 922(q)(2)(A) under 18 U.S.C. § 922(q)(2)(B)(ii) .......................... 3

Statement of the Case ......................................................... 3

Statement Regarding Oral Argument ................................... 4

Statement of Facts .............................................................. 4

    I.  At the beginning of August of 2023, Billings Police start getting 911 calls reporting Metcalf walking in the vicinity of Broadwater Elementary School with a firearm ......................................................................... 4

    II.  Billings police speak to Metcalf about his actions, and Metcalf describes patrolling the area because he is being "gang-stalked" by a former neighbor. .................... 5

    III.  The ATF contacts Metcalf who describes following cars and patrolling around the block with a firearm multiple times a day. .............................................................. 7

IV. Broadwater Elementary School takes steps to mitigate the threat of Metcalf's actions .................................... 8

V. Metcalf is arrested on a criminal complaint, later indicted, and files a motion to dismiss the charge. .................. 8

VI. The district court denies Metcalf's motion to dismiss .......................................................................................... 9

VII. Metcalf pleads guilty to the charge and is sentenced to probation. ...................................................... 10

Summary of Argument ................................................................ 11

Argument ..................................................................................... 13

I. Metcalf cannot show the United States' prohibition on possession of a firearm in a school zone is unconstitutional. ............................................................ 13

A. The Second Amendment does not protect Metcalf's possession of a firearm in a sensitive place next to a school. ......................................... 13

B. Section 922(q)(2)(A) is Consistent With Our Nation's Historical Tradition of Firearm Regulation ............................................................ 21

C. Metcalf's as-applied challenge fails. ................. 33

II. Metcalf does not meet the exemption in 922(q)(2)(B)(ii) because the Montana law he relies upon does not meet the federal requirements for the exemption ............................................................ 36

Conclusion .................................................................................... 41

Statement of Related Cases ......................................................... 43

Certificate of Compliance ........................................................... 44

Certificate of Service ................................................................... 45

# TABLE OF AUTHORITIES

<u>Cases</u>

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................... 14, 17

*Frey v. Nigrelli,*
    661 F. Supp. 3d 176 (S.D.N.Y. 2023) ........................................ 17, 20

*Hill v. State,*
    53 Ga. 472 (Ga. 1874) ................................................................ 17, 18

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) .................................................................... 14, 17

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) ............................................................. passim

*United States v. Class,*
    930 F.3d 460 (9th Cir. 2019) ..................................................... 20, 21

*United States v. Diaz,*
    838 F.3d 968 (9th Cir. 2016) ........................................................... 40

*United States v. Gorman,*
    314 F.3d 1105 (9th Cir. 2002) ......................................................... 36

*United States v. Guzmán-Montañez,*
    756 F.3d 1 (1st Cir. 2014) ............................................................... 35

*United States v. Haywood,*
    363 F.3d 200 (3d Cir. 2004) ....................................................... 36, 37

*United States v. Lewis,*
    Crim. No. 2008-45, 2008 WL 5412013 (D.V.I. Dec. 24, 2008) ........ 20

*United States v. Lopez,*
    514 U.S. 549 (1995) .................................................................... 18, 31

*United States v. Norbury*,
  492 F.3d 1012 (9th Cir. 2007) ........................................................ 40

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) ................................................ 22, 30, 33, 35

*United States v. Tait*,
  202 F.3d 1320 (11th Cir. 2000) ................................................ 39, 40

*United States v. Vongxay*,
  594 F.3d 1111 (9th Cir. 2010) ........................................................ 13

*United States v. Youssef*,
  547 F.3d 1090 (9th Cir. 2008) ........................................................ 36

*Wolford v. Lopez*,
  116 F.4th 959 (9th Cir. 2024) ................................................. passim

## Statutes

18 U.S.C. § 921(a)(26) ........................................................................5

18 U.S.C. § 922(q) .............................................................................20

18 U.S.C. § 922(q)(1)(E) ............................................................ 30, 31

18 U.S.C. § 922(q)(2)(A) ........................................................... passim

18 U.S.C. § 922(q)(2)(B) ...................................................................32

18 U.S.C. § 922(q)(2)(B)(i)............................................................ 9, 32

18 U.S.C. § 922(q)(2)(B)(ii) .............................................................10

18 U.S.C. § 3231................................................................................3

28 U.S.C. § 1291 ...............................................................................3

Ala. Code § 13A-11-72.....................................................................27

Alaska Stat. §§ 11.61.210 ................................................................27

Ariz. Rev. Stat. Ann. § 13-3102 ......................................................27

Ark. Code Ann. §§ 5-73-119 ...................................................27

Cal. Penal Code § 626.9 .........................................................27

Cal. Penal Code § 626.9(h) .....................................................24

Cal. Penal Code § 626.9(i) ......................................................24

Colo. Rev. Stat. §§ 18-12-105.5 .............................................27

Conn. Gen. Stat. § 53a-217b ...................................................27

D.C. Code § 7-2509.07(a)(2) ..................................................24

D.C. Code §§ 7-2509.07 ..........................................................27

Del. Const. art. 28 (1776) .......................................................28

Fla. Stat. § 790.115(2) ............................................................24

Fla. Stat. §§ 790.115 ...............................................................27

Ga. Code Ann. § 16-11-127.1 ..................................................27

Idaho Code § 18-3302D(1) ......................................................27

Idaho Code § 18-3302D(2)(e) .................................................27

Idaho Code § 18-3309(1) .........................................................24

Idaho Code § 18-3309(2) .........................................................24

Iowa Code §§ 280.2 ..................................................................27

Ky. Rev. Stat. Ann. § 527.070(1) ............................................27

La. Stat. Ann. § 14:95.2(A) .....................................................28

La. Stat. Ann. § 40:1379.3 .......................................................24

Mass. Gen. Laws ch. 269 ...................................................24, 28

Md. Code Ann., Crim. Law § 4-102 ........................................28

v

Md. Code Ann., Crim. Law § 4-111(a) ................................................28

Md. Code Ann., Crim. Law § 4-111(c) ................................................28

Md. Code Ann., Crim. Law §4-111(d) ...............................................24

Minn. Stat. § 609.66................................................................................28

Mont. Code Ann. § 45-8-360 ....................................................... passim

Mont. Code Ann. § 45-8-361(1) ...........................................................28

N.C. Gen. Stat. § 14-269.2 ...........................................................24, 28

N.J. Stat. Ann. § 2C:39-5(e) ................................................................28

N.J. Stat. Ann. § 2C:39-5(e)(1) ...........................................................24

N.M. Stat. Ann. § 30-7-2.4 ..................................................................24

N.Y. Penal Law § 265.01 ..............................................................24, 28

Neb. Rev. Stat. § 28-1204.04 ...............................................................28

Neb. Rev. Stat. § 28-1204.04(1) ..........................................................24

Pub. L. No. 101-647 ...............................................................................30

S.C. Code Ann. § 16-23-420 .....................................................9, 24, 28

