No. 24-4818

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GABRIEL COWAN METCALF,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the District of Montana (No. CR-23-103-BLG-SPW)
(Hon. Susan P. Watters)

_____

**BRIEF OF EVERYTOWN FOR GUN SAFETY
AS AMICUS CURIAE IN SUPPORT OF
PLAINTIFF-APPELLEE AND AFFIRMANCE**

_____

Janet Carter
William J. Taylor, Jr.
Erik P. Fredericksen
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163
(646) 324-8198
efredericksen@everytown.org

February 5, 2025

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ...................................................................................... 4

    I.   *Rahimi* Clarifies that Courts Should Apply a Flexible, Principles-Based Approach to History in Second Amendment Cases .......... 4

    II.  Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis ............................................. 13

        A.   Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus .. 14

        B.   If the Court Reaches the Time-Period Question, the Proper Focus Is the Reconstruction Era ........................................... 21

    III.  This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as "Outliers" ............................................. 30

CONCLUSION .................................................................................. 34

# TABLE OF AUTHORITIES

## CASES

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024), *petition for cert. filed*, No. 24-795 (U.S. Jan. 22, 2025) ................................................................... *passim*

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ............................................... 16

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024) ............... 17, 20

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......................................... 14, 17, 20, 21

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ............................................................ 33

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................ 22

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ............................................... 34

*Goldstein v. Hochul*,
680 F. Supp. 3d 370 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023) ........................................................ 19

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) ............................................... 22

*Kipke v. Moore*,
No. 1:23-cv-01293, 2024 WL 3638025 (D. Md. Aug. 2, 2024), *appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024) ................................. 29

*LaFave v. County of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024), *appeal docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024) ................................. 23

*Lara v. Comm'r Pennsylvania State Police*,
125 F.4th 428 (3d Cir. 2025) ........................................ 28, 30

iii

*Mahanoy Area Sch. Dist. v. B. L.*,
    594 U.S. 180 (2021) ................................................................. 25

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................... 9, 22, 33

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995) ................................................................. 25

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
    680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*, No. 23-1719 (4th
    Cir. July 10, 2023) ....................................................... 11, 23

*Nat'l Rifle Ass'n v. Bondi*,
    61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72
    F.4th 1346 (11th Cir. 2023) .............................. 19, 23, 24, 29

*Nev. Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) ................................................................. 20

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) .......................................................... *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
    95 F.4th 38 (1st Cir. 2024), *petition for cert. filed*, No. 24-131 (U.S.
    Aug. 2, 2024) ........................................................................ 17

*Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
    --- F.4th ----, 2025 WL 340799 (5th Cir. Jan. 30, 2025) ............... 28, 29

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ................................................................. 20

*Rupp v. Bonta*,
    723 F. Supp. 3d 837 (C.D. Cal. 2024), *appeal docketed*, No. 24-2583
    (9th Cir. Apr. 24, 2024) ....................................................... 23, 29

*United States v. Alaniz*,
    69 F.4th 1124 (9th Cir. 2023) ............................................. 16, 21

*United States v. Allam*,
    677 F. Supp. 3d 545 (E.D. Tex. 2023), *appeal docketed*, No. 24-40065
    (5th Cir. Feb. 1, 2024) ........................................................ 8, 17

*United States v. Diaz,*
   116 F.4th 458 (5th Cir. 2024) .............................................. 12

*United States v. Garcia,*
   115 F.4th 1002 (9th Cir. 2024) .......................................... 12

*United States v. Greeno,*
   679 F.3d 510 (6th Cir. 2012)............................................... 22

*United States v. Perez-Garcia,*
   96 F.4th 1166 (9th Cir. 2024) ............................................. 7

*United States v. Rahimi,*
   602 U.S. 680 (2024)................................................... *passim*

*We the Patriots, Inc. v. Lujan Grisham,*
   697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal dismissed,* 119 F.4th
   1253 (10th Cir. 2024) ...................................................... 23

*Wolford v. Lopez,*
   116 F.4th 959 (9th Cir. 2024) ....................................... *passim*

*Worth v. Jacobson,*
   108 F.4th 677 (8th Cir. 2024), *petition for cert. filed,* No. 24-782 (U.S.
   Jan. 17, 2025) .......................................................... 28, 29

## STATUTES

18 U.S.C. § 922(q)(1)(E).......................................................... 10

18 U.S.C. § 922(q)(2)....................................................... *passim*

18 U.S.C. § 922(q)(2)(B)(i) ...................................................... 2

18 U.S.C. § 922(q)(2)(B)(ii) ..................................................... 2

1901 Minn. Laws 396-97, ch. 250, § 1, https://tinyurl.com/4fjy7993 ..... 11

## OTHER AUTHORITIES

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction*
   (1998) .................................................................... 27