Tenn. Code Ann. § 39-17-1309.............................................................28

Tex. Penal Code § 46.03(a)(1) ............................................................28

Va. Code Ann. § 18.2-308.1..................................................................28

Wash. Rev. Code Ann. § 9.41.280 ......................................................28

Wis. Stat. § 948.605 ..............................................................................28

## Rules

Fed. R. App. P. 34(a) ...............................................................................4

vi

Regulations

Ariz. Admin. Code § 7-4-102(3)...........................................................24

Iowa Admin. Code 681-9.1(262)(g) .....................................................24

Other Authorities

2 A Digest of the Laws of Texas, Containing the Laws in Force, and
    the Repealed Laws on Which Rights Rest, From 1754 to 1874
    (4th ed. 1874)...................................................................................28

2 Public Local Laws of Maryland, Articles 11-24,
    (King Bros., ed. 1888) ....................................................................28

26 Hen. 8, c.6, § 6 (1534)..................................................................28

Act of March 16, 1870, No. 100, § 73, 1870 La. Acts 159-60.............28

Act of Apr. 12, 1871, ch. 34, § 3, 1871 Tex. Gen. Laws ....................25

Act of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 176 ......................25

Act of Apr. 30, 1879, § 1, 1879 Mo. Laws 90 .....................................28

Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76........................................25

Act of April 7, 1886, ch. 189, 1886 Md. Laws 315 ..............................29

Act of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30-31.........26

Act of Feb. 27, 1903, ch. 35, § 3, 1903 Mont. Laws 49-50 ..................26

Act of Feb. 12, 1927, §§ 1-5, 1927 N.C. Sess. Laws, Public-Local Laws
    68 ....................................................................................................26

Acts of the General Assembly and Ordinances of the Trustees, for the
    Organization and Government of the University of North-Carolina
    (Sept. 1838)..............................................................................23, 24

Dickinson College, The Statutes of Dickinson College (1830)...........24

Giffords Law Center, Guns in Schools, https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/guns-in-schools/......................................................25

Gun Free School-Zones Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789 ...................................................................................28

Kemper College, The Laws of Kemper College Near Saint Louis, Missouri (1840)....................................................................24

"Laws of McKenzie College," in University of Texas, The Correlation of High School and College Courses in the Sciences (1918)...........24

"Why Guns Are and Are Not the Problem," *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (Randolph Roth, Jennifer Tucker, *et al.* 2019)....................................................................26

The Minutes of the Senatus Academicus of the State of Georgia (Aug. 1810) ........................................................................23

The Statutes of Oklahoma, ch. 25, art. 47, § 7, 1890 Okla. Sess. Laws ...............................................................................26

*The "Sensitive Places"* Doctrine, 13 Charleston L. Rev. 205 (Kople & Greenlee 2018)..............................................................17

"University of Nashville," American Annals of Education and Instruction, for the Year 1837(1938) ...............................................24

University of Virginia Board of Visitors Minutes, at 71-72 (Oct. 1824) ........................................................................23

Waterville College, Laws of Waterville College, Maine (1832) .........24

## INTRODUCTION

Gabriel Metcalf repeatedly carried a firearm directly across the street from Broadwater Elementary School in Billings, Montana. He would "patrol" around the block with the firearm, he would stand in the street facing the elementary school carrying the firearm, and he would follow cars with the firearm. Metcalf was indicted and subsequently pleaded guilty to violation of 18 U.S.C. § 922(q)(2)(A), unlawful possession of a firearm in a school zone. He reserved his right to appeal his challenge to the constitutionality of the statute and his argument he is exempt from the statute.

His claim under the Second Amendment fails for two reasons, either of which is sufficient to deny relief. First, the Supreme Court has repeatedly made clear that the government may prohibit "the carrying of firearms in sensitive places such as schools and government buildings." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022). This Court has likewise concluded that parks and playgrounds, as well as the streets and sidewalks surrounding them are sensitive places under the Second Amendment. *Wolford v. Lopez* 116 F.4th 959, 982-85 (9th Cir. 2024).

Second, section 922(q)(2) is valid because it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2130. Restricting firearm possession in schools and the streets and sidewalks providing a line of fire on playgrounds and classrooms regulates firearms for a similar purpose and similar extent as noncontroversial laws governing sensitive places across the nation's history.

Metcalf's claim to the exemption in Section 922(q)(2)(B)(ii) fails because that exemption only applies where "the law of the State . . . requires that, before an individual obtains [a license to possess a firearm in a school zone], the law enforcement authorities of the State . . . verify that the individual is qualified under law to receive the license." The Montana law that Metcalf relies upon, Mont. Code Ann. § 45-8-360, however, does not require that law enforcement authorities of the state verify that the individual meets its statutory qualifications before obtaining a license. Because the Montana provision does not meet the federal requirements for the exemption to apply, Metcalf's firearm possession was not exempted.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291.  Final judgment was entered on August 2, 2024.  ER-4.  The defendant timely filed a notice of appeal on August 6, 2024.  ER-170-71.

## STATEMENT OF THE ISSUES

I.   **Whether 18 U.S.C. § 922(q)(2)(A), which bars possession of firearms in a school zone, is unconstitutional under the Second Amendment as applied to Metcalf's possession on the street and sidewalk directly across from an elementary school.**

II.  **Whether Mont. Code Ann. § 45-8-360 meets the requirements for exemption from 18 U.S.C. § 922(q)(2)(A) under 18 U.S.C. § 922(q)(2)(B)(ii).**

## STATEMENT OF THE CASE

A federal grand jury indicted Metcalf for unlawful possession of a firearm in a school zone under 18 U.S.C. § 922(q)(2)(A).  ER-154-55.  Metcalf filed a motion to dismiss the indictment, which was denied.  ER-67.

Metcalf subsequently pled guilty to the indictment, reserving his right to appeal.  ER-10.  The district court sentenced Metcalf to 3 years of probation.  ER-5.  Metcalf appeals.  ER-170.

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rules of Appellate Procedure 34(a), the United States advises the Court of its view that oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs and record.

## STATEMENT OF FACTS

**I.  At the beginning of August of 2023, Billings Police start getting 911 calls reporting Metcalf walking in the vicinity of Broadwater Elementary School with a firearm.**

In August of 2023, Gabriel Metcalf, a 50-year-old resident of Billings, Montana, lived across the street from Broadwater Elementary School.  PSR ⁋ 14.  He resided in the home of his mother assisting her and was financially dependent on her.  PSR ⁋ 59.  The Billings Police Department began receiving multiple 911 calls that Metcalf was walking in the vicinity of Broadwater Elementary with a firearm. PSR ⁋ 12.