Brief for Independent Institute as Amicus Curiae, *New York State Rifle
   & Pistol Ass'n v. Bruen,* 597 U.S. 1 (No. 20-843) (July 20, 2021) ....... 15

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) ........................................................ 15

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ............................................................................................. 24

Joseph Blocher & Eric Ruben, *Originalism-By-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99 (2023) ............................... 8

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ............................................................................. 24

Kurt L. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439) ................................................... 27, 28

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ............................................... 26

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ... 24

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) ......................... 24

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) ....................................................................... 24

Transcript of Oral Argument, *New York State Pistol & Rifle Ass'n v. Bruen*, 597 U.S. 1 (2022) (No. 20-843) ................................................ 24

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Gun Free School Zones Act ("the Act") restricts the possession and carry of loaded, unsecured firearms in school zones. *See* 18 U.S.C. §

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

922(q)(2).[2] That restriction is constitutional under the approach to Second Amendment cases in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), *United States v. Rahimi*, 602 U.S. 680 (2024), and *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), for the reasons set out in the government's brief, Dkt. 19 ("U.S. Br."). As the government explains, the Second Amendment unquestionably allows Congress to restrict firearms not just inside a school but—as in this case—also directly across the street from one.[3]

Everytown agrees that this Court may affirm based solely on the settled law from the Supreme Court and this Court that schools are sensitive places and that guns may also be prohibited from buffer zones and areas adjacent to such locations. *See* U.S. Br. 13-21. In case this Court wishes to proceed to a full historical analysis under *Bruen* and

---

[2] The Act does not apply to "private property not part of school grounds." *Id.* § 922(q)(2)(B)(i). Thus, as the district court stressed, "Metcalf was not in violation of [the Act] while he possessed the firearm on his private property (home or yard)." ER-88.

[3] Everytown also agrees that Metcalf does not fall within the exemption under 18 U.S.C. § 922(q)(2)(B)(ii) for certain firearms licensees. *See* U.S. Br. 36-41; ER-70-77.

2

*Rahimi*, however, Everytown submits this amicus brief to expand on three methodological points.

*First*, *Rahimi* clarifies that the Second Amendment analysis requires a flexible, principles-based approach to history. That is even more true here, given that "the prevalence of school shootings both before and since the enactment of [the Act] constitutes an 'unprecedented societal concern.'" ER-82 (citing *Bruen*, 597 U.S. at 27). Metcalf's argument that the government's historical analogues are too dissimilar from the Act effectively demands historical twins, inviting this Court to make the very error that the Supreme Court corrected in *Rahimi*.

*Second*, in conducting the Second Amendment historical inquiry, this Court should give significant weight to Reconstruction-era and later evidence. *Bruen*, *Rahimi*, and this Court's decisions make clear that this is true regardless of which time period is the central focus of that inquiry—the founding era, when the Second Amendment was first ratified, or the Reconstruction era, when the people made the right applicable to the states. Indeed, as the Court held in *Wolford*, in a sensitive-places case, it "look[s] to the understanding of the right to

3

bear arms *both* at the time of the ratification of the Second Amendment in 1791 *and* at the time of the ratification of the Fourteenth Amendment in 1868." *Wolford*, 116 F.4th at 980.  This Court need not resolve the question of which of those periods to prioritize because founding-era and Reconstruction-era evidence both support the constitutionality of the Act. But if it chooses to do so, it should conclude that the historical analysis properly centers on the Reconstruction era and 1868.

*Third*, the Court should reject the misguided argument that the government's analogues are "outliers" or insufficiently numerous. That argument is misplaced here, given the robust historical record supporting the Act. And, regardless, as this Court recently confirmed in *Wolford*, even "a small number of laws" can establish a tradition of prohibiting firearms in a particular sensitive location. *See id.* at 979-80.

## ARGUMENT

### I.    *Rahimi* Clarifies that Courts Should Apply a Flexible, Principles-Based Approach to History in Second Amendment Cases

*Rahimi* involved a Second Amendment challenge to the federal law that prohibits individuals subject to certain domestic violence restraining orders from possessing firearms. *See* 602 U.S. at 688. The

4

Supreme Court upheld the law, relying on two regulatory traditions from the eighteenth and nineteenth centuries that "specifically addressed firearms violence," *id.* at 695: affray laws (which prohibited "arming oneself to the Terror of the People," *id.* at 697-98 (cleaned up)) and surety laws (which "targeted the misuse of firearms" by requiring "individuals suspected of future misbehavior" to post a bond or else be incarcerated, *id.* at 695-97). Although neither of those traditions closely mirrored the modern domestic violence prohibitor, together they established a principle of disarming "individual[s] [who] pose[] a clear threat of physical violence to another," a principle also reflected in the modern law. *Id.* at 698-99.