Metcalf's residence is on Broadwater Avenue directly across the street from the elementary school.  PSR ⁋ 14.  The sidewalk and streets in front of Metcalf's residence are marked with school zone speed limit signs and flashing lights.  *Id*.  The sidewalk and street

4

are within 1,000 feet of the school and are a "school zone" under 18 U.S.C. § 921(a)(26). *Id.*

On August 2, a police detective watched Metcalf walk off his property with a firearm to a nearby business on 5th Street West. PSR ⁋ 12. This area is also within the school zone. PSR ⁋ 14. Billings police received multiple calls about Metcalf over the next few weeks and he was again seen walking on the sidewalk with a firearm on August 11, 2023. PSR ⁋ 12. On August 14, a caller reported Metcalf was walking westbound on Broadwater Avenue with a firearm. PSR ⁋ 13.

## II. Billings police speak to Metcalf about his actions, and Metcalf describes patrolling the area because he is being "gang-stalked" by a former neighbor.

On August 14, a Billings police officer contacted Metcalf after another report of him walking near the intersection of 5th Street West and Broadwater Avenue with a firearm. PSR ⁋ 15. Metcalf stated he was securing his perimeter due to being "gang-stalked" by an ex-neighbor, David Carpenter.[1] *Id.* He stated he patrolled

---

[1] David Carpenter was Metcalf's neighbor in August of 2022, the prior year. PSR ⁋ 24. The property manager of Carpenter's residence had received many complaints about Carpenter from

numerous times a day to ensure no one planted incendiary devices in his yard. *Id.* Metcalf had an "officer caution" dating back to 2013 for becoming agitated with officers while carrying a rifle on two occasions and the caution noted the defendant suffered from a mental ailment. *Id.* The officer noted that Metcalf's behavior was escalating because he started following cars directly across the street of the school. *Id.*

On August 15, 2023, the Billings police officer in charge of the school resource officer program contacted Metcalf about having a firearm in the school zone. PSR ⁋ 16. Metcalf was told he was frightening staff, students, and parents. *Id.* Metcalf was asked if he

---

Metcalf's mother, none of which he corroborated, and ultimately told Carpenter to vacate the residence after August of 2022 to solve the problem. *Id.* Carpenter had not been Metcalf's neighbor since that time. *Id.* Metcalf and his mother obtained an order of protection against Carpenter and filed reports to police that Carpenter had violated that order. PSR ⁋ 11. It had been over a year since Carpenter lived in the area when the calls came in about Metcalf's patrols. PSR ⁋ 24. Metcalf's paranoia continued into his mental health counseling from October of 2023 to February of 2024. PSR ⁋ 55. In February of 2024, Metcalf was terminated from mental health counseling due to his strong delusions and breakdown in communication with his counselor which included showing up to counseling wearing a mask and goggles. *Id.*

would consider not patrolling during school hours, but Metcalf
refused. *Id.*

### III. The ATF contacts Metcalf, who describes following cars and patrolling around the block with a firearm multiple times a day.

On August 17, 2023, ATF agents contacted Metcalf after
Metcalf called the FBI and reported Billings police were harassing
him. PSR ⁋ 18. Metcalf stated he needed to tell his story because he
might not be alive soon due to being "gang stalked". *Id.* He stated
he walked down the sidewalk from his property with a shotgun
conducting surveillance and identifying vehicles who were "gang
stalking" him. *Id.* He described following cars with a firearm,
walking to a local business with a firearm, and escorting his mother
to work down the street with a firearm. *Id.* He stated he stood
watch during the night and only slept for a few hours. He described
sweeping his property every day for people lying in wait and
explosive devices. *Id.* He admitted he knew he was in a school zone,
but stated the law was unconstitutional. PSR ⁋ 20.

7

### IV. Broadwater Elementary School takes steps to mitigate the threat of Metcalf's actions.

Due to Metcalf's patrols of the area with a firearm, Broadwater Elementary put tarping over their southern perimeter fence and erected a temporary fence on the northern side of the school so that there would not be a line of sight between the area of Metcalf's patrols and children playing on the playground. PSR ⁋ 23. The school also stopped using the crosswalk on 5th Street and Broadwater due to it being an area Metcalf patrolled. *Id.* The school further asked for additional police presence. *Id.*

### V. Metcalf is arrested on a criminal complaint, later indicted, and files a motion to dismiss the charge.

On August 21, 2023, a criminal complaint charged Metcalf with unlawful possession of a firearm, and he was arrested at his residence. PSR ⁋ 1, 21. The shotgun he had been observed with and reported carrying, as well as ammunition, was recovered from his camper located on his mother's property next to her house. PSR ⁋ 21.

On September 14, 2023, Metcalf was indicted by a Grand Jury on a single count of unlawful possession of a firearm in a school zone. ER-154-55. On October 10, 2023, Metcalf filed a motion to dismiss

the indictment alleging the charge was unconstitutional and he was exempt from the law because he was licensed by the State of Montana to carry a firearm in a school zone. ER-151-52.

## VI. The district court denies Metcalf's motion to dismiss.

On January 31, 2024, the district court entered an order denying Metcalf's motion to dismiss. ER-67.

The district court rejected Metcalf's argument that 18 U.S.C. § 922(q) is unconstitutional. ER-88. The district court noted the Supreme Court precedent set by the *Bruen* and *Heller* decisions and found that the Second Amendment is not violated by Congress's prohibition on possessing firearms in a school. ER-81.

The district court next turned to whether Congress could prohibit weapons in the 1,000-foot radius surrounding schools. ER-82. The district court looked to historical prohibitions on firearms near polling places as evidence that a ban of firearms in buffer zones around "sensitive locations" like schools is consistent with the history and tradition of the United States. ER-85-87. Finally, the district court noted that 18 U.S.C. § 922(q)(2)(B)(i) did not prohibit Metcalf

from possessing the firearm on his private property, but only when he went onto a public sidewalk within 1,000 feet of a school.  ER-88.

As to Metcalf's argument that he was exempted under 18 U.S.C. § 922(q)(2)(B)(ii), the district court noted that the statute requires that before the individual obtains a license to possess a firearm in a school, the law enforcement authorities of the State verify the individual is qualified under law.  ER-70-71.  The district court noted that Montana's licensure law, Mont. Code Ann. § 45-8-360, requires no law enforcement verification.  ER-70-71.

The district court held that Montana law "automatically considers every person in the state to be licensed then claws back that licensure from those who have committed violent felonies or are disqualified by the Montana Constitution."  ER-75.  The district court noted "there is no licensure process in place" and "a state legislature cannot work around federal law simply by proclaiming that a state statute meets the federal requirement."  *Id.*

## VII.  Metcalf pleads guilty to the charge and is sentenced to probation.

On March 25, 2024, Metcalf appeared for what was to be the first day of his jury trial but instead elected to change his plea.  PSR

10

¶ 7. He pled guilty to the indictment and was sentenced on August 2, 2024, to three years of probation.  ER-4-5.