*Rahimi* provides guidance to courts applying *Bruen*'s historical analysis. It emphasized that "some courts have misunderstood the methodology of [its] recent Second Amendment cases" to require overly specific historical analogues to a challenged statute. *Id.* at 691. The Supreme Court stressed that the Second Amendment "was never thought to sweep indiscriminately," and that its precedents "were not meant to suggest a law trapped in amber." *Id.* To the contrary, "the Second Amendment permits more than just those regulations identical

5

to ones that could be found in 1791." *Id.* at 691-92. "Holding otherwise," the Court explained, "would be as mistaken as applying the protections of the right only to muskets and sabers." *Id.* at 692.

Against that backdrop, the Supreme Court clarified in *Rahimi* that "the appropriate analysis" in Second Amendment cases is not to look for a "dead ringer" or "historical twin," *id.*, as the Fifth Circuit had erroneously done in finding the challenged law unconstitutional, *see id.* at 701. Rather, courts should "consider[] whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added); *see also id.* at 740 (Barrett, J., concurring) ("'Analogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." (citing *Bruen*, 597 U.S. at 28-20)). Moreover, *Rahimi* confirms that different strands of historical laws may be "[t]aken together" to identify the principles against which modern laws should be judged. *See id.* at 698 (majority opinion).

This Court has already recognized and applied the lessons of *Rahimi*. *Wolford* emphasized that, under *Rahimi*, "historical regulations need not be a close match to the challenged law" and

6

instead "may evince principles underpinning our Nation's regulatory tradition," which can suffice to support the law. *Wolford*, 116 F.4th at 978, 980. And even before *Rahimi*, this Court recognized that a "divide-and-conquer approach to the historical evidence," which would "isolate each historical precursor and ask if it differs from the challenged regulation in some way," misapplies *Bruen* and "misses the forest for the trees." *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024).

Moreover, as the district court correctly determined, "the prevalence of school shootings ... constitutes an 'unprecedented societal concern.'" ER-82 (citing *Bruen*, 597 U.S. at 27); U.S. Br. 26-27 (explaining that school-related shootings were not a widespread societal concern until relatively recently). Metcalf himself appears to concede this point, *see* Dkt. 5 ("Metcalf Br.") 25 (referring to "the unprecedented modern societal problem of gun violence in schools"). The only other post-*Bruen* case considering a challenge to the Act reached the same conclusion. *See United States v. Allam*, 677 F. Supp. 3d 545, 567-69

7

(E.D. Tex. 2023), *appeal docketed*, No. 24-40065 (5th Cir. Feb. 1, 2024);[4]
*see also* Joseph Blocher & Eric Ruben, *Originalism-By-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 156 (2023) ("At the Founding, there was no comparable problem of gun violence at schools."). That further calls for a "more nuanced" approach to historical analogy in this case. ER-82-83; *see Bruen*, 597 U.S. at 27.

Applying these principles, the Act is consistent with historical tradition. It is consistent with the overarching "'sensitive places' principle that limits the right to public carry." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring); *see also Wolford*, 116 F.4th at 980 ("The relevant tradition—regulation of firearms at sensitive places—existed at the Founding."). And it is also consistent with two more granular principles, which together are dispositive. The first principle is that schools are sensitive places. *See Wolford*, 116 F.4th at 970 (citing passages in *District of Columbia v. Heller*, 554 U.S. 570 (2008),

---

[4] *Allam* also involves a defendant prosecuted for possessing a firearm across the street from a school and also rejected the defendant's Second Amendment claim. *See id.* at 548, 579-80. The Fifth Circuit panel assigned to decide the defendant's appeal recently "determined under FRAP 34(a) that oral argument will not be required in this case" and removed the case from the tentative argument calendar. *See United States v. Allam*, No. 24-40065 (Jan. 16, 2025), Dkt. 128.

8

*McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010), and *Bruen*, and concurrence in *Rahimi*, that name schools as sensitive places); *see also* Metcalf Br. 34 (conceding that schools are sensitive places). The second principle is that guns may be prohibited from areas around sensitive places. *See Wolford*, 116 F.4th at 985, 989-90. At the very least, these principles allow a government to forbid what Metcalf did: carrying a gun *directly across the street* from a school.