## SUMMARY OF ARGUMENT

The Second Amendment precedents of the Supreme Court and this Court support Section 922(q)(2)(A)'s constitutionality. Those decisions strongly suggest that laws prohibiting firearm possession in certain sensitive places, including schools and the immediate vicinity, are consistent with the Second Amendment. The Court's repeated assurances provide a basis for upholding Section 922(q)(2)(A)'s limited ban, particularly as applied in this case, where Metcalf possessed the firearm while he patrolled the sidewalk directly across the street from an elementary school, forcing the school not to allow students to walk on that sidewalk and to erect fences blocking his line of sight to a playground.

Moreover, Section 922(q)(2)(A) is consistent with our Nation's historical tradition of firearm regulation. For more than two centuries, legislatures have increasingly prohibited students and others from possessing firearms on school grounds to protect children, faculty, and staff. And shortly after the founding,

11

legislatures began imposing limits on gun possession near sensitive places to protect individuals entering and leaving those places from harm. These historical regulations, when taken together, demonstrate legislatures' authority to restrict gun possession where their presence poses a heightened risk of danger.  Section 922(q)(2)(A) falls comfortably within this tradition.

Finally, Metcalf cannot show the exemption in Section 922(q)(2)(B)(ii) applies to him because the Montana law he relies on simply does not meet the requirements of the federal statute.  The exemption only applies where "the law of the State . . . requires that, before an individual obtains [a license to possess a firearm in a school zone], the law enforcement authorities of the State . . . verify that the individual is qualified under law to receive the license."  The Montana law that Metcalf relies upon, Mont. Code Ann. § 45-8-360, includes express qualifications for a person to be "considered to be individually licensed" for purposes of the exceptions to the Gun-Free School Zones Act: excluding individuals (1) convicted of a violent, felony crime," or (2) otherwise not "able to own or to possess a firearm under the Montana constitution."  The statute, however, does

12

not require that law enforcement authorities of the state verify that the individual meets those qualifications before obtaining a license. Because the Montana provision does not meet the federal requirements for the exemption to apply, Metcalf's firearm possession was not exempted.

Metcalf's conviction should be affirmed.

## ARGUMENT

I. **Metcalf cannot show the United States' prohibition on possession of a firearm in a school zone is unconstitutional.**

**Standard of review:** This Court reviews the constitutionality of a statute de novo. *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010).

A. **The Second Amendment does not protect Metcalf's possession of a firearm in a sensitive place next to a school.**

As this Court has made plain, the Supreme Court's Second Amendment precedents have repeatedly emphasized that bans on firearms in sensitive places such as schools comport with the Second Amendment. The Court's assurances provide a sufficient basis for upholding Section 922(q)(2)(A) as applied to the facts of this case.

13

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). But the Court emphasized that, like most rights, "the right secured by the Second Amendment is not unlimited": it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. The Court thus cautioned that "nothing in [its] opinion should be taken to cast doubt on … laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," among other "longstanding prohibitions." *Id.* at 626-27. The Court characterized these laws as "examples" of "presumptively lawful regulatory measures," but emphasized that its list was not "exhaustive." *Id.* at 627 n.26. In *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010), a plurality of the Court "repeat[ed *Heller*'s] assurances" about the constitutionality of laws prohibiting firearms in "schools."

The Court went further in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), expounding upon its earlier assurances regarding "laws forbidding the carrying of firearms in

14

sensitive places such as schools and government buildings." *Id.* at 30.
As this Court recognized in *Wolford v. Lopez*, 116 F.4th 959 (9th Cir.
2024), *Bruen* "provided specific guidance on the appropriate analysis
when addressing the regulation of firearms in sensitive places in
particular." 116 F.4th at 979. It "assume[d] it settled that
[legislative assemblies, polling places, and courthouses] were
'sensitive places' where arms carrying could be prohibited consistent
with the Second Amendment." *Id.* (quoting *Bruen*, 597 U.S. at 30).
It then empowered courts to "use analogies to those historical
regulations of 'sensitive places' to determine that modern regulations
prohibiting the carry of firearms in <u>new</u> and analogous sensitive
places are constitutionally permissible." *Id.* (quoting *Bruen*, 597 U.S.
at 30). This led to the conclusion that firearm bans "in sensitive
places such as schools and government buildings," were justified
"even if a modern-day regulation is not a deadringer for historical
precursors." *Bruen*, 597 U.S. at 30.

Carefully analyzing the logic of *Bruen*, *Wolford* explained,

[t]he following regulations justified the Court's conclusion that
legislative assemblies, polling places, courthouses, and schools were
'sensitive places' where firearms could be banned: a pair of
Maryland statutes from 1647 and 1650 banning arms at legislative

15

assemblies; a 1776 Delaware law and a 1787 New York law prohibiting arms at polling places, as well as some state laws enacted after 1868; a single 1786 Virginia law prohibiting arms at courthouses and a 19th Georgia law prohibiting weapons in a court of justice; and localized bans on carrying of firearms at a few schools beginning in 1824.

*Id.* (citations omitted). The Court then explained why the Supreme

Court appears to apply a more lenient standard with respect to

sensitive places than the broader ban at issue in *Bruen*:

Our Nation has a clear historical tradition of banning firearms at sensitive places. When examining whether a <u>particular</u> place falls within that tradition, a small number of laws, even localized laws, can suffice, <u>if</u> those laws were viewed as non-controversial. Nor did the Founders have a rigid conception of what kinds of places qualified as sensitive. The Supreme Court held that schools qualify as sensitive places because of localized, non-controversial laws that prohibited firearms at a few schools, and those laws were first enacted in 1824—more than three decades after the ratification of the Second Amendment. The relevant tradition—regulation of firearms at sensitive places—existed at the Founding. Whether a place falls within that tradition requires an examination of laws, including 19th-century laws.

*Id.* at 980.

This Court's and the Supreme Court's statements provide a

sufficient basis for treating schools as "sensitive places" where "arms

carrying could be prohibited consistent with the Second

Amendment." *Bruen,* 597 U.S. at 30. The Supreme Court has

repeatedly characterized schools as among the "longstanding"

16

sensitive places where arms-bearing may be limited. *Heller*, 554 U.S. at 626; *McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 30. And it suggested in *Bruen* that schools are sufficiently like the non-exhaustive list of "settled" locations where firearm possession may be "altogether prohibited." *Bruen*, 597 U.S. at 30; see *also Frey v. Nigrelli*, 661 F. Supp. 3d 176, 206 (S.D.N.Y. 2023) (reading *Bruen* to have "'assumed it settled that' schools full of children were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment").