Metcalf does not seriously engage with these binding principles. His brief does not mention *Rahimi* or *Wolford*. And he and his amici encourage this Court to contravene both cases by taking a divide-and-conquer approach to history, rejecting historical analogues one by one for differing from the Act in some way. *See* Metcalf Br. 20, 22-23; Brief of Amici Curiae California Rifle & Pistol Association et al., Dkt. 9 ("CRPA Br.") 10-11, 16-17; Brief of Amicus Curiae Mountain States Legal Foundation's Center to Keep and Bear Arms, Dkt. 10 ("MSLF Br.") 13-18. Their arguments are without merit.

Metcalf, for example, contends that historical laws restricting firearms in the vicinity of polling places are dissimilar to the Act because they applied only on or around election days, while the Act

applies year-round. Metcalf Br. 20, 22-23; *see also* CRPA Br. 16-17;
MSLF Br. 15-16. But that is precisely the kind of "twins"-based analysis
that caused the Supreme Court to reverse in *Rahimi*. Instead, the
government's laws "reveal a principle, not a mold." *Rahimi*, 602 U.S. at
740 (Barrett, J., concurring). And *Wolford* has already recognized the
principle relevant here: the sensitivity of a location may warrant
firearms prohibitions in the surrounding area, not just in the location
itself. *See Wolford*, 116 F.4th at 989-90 (explaining that history
demonstrates "the Nation's tradition of regulating sensitive places and
the corresponding buffer zones"); *see also id.* at 985 (upholding law
prohibiting guns in playgrounds and youth centers and on the "street[s]
or sidewalk[s] immediately adjacent" to those locations). Just as the
presence of guns around a polling place might intimidate citizens on
their way to vote, so might the presence of guns across the street from a
school terrify children and families arriving at or leaving school. Both
congressional findings accompanying the Act, *see* 18 U.S.C. §
922(q)(1)(E), and the steps the elementary school in this case took "to
mitigate the threat of Metcalf's actions," U.S. Br. 8, reflect that
common-sense fact. Accordingly, and as the government demonstrates,

the historical record shows that the Act is consistent with the principles underpinning our regulatory tradition. *See* U.S. Br. 21-33; *see also* ER-85-87.[5]

The approach Metcalf's amici encourage is even more wrong. They assert that the government must demonstrate the existence of "'distinctly similar' historical laws" to support the challenged prohibition, which (in their view) addresses the "social concern of criminals committing crimes with weapons they carry in public." CRPA Br. 10-11 (quoting *Bruen*, 597 U.S. at 26). Only "uniquely modern circumstances," they contend, "call for an analogical analysis." *Id.* at 6.

---

[5] Historical laws prohibiting guns in the areas surrounding sensitive places include laws concerning parks, courthouses, schools, and other locations. *See* U.S. Br. 28-30; *see also, e.g.*, *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 589 (D. Md. 2023) (citing historical laws prohibiting guns in areas around polling places, schools, and parks), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023). Moreover, historical laws support substantial gun-free areas (even though Metcalf, who carried his firearm mere yards from a school, cannot challenge the Act's hypothetical application further away). *See* U.S. Br. 29 (citing laws prohibiting guns within half a mile and 300 yards of polling and voter-registration places); *see also, e.g.*, 1901 Minn. Laws 396-97, ch. 250, § 1, https://tinyurl.com/4fjy7993 (prohibiting firearms within 3000 feet of state parks).

And they claim that *Wolford* requires applying a distinctly-similar test here. *See id.* at 10-11.

This argument is incorrect—and flatly misrepresents *Wolford*. To begin, Metcalf's amici have failed to acknowledge the Act's specific societal concern, which is carrying guns *in and around schools*, not everywhere "in public." As already discussed, gun violence in and around schools is an unprecedented societal concern. *See supra* pp. 7-8. And, even if it were not, a flexible, principles-based approach to history would still apply here. *Rahimi* applied that approach even though domestic violence has existed since long before the founding. *See* 602 U.S. at 691-92, 698-700; *United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024) (explaining that *Rahimi* analogized to surety and going-armed laws, "despite the fact that domestic violence is not a new phenomenon"); *see also United States v. Garcia*, 115 F.4th 1002, 1008 (9th Cir. 2024) (Sanchez, J., concurring in denial of rehearing en banc, joined by seven judges) (explaining that "*Rahimi* thoroughly discredited" approaches to history that require "overly specific historical analogues"). Finally, *Wolford* specifically refused to apply a "distinctly

12

similar" test to sensitive-places restrictions. *See Wolford*, 116 F.4th at 979.[6]

*Bruen*, *Rahimi*, and *Wolford* compel the conclusion that the Act is constitutional. The district court's judgment should be affirmed.