That reasoning makes sense. Courthouses and legislative assemblies, two of the "settled" sensitive places, *Bruen*, 597 U.S. at 30, serve an important public function whose purpose would be upended by the pervasive presence of firearms. *See* Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 246 (2018); *see also Hill v. State*, 53 Ga. 472, 478 (Ga. 1874) (upholding a state statute that prohibited carrying weapons into a court of justice and explaining that "[t]he right peaceably to do any … public duty" is "seriously interfered with if it is the right and the custom of 'people' to attend such meetings armed as though for

17

battle"). The same is true for schools. Guns in and around schools make "teachers unable to teach" and "students unable to learn." *United States v. Lopez*, 514 U.S. 549, 619 (1995) (Breyer, J., dissenting). The presence of firearms thus "significantly undermine[s] the quality of education" in schools. *Id.*; *see also id.* (reasoning that "guns and learning are mutually exclusive"). Consequently, legislatures may limit firearm possession in schools to ensure that students "may perform the purpose of their assembling unmolested by terror, or danger, or insult." *Hill*, 53 Ga. at 478; *see also* ER-87 (explaining that "the law protects children from the deadly gun violence that threatens to subvert their first duty as citizens—to become educated").

Applying this reasoning, this Court has expressly stated that schools qualify as sensitive places. *Wolford*, 116 F.4th at 979-80. Indeed, Metcalf himself concedes that bans on firearm possession in school buildings and school grounds is constitutional. Op. Br. at 22 ("The Second Amendment likely tolerates a regulation prohibiting the carrying of firearms in a school building, and perhaps even on the school's grounds.").

Metcalf's contention is that the ban is unconstitutional as applied to his conduct, which included repeatedly patrolling and following cars with a firearm "directly across the street" from an elementary school. PSR ⁋ 14. He does so even though his actions led the school to put tarping over their southern perimeter fence and erected a temporary fence on the northern side of the school so that there would not be a line of fire between the area of Metcalf's patrols and children playing on the playground. PSR ⁋ 23.

Fortunately, Ninth Circuit precedent has already confirmed that nearly identical buffer zones are appropriately considered sensitive places for Second Amendment purposes. In *Wolford*, this Court compared several locations including playground and youth centers to schools to determine if they qualify as sensitive places. *Wolford,* 116 F.4th at 982-985. This Court noted that the California law at issue prohibited carrying a firearm in a playground or youth center as well as the street or sidewalk immediately adjacent to the playground or youth center. *Id.* at 985. This Court found that the plaintiff was unlikely to succeed on a Second Amendment challenge to that law. *Id.*

19

Again, the logic of *Bruen* dictates this result. It would make little sense to read *Heller*'s and *Bruen*'s approval of laws prohibiting firearm possession in schools as casting doubt on laws prohibiting firearm possession mere feet from school grounds and in firing range of its playground and classrooms. *See United States v. Class*, 930 F.3d 460, 464 (9th Cir. 2019) (explaining that "the same security interests which permit regulation of firearms 'in' government buildings permit regulation of firearms" on property around the building as well); *see also United States v. Lewis*, Crim. No. 2008-45, 2008 WL 5412013, at *2 (D.V.I. Dec. 24, 2008) (holding that "*Heller* unambiguously forecloses a Second Amendment challenge" to Section 922(q)(2) because a school zone "is precisely the type of location of which *Heller* spoke"); *Frey*, 661 F. Supp. 3d 176, 206 (reading *Bruen* to "settle[]" the characterization of schools as "sensitive places").

Metcalf argues that, under the statute, he *could* have been charged if he had merely left his home with a firearm because his property lies within 1,000 feet of a school ground.[2] Op. Br. at 22.

---

[2] This statement is also simply inaccurate. Note only does 18 U.S.C. § 922(q), exempt firearm possession on "private property not part of school grounds," it also does not apply to possession of

That, however, ignores Metcalf's escalating conduct, which involved "patrolling" and following cars down the street with his firearm, despite multiple warnings from law enforcement. The defensive actions taken by the school in this case illustrate exactly why Metcalf's possession of firearms threatened students' ability "to freely and safely travel to and from" school, as well as their safety on school grounds within firing range. *Class*, 930 F.3d at 464.

That reasoning is sufficient to reject Metcalf's as-applied Second Amendment challenge to Section 922(q)(2)(A). And that is particularly so given the facts of this case, where Metcalf was patrolling on the sidewalk directly across the street from an elementary school, following cars in the street, and in an area that students traversed to attend school. PSR ⁋ 23.

### B. Section 922(q)(2)(A) is Consistent With Our Nation's Historical Tradition of Firearm Regulation.

Even if the Supreme Court has not definitively settled the question of Section 922(q)(2)(A)'s constitutionality in this case,

---

firearms in a locked container or firearms rack or possession by one properly licensed by the state.

21

*Bruen*'s text-and-history framework demonstrates that that provision passes constitutional muster. The Supreme Court has instructed that to assess whether a "challenged regulation is consistent with the principles that underpin our regulatory tradition," courts "must ascertain whether the law is 'relevantly similar' to laws that our tradition is understood to permit," focusing on "[w]hy and how the regulation burdens the right." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (citation omitted). The district court correctly held that Section 922(q)(2)(A) is consistent with various longstanding historical prohibitions on gun possession in and around "sensitive places" like schools and polling places. ER-86-87. Those laws, in addition to historical restrictions on gun possession on university campuses, reflect the principle that legislatures may prohibit firearm possession in places where their presence would pose a heightened risk of danger and where individuals need heightened protection from potential firearm violence. Section 922(q)(2)(A) thus comports with the Second Amendment.

> **i.** **Legislatures have long prohibited firearm possession in or near schools and universities.**

22

Since shortly after the founding, legislatures have limited firearm possession in schools, on school grounds, and in the area around schools. And as firearms became more deadly and school-related shootings increased, those restrictions proliferated across the country. Section 922(q)(2)(A) is relevantly similar to those historical and longstanding restrictions.

### 1. Prohibitions on students' possession of arms on university campuses

The historical record yields several prohibitions on firearm possession on university campuses. For example, an 1810 regulation at the University of Georgia "ordained" that "no student shall be allowed to keep any gun, pistol, … or any other offensive weapon in College or elsewhere," including "out of the college." *The Minutes of the Senatus Academicus of the State of Georgia*, 1799-1842, at 86 (Aug. 1810). The University of Virginia Board of Visitors, whose members included Thomas Jefferson and James Madison, implemented a similar restriction, resolving that "[n]o Student shall, within the precincts of the University, … keep or use weapons or arms of any kind, or gunpowder[.]" *University of Virginia Board of Visitors Minutes*, at 71-72 (Oct. 1824). And in 1838, the University of

23

North Carolina established that "[n]o Student shall keep … fire arms, or gunpowder." *Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North-Carolina*, at 15 (Sept. 1838).

Throughout the 1800s and early 1900s, similar restrictions were instituted at various colleges and universities throughout the country, including Waterville College in Maine, McKenzie College in Texas, Kemper College in Missouri, the University of Nashville, and Dickinson College in Pennsylvania.[3] Today, many states prohibit or strictly limit firearm possession on school grounds subject to certain exceptions.[4] And in the absence of a relevant state statute, several

---

[3] *See* Waterville College, Laws of Waterville College, Maine, at 11 (1832); "Laws of McKenzie College," in University of Texas, The Correlation of High School and College Courses in the Sciences, at 392-93 (1918); Kemper College, The Laws of Kemper College Near Saint Louis, Missouri, at 9 (1840); "University of Nashville," American Annals of Education and Instruction, for the Year 1837, at 7:185 (1938); Dickinson College, The Statutes of Dickinson College, at 22-23 (1830).