## II. Reconstruction-Era and Later Historical Evidence Is a Crucial Part of the *Bruen-Rahimi* Analysis

Plaintiffs' amici suggest that the district court erred in considering historical evidence from Reconstruction and later in conducting the *Bruen-Rahimi* historical analysis. *See* CRPA Br. 7, 13-15. That is not correct. Even though the Supreme Court and this Court have not yet resolved the question of which period is the primary focus of the historical inquiry, both have made clear that evidence from Reconstruction and beyond is an important part of the analysis. That principle is sufficient to reject any effort to discount such evidence. If, however, the Court wishes to answer the question of which time period

---

[6] Metcalf's amici are also wrong to suggest that a different principle unites (and delimits) all sensitive places: comprehensive, government-provided security. *See* CRPA Br. 4, 8. This Court has already unambiguously rejected that baseless theory. *See Wolford*, 116 F.4th at 981 ("Put simply, a lack of comprehensive government security is not a determinative factor.").

is the central focus, the correct originalist answer is to focus on the Reconstruction era and 1868, not the founding era and 1791.

**A.  Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus**

The district court was correct to rely on Reconstruction-era and later history, *see* ER-86, because *Heller*, *Bruen* and *Rahimi* all make clear that such history is crucial to the Second Amendment analysis. *Heller* announced that post-ratification history "is a critical tool of constitutional interpretation" and examined "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Heller*, 554 U.S. at 605. In doing so, it relied on "'19th-century cases that interpreted the Second Amendment,'" "'discussion of the Second Amendment in Congress and in public discourse' after the Civil War," and "'how post-Civil War commentators understood the right.'" *Bruen*, 597 U.S. at 21 (describing and quoting *Heller*, 554 U.S. at 610, 614, 616-19).

*Bruen*, similarly, relied on mid-19th-century cases and statutes, *see id.* at 51-57, and surveyed "public discourse surrounding Reconstruction," *id.* at 60. *Bruen* also invoked 19th-century evidence in

14

discussing sensitive places in particular. It indicated that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis, *id.* at 30 (emphasis added), and cited to sources in which all the 19th-century laws restricting guns in the locations the Court listed were from the *late* 19th century.[7] As this Court has recognized, *Bruen* shows that analyzing sensitive-place regulations requires a broad examination of history, "including 19th-century laws." *Wolford*, 116 F.4th at 980.

    *Rahimi* has now put the relevance of 19th-century evidence even further beyond doubt. It rested its decision *upholding* a challenged federal law in large part on laws passed between 1836 and 1868. *See* 602 U.S. at 696 (relying on Massachusetts surety statute from 1836); *id.* (invoking similar statutes of nine other jurisdictions by citation to

---

[7] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

*Bruen*, 597 U.S. at 56 & n.23); *Bruen*, 597 U.S. at 56 & n.23 (citing 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon, 1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws).

This Court and other circuits have likewise recognized that 19th-century and later laws are critical to the historical inquiry. In conducting that inquiry, this Court has looked to "when the Second *or Fourteenth Amendment* was ratified." *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (emphasis added); *see also United States v. Alaniz*, 69 F.4th 1124, 1129 & n.2 (9th Cir. 2023) (relying on evidence through Reconstruction to reject Second Amendment challenge). With respect to sensitive places in particular, the Court stressed in *Wolford* that it would examine "the understanding of the right to bear arms *both* at the time of the ratification of the Second Amendment in 1791 *and* at the time of the ratification of the Fourteenth Amendment in 1868." 116 F.4th at 980. The Second Circuit has similarly explained that "evidence from the Reconstruction Era regarding the scope of the right to bear arms ... is at least as relevant as evidence from the Founding Era." *Antonyuk v. James*, 120 F.4th 941, 988 n.36 (2d Cir. 2024), *petition for*

16

*cert. filed*, No. 24-795 (U.S. Jan. 22, 2025); *see Wolford*, 116 F.4th at 980 (agreeing with earlier opinion in *Antonyuk*, in which Second Circuit took same approach). And many other courts, including the First and Fourth Circuits, have also adopted this "long view ... of history," *Bianchi v. Brown*, 111 F.4th 438, 471 (4th Cir. 2024) (en banc), *petition for cert. filed sub nom. Snope v. Brown*, No. 24-203 (U.S. Aug. 21, 2024), and considered historical sources from the 19th and 20th centuries.[8]

This focus on Reconstruction-era and later evidence follows the Supreme Court's instruction, noted above, that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 605) (second emphasis added). As Justice Kavanaugh explained in *Rahimi*, "the Framers[]

---

[8] *See Bianchi*, 111 F.4th at 465-71 (considering 19th- and 20th-century evidence in rejecting Second Amendment challenge); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46-48, 51-52 (1st Cir. 2024) (same), *petition for cert. filed*, No. 24-131 (U.S. Aug. 2, 2024); *see also, e.g., Allam*, 677 F. Supp. 3d at 576-78 (relying on many of the same Reconstruction-era sources that the government points to here, and the district court relied on, in rejecting a similar challenge to the Act).

expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. 602 U.S. at 725 (Kavanaugh, J., concurring); *see also id.* at 728-29 (collecting over thirty Supreme Court cases relying on post-ratification history, including evidence long after the founding). Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions." *Id.* at 738 (Barrett, J., concurring) (cleaned up). And that is consistent with *Bruen*'s guidance that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up).