[4] *See, e.g.*, Ariz. Admin. Code § 7-4-102(3); Cal. Penal Code § 626.9(h), (i); D.C. Code § 7-2509.07(a)(2); Fla. Stat. § 790.115(2); Idaho Code § 18-3309(1), (2); Iowa Admin. Code 681-9.1(262)(g); La. Stat. Ann. § 40:1379.3; Md. Code Ann., Crim. Law § 4-111(d); Mass. Gen. Laws ch. 269, § 10(j); Neb. Rev. Stat. § 28-1204.04(1); N.J. Stat.

universities and colleges have implemented policies regulating

firearm possession and use on campus.[5]

## 2. Prohibitions on students' possession of arms on university campuses

There is also a sufficiently longstanding tradition of

legislatures restricting the carrying of firearms in or around other

schools. One of the first restrictions, an 1871 Texas law, prohibited

"any person" from carrying "a pistol or other firearm" into (among

other places) "any school room, or other place where persons are

assembled for … educational or scientific purposes." Act of Apr. 12,

1871, ch. 34, § 3, 1871 Tex. Gen. Laws. 25-26. An 1878 Mississippi

law prohibited university students from carrying a pistol or other

concealed weapon. Act of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws

176. Missouri also prohibited "any person" from carrying "any kind of

fire arms" into, among other places, "any school room or place where

people are assembled for educational, literary or social purposes." Act

---

Ann. § 2C:39-5(e)(1); N.M. Stat. Ann. § 30-7-2.4; N.Y. Penal Law §
265.01-a; N.C. Gen. Stat. § 14-269.2; S.C. Code Ann. § 16-23-420.

[5] *See* Giffords Law Center, Guns in Schools,
https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/guns-in-schools/(citing various school policies).

of Mar. 5, 1883, § 1, 1883 Mo. Laws 76. By the end of the 1800s, Arizona and Oklahoma had passed similar restrictions.[6] And the legislative trend of restricting firearm possession in schools continued into the early 1900s. In 1903, Montana passed a law prohibiting individuals from carrying firearms into schools or other educational settings. Act of Feb. 27, 1903, ch. 35, § 3, 1903 Mont. Laws 49-50. In 1927, North Carolina did the same. Act of Feb. 12, 1927, §§ 1-5, 1927 N.C. Sess. Laws, Public-Local Laws 68.

There were understandably few 18th-, 19th-, and early 20th-century laws limiting firearm possession in and near schools. *Bruen*, 597 U.S. at 30. During that period, there were hardly any reports of school-related shootings. ER-82. And owing to the cumbersome nature of firearms, there was likely little concern that individuals would use firearms to harm others. *See* Randolph Roth, "Why Guns Are and Are Not the Problem," in Jennifer Tucker, *et al., A Right to*

---

[6] Act of Mar. 18, 1889, No. 13, § 3, 1889 Ariz. Sess. Laws 30-31 (prohibiting "any person" from having or carrying "about his person a pistol or other firearm" into "any school room, or other place where persons are assembled for amusement or for educational or scientific purposes"); The Statutes of Oklahoma, ch. 25, art. 47, § 7, 1890 Okla. Sess. Laws 495-96 (similar).

*Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019) (explaining that in early America, using a firearm to harm others was rare because muzzle-loading firearms had limitations as weapons). The most commonly used firearms often misfired, and with the exception of a few double-barreled pistols, they could not fire multiple shots. *Id.* at 117. And because firearms usually took at least a minute to load, they could not be used impulsively unless they were already loaded for some other purpose. *Id.*

Beginning in the mid-to-late 1800s, however, firearms became less unwieldy and more accessible. *Id.* at 121. In the ensuing decades, school shootings became more common. ER-82. In response, states, territories, and municipalities increasingly restricted firearm possession and use in and near schools. Today, nearly every state and territory prohibit firearm possession in schools, on school grounds, or near schools.[7]

---

[7] *See, e.g.*, Ala. Code § 13A-11-72; Alaska Stat. §§ 11.61.210, 18.65.755; Ariz. Rev. Stat. Ann. § 13-3102; Ark. Code Ann. §§ 5-73-119, 5-73-306; Cal. Penal Code § 626.9; Colo. Rev. Stat. §§ 18-12-105.5, 18-12-214; Conn. Gen. Stat. § 53a-217b; D.C. Code §§ 7-2509.07, 22-4504; Del. Code Ann. tit. 11, § 1457A; Fla. Stat. §§

### ii. Legislatures have long prohibited firearm possession around sensitive places like polling places and schools.

In addition to regulating firearm possession in schools and universities, legislatures have long prohibited individuals from possessing firearms in the area surrounding certain sensitive places. In 1534, King Henry VIII issued a version of the Statute of Northampton, applicable to Wales, which prohibited arms within two miles of a court. 26 Hen. 8, c.6, § 6 (1534); *see Bruen*, 597 U.S. at 30 (characterizing "courthouses" as sensitive places). At the founding, Delaware's constitution prohibited militias from assembling "within one mile of a polling place" during the 24 hours before the polls

---

790.115, 810.095, 790.06; Ga. Code Ann. § 16-11-127.1; Idaho Code § 18-3302D(1), (2)(e); Iowa Code §§ 280.2, 724.4B(1); Ky. Rev. Stat. Ann. § 527.070(1); La. Stat. Ann. § 14:95.2(A); Me. Rev. Stat. Ann. tit. 20-A, § 6552(1); Md. Code Ann., Crim. Law §§ 4-102, 4-111(a), (c); Mass. Gen. Laws ch. 269, § 10(j); Minn. Stat. § 609.66 Subd.1d; Mont. Code Ann. § 45-8-361(1); Neb. Rev. Stat. § 28-1204.04; N.J. Stat. Ann. § 2C:39-5(e); N.Y. Penal Law § 265.01-a; N.C. Gen. Stat. § 14-269.2; N.D. Cent. Code, § 62.1-02-05; Okla. Stat. tit. 21, § 1280.1; S.C. Code Ann. § 16-23-420; Tenn. Code Ann. § 39-17-1309; Tex. Penal Code § 46.03(a)(1); Vt. Stat. Ann. tit. 13, § 4004; Va. Code Ann. § 18.2-308.1; Wash. Rev. Code Ann. § 9.41.280; Wis. Stat. § 948.605.

28

opened and until 24 hours after the polls closed. Del. Const. art. 28 (1776).