Appreciating the relevance of postenactment history accords not only with Supreme Court caselaw, but also with common sense. If a regulation passed in the decades around Reconstruction did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in earlier decades, then it can be inferred that the regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence

18

to the contrary, a court should presume that a Reconstruction-era or later tradition also reflects the founding-era understanding. Such a presumption reflects and confirms the principle that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Id.* at 37. Here, there is no founding-era evidence that contradicts later tradition. Rather, as the government explains, founding-era evidence supports the tradition on which it relies. *See* U.S. Br. 23, 28-29. There is no reason to think there was some drastic shift in the understanding of the Second Amendment from 1791 to 1868.[9]

Nor is 1868 a cutoff. It is "implausible" that "public understanding would promptly dissipate whenever [one] era gave way

---

[9] The attempted reliance by Metcalf's amici on colonial-era laws requiring some men to carry guns to church, *see* CRPA Br. 12-13, is misplaced. Those laws "were not rooted in the Second Amendment's tradition," but rather were passed so that "militiamen or free white men" could "defend against potential attacks by Native Americans and Blacks during slave uprisings." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 396 (S.D.N.Y. 2023), *appeal docketed*, No. 23-995 (2d Cir. July 6, 2023); *see Wolford*, 116 F.4th at 997 (rejecting reliance on these laws for similar reasons). And in any case, reliance on such laws "mistakes a legal obligation for a right." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1331 (11th Cir. 2023) (discussing historical laws requiring militia service), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023).

19

to another." *Antonyuk*, 120 F.4th at 973; *see also Heller*, 554 U.S. at 605 (examining history "through the end of the 19th century"); *Bianchi*, 111 F.4th at 468-70 (noting that laws from "a later century than the ratification of the Second and Fourteenth Amendments" still "remain relevant" and considering consistent 20th-century evidence). After all, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002)); *see also Wolford*, 116 F.4th at 983 (giving "meaningful evidentiary weight" to laws passed after the ratification of the Fourteenth Amendment). And, as noted, such consideration of later history is particularly warranted where, as here, the challenged law addresses an "unprecedented societal concern." *See supra* pp. 7-8.

In sum, Reconstruction-era and later history did not come "too … late in time." CRPA Br. 14. Instead, that history plays a crucial role in the *Bruen-Rahimi* historical analysis.

20

**B.    If the Court Reaches the Time-Period Question, the Proper Focus Is the Reconstruction Era**

Because 18th- and 19th-century evidence is consistent in this case, this Court need not decide which period to privilege in its historical analysis—a question both the Supreme Court and this Court have left open. *See Rahimi*, 602 U.S. at 692 n.1; *Bruen*, 597 U.S. at 37-38; *Alaniz*, 69 F.4th at 1129 n.2. But if the Court chooses to address the issue, it should conclude that the proper focus of the inquiry is on the Reconstruction era and 1868, when the Fourteenth Amendment was ratified.

To see why, it is first necessary to understand why that is correct in cases challenging state laws. Because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35), focusing on 1868 in a case concerning a state law is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? Since the people chose to extend the Bill of Rights to the states in 1868, it is their understanding of the scope of each right at that time that should control the originalist analysis today.

21

Indeed, holding otherwise would not make sense in light of the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010); *see also id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973.

That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *accord United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018).[10]

---

[10] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts. Those analyses generally remain good law. *Bruen* rejected the

22

In fact, since *Bruen*, courts have seen a notable "trend … of recognizing the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era," in cases involving state or local laws. *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *8 (E.D. Va. Aug. 23, 2024), *appeal docketed*, No. 24-1886 (4th Cir. Sept. 16, 2024); *see Bondi*, 61 F.4th at 1322 ("[H]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era.");[11] *Rupp v. Bonta*, 723 F. Supp. 3d 837, 851, 876-78  (C.D. Cal. 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc.*, 680 F. Supp. 3d at 582-83 (agreeing with *Bondi*); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi* and *Maryland Shall Issue*), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024).

---

second step (means-end scrutiny), but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

[11] Despite being vacated for rehearing en banc, *Bondi*'s robust reasoning and authorities remain persuasive. *See Antonyuk*, 120 F.4th at 973-74 (continuing to find *Bondi* persuasive on this point).