Several states likewise passed laws prohibiting the carrying of arms around sensitive places. In 1870, Louisiana passed a law prohibiting the carrying of firearms on election day and within a half mile of any place of registration or revision of registration. Act of March 16, 1870, No. 100, § 73, 1870 La. Acts 159-60. Texas also had a law that prohibited any person from carrying a firearm within a half mile of a polling place during polling hours. 2 A Digest of the Laws of Texas, Containing the Laws in Force, and the Repealed Laws on Which Rights Rest, From 1754 to 1874, at 1317-18 (4th ed. 1874). In 1874, Maryland banned carrying arms in Kent County on election day, and 12 years later the Maryland legislature passed a law prohibiting the carrying of arms "within 300 yards of the polls on election day in Calvert County." 2 Public Local Laws of Maryland, Articles 11-24, at 1457 (King Bros., ed. 1888); Act of April 7, 1886, ch. 189, 1886 Md. Laws 315.

Those prohibitions sometimes extended to the area surrounding schools. In 1879, Missouri prohibited "any person" from discharging

29

"any gun, pistol or fire-arms of any description, in the immediate vicinity of any court house, church or building used for school or college purposes." Act of Apr. 30, 1879, § 1, 1879 Mo. Laws 90. The statute defined "immediate vicinity" to mean "a distance not exceeding two hundred yards." *Id.* § 3, at 91.

### iii. Section 922(q)(2)(A) is relevantly similar to these historical laws when considered together.

Section 922(q)(2)(A) is "relevantly similar" to historical laws and regulations prohibiting the possession and carrying of arms on universities, in schools, and around sensitive places like polling places. *Rahimi*, 144 S. Ct. at 1898.

Congress passed Section 922(q)(2)(A) as part of the Gun Free School-Zones Act of 1990, Pub. L. No. 101-647, 104 Stat. 4789, 4844. Given the increasing number of then-unprecedented shootings in and around schools, *see* ER-82, Congress recognized that "ordinary citizens" may "fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason." 18 U.S.C. § 922(q)(1)(E). Because of the impact school shootings have on "the quality of education in our country," *id.* §

30

922(q)(1)(F), and the difficulties that "[s]tates, localities, and school systems" had "handl[ing] gun-related crime by themselves," *id.* § 922(q)(1)(H), Congress passed Section 922(q)(2)(A) with the primary purpose of "ensur[ing] the integrity and safety of the Nation's schools," *id.* § 922(q)(1)(I). *See also Lopez*, 514 U.S. at 619 (Breyer, J., dissenting) (explaining legislative background of the Gun Free School-Zones Act).

Historical restrictions on possessing arms in and around schools and other sensitive places had similar purposes to Section 922(q)(2)(A). As the district court explained, gun violence threatens to subvert children from becoming educated which is their first duty as citizens. ER-87. Likewise, the historical prohibitions on carrying firearms in buffer zones around "sensitive places" are justified because they are "necessary to preserve the very root of republican government." ER-87.

Section 922(q)(2)(A) also imposes burdens sufficiently similar to historical restrictions on possessing arms in and around schools and other sensitive places. Like historical laws restricting carrying firearms in or near schools, Section 922(q)(2)(A) is generally

applicable to "any" person.  It is also not a total prohibition on all persons carrying any firearm in the vicinity of a school under all circumstances, it is thus less burdensome than historical restrictions on firearm possession near polling places, which did not have carve outs.  *See* 18 U.S.C. § 922(q)(2)(B).

Applying *Wolford*, banning firearms both within schools and in the area immediately surrounding them has been non-controversial and is analogous to the treatment of other sensitive areas throughout the nation's history.  116 F.4th at 980.  *Wolford* itself looked to restrictions on firearms surrounding schools in determining that parks and playgrounds and the areas surround them were sensitive places for Second Amendment purposes.  *Id.* at 982-985.

To be clear, this discussion of the statute's scope is not aimed at satisfying the means-end scrutiny that *Bruen* rejected. The point is that, for most law-abiding citizens most of the time—i.e., in states with licensing requirements in compliance with the statute—Section 922(q)(2) is more akin to a licensing requirement than to a ban. See 18 U.S.C. § 922(q)(2)(B)(ii).   When a law-abiding citizen is on their own property, the statute is not a ban.  See 18 U.S.C. §

922(q)(2)(B)(i).  And even when a law-abiding citizen is in a State in which he is not licensed, the statute is more akin to a transitory storage requirement than to a ban. See 18 U.S.C. § 922(q)(2)(B)(iii). Understood in that properly cabined way, Section 922(q)(2) is "relevantly similar" to the historical precursors below, both in "how" and "why" it burdens "a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132-2133. It does not matter that the precursors did not ban everyone, always, from possessing firearms near a school, because Section 922(q)(2) does not do that either.

To be sure, Section 922(q)(2)(A) is not identical to the historical restrictions discussed above. "[B]ut it does not need to be." *Rahimi*, 144 S. Ct. at 1901. Its limited prohibition on firearm possession within a school zone fits comfortably within the regulatory tradition that historical school-related and buffer-zone restrictions "represent." *Id.*

## C.    Metcalf's as-applied challenge fails.

Metcalf cannot show that Section 922(q)(2)(A) is unconstitutional as applied to him based on his particular circumstances.  Metcalf's residence is directly across the street of

33

Broadwater Elementary School and when he would patrol up and down the street, he was in sight line—and, thus, firing line—of a playground.  PSR ¶¶ 14, 23.

Metcalf argues that school had not yet started (Br. 23 n.1) but ignores the reality that the school was open, and parents, students, and staff were present as would be in any school in the run up to starting. PSR ¶¶ 16, 23, 25.  Moreover, the elementary school always shares the sensitive nature of parks and playgrounds at issue in *Wolford*.  116 F.4th at 982-985.  In this case, school staff had reported their concerns, which Metcalf was aware of, but he refused to cease his patrols during school hours.  PSR ¶ 16.  This was even after being told the school would be locked down.  PSR ¶ 20.  These facts demonstrate that Section 922(q)(2)(A) is constitutional as applied to him.

Metcalf otherwise makes the contention (Br. 25) that Section 922(q)(2)(A) violates the Second Amendment because the combined effect of school-zone restrictions is to create "federal jurisdiction of every urbanized area of the country." But any theoretical effect of the law's outer bounds is irrelevant here, where Metcalf possessed the

firearm directly across the street from the school's playground and patrolled a street that includes a crosswalk children use to get to the school. PSR ⁋ 23. Furthermore, the hypothetical outer limits of the law's effect would be no basis for holding that the statute is unconstitutional in this case. As *Rahimi* explained, courts should refrain from "focus[ing] on hypothetical scenarios" where a challenged statute "might raise constitutional concerns." *Rahimi*, 144 S. Ct. at 1903. Applications of the statute that might theoretically raise constitutional questions thus present no basis for striking down Section 922(q)(2)(A) here.

Further, several aspects of Section 922(q)(2)(A) protect against accidental violations of the law or it being a ban on all gun possession in urban areas, as Metcalf asserts.