23

The conclusion that the 1868 understanding should govern in a case against a state is far from radical. It is the answer former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[12] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi*, 61 F.4th at 1322 n.9 (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo).[13] Both

---

[12] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[13] *See* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52-53 (2010); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008); *see also* Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008).

To be clear, we do not suggest that each of these scholars also believes that 1868 is the correct focus for analyzing the meaning of the right in cases against the federal government. But, as explained below, the weight of authority and analysis favors 1868. *See infra* pp. 25-29.

Justice Thomas and Justice Scalia have expressed similar views. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 212 (2021) (Thomas, J., dissenting) ("While the majority entirely ignores the relevant history, I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (cleaned up)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (calling for "further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution"). Simply put, a faithful originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

The pertinent question here, of course, is whether the 1868 understanding should also control in challenges to *federal* gun laws. If the Court decides to resolve the issue, it should conclude that 1868 is the correct focus in evaluating both federal and state laws.

To be sure, the choice between 1791 and 1868 is a less straightforward one for federal laws. "Originalists seem," at first glance,

25

to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* seemed to reject the possibility of different standards for the state and federal governments, requiring incorporated rights to "have the same scope" against each. 597 U.S. at 37. Accordingly, it appears that originalists must justify applying either the 1868 understanding or the 1791 understanding (if they conflict) to all levels of government.

Existing doctrine does not resolve this choice. In *Rahimi*, the Supreme Court specifically declined to resolve it—in a case concerning a federal law. *See* 602 U.S. at 692 n.1. And in *Bruen*, the Court noted only that prior decisions had "*assumed*" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." 597 U.S. at 37 (emphasis added). If the majority believed those decisions controlled the issue, it would have said so.

26

Instead, the Court expressly left the question open, pointing to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 37-38. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id.* (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439). The Court's choice to highlight *only* these two scholars suggests a belief that their views are correct, and thus that Reconstruction should be the central focus.

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning as to not only the states, but also the federal government. *See* Amar, *The Bill of Rights*, *supra*, at xiv, 223, 243 (referring to this as a doctrinal "feedback effect"); *see also id.* at 283

27

("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866."). More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, … invest[ing] those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2; *see Bruen*, 597 U.S. at 38. On this view, too, 1868 meanings bind both the states and the federal government.

This Court should follow the path *Bruen* marked in citing Professors Amar and Lash, and not the Third Circuit's focus on 1791 in *Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428, 438-41 (3d Cir. 2025), or the Eighth Circuit's and Fifth Circuit's similar approaches in *Worth v. Jacobson*, 108 F.4th 677, 692-93 (8th Cir. 2024), *petition for cert. filed*, No. 24-782 (U.S. Jan. 17, 2025), and *Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, --- F.4th ----, 2025 WL 340799, at *13 (5th Cir. Jan. 30, 2025). Instead of engaging with originalist principles, *Lara* based its conclusion on a "general assumption" in several Supreme Court cases cited by *Bruen*. *Lara*, 125 F.4th at 440 (citing *Bruen*, 597 U.S. at 37). *Worth* pointed to this same assumption to conclude that Reconstruction-era laws "carry less weight

28

than Founding-era evidence." 108 F.4th at 692-93, 697. And *Reese* also relied on this assumption to discount Reconstruction-era laws, without even acknowledging it was only an assumption. *See* 2025 WL 340799, at *13. But the Supreme Court has made clear that this general assumption did not resolve the time-period issue—otherwise, it would have just said so in *Bruen* and *Rahimi*, rather than leaving the issue open. *See Bondi*, 61 F.4th at 1323.

Moreover, the cases *Bruen* cited in describing that assumption did not address the significance of the Fourteenth Amendment's ratification for this issue and cannot have resolved the question that *Bruen* and *Rahimi* expressly left open. *See Bruen*, 597 U.S. at 37-38; *Rahimi*, 602 U.S. at 692 n.1. Thus, *Lara* and *Worth* are not persuasive. *See, e.g.*, *Antonyuk*, 120 F.4th at 974 (rejecting similar reasoning in earlier opinion in *Lara*); *Kipke v. Moore*, No. 1:23-cv-01293, 2024 WL 3638025, at *5 (D. Md. Aug. 2, 2024) (finding *Lara* "unconvinc[ing]"), *appeal docketed*, No. 24-1799 (4th Cir. Aug. 22, 2024); *Rupp*, 723 F. Supp. 3d at 877-78 (declining to follow earlier opinion in *Lara* because, "[r]ather

29

than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles").[14]

*     *     *

In sum, this Court should follow Supreme Court caselaw, *Wolford*, and other decisions from this Court in considering evidence from the Reconstruction era and beyond as part of this nation's historical tradition of firearm regulation, regardless of which time period is central to the Second Amendment inquiry. But if it chooses to settle the time-period issue, it should hold that 1868 is the focus.