First, the statute criminalizes only firearm possession "at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(2)(A). Thus, an individual's mere proximity to the school with a firearm would not subject them to prosecution under Section 922(q)(2)(A). *See United States v. Guzmán-Montañez*, 756 F.3d 1, 10-12 (1st Cir. 2014) (reversed conviction for

35

insufficient evidence where the government's only proof of mens rea was the defendant's proximity to the school); *United States v. Haywood*, 363 F.3d 200, 207-09 (3d Cir. 2004) (similar).

Second, the statute contains various exceptions, including one that permits individuals with qualifying licenses to possess firearms within a school zone, 18 U.S.C. § 922(q)(2)(B)(ii), and one that permits unlicensed individuals to carry an unloaded firearm that is "in a locked container, or a locked firearms rack that is on a motor vehicle," id. § 922(q)(2)(B)(iii). These two carveouts, combined with Section 922(q)(2)'s mens rea requirement, protect an unwitting but otherwise well-intentioned armed citizen from prosecution.

## II. Metcalf does not meet the exemption in 922(q)(2)(B)(ii) because the Montana law he relies upon does not meet the federal requirements for the exemption.

**Standard of review:** This Court reviews de novo a district court's decision whether to dismiss a charge in an indictment based on its interpretation of a federal statute. *United States v. Gorman*, 314 F.3d 1105, 1110 (9th Cir. 2002). "Questions of statutory interpretation are reviewed de novo." *United States v. Youssef*, 547 F.3d 1090, 1093 (9th Cir. 2008).

36

Metcalf asserts he is exempted from 922(q)(2)(A) because he is licensed by the law of Montana to possess a firearm in a school zone under 922(q)(2)(B)(ii).

18 U.S.C. § 922(q)(2)(B)(ii) provides:

> Subparagraph (A) does not apply to the possession of a firearm ... if [1] the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and [2] the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license.

18 U.S.C. § 922(q)(2)(B)(ii) (interpolations added).

Metcalf makes the contention (Op. Br. at 33) that Montana has "verified that any individual who is not prohibited under the laws of Montana or who has not been convicted of a violent felony crime is qualified to receive a license to carry a firearm within a school zone" but 922(q)(2)(B)(ii) requires more than that. The exemption requires more than a state law licensing an individual to possess a firearm in a school zone. It makes clear that, for the exemption to apply, the law of the state must require that *before* an individual obtains a license, law enforcement authorities of the state must verify that the individual is qualified under law. *Id.*

37

Montana law creates qualification necessary to be "considered" licensed but does not require that state law enforcement verify that those qualifications are met before an individual obtains a license. As a result, the statute does not contain the elements necessary for the exception in 922(q)(2)(B)(ii) to apply. Montana law includes language containing qualifications necessary to be "considered" licensed under 922(q)(2)(B)(ii) in MCA 45-8-360:

> In consideration that the right to keep and bear arms is protected and reserved to the people in Article II, section 12, of the Montana constitution, a person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution is considered to be individually licensed and verified by the state of Montana within the meaning of the provisions regarding individual licensure and verification in the federal Gun-Free School Zones Act.

Mont. Code Ann. § 45-8-360.

Montana law establishes qualifications excluding individuals from potential licensure. The Montana statute restricts the licensing to "a person who has not been convicted of a violent, felony crime and who is lawfully able to own or to possess a firearm under the Montana constitution." Mont. Code Ann. § 45-8-360.

As evident by the plain language of the statute, however, Montana's code does not require that "before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license." 18 U.S.C. § 922(q)(2)(B)(ii).  Indeed, by stating that certain persons are "considered" licensed, Montana makes clear that no qualifications check can occur "before an individual obtains a license."  The verification of qualifications, however, is a requirement of the federal statute for the exemption to apply.

As the district court noted, the state of Montana cannot simply declare its licensure complaint with the requirements for the exemption.  ER-75.  "Proclamation of compliance does not override non-compliance on the face of the text."  ER-76.  The plain text of the Act is unambiguous, "it only applies if the state law requires a law enforcement officer verify that a person is qualified to carry a firearm before deeming them licensed." *Id.*

The Eleventh Circuit has found that the licensing requirement of 922(q)(2)(B)(ii) is met when under state law a sheriff of a county may license an individual after they apply, and the sheriff

39

determines the applicant has a proper reason for carrying a pistol and is a suitable person to be licensed. *United States v. Tait*, 202 F.3d 1320, 1324 (11th Cir. 2000). The Eleventh Circuit noted "[b]y its basic terms, the statute merely requires that the Alabama sheriff ensured that [the defendant] was qualified under Alabama law to receive the license." *Id.* In other words, the determination of the qualifications for licensure are a matter of state law, but the requirement that law enforcement, in this case the Alabama sheriff, "ensure" that the individual was qualified before obtaining a license was a matter of federal law. The qualification imposed can be extremely lenient, but law enforcement still must "ensure" an individual is qualified by law prior to being licensed. *Tait*, 202 F.3d at 1324.

Nor does it help Metcalf that the Montana statute says that individuals meeting the criteria shall be "considered . . . verified." Mont. Code Ann. § 45-8-360. Stating that individuals who meet the qualifications are considered verified is not the same as requiring law enforcement authorities to determine if those qualifications are met. Federal law, not state law, governs our interpretation of federal

40

statutes. *United States v. Diaz*, 838 F.3d 968, 972 (9th Cir. 2016); *see also United States v. Norbury*, 492 F.3d 1012, 1014 (9th Cir. 2007) ("Whether a defendant's prior state conviction was a 'conviction' [within the meaning of § 841] is a question of federal, not state, law.").

Section 922(q)(2)(B)(ii) expressly applies only where the law of the state requires law enforcement authorities to verify the qualifications before issuing a license. That is simply not the way Montana law operates.

For 18 U.S.C. § 922(q)(2)(B)(ii) to apply, the law of the state must require state law enforcement to verify an individual is qualified under law before a license is issued. Montana Code § 45-8-360 does not meet that requirement. Metcalf is not licensed under the requirements of 18 U.S.C. § 922(q)(2)(B)(ii) and thus is not exempted.

## CONCLUSION

The district court should be affirmed.

DATED this 29th day of January, 2025.

Respectfully submitted,

JESSE A. LASLOVICH
United States Attorney

s/ *Thomas Keoki Godfrey*

THOMAS KEOKI GODFREY
Assistant United States
Attorney

## STATEMENT OF RELATED CASES

There are no related cases.

DATED this 29th day of January, 2025.

JESSE A. LASLOVICH
United States Attorney

s/ *Thomas Keoki Godfrey*
THOMAS KEOKI GODFREY
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and the body of the argument contains 7,984 words.

DATED this 29th day of January, 2025.

JESSE A. LASLOVICH
United States Attorney

s/ *Thomas Keoki Godfrey*
THOMAS KEOKI GODFREY
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

JESSE A. LASLOVICH
United States Attorney

s/ *Thomas Keoki Godfrey*
THOMAS KEOKI GODFREY
Assistant United States Attorney