## III.   This Court Should Reject Any Effort to Dismiss the State's Historical Analogues as "Outliers"

Finally, this Court should reject any invitation to disregard the government's historical analogues as insufficiently numerous "outliers." *See* CRPA Br. 4, 6, 15-16. To begin, that argument is untenable here, as the government has presented a robust historical record. *See* U.S. Br.

---

[14] Regardless, even *Lara* acknowledged that "laws 'through the end of the nineteenth century' … can be 'a "critical tool of constitutional interpretation"' because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood," *Lara*, 125 F.4th at 441 (quoting *Bruen*, 597 U.S. at 35)—so long as those laws do not "contradict[] earlier evidence," *id.* (quoting *Bruen*, 597 U.S. at 66).

30

21-30. And, regardless, in *Wolford*, this Court confirmed that a small number of laws can establish a tradition sufficient to designate a place as sensitive. *See* 116 F.4th at 979-80.

    *Wolford* laid out how *Bruen* compels this conclusion. Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id.* at 979 (quoting *Bruen*, 597 U.S. at 30). The sources the Supreme Court cited for the historical record justifying restrictions in those three locations, *Wolford* explained, identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See id.* (reviewing laws cited in article and brief on which *Bruen* relied). Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies were from a single colony (Maryland) and were enacted three years apart, in 1647 and 1650. *See Bruen*, 597 U.S. at 30. In short, "only one or two colonial laws provided sufficient justification for the Court to designate several places as sensitive." *Wolford*, 116 F.4th at 979. Thus, it is clear

31

that "a small number of laws, even localized laws, can suffice" to justify a sensitive-places restriction "*if* those laws were viewed as non-controversial." *Id.* at 980; *see also id.* at 983 (stating that laws supporting Supreme Court's designating schools as sensitive places were "limited to a few local laws that post-dated the ratification of the Second Amendment and governed only a very small percentage of the national population"); *Antonyuk*, 120 F.4th at 972 ("[C]omparable historical laws need not proliferate to justify a modern prohibition.").

To be sure, one or two laws cannot establish a tradition when they *contradict* the substantial weight of other evidence. *See, e.g.*, *Bruen*, 597 U.S. at 65-66 (declining to give "disproportionate weight" to a Texas law that "'contradict[ed] the overwhelming weight of other evidence'" (quoting *Heller*, 554 U.S. at 632)).[15] But where, as here, there is no such conflict, it makes sense that a small number of laws can suffice, because governments "past and present have not generally legislated to their

---

[15] *Bruen* also expressed "doubt" that three colonial regulations "could suffice to show a tradition." 597 U.S. at 46. But that tentative dictum must be read in light of the fact that the Court went on to find an overwhelming weight of history contradicting New York's claimed tradition, *and* in light of its recognition, in discussing sensitive places, that a small number of laws can suffice.

constitutional limits." *Antonyuk*, 120 F.4th at 969; *see Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring) (rejecting as "flawed" the assumption that past "legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority"). In other words, the absence of particular legislation does not mean that anyone thought such legislation was unconstitutional. As the Supreme Court explained in *Dobbs*, for example, "the fact that many States in the late 18th and early 19th century did not criminalize pre-quickening abortions does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022).

This conclusion also respects bedrock federalism principles that entitle a state to effectuate its citizens' policy choices within constitutional bounds. Local conditions matter. Just as states today may (or may choose not to) "experiment[] with reasonable firearms regulations," *McDonald*, 561 U.S. at 785 (plurality opinion) (citation omitted), states historically may have chosen not to regulate certain conduct, not because the public understood the Second Amendment to prevent such regulations, but because of democratically supported

33

policy choices. *Cf. Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) ("[T]he Constitution establishes a federal republic where local differences are cherished as elements of liberty.").

Properly applying this settled law, as the government has demonstrated and the district court found, the historical record here more than suffices to show that the Act is constitutional.

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

Dated: February 5, 2025

/s/ Erik P. Fredericksen
Janet Carter
William J. Taylor, Jr.
Erik P. Fredericksen
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10163
efredericksen@everytown.org

*Counsel for amicus curiae*
*Everytown for Gun Safety*

34

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**   | 24-4818 |

I am the attorney or self-represented party.

**This brief contains** | 6,868 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　☐ it is a joint brief submitted by separately represented parties.
　　☐ a party or parties are filing a single brief in response to multiple briefs.
　　☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Erik P. Fredericksen |  **Date** | 02/05/2025 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                          *Rev. 12/01/22*